```
 1                  IN THE UNITED STATES DISTRICT COURT
                      NORTHERN DISTRICT OF ILLINOIS
 2                          EASTERN DIVISION

 3                                    )
     UNITED STATES OF AMERICA,        )   Case No. 17 CR 281
 4                                    )
                     Plaintiff,       )
 5                                    )
              vs.                     )   Chicago, Illinois
 6                                    )   December 3, 2018
     CARLOS R. MEZA,                  )   9:00 a.m.
 7                                    )
                     Defendant.       )
 8

 9                              VOLUME 1
              TRANSCRIPT OF PROCEEDINGS - Jury Trial
10        BEFORE THE HONORABLE ELAINE E. BUCKLO, and a Jury

11
     APPEARANCES:
12
     For the Plaintiff:       MR. JOHN R. LAUSCH, JR.
13                            UNITED STATES ATTORNEY
                              BY:  MR. RICK D. YOUNG
14                                 MS. KAITLIN KLAMANN
                              Assistant United States Attorneys
15                            219 South Dearborn Street
                              Chicago, Illinois  60604
16
     For the Defendant:       MR. JOSHUA B. KUTNICK
17                            900 West Jackson Boulevard # 5
                              Chicago, Illinois  60607
18
                              AND
19
                              LAW OFFICE OF MINA ZARDKOOHI
20                            BY:  MS. MINA ZARDKOOHI
                              53 West Jackson Boulevard
21                            Suite 1615
                              Chicago, IL 60604
22
23   Court Reporter:          SANDRA M. MULLIN, CSR, RMR, FCRR
                              Official Court Reporter
24                            219 S. Dearborn Street, Room 2260
                              Chicago, Illinois  60604
25                            (312) 554-8244
                              sandra_mullin@ilnd.uscourts.gov
```

1    (JURY SELECTION AND OPENING STATEMENTS WERE REPORTED BUT

2    NOT TRANSCRIBED AT THIS TIME.)

3    (Proceedings heard in open court.  Jury in.)

4    THE COURT:  All right.  The first thing I need to

5    do is to have you raise your right hand.

6    (Witness sworn.)

7    THE COURT:  Please be seated.

8    MR. YOUNG:  May I proceed, your Honor?

9    THE COURT:  Yes, you may.

10    SCOTT SPENCER, GOVERNMENT'S WITNESS, SWORN,

11    DIRECT EXAMINATION

12  BY MR. YOUNG:

13  Q.  Good afternoon, Mr. Spencer.  Can you please state your

14  first and last name and spell them for the record.

15  A.  Scott Spencer.

16  Q.  Can you spell that for us?

17  A.  S-c-o-t-t, S-p-e-n-c-e-r.

18  Q.  Mr. Spencer, can you tell us what you do for a living?

19  A.  I have a manufacturing business in Carpentersville,

20  Illinois.

21  Q.  How long have you had that manufacturing business?

22  A.  My father and I bought it in 1979, May.

23  Q.  Can you tell us very briefly what type of manufacturing

24  you do at that business?

25  A.  Primarily metal stamping and tool and dye.

1   Q.   Are you familiar with the defendant in this case, Carlos

2   Meza?

3   A.   I am.

4   Q.   Can you tell us how long it is that you've known

5   Mr. Meza?

6   A.   Oh, probably back to about 2005.

7   Q.   Do you see Mr. Meza in the courtroom today?

8   A.   I do.

9   Q.   Can you identify him by pointing to him and identify an

10   article of his clothing?

11   A.   Gentleman with the glasses, right over there.

12            MR. YOUNG:  Your Honor, may the record reflect that

13   the witness has identified the defendant, Carlos Meza?

14            THE COURT:  Could you stand, please?  Is that

15   who --

16            THE WITNESS:  Yes.

17            THE COURT:  They both have glasses, so, okay.

18   BY MR. YOUNG:

19   Q.   Did the defendant, Mr. Meza, ever ask you to invest

20   money with him?

21   A.   Yes, he did.

22   Q.   Did you invest?

23   A.   Yes, I did.

24   Q.   Do you recall approximately when it was that you made

25   this investment or investments?

 1    A.    Starting -- well, the actual investment money was May of
 2    2012.
 3    Q.    Did you invest more than once?
 4    A.    I did.
 5    Q.    Did you make subsequent payments or investments with the
 6    defendant?
 7    A.    I did.
 8    Q.    Do you recall how many payments or investments you made
 9    over time, roughly?
10    A.    Probably about five.
11    Q.    You said the first investment was in May 2012.  How long
12    did these investments go on, approximately?
13    A.    How long did they go on or how long were they supposed
14    to go on?
15    Q.    Well, how long did you continue to make investments with
16    him, the payment of the money?
17    A.    Oh, okay.  For about a year.
18    Q.    Do you have an estimate of how much you paid over the
19    course of that year, how much you invested?
20    A.    I believe it was just under three-quarters of a million
21    dollars.
22    Q.    Did you ever receive any money back in connection with
23    the three-quarters of a million dollars that you invested
24    over the course of that year?
25    A.    No.

1   Q.   I'm going to ask you about the investments in a little

2   more detail in a few moments.  But before I do that, I want

3   to ask you a little bit about the defendant and your

4   relationship with the defendant.  You said that you met him

5   in approximately 2005, or so?

6   A.   Right.

7   Q.   Can you tell us where it was you first met the

8   defendant?

9   A.   At church.

10  Q.   What church was that?

11  A.   The Church of Jesus Christ of Latter-Day Saints.

12  Q.   Were you both members?

13  A.   Yes.

14  Q.   And when you first met him at church back in 2005,

15  approximately, can you give us an idea of how often you would

16  see him at church?

17  A.   Well, there were two congregations that attended that

18  particular building, and he was in the other congregation.

19  And I would see him in the hall talking to other people, and

20  I would talk to him at that point.  Probably once every four

21  to six weeks.

22  Q.   Did that continue over the years leading up to your

23  investments in May of 2012?

24  A.   Yes, it did.

25  Q.   So you knew him roughly seven years, or so, at the time

Spencer - direct by Young

1    you invested?

2    A.    At least, yeah.

3    Q.    Would you see him socially, you know, outside of church,

4    or was your contact primarily with him at church?

5    A.    I don't ever recall meeting him outside of the church

6    environment.

7    Q.    When you would see him at church, five, six times a

8    month, or so, over the years, would you talk to him?

9    A.    Yes, I would.

10   Q.    Can you give us an idea of the types of things that you

11   would talk to the defendant about when you would see him?

12   A.    Well, we were both involved in business, so we would

13   talk about primarily his different business ventures.

14   Q.    And how many times -- well, can you give us an idea of

15   the types of things the defendant said to you over the course

16   of this period of time about what his business was and what

17   he did?

18               MR. KUTNICK:    Objection, foundation.

19   BY MR. YOUNG:

20   Q.    We're talking about a course of discussions you had with

21   the defendant between approximately 2005 and 2012; is that

22   correct?

23   A.    Correct.

24   Q.    And during that period of time, you said you would see

25   him five to six times a month, or so?

Spencer - direct by Young

1   A.   No, no, what I said was probably every four to six weeks
2   I would see him.
3   Q.   Okay.  My apologies.  Every four to six weeks.
4           And during the period of time we're talking about,
5   how often would you talk to the defendant about what he did
6   for a living and what kind of business ventures he has?
7   A.   I believe almost every time we talked, we talked about
8   different things that he was doing.
9   Q.   Do you have a recollection of each of these
10  conversations individually, or do you have more of a
11  collective recollection of what the two of you talked about
12  over the course of the time period we're talking about?
13  A.   I would refer to it as a collective understanding,
14  remembrance.
15  Q.   Do you recall any other people participating in these
16  conversations, or was it you and the defendant?
17  A.   I think there were other people in the, you know, in the
18  foyer, in the group, and probably listening.  But I don't
19  ever remember any specific people that were engaged in the
20  conversation we were in.
21  Q.   What do you remember about these conversations?
22  A.   Well, I remember feeling like Carlos was an extremely
23  successful entrepreneur when I would come away from those
24  meetings.
25  Q.   Did he ever talk about particular businesses that he

1    owned or invested in?

2    A.   Yes, he did.

3    Q.   Can you tell us about that?

4    A.   He said that he owned several, either condos or

5    townhouses, in the Chicago area.  That he had built homes in

6    Chicago.  That he had refurbished apartments.  He said that

7    he had approximately 100 construction trucks that were under

8    contract for the State of Illinois.  He talked about

9    investing in international euros and dollars.  He talked

10   about having a contract with the Mexican government to build

11   low-income housing in the Cancun area.  Generally that's what

12   I recall.

13   Q.   Did the defendant ever take you to see any businesses or

14   any of the properties that he purportedly owned or described

15   to you during your discussions during this period of time?

16   A.   During the course of the time that I knew Carlos, he

17   took me to a building on Milwaukee Avenue, large apartment

18   complex that he said that he owned.

19   Q.   Do you recall when it was approximately that the

20   defendant, Mr. Meza, brought you to the apartment building on

21   Milwaukee Avenue?

22   A.   There were two different instances, and I would think

23   sometime in the first or second quarter of 2012.

24   Q.   Did both instances happen in the first quarter of 2012?

25   A.   One did.  One might have been subsequent to that.

1    Q.   What was your understanding, if any, of why the

2    defendant was bringing you to this property on Milwaukee

3    Avenue around this time?

4    A.   Oh, he wanted to show me some of the things that he was

5    doing.

6    Q.   Can you tell us -- directing your attention to the first

7    time that you went to the property, did anyone go with you?

8    A.   No, I think it was just Carlos and I.

9    Q.   Can you tell us what you and the defendant did when you

10   went to the property on Milwaukee Avenue on that first

11   occasion?

12   A.   Well, we walked around the building.  I remember him

13   talking to one of the people that were in the apartments,

14   just kind of a hello-type thing.  There were businesses on

15   the first floor and then apartments above that.  And we

16   walked around the -- walked around the building and looked at

17   it, and he told me that he was trying to sell it and that the

18   value of the building was somewhere between seven and

19   ten million dollars.

20   Q.   You said that you went to the apartment building on

21   Milwaukee Avenue on a second occasion sometime in the first

22   quarter of 2012.  On this second occasion, did anyone

23   accompany you and Mr. Meza to the apartment building?

24   A.   Yes.  There were some investors, that he referred to

25   them as, from the Minnesota area, if I recall.  And he said

1    that he was in the process of selling the apartments or

2    trying to sell the apartments to these investors.

3    Q.   What happened during this meeting with the investors

4    that Mr. Meza, the defendant, was attempting to sell the

5    apartment building to?

6    A.   We walked around the building.  He, you know, talked a

7    little bit about the building, and then -- and then we went

8    out to dinner.

9    Q.   We've been talking about your visits to the apartment

10   building that the defendant owned on Milwaukee Avenue.  Did

11   you ever take any other trips out of state with the

12   defendant?

13   A.   I did.  We went to North Dakota.

14   Q.   Can you tell us why it was the defendant and you went to

15   North Dakota?

16   A.   Well, he had given me the impression that he was a

17   fairly substantial real estate investor.  And I was working

18   with two old friends of mine, they wanted to buy some

19   building lots in Williston, North Dakota.  And this was back

20   when the oil boom was going on.  And there was a lot of

21   activity in North Dakota.  And I asked him if he would like

22   to come along and see if there was anything that he wanted to

23   invest in.

24   Q.   Do you recall approximately when this visit to North

25   Dakota with Mr. Meza was?

1    A.    That was probably also the first quarter of 2012.

2    Q.    Did you visit more than once with Mr. Meza, or just

3    once?

4    A.    Just once.

5    Q.    And can you tell us what happened during this visit to

6    North Dakota with the two of you?

7    A.    Well, we met with some people that were doing modular

8    houses.  We talked about different projects, and we had a

9    fellow that wanted to work for us that was a crane operator.

10   And he actually, with Carlos, drove around to a property in

11   Minot that was for sale and was a potential investment.

12   Q.    Did you ever purchase any properties or invest in any

13   projects in North Dakota?

14   A.    I did, with my two friends.  We purchased some building

15   lots in Williston.

16   Q.    Did the defendant, to your knowledge, ever invest in any

17   projects with you, at least in North Dakota?

18   A.    No.

19   Q.    Did he ever -- did you ever talk about why he didn't

20   want to invest, why he didn't invest with you?

21   A.    The investment that he looked at, he said that he felt

22   like there was too much excavation involved, and he declined

23   to do it.

24   Q.    In connection with the investments you made in North

25   Dakota, did you ever purchase any type of equipment from the

1    defendant?

2    A.   Yes, I did.  He sold me a skid steer, referred to as a

3    Bobcat.

4    Q.   And can you explain to those of us who don't know, what

5    exactly is a Bobcat?

6    A.   It's a little -- little front-end loader.  It can pick

7    up about a yard, or so, of dirt at a time.

8    Q.   You said that your visit to North Dakota was

9    approximately in the first quarter, the early 2012.  Do you

10   recall when it was that Mr. Meza sold you this Bobcat?

11   A.   That would be the following August, I believe.

12   Q.   Do you recall how much you paid for the Bobcat?

13   A.   I think it was about $20,000.

14   Q.   You testified earlier that you made some investments

15   with the defendant, with the first being in May of 2012.

16   Directing your attention now to that time period, May of

17   2012, do you recall how much it was you first invested with

18   the defendant at that time?

19   A.   The first amount was, that I gave him, that I wired to

20   him, was $200,000.

21   Q.   And after you made that $200,000 investment, did you

22   make a second investment?

23   A.   Yes.  In June of that year, it was another 80,000.

24   Q.   And I'm going to ask you a little bit more about those

25   in a moment.  But may I approach the witness, your Honor?

1          THE COURT:  Yes, you may.

2    BY MR. YOUNG:

3    Q.   Mr. Spencer, I've just handed you what has been marked

4    as Government Exhibit ACB-1.  It is a set of bank records

5    from American Chartered Bank.  Do those records relate to an

6    account that you had at American Chartered Bank back in 2012?

7    A.   Yes, they do.

8          MR. YOUNG:  Your Honor, the government would move

9    to admit Government Exhibit ACB-1 based upon the 902(11)

10   certification and the motion that the government previously

11   filed in connection with this case.

12         MR. KUTNICK:  No objection, your Honor.

13         THE COURT:  It's admitted.

14       (Said exhibit received in evidence.)

15         MR. YOUNG:  May I publish the exhibit, your Honor?

16         THE COURT:  Yes, you may.

17   BY MR. YOUNG:

18   Q.   Mr. Spencer, I would like to direct you to the first

19   page of Government Exhibit ACB-1, and particularly the -- my

20   apologies, I do not have the first page.  If I can direct

21   your attention to the first page of the exhibit, which is on

22   the copy in front of you, or on the screen.  And specifically

23   to the bottom portion of the page underneath the title,

24   Debits, there is a reference to a domestic wire that occurred

25   on May 16th of 2012, in the amount of $200,000, payable to a

Spencer - direct by Young

1   Milwaukee McPherso.  Is that the money that you wired as your
2   first investment?
3   A.   Yes, it is.
4   Q.   And it appears that the wire was made or directed
5   towards an account associated with a Milwaukee McPherso.  Can
6   you tell us what that is?
7   A.   It's actually Milwaukee McPherson.  The N is truncated.
8   It was the LLC that Carlos represented as his investment arm.
9   Q.   Who, if anyone, provided you with the instructions about
10  where to wire your investment?
11  A.   I would receive those from Mr. Meza.
12  Q.   And if I can direct your attention now to the fourth
13  page of the exhibit, Government Exhibit ACB-1.  And, again,
14  to the bottom portion of the page, under the title, Debits,
15  there is a second wiring, second line down, of an amount made
16  payable to Milwaukee McPherso in the amount of $80,000 on
17  June 18th of 2012.  Do you see that entry?
18  A.   Yes.
19  Q.   Was that the second investment that you made to the
20  defendant in June of 2012?
21  A.   Yes, it is.
22  Q.   Were you an experienced investor at the time you wired
23  this $280,000 to the defendant in 2012?
24  A.   Not particularly.
25  Q.   You talked about having a business and making some

1    investments in some projects in North Dakota.  What other

2    types of investments, if any, did you have at that period of

3    time?

4    A.    Those were the two that were outside of normal business.

5    And, of course, I had, you know, the 401k-type investments

6    for retirement that I mainly allowed the manager of the fund

7    to direct.

8    Q.    Did you have any investments in stocks or bonds or

9    mutual funds beyond the trades that you allowed the manager

10   of your mutual fund to direct?

11   A.    I had a small account with Scott Trading.

12   Q.    Where did you get the money that you used for these

13   investments, the $280,000 investment sent to Milwaukee

14   McPherson?

15   A.    The 200,000 came from savings and the 80,000 came from a

16   retirement account.

17   Q.    Did that exhaust your savings and retirement account?

18   A.    No.

19   Q.    Do you remember when it was the defendant first

20   approached you or talked to you about making this investment

21   of, you know, $280,000 in May and June of 2012?

22   A.    To the best of my recollection, it was sometime after we

23   came back from North Dakota, prior to this investment in May.

24   Q.    And that would have been when, can you remind us?

25   A.    2012.

1    Q.   Roughly what month, do you remember?  Early February,
2    March?
3    A.   The investment was -- the first investment, the 200,000,
4    was in May, and the trip was sometime in the first quarter.
5    So March, April, maybe.
6    Q.   Do you recall how many times you talked about -- to the
7    defendant about making this investment before you decided to
8    go forward?
9    A.   Several.
10   Q.   Do you recall where those conversations would typically
11   take place?
12   A.   Most of them were in my office.
13   Q.   Would anyone else participate in these conversations
14   other than yourself and Mr. Meza?
15   A.   No.
16   Q.   Do you have an individual recollection of each and every
17   conversation that you had with Mr. Meza, or do you have more
18   of a general recollection?
19   A.   Certainly a general.
20   Q.   Can you tell us what you talked about during these
21   meetings with Mr. Meza at your office back in early 2012?
22   A.   Yes.  He said that he had the ability to trade euros, US
23   dollars internationally, and that he was experienced in this
24   particular endeavor, investment, and that it had just
25   incredible returns that most people were not aware of.

1   Q.   Did he talk about what exactly your money would be

2   invested in, where it would be going?

3   A.   Well, as things progressed, he talked about a company in

4   California that would be, for the money that we put in, would

5   be leasing us money.  He talked about how the principal was,

6   on several occasions he said, 100 percent guaranteed, which

7   to me was reassuring.

8   Q.   With respect to this company in California that you

9   would be leasing money from, did the defendant describe the

10  name of this company or the individuals involved with this

11  company who would be the participating in the leasing of the

12  funds?

13  A.   Yes.  It was called Renaissance.

14  Q.   Did he provide you with the names of anyone associated

15  with Renaissance?

16  A.   He did.  He said the director-manager was somebody by

17  the name of Bob Adams.

18  Q.   And you talked about leasing funds from Renaissance in

19  California.  Was there any discussion of what would then

20  happen after you leased these funds from Renaissance?

21  A.   Well, that he had trading partners all over the world

22  that would execute these financial trades using -- using the

23  money that was provided by Renaissance.

24  Q.   When you say that he had trading partners all over the

25  world, who are you referring to?  Are you referring to

1    Mr. Adams at Renaissance, or were you referring to Mr. Meza?

2    A.    Mr. Meza.

3    Q.    And was there any discussion of what these trading

4    partners all over the world would be investing the money in?

5    A.    No.    There was, you know, the -- what I -- what I

6    remember him saying is that it was some type of international

7    trades.

8    Q.    You stated that during these discussions Mr. Meza

9    indicated to you that the investment was 100 percent

10   guaranteed.    Was there any explanation of that, how it was

11   that this investment could be 100 percent guaranteed?

12   A.    Well, initially he didn't talk about this, but as -- as

13   it went on, he said that no matter what happens, he would

14   personally make sure that I didn't lose my initial

15   investment.

16   Q.    Was there a discussion about a particular amount.    I

17   mean, you ultimately invested $280,000 in May and June.    Were

18   there discussions about particular amounts and what the money

19   was going to be used for beyond sort of the leasing of the

20   funds from Renaissance?

21   A.    He said that the money that I invested would be worth

22   close to $10 million in a timeframe of about 60 days.

23   Q.    Was there any discussion about how much it was going to

24   cost in total to lease these funds from Renaissance, the

25   funds that would then be traded in these international trades

1    all over the world?

2    A.   He said that it was a -- it was $250,000 per month, that

3    it was a 60-day investment.  I was going to put in 250,000,

4    he was going to put in 250,000.  The extra 30,000 was for

5    some kind of legal -- legal funds.

6    Q.   Now, you said there was going to be a return of up to

7    $10 million, but you also said that you were going to put in

8    $250,000 and the defendant told you he was going to put in

9    $250,000.  Was that $10 million return the return on sort of

10   the combined investment or just your portion of the

11   investment?

12   A.   Just my portion.

13   Q.   Was there any discussion on sort of what the larger

14   return would then be?

15   A.   Not initially.  But by August of that year, he was

16   saying that it was -- the total return was going to be 20

17   million.

18   Q.   What, if any, discussion was there about the amount of

19   time it would take for, you know, your $250,000 investment to

20   generate this $10 million return for you?

21   A.   Sixty days.

22   Q.   Now, over the course of these discussions, did the

23   defendant provide you with any type of paperwork or documents

24   related to, you know, this Renaissance Capital or Bob Adams?

25   A.   Yes, he did.

1          MR. YOUNG:  May I approach, your Honor?

2          THE COURT:  Sure.  You don't need to ask.

3          MR. YOUNG:  Thank you, Judge.

4    BY MR. YOUNG:

5    Q.   Mr. Spencer, I've just handed you what has been marked

6    as Government Exhibit SS-1.  You've had an opportunity to

7    previously review that document in preparation for trial here

8    today; is that correct?

9    A.   I have.

10   Q.   Okay.  And is this one of the documents that the

11   defendant provided to you during the time you were talking to

12   him about this investment back in the early portion of 2012?

13   A.   Yes, it appears to be.

14   Q.   Did you provide a copy of this document to investigators

15   in connection with this case at some point in time?

16   A.   Yes, I did.

17   Q.   And is this a true and accurate copy of the document you

18   provided to investigators in connection with this case?

19   A.   To the best of my knowledge, it is.

20         MR. YOUNG:  Your Honor, the government would move

21   to admit Government Exhibit SS-1 and would request

22   permission, if so admitted, to publish.

23         MR. KUTNICK:  No objection, your Honor.

24         THE COURT:  Yes, go ahead.

25         (Said exhibit received in evidence.)

1   BY MR. YOUNG:

2   Q.   All right.  If I could direct your attention to the

3   first page of Government Exhibit SS-1, and particularly the

4   top portion of the document.  It is entitled, Joint

5   Participation Agreement and states that it is a Joint

6   Participation Agreement between Milwaukee McPherson and

7   Renaissance Capital Group.

8          What was your understanding, if any, at the time

9   you received this document of what the purpose of this

10  document was?

11  A.   Well, this was the agreement between Renaissance and

12  Milwaukee to be able to execute the funding of this

13  international trade agreement.

14  Q.   And at this point in time, did you know anything about

15  Renaissance Capital Group, other than what you had been told

16  by the defendant?

17  A.   No.  The only thing I was told -- I didn't know anything

18  independently.  Mr. Meza told me that he had his people check

19  out Renaissance and a Mr. Bob Adams.

20  Q.   And did you know anything about Milwaukee McPherson, the

21  company that he ultimately wired your investments to, other

22  than what you had been told by the defendant?

23  A.   No.

24  Q.   Directing your attention now a little further down on

25  Page 1, specifically to the Recitals portion of the

1    agreement, sort of middle of the page, actually.  It provides

2    that, "Renaissance, or its nominee, has or can immediately

3    obtain $10 million U.S. dollars in immediately available

4    funds pursuant to the terms and conditions of this

5    agreement."

6           It then goes on to say, "Milwaukee is an accredited

7    investor that desires to have conditional access to the Funds

8    to facilitate a certain specific permitted investment subject

9    to the conditions set forth in this agreement."

10          Did you ever talk to the defendant about who it was

11    that had named or accredited his company as an accredited

12    investor?

13    A.    No, I just -- because of our previous relationship, I

14    just made the assumption that, because he said he was, that

15    he was, indeed, qualified.

16    Q.    And it goes on to provide in Paragraph D that,

17    "Milwaukee intends to pay Renaissance an Initiation Fee of

18    $400,000 for the conditional use of the Funds for the initial

19    28 calendar days as set forth in this Agreement and

20    Participation Fees for the further conditional use of funds

21    as set forth in this Agreement."

22          So it appears to be contemplating an initial fee

23    and then continuing fees.  Did you have any discussions with

24    the defendant about who, if anyone, would be responsible for

25    making these additional -- the additional payment of these

1    participation fees?

2    A.    Not initially because the whole thing was supposed to be

3    done in 60 days.  But after the 60 days, Mr. Meza indicated

4    that he was keeping the contract active by sending

5    Renaissance $250,000 per month.

6    Q.    Directing your attention now to Page 4 of the exhibit.

7    If you give me one moment to flip over there on the screen.

8    I'd like to direct your attention specifically to

9    Paragraph 3.2, and more specifically to the second sentence,

10   which I will try to highlight.  That portion of the joint

11   venture agreement provides, "The Permitted Investment shall

12   be a transaction in which the Funds are exposed to no greater

13   investment or custodial risk than the Funds enjoy in the

14   account."  With the account earlier being defined as a bank

15   account at Credit Suisse.

16              Did you -- did the defendant ever tell you what

17   types of investment would be safer or subject to less risk

18   than having funds on deposit in a bank account?

19   A.    No, he did not.

20   Q.    If I can direct your attention now to the fourth

21   sentence in that same paragraph.  And I will highlight that

22   as well before I read along.  It provides that, "Milwaukee

23   represents and warrants that Milwaukee is able to conduct or

24   arrange for certain principal risk free transactions, without

25   exposing the Funds to any risk whatsoever, and without

1   incurring any lien, claim, encumbrance, additional signatory,

2   additional management agreement or right of offset on the

3   Funds."

4           Did the defendant ever explain to you what type of

5   certain principal risk-free transactions with no risk

6   associated whatsoever he was contemplating using your

7   investment for?

8   A.   No, but it's consistent with what he said about

9   100 percent safe investment.

10  Q.   Directing your attention now to the page -- Page 3 of

11  the document.  So one page up.  If you give me a moment, I

12  will get there on the computer as well.  And if I can direct

13  your attention to Paragraph 2.2.  It provides in relevant

14  part beginning with, "Milwaukee shall deliver..."

15          "Milwaukee shall deliver to the Escrow Agent the

16  sum of $400,000 by wire transfer of immediately available

17  funds for deposit into escrow in accordance with the terms

18  and conditions of the Escrow Agreement and this Agreement.

19  All payments made to Renaissance pursuant to this Agreement

20  shall be from Milwaukee's own funds, and not third party

21  funds."

22          During the course of your discussions with the

23  defendant, did he ever highlight for you this portion of the

24  agreement indicating that his company was not supposed to be

25  making use of third-party funds in connection with this

1    purported transaction involving Renaissance Capital?

2    A.   No, he did not.

3    Q.   There is also a reference to the money, the initiation

4    fee, being delivered to an escrow agent.  And if I could

5    direct your attention now to Page 20 of that same exhibit.

6    And I will pull it up on the screen if you give me a moment.

7    Do you see it on the screen?  It's also the -- it's the

8    document bates-stamped 82 at the bottom as well.

9          It purports to be an escrow agreement.  And it

10   makes reference to an escrow account involving an entity

11   known as Stubbs, Alderton & Markiles LLP.

12         Are you familiar with what an escrow account is?

13   A.   Somewhat, yes.

14   Q.   Can you explain to us what your understanding was at the

15   time of this transaction?

16   A.   Well, Carlos said that he was going to be able to

17   control the funds, and this certainly bolstered that argument

18   by a party putting money into a managed or escrow account.

19   And that money cannot come out until both parties agree and

20   it fulfills the contract under which the escrow was

21   established for.

22   Q.   The escrow agreement appears to describe Stubbs,

23   Alderton & Markiles as being a law firm as there is a

24   reference to an attorney-client trust account.  Were you

25   familiar with that law firm at the time?

1    A.    No.

2    Q.    Did you have any particular discussions that you recall

3    about this law firm and why it had been selected to act as

4    the escrow agent for your investment?

5    A.    No.

6    Q.    You talked a little bit earlier about the defendant

7    indicating that he had had his people check out Bob Adams and

8    Renaissance Capital.  Did you ever ask him specifically who

9    he had check out the company?

10   A.    I did not, but I assumed that he had managers in his

11   Milwaukee McPherson -- experienced managers in his company

12   and that he had attorneys that could perform a task like

13   that.

14   Q.    Did you do any type of independent investigation or

15   otherwise do any type of due diligence in connection with,

16   you know, making your investments in early 2012, May, June,

17   2012?

18   A.    I did not.

19   Q.    Why not?

20   A.    Because I trusted Mr. Meza.

21   Q.    What was it that ultimately led you to make this

22   investment?

23   A.    Well, I mean, this is an impressive group of documents

24   here, much of which, I have to be honest, I don't understand.

25   But I knew there was an escrow agreement, I knew that they

1    said the funds would be safe.  Mr. Meza said that my funds

2    would be safe, that he controlled the deal, 100 percent.  And

3    so, to me, it seemed like a really healthy return for that

4    amount of investment.

5    Q.   You said that Mr. Meza told you that he had control of

6    the deal and this influenced your decision.  Was there any

7    discussion of prior deals like this that Mr. Meza had done,

8    or anything along those lines, experience with these types of

9    programs and renting of these fees?

10   A.   He did tell me once that he had had a similar experience

11   with one of these that didn't work out well but that he had

12   fixed all of the problems that he experienced the first time

13   that he went through this; and that this time it was going to

14   be, as he said, 100 percent guaranteed.

15   Q.   Was the fact that the -- let me ask you, what exactly

16   was 100 percent guaranteed?  Was it your investment or was it

17   the return of the 10 to $20 million?

18   A.   It was my understanding that it was just my investment.

19   Q.   Did that guaranty of your investment in any way

20   influence your decision to make this an investment; and if

21   so, can you tell us why?

22   A.   Well, without question.  At the time I thought that

23   Mr. Meza was everything that he had told me.  You know, he

24   said that he had -- his personal net worth was millions of

25   dollars, that he had all these trucks, he had all these

1    contracts, that he had -- that he had family businesses in

2    Ecuador that were in the trucking business, and that he had

3    millions of dollars in South America.  And so when somebody

4    that you trust tells you that your investment is guaranteed,

5    as I mentioned earlier, he initially said it was guaranteed

6    through these contracts.  Subsequent to that, he said it

7    was -- it would be guaranteed because of his personal net

8    worth.

9    Q.    You also indicated that during your discussions with the

10   defendant he indicated that he was going to be putting in 250

11   toward the deal, $250,000, later indicated that he would be,

12   you know, paying these continuing fees that would be due as

13   the trading went on.  Did that in any way influence your

14   decision to invest your money into these transactions with

15   the defendant?

16   A.    Oh, absolutely.

17   Q.    Can you explain?

18   A.    Well, I think the term is skin in the game.  When

19   somebody is willing to put their money at risk alongside

20   yours for a single investment and you believe that person to

21   be honest and competent, it makes all the difference in the

22   world.

23   Q.    What was your understanding of where your money was

24   going, the $200,000 in May and the $80,000 in June?

25   A.    That it was going to go into an escrow account

1    controlled by Milwaukee McPherson and the Renaissance Group.

2    Q.   Was there ever any discussion of the money being used

3    for other purposes?

4    A.   Not between Carlos and I.

5    Q.   Was there ever any discussion between the defendant and

6    you about loans or money being sent back to the defendant by

7    Renaissance?

8    A.   Say it again.

9    Q.   Was there ever any discussion of the defendant receiving

10   money back from Renaissance apart from the returns --

11   A.   No.

12   Q.   -- on the investment?

13   A.   I was -- I was told that Renaissance never gave him any

14   money either.

15   Q.   When were you told that?

16   A.   At the very end of the whole deal.

17   Q.   You said that you initially expected the $10 million

18   return on your investment to come within 60 days, which would

19   be somewhere around August of 2012.  What happened when the

20   60-day time period from your, you know, first initial

21   investment came?

22   A.   Well, leading up to that, he said that one of his

23   overseas traders was slowing the transaction down.  And he

24   proposed that, if we could buy this trader out, that

25   everything else was in place and the transaction could take

1   place almost immediately, but he said certainly within

2   another 60 days.

3   Q.   So did you receive any return on your investment during

4   the summer of 2012?

5   A.   No.

6   Q.   And did you have conversations, you know, as sort of the

7   end of 2012 came and went, with the defendant about what had

8   happened to the money?

9   A.   Several conversations.

10  Q.   And do you recall each and every one of those

11  conversations individually, or do you have more of a

12  collective memory?

13  A.   Just a collective memory.

14  Q.   Would these conversations typically occur in your office

15  or somewhere else?

16  A.   Either in my office, I think we went out to dinner a

17  couple of times, and then on phone conversations, I believe.

18  Q.   Other than your discussions about this need to buy

19  someone else out of the transaction, do you remember any

20  other reasons why, you know, if any, the defendant indicated

21  there was a delay in receiving the $10 million return that

22  you were supposed to receive in connection with your

23  investment?

24  A.   No.   In the time period of August, September and October

25  it was all hung up because of this trader.

Q. We looked a few moments ago at the Joint Venture Agreement. Were you provided with any other documents during this course of time by the defendant regarding, you know, the investment or the failure of the investment to come through?
A. Yes, I was.
Q. Mr. Spencer, I've just handed you what have been marked as Government Exhibits SS-5 and SS-6. Are these documents that you received over the period of time we've been talking about, namely, the summer of 2012?
A. Yes.
Q. Who was it that provided you with these documents?
A. Mr. Meza.
Q. Did these documents relate to your investment or this transaction with Renaissance Capital?
A. That's how they were represented.
Q. And did you provide copies of these documents to investigators in connection with the case?
A. I did.
Q. Are these true and accurate copies, these exhibits, that is, true and accurate copies of the documents you provided?
A. They appear to be, yes.
MR. YOUNG: Your Honor, the government would move to admit Government Exhibits SS-5 and SS-6, and we'd seek to publish, if so admitted.
MR. KUTNICK: No objection, your Honor.

1            THE COURT:  They're admitted.  You may publish.
2            (Said document received in evidence.)
3    BY MR. YOUNG:
4    Q.    Mr. Spencer, I'm going to direct your attention first to
5    Government Exhibit SS-6.  So six before five.  If you give me
6    one moment, I will pull it up on the screen, hopefully.
7            Drawing your attention to the first page of the
8    exhibit, this appears to be a letter; is that correct?
9    A.    Yes.
10   Q.    Of some sort?
11   A.    Yes.
12   Q.    And can you read for us the date on the letter?
13   A.    August 13, 2012.
14   Q.    And it appears to be addressed, you know, from
15   Renaissance Capital Group to a company by the name of CASP
16   International Investment SA.  Are you familiar with what that
17   entity was at the time you received this letter?
18   A.    No, I was not.
19   Q.    Did you know what, if any, involvement CASP had in
20   connection with the trading that you were talking to
21   defendant about and invested in?
22   A.    Only that it was part of the trading.
23   Q.    Directing your attention to the first paragraph of the
24   same letter.  It provides, "I, Robert Adams, Managing
25   Director of Renaissance Capital Group LLC do hereby confirm

1    that this letter serves as my formal and unsolicited request

2    for information and documents on CASP International, Private

3    Placement Ten-Day Banking -- " I'm sorry, "Private Placement

4    Ten Banking Day Investment Transaction Opportunity."

5            Did you know what this Private Placement Ten

6    Banking Day Investment Transaction Opportunity was, or did

7    you otherwise have any discussions with the defendant about

8    what it was?

9    A.   Nothing other than what's reflected in this document.

10   Q.   All right.  Directing your attention to the second page

11   of the exhibit and the paragraph appearing second from the

12   bottom, which I will highlight.  It provides, "Renaissance

13   currently has in excess of 10 million euros in Renaissance

14   bank account under my sole signature management and control

15   for the ten banking day term of CASP International

16   Transaction Program under which I will enjoy a earnings daily

17   for the ten banking day term of 70 percent of the 10 million

18   euros cash deposit currently in Renaissance bank account."

19           Did you have any discussion with the defendant at

20   the time you received these documents about the reported

21   return on the investment described in the letter, 70 percent

22   of 10 million euros?

23   A.   Well, certainly that's a -- I was very excited to get

24   this letter because of -- you know, because of what it was

25   saying, we were two weeks late on the Renaissance deal.  And

1   to see this letter and look at the 70 percent return of 10

2   million euro, which at the time was about $13 million, you

3   know, 70 percent of that is a substantial amount of money.

4   And it fulfilled my expectation of what Mr. Meza was selling

5   me.

6   Q.   Directing your attention now to Government Exhibit

7   SS-6 -- I'm sorry, SS-5.  My apologies.  It appears to be a

8   statement from Credit Suisse relating to an account with

9   Renaissance Capital Group LLC.  And there appears to reflect

10  the balance on that -- at that account, or in that account.

11  Can you read what the purported balance was for us?

12  A.   10,700,802.60 euros.

13  Q.   What was your understanding, if any, of what this

14  balance in the account for Renaissance represented in

15  connection with this transaction?

16  A.   To me this represented exactly what Mr. Meza was saying,

17  in that -- actually, it exceeded expectations because it was

18  supposed to be 10 million US.  This is 10.7 euro, which at

19  the time would have been I think close to $14 million, was

20  accessible to Renaissance for trading.

21  Q.   And did you undertake any action to confirm or otherwise

22  verify that Renaissance had this amount of money in an

23  account at Credit Suisse at the time?

24  A.   I did not.

25  Q.   And it appears to be euros.  Were you familiar with

1    conversion rates at the time, euros to dollars?

2    A.   As I said, to me it, if I recall, it was about close to

3    $14 million.

4    Q.   I'd like to direct your attention to August of 2012.

5    Did you provide the defendant with any additional funds

6    around that time?

7    A.   Yes, I did.

8    Q.   If I can direct your attention back to Government

9    Exhibit ACB-1 for a moment, the bank records that we were

10   previously looking at from your account at Charter One Bank

11   (sic.), and specifically Page 8 of the exhibit.  There

12   appears to be a wire or a series of wire transmissions to

13   Milwaukee McPherson made on August 21st of 2012, in the

14   amount of $15,000 and 20,000.  Do you see those two entries?

15   A.   I do.

16   Q.   Are those -- do those represent amounts of money that

17   you sent to the defendant in August?

18   A.   Yes.

19   Q.   Do you recall why it was you were sending the defendant

20   these funds in August of 2012?

21   A.   After having received this Credit Suisse letter and then

22   also the one from RCG to CASP, I was re-energized as to what

23   was going on, and it restored my confidence that things were

24   going to turn out as Mr. Meza said they were.  And so I

25   believe the 15,000 he said he needed for some type of legal

1    fees.  I think it had to do with the buyout.  But I'm not --

2    I'm not certain.  And the 20,000 was -- I believe that 20,000

3    was for the skid steer, Bobcat, that we talked about.

4    Q.   Now, you said a little bit earlier that as things

5    progressed over the summer of 2012, and into the fall, there

6    were some discussions about having to buy someone out as part

7    of the transaction.  Can you tell us how many discussions you

8    had during this time period about the need to buy someone

9    else out?

10   A.   Several.  I don't know the exact number.

11   Q.   And can you provide us with any further information

12   about those, why it was someone needed to be bought out?

13   A.   Just that he was holding up the deal, that the

14   transaction was ready to go, and everything looked really

15   good.  But this one trader was -- was holding things up.

16   Q.   Did the defendant ask for additional funds from you?

17   A.   He did.

18   Q.   How much did he ask for you to buy out the trader?

19   A.   He said for $400,000 we could buy out the trader.

20   Q.   Was there any discussion about the defendant

21   contributing money towards this buyout of the trader in

22   October of 2012?

23   A.   I don't recall any.  I believe the only -- the only

24   reference was -- I think this was the first time that he said

25   that he had to put the 250,000 a month in to keep the

1    Renaissance deal alive, and so that's where his money was

2    going.

3    Q.   Did you -- did you contribute another $400,000?

4    A.   I did.

5    Q.   You said earlier that you had obtained the $280,000 that

6    you had invested from your savings account and your

7    retirement account, I believe.  Where did you obtain the

8    $400,000 that you sent in October of 2012?  Was it from one

9    of your accounts, or did you borrow the money?

10   A.   I borrowed the money on a building that I owned.

11   Q.   Who did you borrow the money from initially?

12   A.   Initially I borrowed it from a gentleman by the name of

13   Andrew Lee.

14   Q.   Who was Andrew Lee?

15   A.   He was actually somebody that Mr. Meza introduced me to.

16   And he and a group of other people were what he referred to

17   as hard money lenders.

18   Q.   When you use the term hard money lender, can you explain

19   to us what that means?

20   A.   It means that they will loan you money on a particular

21   asset.  So if you have a building or a car, you have to tie

22   that building or car up in order for them to give you money.

23   Q.   And did you ultimately pay back Mr. Lee for the

24   $400,000?

25   A.   I did.

1    Q.   Where did you obtain the money that you paid Mr. Lee
2    back with?
3    A.   I was able to get a regular lower interest mortgage from
4    a bank.
5    Q.   Why was it you didn't go to a bank for a lower interest
6    mortgage in the first place?
7    A.   Because Carlos was in a big hurry to get this 400,000 to
8    the trader so we can get this thing done.
9    Q.   Did you wire the $400,000, or was the $400,000 wired in
10   the same manner that the 280 had been wired?
11   A.   Yes, it was.
12   Q.   Who, if anyone, provided you with the instructions about
13   where to wire the money to?
14   A.   I would have received those from Mr. Meza.
15   Q.   Was there any discussion of how long it would take for
16   you to receive the returns on your investment, the
17   $10 million that you were supposed to receive, after you made
18   this additional wiring or payment of $400,000 in October 2012
19   to buy this person out of the deal?
20   A.   He indicated that the deal was almost done, but that
21   under any of the worse circumstances it would be another
22   60 days.
23   Q.   Did you have any additional discussions with the
24   defendant as you waited for that -- as the 60 days came or
25   approached?

1   A.   I would say at least weekly.

2   Q.   And would it be fair to say that you had the same

3   general recollection of the conversations you had with the

4   defendant over that period of time as you have had with your

5   other conversations?

6   A.   Yes.

7   Q.   Can you tell us what you two discussed?

8   A.   Well, it was really quite simple.  I'd say, when is it

9   coming in?  And I would get various answers.  After a while I

10  would call them excuses.

11  Q.   Do you remember what any of those answers were?

12  A.   You know, the trader is in the process of doing it.

13  Just, you know, it got to the point where I wasn't actually

14  listening very closely.

15  Q.   And did this go on beyond the expiration of the 60-day

16  period from October?

17  A.   Yes, it did.

18  Q.   I'd like to direct your attention now to April of 2013.

19  Around that time period, did you come to have an in-person

20  meeting with the defendant at your office?

21  A.   I did.

22  Q.   Was there anyone else present during this meeting at

23  your office, other than yourself and the defendant?

24  A.   There was not.

25  Q.   And, I'm sorry, can you remind me where your office is

1   located?

2   A.   Carpentersville, Illinois.

3   Q.   And can you tell us what the purpose of this meeting

4   between you and the defendant at your office was back in

5   April of 2013?

6   A.   Well, at this point, Mr. Meza was apologizing because I

7   was paying these high interest rates on the -- on the

8   building that I was only supposed to make two on, and it kept

9   going.  And so I'm making these payments to the bank, and he

10  is saying well, you know, I feel bad.  It is coming through,

11  he said, but I have -- I have a deal that's very similar to

12  this that has already transacted.  The money is in the Wells

13  Fargo Bank in San Francisco, and I have three -- I don't know

14  what he said, partners, attorneys, somebody -- on their way

15  to San Francisco as we speak to pick up the money.

16  Q.   Was this deal that had already been transacted involving

17  San Francisco something involving Bob Adams and Renaissance,

18  or was there any -- or was it something else?

19  A.   It was a totally different group.  I think it was called

20  Virginia Worldwide.

21  Q.   Was there any discussion between the defendant and

22  yourself about what exactly this Virginia Worldwide was?

23  A.   No, other than it was a similar, you know, type of

24  international investing group.

25  Q.   Did you have any discussion about what had happened to

1    Renaissance and Bob Adams and all the money --

2    A.    Well, no, he never -- he never indicated that it was not

3    going to happen.  He indicated that it was coming, that just

4    a lot of details had to be, you know, ironed out, but that it

5    was -- it was imminent.

6    Q.    Was there any discussion about, or what would be the

7    return on your investment of this additional amount with the

8    Virginia Worldwide Group?

9    A.    Well, he said it was already transacted and that he

10   initially asked me for $50,000, and he said I would get the

11   $50,000 back, plus another 50,000, which would cover the

12   interest and the payments that I had been making on my

13   mortgage on my building.

14   Q.    Did you talk -- was there any discussion of the payments

15   that you would receive from the Bob Adams or Renaissance

16   investment at this meeting?

17   A.    Absolutely.

18   Q.    And can you tell us about that?

19   A.    He went so far -- after we talked about the Virginia

20   Worldwide, he went so far as to give me a schedule of when

21   that money was going to be coming in.

22   Q.    Before we talk a little bit more about the scheduling,

23   and the like, was there any discussion of exactly what this

24   $50,000 was going to be for, this $50,000 that you needed to

25   send to Virginia Worldwide?  Was it a fee?  Was it something

1    else?

2    A.    Yes, fees, attorney fees of different types.  You know,

3    just a bunch of things that were associated with doing a

4    large deal.

5    Q.    Did you talk about -- I apologize if I asked this.  Did

6    you talk about a particular repayment schedule on this

7    $50,000 that you were going to send back?

8    A.    Yes.

9    Q.    Were these discussions memorialized in some fashion,

10   these discussions that you had with the defendant at your

11   office in April of 2012?

12   A.    Yes, they were.

13   Q.    Can you explain how it is exactly that you memorialized

14   these or documented these sort of discussions or agreement?

15   A.    I actually wrote on the top of a white board,

16   "Contract," and then I put all the details of what our

17   discussion was at the time.  And then both he and I signed

18   the bottom of the white board.

19   Q.    And did you take a photograph of that white board?

20   A.    I did.

21   Q.    Mr. Spencer, I've just handed you what has been marked

22   as Government Exhibit SS-7.  Can you take a look at it for a

23   moment.  Are you familiar with this exhibit?

24   A.    I am.

25   Q.    Is this a photograph of the white -- a two-page split

Spencer - direct by Young

1    photograph of the white board?

2    A.    Yes, it is.

3    Q.    And does it truly and accurately depict the white board

4    as it appeared in your office in April of 2012?

5    A.    Yes, it does.

6           MR. YOUNG:  Your Honor, the government would move

7    to admit Government Exhibit SS-7.

8           MR. KUTNICK:  No objection, your Honor.

9           THE COURT:  It's admitted.

10        (Said exhibit received in evidence.)

11          MR. YOUNG:  May we publish the exhibit, your Honor?

12          THE COURT:  Yes, you may.

13          MR. YOUNG:  Thank you.

14   BY MR. YOUNG:

15   Q.    Mr. Spencer, I am projecting the second page of

16   Government Exhibit SS-7.  Does this photograph depict the

17   left portion of the white board or the right portion?

18   A.    This is the right portion of the white board.

19   Q.    Would it be safe to assume that the white board was

20   large enough that it couldn't be fit in one photograph?

21   A.    Yes.  It was a four-foot by eight-foot white board.

22   Q.    And looking at the second page, this portion of the

23   white board that is depicted on this photograph appears to be

24   entitled, "Contract."  And at the very bottom, after three

25   items, there appear to be two signatures.  Do you recognize

1    those signatures?

2    A.   The one on the top is mine and the one on the bottom is

3    Carlos'.

4    Q.   And when you refer to the one on the bottom, is it the

5    one I'm highlighting right now?

6    A.   That is correct.

7    Q.   All right.  As I said, there appear to be three items

8    listed under the title, "Contract."  Item 1 provides, "4/19

9    Carlos receives $50,000 from SS."  Is that a reference to the

10   $50,000 that you were being asked to send to Virginia

11   Worldwide?

12   A.   Yes, it was.

13   Q.   Item 2 provides, "4/26 - 4/29, Carlos repays 50,000 to

14   SS.  If not, Carlos sells apartment by 5/15 to repay SS."

15        Can you explain to us what that portion of the

16   agreement between you and the defendant, Mr. Meza, means or

17   meant?

18   A.   Yes.  The reference to an apartment was generally an

19   apartment condo, town home, that he said he owned several and

20   that they were highly desirable and easy to -- easy to sell.

21   And so my thought here is that he would -- he would get that

22   money back to me very quickly.

23   Q.   Directing your attention now to the third item, it

24   reflects, "See Schedule," and then there is an arrow back.

25   Is that arrow directed to the left side portion of the white

1  board?

2  A.   Yes, it is.

3  Q.   And if I can now direct your attention to Page 1 of that

4  same exhibit.  Does this page of the two-page exhibit depict

5  the left side portion of the white board?

6  A.   It does.

7  Q.   And, in particular, is this the schedule that is

8  referenced in Item 3 of the contract between you and

9  Mr. Meza, the defendant?

10  A.   Yes, it is.

11  Q.   Can you explain the schedule for us as it appears here

12  in this photograph of the white board?

13  A.   Yes.  That after I gave Mr. Meza the $50,000 by 4/26, he

14  would be receiving 400,000, of which he would give me both

15  the $200,000 repayment and $50,000 initial investment.

16  Q.   If I can stop you there.  So then was the $400,000 that

17  he would be receiving on April 26th something being paid out

18  from the Virginia Worldwide --

19  A.   Yes.

20  Q.   -- Investment?  If you could proceed with the

21  explanation of the remainder of the schedule.

22  A.   Friday, May 3rd, from the Renaissance investment, he

23  said that $2.6 million would be coming in to Milwaukee

24  McPherson, which he would split with me 50/50.  On Friday,

25  the 10th of May, he would split 9.1, which was also coming

1    from the Renaissance Group.  And on Friday, the 17th of May,
2    the balance of the $25 million would be split 50/50 and half
3    would go to me.

4    Q.   So this contemplates -- or the white board specifically
5    contemplates a 50/50 split on the returns of both the
6    Virginia Worldwide money as well as the Renaissance Capital
7    money.  Was that a change in any way from your understanding
8    of what your split would be, or was it always your
9    understanding that it was going to be 50/50 of the returns?
10   A.   I'm pretty sure I remembered it always being a 50/50
11   split.  I'm not sure I knew that on the very first
12   investment, but after things started going, he would talk
13   about it in those terms.

14   Q.   So as part of this agreement reflected on the white
15   board that we just looked at, you were to pay him $50,000 to
16   send to Virginia Worldwide.  Did you send any money to
17   Virginia Worldwide?

18   A.   I did.

19   Q.   Was it $50,000, or was it a different amount?

20   A.   It was a different amount.

21   Q.   Do you recall how much it was that you sent to Virginia
22   Worldwide?

23   A.   40,000.

24   Q.   How was it that that money was sent?  Was it by wire or
25   some other method?

1   A.    It was by wire.

2   Q.    And where did you get the money that you sent to

3   Virginia Worldwide, the $40,000?

4   A.    I got it out of a retirement account.

5   Q.    And we've been talking about a meeting occurring in

6   April of 2013.  Did you send the wire -- the money around

7   that time?

8   A.    It would have been around that time.  I don't remember

9   exactly when.

10  Q.    Who provided you with the wire instructions for the

11  payment to Virginia Worldwide that you made in August -- I'm

12  sorry, April of 2013?

13  A.    Mr. Meza.

14  Q.    Why did you pay a lesser amount?

15  A.    I just didn't have the 50,000.  And we had a discussion

16  about it, and he said 40 would work.

17  Q.    We were looking at a series of repayments that were to

18  be made to you, the $400,000 from Virginia Worldwide and then

19  the additional amounts from the Renaissance investment over a

20  period of a few months, as detailed in that white board

21  schedule.  Did you ever receive any of those payments?

22  A.    I did not.

23  Q.    Did you have additional discussion with the defendant

24  when you failed to receive the payments as outlined in that

25  schedule?

1    A.   Several.

2    Q.   And do you have a general recollection of these

3    conversations?

4    A.   General, yes.

5    Q.   Okay.  And can you tell us approximately what period of

6    time they occurred over?

7    A.   Well, they certainly started happening on the 26th of

8    April, when that money didn't come in, and either weekly or

9    twice a week subsequent to that.

10   Q.   Do you have an individual recollection of each

11   conversation, or more of a general?

12   A.   General.

13   Q.   Can you tell us what you talked about?

14   A.   We talked about -- basically I was saying, where is the

15   money.  And he would always come up with a different excuse.

16   Q.   Do you remember any of the reasons you were provided

17   about why the money hadn't been paid in accordance with the

18   schedule outlined during that meeting in your office?

19   A.   Just that paperwork was held up.  Just a lot of

20   different, you know, technical-type things.  You know, and he

21   still maintained that everything was coming.

22   Q.   You testified earlier that you were assured by the

23   personal guaranty because the defendant had indicated that he

24   had, you know, funds located across the, you know, in other

25   countries.  Was there any -- was there ever any discussion of

1   reimbursing you for your investment using these funds?

2   A.   Right.  Yeah, starting in I think June, where I -- you

3   know, I was becoming probably somewhat animated about the

4   return of the money, he said, well, I will -- one thing I

5   remember is he said, well, I'll put your June mortgage

6   payment on my credit card.  But the main thing that he said

7   is, I'll bring this money -- I'll bring your money in from

8   South America to repay you.

9   Q.   Did he say where from South America he was going to

10  bring in the money?

11  A.   If he did, I don't recall.

12  Q.   Did that ever happen?

13  A.   It did not.

14  Q.   Did you ever have any discussions as to why it was he

15  didn't bring this money in from South America that he was

16  purportedly going to be able to repay you with?

17  A.   Yes, he said -- he started the -- he started the process

18  and then realized that the taxes were going to be extremely

19  high on the transaction.

20  Q.   Did you ever offer to pay the taxes?

21  A.   I did.

22  Q.   And what was the response?

23  A.   It just fizzled out.

24  Q.   You indicated earlier that the defendant had told you

25  that he owned multiple condos and buildings and things along

1    those lines.  Was there ever any discussion of the defendant

2    mortgaging or otherwise, you know, using those assets to

3    liquidate them and paying for the money you had invested but

4    not given back yet?

5    A.   About this time -- around this time, probably in the

6    July time period, I found out that the assets that he said he

7    owned, he did not own.

8    Q.   How long did your -- you talked about it earlier, a

9    little earlier, about not sort of doing any independent

10   research into Bob Adams or Renaissance Capital.  Did you ever

11   have an occasion to do a little bit of digging into

12   Renaissance Capital?

13   A.   Yes, at one point, and I'm thinking it was July of '13,

14   I actually called Bob Adams myself.

15   Q.   And at some point did you join in defendant to that

16   conversation?

17   A.   Yes.  He put me on hold and brought Mr. Meza in on the

18   conversation.

19   Q.   How was it that you found the number that you dialed for

20   Bob Adams?

21   A.   Just the internet.

22   Q.   And when you spoke with the person who picked up the

23   call, did they identify themselves as Mr. Adams?

24   A.   Yes.

25   Q.   And can you tell us what transpired during this call

1    between yourself, the defendant, and the person identifying

2    himself as Bob Adams?

3    A.   Actually, I talked to Mr. Adams twice.  The first time

4    he put me on hold as soon as he found out what I was

5    investing in, what I was doing, and he called Mr. Meza and

6    asked him why he was using third-party funds when the

7    contract said that he was not supposed to.  And Carlos

8    responded, don't worry about -- don't worry about it, I'll

9    handle it.  He said that several times without saying

10   anything else.

11   Q.   Did Mr. Adams explain why he was asking the defendant

12   about the third-party funds?

13               MR. KUTNICK:  Objection.

14   BY THE WITNESS:

15   A.   Yeah, he -- well, because he said --

16               MR. YOUNG:  There has been an objection.

17               MR. KUTNICK:  Hearsay.

18               THE COURT:  Sustained.

19               MR. YOUNG:  In the context of the defendant's

20   response, your Honor.  So in setting a context for the

21   defendant's response.  Let me ask a different question.

22               THE COURT:  Yes.

23   BY MR. YOUNG:

24   Q.   You said there was a discussion between Mr. Adams and

25   the defendant about third-party funds.  And the defendant

1   responded not to worry about it.  Do you remember exactly

2   what it was that Mr. Adams said to the defendant that caused

3   him to respond, not to worry about it?

4   A.   Yes.

5            MR. KUTNICK:  Objection, hearsay, your Honor.

6            THE COURT:  Yes, sustained.

7   BY MR. YOUNG:

8   Q.   When was the last time you spoke with defendant?

9   A.   I said hello to him on the way in.  Prior to that --

10  Q.   About the investment.

11  A.   About this?

12  Q.   Yeah.

13  A.   Probably July of -- July, August timeframe of 2013.

14  Q.   Did he ever provide you with any explanations for sort

15  of the failure to pay a return on the investment other than

16  what we've already talked about?

17  A.   No.

18  Q.   And you never received any return on your investment; is

19  that correct?

20  A.   I did not.

21  Q.   Can you tell us what type of impact the loss of that

22  money has had, the impact that the loss of $700,000 has had

23  on you?

24           MR. KUTNICK:  Objection.

25           THE COURT:  We have to take a sidebar.

1          (At sidebar outside the hearing of the jury.)

2          THE COURT:  Why shouldn't I sustain that objection?

3          MR. YOUNG:  Your Honor, I think it's relevant to

4   the victims of the offense and the impact of the loss,

5   particularly based upon the opening that has been -- that he

6   has been trying to -- you know, he was trying to help them.

7   This is all, you know, sort of his desire to help, you know,

8   Mr. Spencer with his project in North Dakota, and the like.

9   I think it's fair to talk about sort of the result of that.

10          MR. KUTNICK:  My response, your Honor, is that it

11   speaks for itself that he lost $700,000.  The jury can

12   certainly accept that that's a substantial loss for him to go

13   into exactly.

14          THE COURT:  I'm just saying for some people it

15   probably isn't, but --

16          MR. KUTNICK:  But for him to be able to kind of

17   moan about the financial impact that it had on him is, it's

18   inflammatory, it's prejudicial, and it's really no more --

19   it's not probative.  And the mere fact that he lost the money

20   is the relevant fact, not what the effect is of losing that

21   money.

22          THE COURT:  It might depend on how it was argued.

23          MR. KUTNICK:  I'm sorry, Judge?

24          THE COURT:  It might depend on how it was argued

25   later on.  I will let you ask, but it's -- but briefly.  I

Spencer - direct by Young

1  don't want to hear that, you know, his kid can't go to

2  college, or something.

3          MR. YOUNG:  Fair enough.

4      (Proceedings in open court in the hearing of the jury.)

5  BY MR. YOUNG:

6  Q.  Very briefly, Mr. Spencer, can you tell us the impact

7  the loss of the $700,000 has had on you?

8  A.  Well, it has been quite devastating.  As you can

9  imagine, many of the plans that I had for retirement and

10 stopping work have evaporated.

11         MR. YOUNG:  May I have a moment, your Honor?

12         THE COURT:  Yes.

13         MR. YOUNG:  Your Honor, I tender the witness.

14         THE COURT:  All right.  I would like to go for a

15 few more minutes because I don't think our snack is here.

16         MR. KUTNICK:  Your Honor, could I have a few

17 minutes recess prior to cross-examination?

18         THE COURT:  All right, we'll just go ahead and take

19 a recess.

20         MR. KUTNICK:  Thank you, your Honor.

21         THE COURT:  Okay.  Thank you.

22     (Jury out at 2:26 p.m.)

23         THE COURT:  Okay.  Ten minutes.

24     (Jury in at 2:44 p.m.)

25         THE COURT: Please be seated.  Counsel?

1    MR. KUTNICK:  Thank you, your Honor.

2    CROSS-EXAMINATION

3    BY MR. KUTNICK:

4    Q.   Good afternoon, Mr. Spencer.

5    A.   Good afternoon.

6    Q.   Just bare with me one moment while I get my documents

7    together.  So, Mr. Spencer, you own a metal stamping company

8    called, what's it called, Performance Metal Stamping?

9    A.   Performance Stamping Company.

10   Q.   And that's a business -- that's your family business?

11   A.   It was.  My father just passed away last week.

12   Q.   Did your father start that business?

13   A.   No, we actually started it together.

14   Q.   You started it together.  When was that business

15   started?

16   A.   We actually purchased an existing company called Buehler

17   Tool & Machine in May of 1979.

18   Q.   Have you continually worked in that business for your

19   entire career?

20   A.   Since 1979, yes.

21   Q.   Without getting too technical about your age, were you

22   in your 20s at that time or --

23   A.   I was 29.

24   Q.   29 years old, okay.

25   A.   I'm 68 now.

1   Q.   Okay.  Thank you very much.  I didn't ask, but thank
2   you.  Now, that's a relatively lucrative business; isn't it?
3   A.   No.
4   Q.   Has it ever been lucrative over the history?
5   A.   Yeah, actually, up until about 2000 -- actually, prior
6   to 9/11 2001, it was fairly profitable.
7   Q.   So for -- so up to that point in your ownership of the
8   business, you were making a nice sum of money from that
9   business; correct?
10  A.   I would say -- well, it was a startup company.  And so
11  the first ten years were a struggle.  But from about 1990 to
12  2000, it was profitable.
13  Q.   Now, you are a member of The Church of Jesus Christ of
14  Latter-Day Saints; correct?
15  A.   I am.
16  Q.   You attend the first ward; is that right?
17  A.   It's called Crystal Lake First Ward.
18  Q.   Crystal Lake First Ward?
19  A.   It's a congregation.
20  Q.   So that be would the congregation that's located in
21  Crystal Lake; correct?
22  A.   Yes.
23  Q.   Okay.  And there are other congregations located around
24  the whole country; right?
25  A.   Correct.

1    Q.   And specifically there are other congregations around

2    Northern Illinois; isn't that right?

3    A.   Correct.

4    Q.   Mr. Meza, he attends the second ward; correct?

5    A.   Crystal Lake Second Ward, yes.

6    Q.   Okay.  Do you know how -- that's when you were

7    describing on direct that you would go for one service, for

8    lack of a better term, and then he would go to another

9    service?

10   A.   Correct.

11   Q.   Is that correct?

12   A.   Different times.  Usually 9:00 and 11:00 o'clock.

13   Q.   But the same building?

14   A.   Right.

15   Q.   And how long have you been attending the first ward?

16   A.   We moved up to the area in 1979, shortly after we bought

17   the business.

18   Q.   Are you aware how long Mr. Meza has been attending the

19   second ward?

20   A.   I would say at least 2005 --

21   Q.   Okay.

22   A.   -- timeframe.

23   Q.   You're not sure?

24   A.   Close.  Yeah, you know, probably somewhere around 2005.

25   Q.   Okay.  At least?

1   A.   Plus or minus a couple years.

2   Q.   At least ten years, maybe more; correct?

3   A.   I would think so, yes.

4   Q.   And you have done business with other members of the

5   church; isn't that correct?

6   A.   Over the years, yes.

7   Q.   Okay.  You have never done any -- you had never done

8   business previously with Mr. Meza until this initial

9   Renaissance deal; isn't that correct?

10  A.   That's correct.

11  Q.   Though -- we're going to talk about the North Dakota

12  trip for a moment -- in a moment.  But before I get there --

13  well, I guess, how did you meet Carlos?

14  A.   Just out in the foyer in between meetings.

15  Q.   Well, how many people are members of the congregation?

16  A.   Oh, I would say over the years it fluctuates, but a

17  congregation is usually about 150 each.

18  Q.   So do you know every member of the congregation?

19  A.   No.

20  Q.   Do you know how you --

21  A.   I do know at one point I knew probably 95 percent of the

22  first ward.

23  Q.   Do you know who introduced you to Carlos Meza?

24  A.   I don't recall.

25  Q.   But when you met him, it was your belief that he had

1    experience with real estate development; is that correct?

2    A.    That is correct.

3    Q.    You don't know how you learned that; right?

4    A.    He told me.

5    Q.    You didn't know that before you talked to him initially?

6    You hadn't heard that about him in the church?

7    A.    Oh, I see what you're saying.  I don't recall.

8    Q.    In 2000 -- I think it was early 2012, you invited

9    Mr. Meza to go with you to North Dakota; is that correct?

10   A.    Correct.

11   Q.    And the purpose of that was because you wanted him --

12   you were venturing into a large real estate investment;

13   correct?

14   A.    Not large for me.  It was a fraction of what I gave

15   Mr. Meza.

16   Q.    Not large for you?  What was -- you were going to

17   develop a property; correct?

18   A.    With four other people.

19   Q.    Okay.  And it was going to be a residential development;

20   is that right?

21   A.    Correct.

22   Q.    And it was going -- it was going to involve excavation

23   of property; right?

24   A.    Correct.

25   Q.    Construction of buildings; correct?

1   A.   Houses, primarily.

2   Q.   And it was you and three other investors?

3   A.   Right.

4   Q.   Those three other investors were also members of the

5   church?

6   A.   Yes.

7   Q.   Were they here in Illinois, or were they somewhere else

8   around the country?

9   A.   Two were in -- well, actually, at the time, none of them

10   were in Illinois.  I had met two of them in Illinois.  One

11   was at that point living in Southern Utah, one lives in

12   Austin, Texas, and the third, at the time, was living in

13   Minot, North Dakota.

14   Q.   And the reason why you had partners on that investment

15   is because you weren't putting in all the money yourself;

16   right?

17   A.   That is correct.

18   Q.   You were actually -- not only did you have those three

19   other partners, but you were also seeking additional

20   investments from other church members to go into that

21   property with you; correct?

22   A.   No.

23   Q.   Do you know a person by the name of Steven Yakman?

24   A.   Yes.

25   Q.   Isn't it correct that Steven Yakman gave you

1    $1.148 million on February 24, 2012, to be invested into the
2    North Dakota property?
3    A.   What was the date again?
4    Q.   February 24, 2012.
5    A.   I'm not positive on the date, but the timeframe sounds
6    correct.
7    Q.   And he gave you that amount of money?
8    A.   That is correct.
9    Q.   And the intention was that it was to be invested in the
10   North Dakota property?
11   A.   Correct.  And that's the person I referred to as living
12   in Austin, Texas.
13   Q.   On that same day -- who is Wilma Spencer?  Is that a
14   relative of yours?
15   A.   That's my mother.
16   Q.   Your mother.  She also wired you on February 24, 2012,
17   $140,000; is that correct?
18   A.   That was actually my father was doing that, and that
19   would have been correct.
20   Q.   And that the purpose of that wire transfer was to be
21   invested in the North Dakota property; correct?
22   A.   Correct.
23   Q.   You also, on February 27, 2012, received a $600,000 wire
24   transfer from something called YFT Real Properties.  Does
25   that sound right?

1    A.    That's also Steve Yakman.

2    Q.    That's also Steve Yakman?  And same question, the

3    purpose of the investment was for the North Dakota project?

4    A.    Yes.

5    Q.    You took a loan also for $251,000 on May 16th of 2012;

6    is that right?

7    A.    I can't say that I totally recall that transaction.

8    Q.    Okay.  Is there something that would refresh your

9    recollection about whether or not you received $251,000 on

10   May 15, 2012?

11   A.    I'm sure if I saw the documentation I would.

12             MR. KUTNICK:  Can I have one moment, please, Judge?

13             THE COURT:  Yes.

14   BY MR. KUTNICK:

15   Q.    Now, one of the reasons that you asked Carlos to

16   accompany you to North Dakota was because of his expertise in

17   real estate development; correct?

18   A.    Yes.

19   Q.    And you didn't have any real experience or expertise in

20   real estate development; did you?

21   A.    I did not.

22   Q.    One of the things that you wanted Carlos to do when you

23   got to North Dakota -- oh, by the way, you paid for his trip

24   to North Dakota; right?

25   A.    I did.

1   Q.   You paid -- and one of the things you wanted from him
2   was to get his opinion on the development; is that right?
3   A.   I believe so.
4   Q.   So he was then -- you also wanted -- you needed a crane
5   at that business, isn't that -- at that development; is that
6   correct?
7   A.   No, we did not need a crane.  We had talked about
8   possibly getting one, but we didn't need one.
9   Q.   Okay.  So there was a plan to try to procure a
10  construction crane; is that right?
11  A.   There was some discussions around that, yeah.
12  Q.   Okay.  As a matter of fact, there was a discussion to
13  bring an individual, a crane operator, by the name of Doug
14  Pitt --
15  A.   Correct.
16  Q.   -- to the location; correct?
17  A.   Correct.
18  Q.   And Mr. Pitt is a Canadian citizen; isn't that right?
19  A.   Correct.
20  Q.   You asked Carlos to be in charge of bringing Doug Pitt
21  into the country to take care of the legal visas and
22  transportation, things of that nature, to get Mr. Pitt into
23  the country, correct, legally?
24  A.   Carlos said that he was expert at getting people visas
25  from other countries.

1    Q.   Okay.

2    A.   So we would have had that discussion.

3    Q.   Okay.  So it was your understanding that after that

4    discussion Carlos was going to take the steps to bring Doug

5    Pitt to this country; right?

6    A.   Not totally independently but to help assist.

7    Q.   One of the things that was involved in bringing Doug

8    Pitt was you needed to get his papers straight; right?

9    A.   We needed to have the proper documentation, yes.

10   Q.   So Carlos -- you had Carlos hire an immigration attorney

11   to get that job done; correct?

12   A.   I don't think Carlos ever paid for any attorneys.  He

13   may have.  But I also recall spending a lot of money on

14   trying to get Doug Pitt into this country.

15   Q.   But Carlos did spearhead the hiring of an attorney to

16   handle the immigration issues for Doug Pitt; correct?

17   A.   I think he recommended an attorney.

18   Q.   Okay.  But you're not sure whether or not Carlos was the

19   one that made the payments to that attorney or not; are you?

20   A.   I am not.

21   Q.   You also at that time purchased a -- was it a Bobcat

22   from Carlos Meza?

23   A.   Correct.

24   Q.   And the cost of that Bobcat was $20,000?

25   A.   That's the best of my recollection.

1   Q.   Okay.  It could have been more; right?

2   A.   Well, I know that before I picked it up, I believe that

3   was in August of 2012, Carlos had the trailer refurbished,

4   and I recall writing a check for that as well.  So it was

5   approximately 20,000, plus the trailer.  Plus I had to put

6   new tires on.

7   Q.   Okay.  So aside from the tires, does the sum of about

8   35,000 sound right for the trailer and the Bobcat?

9   A.   I think that's high.  I think it was closer to 20,000.

10   Q.   Well, didn't you say the Bobcat itself was 20,000?

11   A.   The deal was the Bobcat came on the trailer.

12   Q.   Let me just -- I forgot to ask you a couple things about

13   the crane, the proposed crane operation.  You had Carlos do

14   other things in an effort to try to locate a crane; correct?

15   A.   Yes.

16   Q.   Okay.  He traveled around the State of Wisconsin,

17   actually, looking at various cranes for your North Dakota

18   project; isn't that right?

19   A.   At one point I recall he went to Wisconsin to look at a

20   crane.

21   Q.   Okay.  And that trip was on his expense; is that right?

22   A.   To the best of my recollection.

23   Q.   Mr. Meza also -- and cranes are really expensive; aren't

24   they?

25   A.   The type of crane that we were looking for is expensive.

1    Q.   Like a million dollars; is that right?

2    A.   Probably not that much for a used one, but they're a lot

3    of money.

4    Q.   Okay.  So another assignment that you gave Carlos was to

5    try to obtain financing to purchase the crane; isn't that

6    right?

7    A.   I do not recall that.

8    Q.   You were to finance the crane, though, in order to

9    purchase it.  You weren't writing a check outright for it;

10   right?

11   A.   That is correct.

12   Q.   And Carlos was handling the leg work, so to speak, for

13   this -- for the business, right, the crane business?

14   A.   Well, if you mean he went to Wisconsin once and talked

15   about finding a place to finance it, I would say those two

16   are correct.

17   Q.   And he also was involved in the Doug Pitt immigration

18   situation; is that right?

19   A.   Yes.  I think the extent of that was recommending an

20   attorney.

21   Q.   Now, you have been a business owner for your entire

22   adult life; right?

23   A.   Correct.

24   Q.   You stated that you have some personal investments like

25   through Scottrade; correct?

1    A.    Yes.

2    Q.    Is that a yes?  You have had other financial investments

3    over the years; is that right?

4    A.    Other than my own business?

5    Q.    Have you?

6    A.    Not other than my metal business.

7    Q.    Okay.  But you do invest in the stock market; correct?

8    A.    Minimally.  The Scott account trade probably was never

9    more than, you know, $40,000.

10   Q.    Didn't you -- well, strike that.  You said you have an

11   educational background in business; is that correct?

12   A.    I do not.

13   Q.    What is your educational background?

14   A.    Well, actually, three years of zoology in college.

15   Q.    And during the entire pendency of you owning a business,

16   you never invested any funds for the business?

17   A.    I certainly did around the -- you know, we bought

18   machines and did -- you know, bought the buildings the

19   machines are in.  But it was primarily around the -- my own

20   business.

21   Q.    Well, when you decided to venture out in the North

22   Dakota project, you knew that you would need to seek

23   investors to cover the bills; right?

24   A.    Actually, the two people that were heading the project,

25   they were seeking the investors.  I was one of them.

1    Q.   You're certainly aware that any investment carries some

2    degree of risk; isn't that right?

3    A.   Yes.

4    Q.   And you're certainly aware as a business person, an

5    experienced businessman, that nothing is guaranteed in

6    business; correct?

7    A.   I would say that's generally correct, yes.

8    Q.   Did you eventually come to meet a person by the name of

9    Alan Milton?

10   A.   Who?

11   Q.   Alan Milton.  Or talk to.  I don't necessarily mean

12   face-to-face.

13   A.   I'm not -- the name doesn't ring a bell.

14   Q.   Does not ring a bell?  So in early 2012, this was after

15   you had been dealing with Carlos in the North Dakota venture;

16   correct?

17   A.   What part of 2012?

18   Q.   I'm going to say right when he came to talk to you about

19   the first investment with Renaissance.

20   A.   Yeah, that was after the trip to North Dakota.

21   Q.   After the trip to North Dakota.  Carlos came to you and

22   said that, for an outlay of $200,000, that you would be able

23   to receive a return of $10 million; correct?

24   A.   250,000.

25   Q.   250,000?  And that return was to happen over 60 days;

1   correct?

2   A.   Correct.

3   Q.   And you were excited about that investment; weren't you?

4   A.   I was.

5   Q.   And Carlos told you that he had been placed in contact

6   with a person by the name of Robert Adams with Renaissance

7   Capital Group; isn't that right?

8   A.   That is correct.

9   Q.   He told you that he had extensive conversations with

10  Mr. Adams about the nature of this investment; is that right?

11  A.   I don't know if extensive is the right adjective, but he

12  had -- he had several conversations.

13  Q.   He showed you what the government previously -- on

14  direct examination the government showed you a document

15  entitled Joint Partnership Agreement.  And, for the record,

16  I'm going to get the number of that in one moment.

17       Do you still have that there in front of you?

18  A.   Yes.  It's called SS-1 Joint Participation Agreement.

19  Q.   Thank you very much.  Now, that is an agreement that was

20  between Renaissance LLC and Milwaukee McPherson; correct?

21  A.   Correct.

22  Q.   And it's your understanding, as we've said before,

23  Milwaukee McPherson was a company that was owned by Carlos'

24  mother; is that right?

25  A.   I wasn't aware of the mother side of it.  I mean, he did

 1    actually make that -- make me aware of that, but it wasn't
 2    initially.
 3    Q.   Okay.  But he runs the business; right?
 4    A.   Correct.
 5    Q.   And you understood -- you read the joint partnership
 6    agreement; correct?
 7    A.   I would say I perused it and tried to understand it.
 8    Q.   Okay.  Well, you were about to invest a quarter of a
 9    million dollars; right?
10    A.   Correct.
11    Q.   And that was a substantial sum of money for you, you
12    testified to already; correct?
13    A.   Absolutely.
14    Q.   And you were presented with a, well, the first part is a
15    14-page document relating to that, where that money would go
16    and what it would be used for; correct?
17    A.   Correct.
18    Q.   And you did not hire an attorney to read through this;
19    did you?
20    A.   I did not.
21    Q.   You did not even read through every single page
22    yourself; did you?
23    A.   Like I said, I -- I read through it and didn't
24    understand everything.
25    Q.   You noticed on Page 14 of that agreement that it was

1    signed by an individual by the name of Robert Adams; correct?

2    A.   Yes.

3    Q.   And attached to that agreement is an exhibit which is

4    basically a letter saying how the money will be held; isn't

5    that correct?

6    A.   The escrow letter.

7    Q.   And that letter is written by Robert Adams; correct?

8    Purportedly.  It's not signed, but --

9    A.   Yeah, I don't know who it was written by.

10   Q.   But you read that letter; correct?

11   A.   I did.

12   Q.   And you read it prior to giving the $250,000 to Carlos

13   to invest?

14   A.   I'm not sure when I got that, to tell you the truth.  I

15   think I might have got that subsequent to the Joint

16   Partnership Agreement, but I'm not certain.

17   Q.   But you definitely saw it, though; right?

18   A.   I did.

19   Q.   And you knew that that was the purported promise, that

20   the money would be kept in that escrow; correct?

21   A.   I did.

22   Q.   And Carlos did not -- that document was not generated by

23   Carlos; correct?

24   A.   To the best of my knowledge, no.

25   Q.   Now, the first $200,000 you wired over to Milwaukee

1   McPherson on May 16, 2012; is that right?

2   A.   Correct.

3   Q.   And you were supposed to see a return on that investment

4   60 days later; correct?

5   A.   Actually, I think the clock was supposed to begin when I

6   got the other 50,000.  It turned out to be 80,000 because

7   there was supposed to be some fees involved, and that went

8   out I believe the mid -- mid July.

9   Q.   Right.  I'm going to get up to that.

10   A.   Excuse me, mid June.

11   Q.   Right now I want to talk about the initial payment on

12   May 16, 2012 --

13   A.   Yes.

14   Q.   -- of 200,000.  Do you recall that?

15   A.   Yes.

16   Q.   Okay.  Now, it was your understanding at that time that

17   you were entering into a partnership with Milwaukee

18   McPherson; correct?

19   A.   Nothing to do with a partnership, just an investment

20   that Carlos was going to manage for me.

21   Q.   But the understanding was that you were going to split

22   the profits with him, 50/50; right?

23   A.   Correct.

24   Q.   You won't call that a partnership?

25   A.   Well, a partnership is a written document that

 1   establishes -- you know, this was -- this was an investment.

 2   There wasn't a -- you know, as you know, as an attorney, it's

 3   not a partnership agreement until there is things that are

 4   signed that says this is a partnership.  This was an

 5   investment that I was making on the basis of who I thought

 6   Carlos Meza was.

 7   Q.   You never received any documentation from Carlos Meza

 8   about what was going to happen with that $200,000; did you?

 9   A.   The specifics?

10   Q.   Right.

11   A.   Nothing other than what's here.

12   Q.   Now, on a month later, on June 18, 2012, you wired over

13   another $80,000 to Milwaukee McPherson; correct?

14   A.   That is correct.

15   Q.   And that was for -- actually to be used for -- to

16   attempt to obtain financing on a crane; isn't that right?

17   A.   No.

18   Q.   That was -- what was it for?

19   A.   Well, the -- it was all for Renaissance.  And the 30,000

20   was for fees.  There was a $250 -- $250,000 each per month,

21   is the way Mr. Meza explained it to me.

22   Q.   Did you --

23   A.   There was never any money transacted for a crane.

24   Q.   You never had any contemplation that you were going to

25   get back that 280,000; did you?  Did you think you were going

1    to get a return of that 280,000 in addition to the return on
2    the investment?  Meaning, was that refundable initial
3    investment?
4    A.   Other than the fact that it would be a part of the
5    $10 million, and that it was, according to Mr. Meza,
6    100 percent guaranteed.
7    Q.   You weren't going to get 10 million plus 280,000, I
8    guess is what I'm saying?
9    A.   I guess I hadn't contemplated that.  But if you give me
10   10 million, I wouldn't worry about the 280,000.
11   Q.   Fair enough.  Now, about two months later, the
12   investment was due; right?  Is that a yes?  I'm sorry, you
13   just have to say yes so the court reporter --
14   A.   I'm sorry, I'm not used to doing this.  Yes.
15   Q.   Okay.  In fact, it was now becoming past due; correct?
16   A.   Yes.
17   Q.   You were getting nervous; weren't you?
18   A.   Yes.
19   Q.   Carlos was also nervous; wasn't he?
20   A.   He was very -- he was actually very optimistic and
21   encouraging us to what was going to happen shortly.
22   Q.   Okay.  So at that time he had -- he had confidence that
23   it was coming?
24   A.   He displayed that.
25   Q.   And the reason -- before I move on to why he was

spencer - cross by Ruemmler

1   confident, on August 21st, 2012, you wired over two payments

2   to Milwaukee McPherson, one for 20,000 and one for 15,000;

3   correct?

4   A.   That is correct.

5   Q.   Those were not part of the Renaissance investment; were

6   they?

7   A.   The best of my recollection, this goes into that trading

8   thing that I talked to Mr. Young about.  The best of my

9   recollection was that the 15 was going to be part of the fees

10  for this trader that was going to be bought out.  The 20,000

11  was for the Bobcat.

12  Q.   Well, I thought that the 30,000 on top of the 250 was

13  for the fees.

14  A.   Well, there was -- there was now new fees because we

15  were supposed to be in the process of buying out a trading

16  partner.

17  Q.   Well, I think you're -- aren't you getting on to the

18  second investment where you needed to -- the $400,000

19  investment?  Are you getting a little ahead?

20  A.   No, this is the very time that he started -- as soon as

21  it, you know, we went past probably the first week of August,

22  Mr. Meza started talking about buying out this trader that

23  was hanging up the deal.

24  Q.   So -- but you did purchase the Bobcat at that time;

25  right?

1    A.    August, yeah.

2    Q.    Okay.  August of 2012; correct?

3    A.    Right.

4    Q.    So at least a portion of that 35,000, the 20 plus the

5    15, was for the Bobcat; correct?

6    A.    Yes.

7    Q.    You had no intention of that money being used for the

8    investment with Renaissance; did you?

9    A.    No.

10   Q.    You knew that Carlos was going to put those funds

11   towards the Bobcat purchase; correct?

12   A.    My understanding was that I was purchasing this from

13   Mr. Meza, that he owned the Bobcat, and that $20,000 was a

14   good deal on it.

15   Q.    Okay.  Now, Mr. -- as part of -- as part of Carlos'

16   assurances to you that this investment was going to go

17   through, he showed you a Credit Suisse bank statement;

18   correct?

19   A.    That is correct.

20   Q.    For Renaissance Capital Group; right?

21   A.    Yes.

22         MR. KUTNICK:  For the record, your Honor, my copy

23   is ILATG001-000088.

24         MS. ZARDKOOHI:  SS-5.

25         MR. KUTNICK:  That's SS-5?  You guys' five?

Spencer - cross by Kutnick

1   BY MR. KUTNICK:

2   Q.   I think you've already looked at SS-5; correct?

3   A.   Yes.

4   Q.   You even have a copy of it up here?

5   A.   I have it right in front of me.

6   Q.   Okay.  And this was a document that Carlos told you that

7   had been provided to him by Robert Adams; correct?

8   A.   Correct.

9   Q.   And Carlos believed -- at least told you that he

10  believed that this money was there and this was the money

11  that was going to secure your investment; correct?

12  A.   Yep.

13  Q.   Carlos told you about extensive conversations on the

14  phone that he had with Robert Adams; isn't that right?

15  A.   Yeah, I guess extensive could be used.

16  Q.   All right.

17  A.   Several.

18  Q.   Many; right?

19  A.   Many.

20  Q.   Several is what your word is?  Okay, let's go with

21  several.  And those conversations that you had with Robert

22  Adams were about -- well, let me withdraw that question.

23          Carlos recorded many of those conversations with

24  Robert Adams; didn't he?

25  A.   I have no idea.

1    Q.   Well, Carlos -- you would meet with Carlos frequently, I
2    think you said four to six times a month, you said, I think?
3    A.   No.
4    Q.   Four to six times a month you would see Carlos?
5    A.   No, that was earlier on that I said four to six -- four
6    to six -- every four to six weeks is what I said I would meet
7    him at church.
8    Q.   Oh, you spoke to him --
9    A.   But it came --
10   Q.   But that was earlier.
11   A.   At this time period, in August, I was probably talking
12   to him on average once to twice a week.
13   Q.   Because you were inquiring about the Renaissance
14   investment; right?
15   A.   Absolutely.
16   Q.   And when he would talk to you, he would tell you whether
17   or not he had new information; correct?
18   A.   Yes.
19   Q.   And the way that he would get new information is by
20   having conversations with Robert Adams; correct?
21   A.   Yes.
22   Q.   And he would tell you about the content of those
23   conversations with Robert Adams; correct?
24   A.   Yes, from time to time, not that -- not that he had new
25   information, you know, every time I talked to him.

1   Q.   Well, you said he would give you excuses and things;

2   right?

3   A.   Right.

4   Q.   But he would tell -- as far as you know, he was

5   conveying information that he received from Robert Adams;

6   correct?

7   A.   As far as I knew, that is correct.

8   Q.   You met with -- you met with Carlos real frequently

9   face-to-face around this time; didn't you?

10  A.   Yes.

11  Q.   You would meet up at places like your office; right?

12  A.   Correct.

13  Q.   You would meet up at places like the Chipotle in

14  Carpentersville?

15  A.   I think it was in Algonquin, but, yes.

16  Q.   All right, I was, I guess, getting close.  There was a

17  breakfast spot on Route 31 you would meet at from time to

18  time?

19  A.   I don't ever recall having breakfast with Carlos.

20  Q.   Okay.

21  A.   Not that I didn't, but I -- I don't -- I don't recall --

22  okay, there is, yeah, Reese's in Algonquin.  I don't recall

23  meeting him there, but it's a possibility.  I like the place.

24  Q.   Okay.  You just may not remember that meeting; correct?

25  A.   Correct.

1   Q.   You met with him from time to time at the McDonald's on

2   Route 14; right?

3   A.   No.

4   Q.   Never?

5   A.   I don't recall.  I'm not a McDonald's person.

6   Q.   Impossible?

7   A.   No, it's not impossible, but it's not some place that I

8   would have -- if I was on Route 14, I probably wouldn't have

9   gone to McDonald's.

10  Q.   How about the Chili's on Route 68, did you ever meet

11  with him there?

12  A.   Chili's on Route 68?  There is a Chili's on 14.  I don't

13  recall one on 68, but.

14  Q.   Do you recall meeting with him at a Chili's in the area

15  at least one time to discuss the investment with Renaissance?

16  A.   I don't recall that.

17  Q.   Okay.  But it's possible?

18  A.   It's possible.

19  Q.   You met with Carlos at his home before; didn't you?

20  A.   I was in his home once.  And I think he was showing me

21  his new granite.  I met his -- I saw his wife, and stuff,

22  there.  I don't recall -- it was more of a meet-and-greet

23  type meeting.  It wasn't -- we did not sit down and talk

24  about business in his home.

25  Q.   Okay.  Well, it was a social visit?

1    A.    I remember -- I remember going to his home, and for some

2    reason I remember that he said that he had new granite.  He

3    introduced me to his daughters, and I had already known his

4    wife, and I think that was the extent of it.

5    Q.    By the way, it's a relatively modest home, right, not

6    large?

7    A.    No.

8    Q.    It's nice, but not extravagant or anything like that;

9    right?

10   A.    That is correct.

11   Q.    Okay.  And when you were there, you didn't notice any

12   kind of, like, highly expensive art, or things of that nature

13   in the house; did you?

14   A.    My wife would have noticed, I wouldn't have.  The only

15   thing I recall in the whole house actually was the granite

16   that he pointed out that he just put in.

17   Q.    Okay.  And your prior dealings -- as long as we're

18   talking about this, in your prior contacts and dealings with

19   Carlos, he is not flashy guy; is he?

20   A.    I would say no.

21   Q.    Doesn't wear expensive clothes, right, expensive

22   jewelry?

23   A.    No, I would -- I would say not.  And had he done that, I

24   probably wouldn't have invested with him.

25   Q.    Okay.  Driven a -- he doesn't drive a real extravagant

1    car, or anything like that?

2    A.    No.

3    Q.    Okay.  Yet, his claims that he was a multimillionaire

4    real estate developer, those were claims that you believed?

5    A.    I certainly did, yes.  And, actually, in that context, I

6    appreciate somebody that has got a lot of money that

7    doesn't -- you know, doesn't show it off all the time.  And

8    that actually added to his credibility, in my estimation.

9    Q.    So even though you had put up the $200,000 on May 16,

10   2012, and the $80,000 in June of 2012, then Carlos comes to

11   you again to make a second investment in October of 2012;

12   correct?

13   A.    That is correct.

14   Q.    And he --

15   A.    That actually -- that started in August, though.

16   Q.    It started -- the talk of it started in August?

17   A.    Correct.

18   Q.    And this is where I think you were hinting at before,

19   where the need was to buy out another investor who was

20   holding up the deal?

21   A.    Right.

22   Q.    Correct?  And that was information that Carlos told you

23   he received from Robert Adams; correct?

24   A.    No, I think -- I had the impression at the time that

25   Carlos knew the trader.

1    Q.    Knew the trader who was holding up the deal?

2    A.    Yes.

3    Q.    Did he ever tell you that he knew the trader?

4    A.    I'm sorry?

5    Q.    Did he tell you he knew the trader?

6    A.    He told me he -- initially, when we started, he said I

7    know -- I know the traders that are involved in this -- in

8    this process because he was pushing the fact that he was in

9    control of it and that he knew the traders, he knew -- he had

10   Bob Adams checked out.

11             MR. KUTNICK:  Could I have one moment, please, your

12   Honor?

13             THE COURT:  Yes.

14             MR. KUTNICK:  Sorry, one moment, your Honor.

15   BY MR. KUTNICK:

16   Q.    So in order to come up -- you didn't have the 400,000

17   that you needed for the second investment on hand; right?

18   A.    Correct.

19   Q.    You needed to procure a loan in order to come up with

20   that 400,000; correct?

21   A.    That is correct.

22   Q.    And you procured that loan from a company called ALSJ

23   Incorporated; right?

24   A.    Correct.

25   Q.    Owned by an Andrew Lee?

1   A.   Correct.

2   Q.   And you took out a mortgage in the amount of $450,000;

3   correct?

4   A.   Correct.

5   Q.   And that was to be secured by a piece of property that

6   you owned; is that right?

7   A.   Correct.

8   Q.   Now, you borrowed money before in your professional

9   life; haven't you?

10  A.   I have.

11  Q.   You borrowed money before in your personal life; haven't

12  you?

13  A.   I have.

14          MR. KUTNICK:  May I approach the witness, Judge?

15          THE COURT:  Yes.  You don't need to ask.

16          MR. KUTNICK:  I'm going to show you what's been

17  marked, by the way, Defendant's 17.

18  BY MR. KUTNICK:

19  Q.   I'm showing you what's been marked previously as

20  Defendant's Exhibit 17 for identification.  Could you just

21  take a look at that and see if that's the mortgage that we're

22  talking about?

23  A.   I would say, just glancing at it, it appears to be the

24  mortgage.

25  Q.   It is the mortgage.  So you --

1   A.   That you were referencing, yes.

2   Q.   So you agree that this is the mortgage that you took out

3   in order to pay into the Renaissance fund for the second

4   time; correct?

5   A.   Actually, I paid it into Milwaukee McPherson.

6   Q.   I'm sorry, I meant into Milwaukee McPherson, you're

7   correct.  And it reflects that the principal amount is

8   $450,000; correct?

9   A.   Yes.

10  Q.   And the interest rate was 36 percent.  Isn't that

11  correct?

12  A.   That is correct.

13  Q.   And the term of the loan was, what, do you recall?

14  A.   Not without reading through it.

15  Q.   Well, would it make sense that it matures on January 17,

16  2013?

17  A.   Yes.

18  Q.   Okay.  And it was made October 17th of 2012; right?

19  A.   Correct.

20  Q.   So that's relatively short-term investment; correct?

21  A.   Correct.

22  Q.   Relatively high interest; correct?

23  A.   Very much so.

24  Q.   And you had high-interest payments that needed to be

25  made on that loan; correct?

1    A.    Correct.

2    Q.    And, in fact, those payments were about $13,500 per

3    month; isn't that right?

4    A.    That is correct.

5    Q.    And those were heavy-duty payments for you to make in

6    your metal stamping business; right?

7    A.    Correct.

8    Q.    And you directed Carlos to pay two of those interest

9    payments to ALSJ, Inc.; didn't you?

10   A.    The first two, you say?

11   Q.    Yes, the first two.

12   A.    I think I asked him if he would.

13   Q.    Okay.  And he did so; right?

14   A.    Not that I recall.  I mean, I'm not saying that it's

15   impossible.  But as part of the -- as part of the deal, I may

16   have said I'll take this out for the two months if you pay

17   it.  But I don't recall Carlos paying those payments.

18   Q.    Well, nobody ever came back to you for those first two

19   months of payments; right?

20   A.    Like I said, I don't recall making those payments.

21   Q.    Okay.  And no one -- and ALSJ, Inc., never sought to

22   collect those first two interest payments from you; did they?

23   A.    When we -- when we closed out the account, there was no

24   balance.

25   Q.    Okay.  So it's fair to say that Carlos Meza paid those

1    first two payments for you; correct?

2    A.    I would have to see the documentation.

3    Q.    Well, you didn't pay them; right?

4    A.    I can't say that I didn't.  Those were stressful times

5    for me.

6    Q.    I didn't quite hear you.  Did you say you can't say that

7    you didn't or you can't say that you did?

8    A.    I can't say that I didn't make those payments.  I'd have

9    to see the paperwork.

10   Q.    Do you have proof that you did make those payments?

11   A.    I'd have to go back and look.

12         MR. KUTNICK:  One moment, please, your Honor.

13   BY MR. KUTNICK:

14   Q.    So just to recap for a second, you paid the 200,000 in

15   May of 2012; correct?

16   A.    Correct.

17   Q.    You paid the 80,000 in June of 2012; correct?

18   A.    Correct.

19   Q.    Carlos promised you that you would see a return on the

20   investment in 60 days, and you did not see it; correct?

21   A.    Correct.

22   Q.    Yet, he comes to you and asks you for another 400,000,

23   money you don't even have on hand, and you agree to go ahead

24   and more than double your initial investment; correct?

25   A.    Not quite double, but the 80 and the -- the first

1   200,000, yeah, it would have been double.

2   Q.   Your math is better than mine, Mr. Spencer.  So, you're

3   right, not quite double, but you know what I'm saying.

4   Despite that, you still decided to invest the additional

5   400,000; correct?

6   A.   I did.

7   Q.   And then, in April of 2013, there was a third

8   investment; wasn't there?

9   A.   Correct.

10  Q.   This was the one for $50,000 that he had -- well, he had

11  asked for 50,000, you ended up paying 40; correct?

12  A.   Right.

13  Q.   Now, this investment had -- it was not with Renaissance

14  Capital Group; was it?

15  A.   It was not.

16  Q.   It was with a company called Virginia Worldwide; isn't

17  that right?

18  A.   Correct.

19  Q.   So this was not an investment that Milwaukee McPherson

20  or Carlos Meza was partnering with you on, was he, or they?

21  A.   No.  What I said earlier was that this deal, he had

22  done -- I don't know whether he had done through Milwaukee

23  McPherson or some other entity, or him personally, but that

24  he had done it, that it had paid out, the money was sitting

25  in the bank in San Francisco, and it was just a matter of a

1    few days to collect the funds.

2    Q.    So, then, your testimony is that Carlos directed you to

3    wire $40,000 directly to Virginia Worldwide's Wells Fargo

4    Bank account on April 19, 2013; correct?

5    A.    Yes.

6    Q.    Carlos, other than your testimony that he directed you,

7    it did not -- that money was not going through the Milwaukee

8    McPherson account; correct?

9    A.    That is correct.

10   Q.    And you had no written contract with Virginia Worldwide

11   for that $40,000; did you?

12   A.    I did not.

13   Q.    You just sent the money; right?

14   A.    That is correct.

15   Q.    Carlos didn't show you any kind of written contracts

16   with Virginia Worldwide; correct?

17   A.    Not that I recall.

18   Q.    In the summer of 2013, you met a person by the name of

19   Larry Gelfond; is that correct?

20   A.    In regards to what?

21   Q.    In regards to the investment with Virginia Worldwide.

22   A.    I do not recall that name or meeting anybody about

23   Virginia Worldwide.

24   Q.    So you have never met or spoken to a person named Larry

25   Galfont?

1    A.   I can't say it definitively, but I don't recall ever
2    talking -- I don't remember the name, and I don't remember
3    talking to -- was he associated with Virginia Worldwide?
4    Q.   Well, let me just move on to the next question, since
5    you answered my question.
6    A.   Was he an attorney?
7    Q.   Sir, I'm sorry, I can't answer your questions.  I'll
8    just go on and ask another question.  Okay?
9    A.   Okay.
10   Q.   Did you -- so that name, it does ring a bell.  You've
11   heard the name Larry Galfont before; right?
12   A.   It doesn't jump out.
13   Q.   You never met with a person named Larry Galfont at your
14   factory around the summer of 2013?
15   A.   About Virginia Worldwide?
16   Q.   Yes.
17   A.   I do not recall anything about that.
18   Q.   About other investments?
19   A.   No.
20   Q.   So now it was almost a year later after Carlos -- after
21   you had put up $700,000 or more --
22   A.   Right.
23   Q.   -- for this Renaissance investment.  And you were really
24   steamed; right?
25   A.   I was upset.  I was probably more nervous than I was

1   upset.

2   Q.   You were frustrated?

3   A.   Frustrated is a good word.

4   Q.   You kept getting -- you kept getting reasons from Carlos

5   as to why the money wasn't coming in?

6   A.   Correct.

7   Q.   Those reasons were not satisfying to you; were they?

8   A.   No.

9   Q.   You wanted to get your own answers; didn't you?

10  A.   I did.

11  Q.   And you contacted, on your own, this person by the name

12  of Robert Adams; correct?

13  A.   I did.

14  Q.   You found him yourself; right?

15  A.   Yes.

16  Q.   You didn't ask Carlos, hey, where is Bob Adams, how can

17  I talk to him, you actually went around Carlos.  I'm going to

18  talk to this guy one-on-one; correct?

19  A.   Correct.

20  Q.   And you did track him down; didn't you?

21  A.   I did.

22  Q.   And this is when you said you had the three-way call, he

23  three-way called in Carlos and something about the fact that

24  Carlos wasn't supposed to use third-party funds; correct?

25  A.   Correct.

1    Q.   Okay.  But that didn't get you your answers; did it?

2    A.   No.

3    Q.   You had more conversations with Robert Adams; didn't

4    you?

5    A.   I did.

6    Q.   And Robert Adams gave you similar assurances about the

7    return of the money; didn't he?

8    A.   Absolutely not.

9    Q.   He showed confidence that this was something that could

10   work; isn't that right?

11   A.   No.

12   Q.   Well, did he tell you that the money was gone, you were

13   never going to see it again?

14   A.   Yes.

15   Q.   Did he explain to you where the money had gone?

16   A.   Yes.

17   Q.   Okay.  And it was not to Carlos Meza; correct?

18   A.   No.

19   Q.   Meaning, no, it was not to Carlos Meza; right?

20   A.   Right.

21   Q.   Okay.  So after you had given this over -- you gave a

22   total of over $700,000, some of it through Renaissance, some

23   of it through Virginia Worldwide, and you had no written

24   assurances whatsoever; correct?

25   A.   That is correct.

Spencer - cross by Kuchnek

1    Q.   Is it your belief that a large portion of your money
2    did, in fact, go to Renaissance?
3    A.   I had a conversation with Bob Adams, and he told me
4    where the money went.
5    Q.   Okay.  And it was to Renaissance; right?
6    A.   It went through Renaissance.
7    Q.   Okay.  And then another -- the other portion, the 40,000
8    from April of 2013, that -- that had nothing to do with
9    Renaissance; right?
10   A.   That is correct.
11   Q.   And none of that money went to Carlos or Milwaukee
12   McPherson; did it?
13   A.   That, I have no idea.
14   Q.   You don't know what happened to it after you wired it
15   directly to Virginia Worldwide?
16   A.   I do not.
17   Q.   In your investigation of Robert Adams and Renaissance,
18   did you become aware of a lawsuit that was pending in
19   Atlanta, Georgia federal court against Robert Adams and
20   Renaissance?
21            MR. YOUNG:  Objection, relevance.
22            THE COURT:  Let's take a sidebar.
23        (At sidebar outside the hearing of the jury.)
24            THE COURT:  I should know what that is, I don't
25   remember.

| | |
|---|---|
| 1 | MS. ZARDKOOHI:  We talked about it. |
| 2 | MR. KUTNICK:  Yes, we did.  We talked about there |
| 3 | was a lawsuit that similar victims filed against Renaissance |
| 4 | Group in Atlanta.  I believe that the witness is aware of it. |
| 5 | I think he became aware of it during his investigation of -- |
| 6 | THE COURT:  Okay.  So how would it be relevant? |
| 7 | MR. KUTNICK:  To show that he was aware or became |
| 8 | aware of the fraudulent nature of the investment through |
| 9 | somebody besides Robert Adams. |
| 10 | THE COURT:  This is after he made the investment? |
| 11 | Long after? |
| 12 | MR. KUTNICK:  Yes, it was after he made the |
| 13 | investment. |
| 14 | THE COURT:  So how would it be relevant as to -- I |
| 15 | mean, what issue in this before me and this jury would it be |
| 16 | relevant to in terms of the charges? |
| 17 | MR. KUTNICK:  It's to show that Carlos -- that, |
| 18 | first of all, it's going to our defense that Carlos did not |
| 19 | intend to defraud, did not have knowledge of the fraudulent |
| 20 | scheme.  That Bob Adams was basically doing this all over the |
| 21 | country, and that -- I wasn't going to go that far because I |
| 22 | don't have all that proof, but, I mean, I have proof of the |
| 23 | lawsuit in Atlanta.  So that's the relevance of it. |
| 24 | MR. YOUNG:  I would just add, your Honor, it would |
| 25 | also be hearsay objection as well, to the extent he is |

1    offering it for the proof of that.  A complaint is simply
2    allegations.
3            THE COURT:  Well, that's right.
4            MR. KUTNICK:  It wouldn't be for the proof of the
5    matter asserted, it would be for the fact on the witness, I
6    suppose.
7            MR. YOUNG:  That goes back to relevance.
8            THE COURT:  Yeah, no, I'm going to sustain it.
9        (Proceedings in open court in the hearing of the jury.)
10            MR. KUTNICK:  Just one moment, please, your Honor,
11   thank you.
12   BY MR. KUTNICK:
13   Q.   I just want to touch on a couple things I might have
14   missed over quickly.  You also had Carlos do a job for you.
15   You owned a property at 14 Lake Marian Road in
16   Carpentersville; correct?
17   A.   Correct.
18   Q.   And you had, was there a problem with the title on that
19   property?
20   A.   When we -- if I recall correctly, when we went to get
21   the -- the title ready to be able to mortgage it, I believe
22   there was some minor problem with it, yeah.
23   Q.   Okay.  And you asked Carlos to clean the title on that
24   property for you; correct?
25   A.   Carlos said that he could do it.

1   Q.   Okay.  And you never specifically paid him for that job;
2   did you?
3   A.   No.
4   Q.   You have a son named Ryan; right?
5   A.   I do.
6   Q.   And you -- and for a time during this period of time of
7   the investments between, let's say, you know, the spring of
8   2012, through the summer of 2013, Ryan was tagging along with
9   Carlos; right?
10  A.   Correct.
11  Q.   He was learning Carlos' business; right?
12  A.   Yeah, it's -- he was supposed to be somewhat of an
13  apprentice-type position.
14  Q.   And did you ever have any conversations with Ryan about
15  the Renaissance investments?
16  A.   I know that he was aware of it.  I don't know that we
17  spent any time talking about the specifics.
18  Q.   Did Ryan ever tell you that he -- well, strike that.
19       Just one other thing that I missed regarding the
20  Performance Crane and Excavating LLC.  You actually went
21  in -- entered into a partnership agreement; right?  Not a
22  partnership agreement, it was a membership statement, where
23  you included Carlos as a member of that -- that company, that
24  venture; correct?
25  A.   LLC?

1    Q.    LLC, correct.

2    A.    I think I did, yeah.

3    Q.    Okay.  I'm going to show you what I've marked as

4    Defendant's Exhibit No. 16 for identification.  Could you

5    take a look at that and tell us what that is, please?

6    A.    Yeah.  This is the establishment of an LLC, a resolution

7    for the LLC.

8    Q.    And that was relating to your creation of an LLC to

9    basically purchase the crane; correct?

10   A.    Well, the -- it was more than that.  It was going to be

11   purchase and operate and sell the services of a crane.  You

12   had mentioned Doug Pitt, he was going to operate the crane.

13   And at the time there was a lot of activity requiring a crane

14   in the Williston area.  And so this was the establishment of

15   what we hoped to be a viable company.

16   Q.    And there are three people named -- as members of that

17   LLC; correct?

18   A.    Right.

19   Q.    Yourself, Carlos Meza, and a third individual; correct?

20   A.    Yes.

21   Q.    So after all this -- after the first investment, the

22   second investment, the third investment, you continued to do

23   those because you believed that Carlos was sincere about

24   these investments; correct?

25   A.    Sincere is probably not the right word.  Qualified would

1  be one term.  That he had a substantial amount of wealth,

2  would be another pillar of that.  And that I trusted him to

3  be the third pillar.

4  Q.  By the way, you learned that Robert Adams was also a

5  member of the church; right?

6  A.  I did.

7  Q.  And so you have a trusting relationship with him for

8  that reason, too; right?

9  A.  I had two phone calls with him.  That's all I had.

10  Q.  But it gave you some reassurance that he was a member of

11  the church; didn't it?

12  A.  I don't know at what point I found that out.  So, you

13  know, whether it was before or after I had done the deal, I

14  couldn't say with certainty.

15  Q.  In all of your dealings with Carlos, you never saw any

16  evidence that he was aware that your money was going to be

17  taken; did you?

18      MR. YOUNG:  Objection, your Honor.  Foundation.

19  Argumentative as well.

20      THE COURT:  I'll let him answer.

21      THE WITNESS: Please repeat the question.

22  BY MR. YOUNG:

23  Q.  And I'll try to be -- you had many, many meetings with

24  Carlos; right?

25  A.  Yes.

1    Q.    The restaurants, and his house, and your factory, and
2    the church.  And in all of these -- and you had many, many
3    phone conversations with him, too; correct?
4    A.    Right.
5    Q.    And in all of these dealings with him, you never heard
6    anything to make you believe that Carlos was aware that you
7    were never going to get your money back; do you?
8    A.    Other than the conversation I had with Bob Adams where
9    he said that he did not receive all the money that I sent
10   him.
11   Q.    Okay.  But you did learn that Bob Adams received a very
12   large portion of the money that you had sent; correct?
13   A.    Correct.
14             MR. KUTNICK:  Can I have one moment, please, Judge?
15             THE COURT:  Yes.
16             MR. KUTNICK:  Your Honor, I have no further
17   questions of this witness.  However, I would ask that the
18   identifying marks be stricken from these two exhibits I
19   showed him and that they be admitted as evidence.
20             MR. YOUNG:  Well, your Honor, I would object to the
21   admission of defendant's exhibits being admitted in our case.
22             THE COURT:  All right.  We will take that up later.
23   Any more questions?
24             MR. YOUNG:  A few follow-up questions, your Honor.
25             THE COURT:  Okay.

1    REDIRECT EXAMINATION

2    BY MR. YOUNG:

3    Q.   Mr. Kutnick had asked you about a conversation with Bob

4    Adams, and you indicated that Mr. Adams had told you that you

5    had not received all of -- that he had not received all of

6    your money.  What was your understanding of what happened to

7    the $280,000 that you gave or wired to the defendant's

8    company in May and June of 2012?  Where did you think that

9    was going?

10   A.   Where did I -- I thought it was all going to -- the

11   250,000, plus fees was going to go to Renaissance.

12   Q.   Did the defendant ever have any discussions with you

13   that he was not sending all of that money to Renaissance

14   Capital?

15   A.   He did not.

16   Q.   Did the defendant ever have any discussions with you

17   telling you that he was using that money for other purposes,

18   his own purposes?

19   A.   He did not.

20   Q.   Would that have affected your decision regarding --

21   affected your decision to invest in this transaction if you

22   had known that?

23   A.   Absolutely.

24   Q.   Counsel also asked you why in October of 2012, you gave

25   another $400,000 to defendant's company after not having

1  received returns on your $200,000 investment in May and your

2  $80,000 investment in June.  Would you have provided that

3  additional $400,000 in funds to defendant's company had you

4  known that your entire $280,000 investment from earlier that

5  year had not been sent to Renaissance Capital?

6  A.  I would not have.

7  Q.  Counsel also asked you on cross-examination, and you

8  agree, that there was no specific documentation as to what

9  was going to happen to the money.  Were you referring to once

10  it was invested in these trading programs -- were you

11  referring to -- you didn't understand what was going to

12  happen to once it was invested in these trading programs?

13  A.  Right, I didn't understand the mechanics of any of that

14  international trading.

15  Q.  He also asked you about recordings.  Did the defendant

16  ever share any recordings with you?

17  A.  Not that I recall.

18  Q.  Did he ever tell you that he was recording conversations

19  with Mr. Adams or others?

20  A.  No.

21  Q.  Would you have been interested to know that at the time?

22  A.  I mean, the driver of this whole thing was that, that

23  I -- you know, I trusted Carlos to do what he said that he

24  could do, and that was the driver through the whole thing.

25  Q.  You said on direct nothing -- or you agreed that nothing

1   is guaranteed in business in general.

2   A.   Correct.

3   Q.   Do you think this was a guaranteed deal?

4   A.   I entered into this agreement because Carlos said that

5   my initial investment was 100 percent guaranteed.

6           MR. YOUNG:  No further questions, your Honor.

7           THE COURT:  Any more?

8                      RECROSS EXAMINATION

9   BY MR. KUTNICK:

10  Q.   And you accepted that 100 percent guaranty without any

11  written assurances from Carlos or anybody else?

12  A.   Correct.

13          MR. KUTNICK:  Nothing else, Judge.

14          THE COURT:  All right.  You're excused.  Thank you.

15          THE WITNESS:  Thank you.  What do I do with these?

16      (Witness excused.)

17          THE COURT:  You can call your next witness.

18          MR. YOUNG:  May I recover the exhibits, your Honor?

19          THE COURT:  Yes, you may.

20          MS. KLAMANN:  Your Honor, the government calls

21  Mr. Cordell Crane.

22      (Witness sworn.)

23         CORDELL CRANE, GOVERNMENT'S WITNESS, SWORN,

24                      DIRECT EXAMINATION

25  BY MS. KLAMANN:

1   Q.   Good afternoon.

2   A.   Hi.  Good afternoon.

3   Q.   Please state your name for the jury.

4   A.   Cordell Crane.

5   Q.   And can you spell that name for the court reporter,

6   please?

7   A.   Sure.  C-o-r-d-e-l-l, C-r-a-n-e.

8   Q.   Mr. Crane, in what city and state do you live?

9   A.   Crystal Lake, Illinois.

10  Q.   How long have you lived in Crystal Lake?

11  A.   About more than 25 years.

12  Q.   What do you do for a living?

13  A.   I'm in IT sales and services.

14  Q.   How long have you been in IT sales?

15  A.   Some form or another most of my career, so 20 plus

16  years.

17  Q.   And are you married?

18  A.   Yes, I am.

19  Q.   How long have you been married?

20  A.   I'm in my 30th anniversary, so going on 31.

21  Q.   Congratulations.

22  A.   Thanks.  Married very young, so.

23  Q.   Do you and your wife have any children?

24  A.   We do.  We have seven children.

25  Q.   That's a busy household.

1   A.   It is.

2   Q.   Do you know the defendant in this case, Carlos Meza?

3   A.   I do.

4   Q.   Do you see him here in court today?

5   A.   I do.

6   Q.   Can you identify him for the jury?

7   A.   He is the gentleman sitting at the end of the desk

8   there, on the left-hand side, with the glasses.

9        MS. KLAMANN:  Your Honor, may the record reflect

10  that the witness has correctly identified the defendant,

11  Carlos Meza?

12       THE COURT:  Well, technically, no.  There is at

13  least two people sitting over at the table with glasses, so.

14       MR. KUTNICK:  Your Honor, he said left, so I would

15  stipulate that it was an identification.

16       THE COURT:  Okay.  All right.

17       THE WITNESS:  I can be more detailed, if you'd

18  like?

19       THE COURT:  That's all right.  Go on.

20  BY MS. KLAMANN:

21  Q.   Mr. Crane, how do you know the defendant?

22  A.   Mr. Meza and I met through church services.

23  Q.   What church is that?

24  A.   The Church of Jesus Christ of Latter-Day Saints.

25  Q.   Are you both members of that church?

 1   A.   Yes.

 2   Q.   And when did you meet the defendant?

 3   A.   Around the end of 2000, beginning of 2001, we started to

 4   get to know each other, I believe, when they moved in the

 5   area.

 6   Q.   Did you socialize with the defendant outside of church

 7   services?

 8   A.   Afterwards, yes.  In the beginning, it was primarily

 9   through church, yes.

10   Q.   Would you say you were friends with defendant?

11   A.   Oh, yes, definitely.

12   Q.   Were your families friends?

13   A.   Very much so, yes.  Our children played together, knew

14   each other.  Our wives were good friends, and we were

15   friends.

16   Q.   Do you know the defendant's wife's name?

17   A.   I do.

18   Q.   What is it?

19   A.   Dwinell.

20   Q.   What is your understanding of what defendant does for a

21   living?

22   A.   My understanding is that he has kind of a broker service

23   sometimes, that he does real estate, he has trucking

24   business.  He told me once how he bought salt, you know, for

25   the state, or things like that, and some trucking business.

1    So just a lot of different things, and investments as well.

2    Q.   Was it your impression that defendant was successful?

3    A.   Yes.

4    Q.   Why did you think he was successful?

5    A.   He said so.  And then he said he had a large net asset

6    worth, definitely.  Much more beyond the house that he lived

7    in.

8    Q.   Has defendant ever asked you to invest any money with

9    him?

10   A.   Yes.

11   Q.   And did you invest with defendant?

12   A.   Yes, I did.

13   Q.   How many investments did you make total with defendant?

14   A.   Three main investments.

15   Q.   When you say "main investments," what do you mean?

16   A.   Well, there would be some add-ons that were necessary to

17   continue the process that he said was required.  Otherwise,

18   it would have been in jeopardy.

19   Q.   So not necessarily three payments; is that right?

20   A.   Correct.  Correct.

21   Q.   How much money total did you invest with the defendant?

22   A.   Approximately $330,000.

23   Q.   Okay.  Let's talk about your first investment.

24   Directing your attention to August 2011.

25   A.   Yes.

1    Q.   At or around this time, did defendant approach you about

2    an investment?

3             MR. KUTNICK:  Objection, your Honor, relevance.

4    Could I be heard, your Honor?

5             THE COURT:  I guess.

6             (At sidebar outside the hearing of the jury.)

7             MS. ZARDKOOHI:  This is, I believe, August 2011, or

8    2011, loan that is outside of the scheme, alleged scheme.

9    It's not an investment through Renaissance or through

10   Virginia Worldwide or Carso.  It's happening about six to

11   eight months, to a year, maybe, before.  I don't know the

12   exact date of the loan.  But it's not related to the scheme

13   whatsoever.

14            THE COURT:  Okay.  Tell me why it's not relevant.

15            MS. KLAMANN:  I am not going to go into a whole lot

16   of detail about it, but it is referenced in one of the

17   documents that discusses the other loans, so it's just

18   background information, your Honor.

19            MS. ZARDKOOHI:  I do understand, I saw that, that,

20   this reference.  But we would be happy to admit that the

21   other document, without going into that section, one that

22   talks about the old loan.

23            MR. YOUNG:  It's not just that it's background,

24   your Honor, I mean, it explains that he later on, when he

25   approaches the -- about the Renaissance investment, he is

1    saying that the proceeds of that essentially it's all wrapped

2    into together in paying back.  So it's just sort of like

3    telling the story so they understand.  Our concern is that

4    the jury won't quite understand what that is a reference to.

5              THE COURT:  And it's something that they're going

6    to see in and of --

7              MR. YOUNG:  In another document that encapsulates

8    sort of the investments that were charged in the scheme.  If

9    counsel perhaps doesn't have an objection to us going to the

10   later transaction and then just in that context explaining

11   sort of what in a portion of the document is a reference to,

12   that may be another --

13             MS. ZARDKOOHI:  Say it's an old loan.

14             MR. KUTNICK:  Unrelated to --

15             MS. ZARDKOOHI:  Unrelated to.

16             MR. KUTNICK:  -- the current investment.

17             THE COURT:  All right.  Well, you could do that,

18   then.  I mean, it -- I would certainly like to do whatever

19   might expedite this.  I don't see that we're adhering to the

20   schedule that you thought, so.

21             MS. ZARDKOOHI:  I think --

22             THE COURT:  I don't want to spend time on something

23   that would only confuse them, but.

24             MR. KUTNICK:  It's not part of the scheme, and it

25   could be just confusing that it's -- could be mixed up with

1    those funds that he later invests.

2              THE COURT:  All right.  Well, the government

3    suggested a way around that.

4              MR. KUTNICK:  We're okay with that.

5              THE COURT:  Okay.  Do that.

6         (Proceedings in open court in the hearing of the jury.)

7    BY MS. KLAMANN:

8    Q.   Mr. Crane, I'm actually going to direct your attention

9    to September 2012, to your second investment.  And we will

10   talk about the first one briefly a little bit later.

11   A.   Okay.

12   Q.   At or around this time, again, September of 2012, did

13   you have a conversation with defendant about an investment?

14   A.   Yes.

15   Q.   Was this an in-person conversation?

16   A.   Yes.

17   Q.   Where did this conversation take place?

18   A.   First it occurred at church, and then we had

19   conversations with him in his vehicle and in his home on

20   occasion.

21   Q.   The initial discussion about the investment, where did

22   that take place?

23   A.   I believe it was in church, yes.

24   Q.   Did anyone else participate in that conversation?

25   A.   No.

1    Q.   Tell us about that initial discussion.

2    A.   So Mr. Meza said that he had a sure-thing investment for

3    me with an associate of his where he recently had -- Bob

4    Adams with Renaissance Capital.  He had an investment that

5    would be highly helpful for my family and me, yield a good

6    return and happen very quickly.  So he -- he asked me, said,

7    hey, this is a great thing to get into, I think you should do

8    this, I'm doing this for you and your family.  And we

9    proceeded forward.

10   Q.   How much money did defendant ask you to invest?

11   A.   $50,000.

12   Q.   What did defendant tell you about the investment?

13   A.   That it was with this gentleman I mentioned, with Bob

14   Adams and Renaissance Capital.  That that was his partner.

15   That they -- he was working together with him to -- it had

16   opportunities for some international investing and trading.

17   Q.   What did the defendant tell you about the returns you

18   would receive on this investment?

19   A.   Initially it was that I'd receive about 20 to 30 percent

20   return on my money in just a few months.

21   Q.   And what, if anything, did defendant tell you about

22   securing this investment?

23   A.   He gave me his personal assurance, since we were good

24   friends, that he would do nothing to hurt or harm my family.

25   And then as I talked to him more about it, I wanted some more

Case: 1:17-cr-00281 Document #: 74 Filed: 01/18/19 Page 111 of 134 PageID #:444
Crane - direct by Rasmann
111

1  assurances, and he offered a property on Ravenswood in
2  Chicago, to put a lien on it, that would also assure my
3  investment to make sure that if anything happened it would
4  still be safe.
5  Q.   You touched on this, but what did defendant tell you
6  about the risk associated with your investment?
7  A.   Basically that there was no risk because of those
8  guaranties.  He had the property in hand that would mitigate
9  any other risk that was involved with it, and that it was a
10 sure thing for me and my family.
11           Again, we had a longstanding friendship, and we had
12 strong associations in our church, in our faith.  And he
13 would remind me of that, and of his position in the church
14 and what he did; and that he wouldn't do anything to put my
15 investment at risk with my family.  He loved my daughter,
16 Sara.  He mentioned her often by name and say, hey, I would
17 never do anything to hurt your little girl.  And talk in
18 things of that manner.
19 Q.   Did defendant tell you that any part of your money would
20 go anywhere other than to Renaissance Capital Group?
21 A.   No.  That it was part of the Bob Adams investment,
22 definitely, 100 percent.
23 Q.   Did defendant tell you that he would spend any portion
24 of your money on his business or personal expenses?
25 A.   No, he did not.

1  Q.  Was this investment memorialized in writing?

2  A.  It was.

3  Q.  By whom?

4  A.  By both of us.  We both signed a document that Mr. Meza

5  provided.

6  Q.  Mr. Crane, I'm showing you a document that I have marked

7  as Government's Exhibit CC-3.  Take a moment to review that.

8  A.  I recognize it.  I know it well.

9  Q.  Have you seen Exhibit CC-3 before?

10  A.  I have.

11  Q.  When was the first time you saw it?

12  A.  It would be on or around this date of September 10,

13  2012.

14  Q.  What is Exhibit CC-3?

15  A.  It's an agreement between Mr. Meza and myself for the

16  investment of $50,000.  It would go through his company,

17  Milwaukee McPherson.  And then it also stipulates that it

18  would be protected with the property on Ravenswood.

19  Q.  Did you create Exhibit CC-3?

20  A.  No.

21  Q.  Is that your signature on Exhibit CC-3?

22  A.  Yes, it is.

23          MS. KLAMANN:  Your Honor, government moves to admit

24  Government Exhibit CC-3 and request permission to publish.

25          MS. ZARDKOOHI:  No objection.

1    THE COURT:  It's admitted.  You may publish.

2    (Said exhibit received in evidence.)

3    BY MS. KLAMANN:

4    Q.    Mr. Crane, Government Exhibit CC-3 lists Milwaukee

5    McPherson LLC on the top.  At the time you signed this

6    agreement, what did you think Milwaukee McPherson LLC was?

7    A.    It's one of the main businesses that Mr. Meza was a

8    proprietor of.

9    Q.    And the exhibit is dated September 10, 2012.  Is that

10   around the time that you recall having discussions with

11   defendant about a $50,000 investment?

12   A.    Yes.

13   Q.    I want to read the exhibit.  The first paragraph states:

14   "Milwaukee McPherson LLC will guaranty a return of 20 percent

15   through 30 percent on your investment in the amount of

16   $50,000 by December 1st, 2012."

17       What did you understand Exhibit CC-3 to mean when

18   it states that, "Milwaukee McPherson will guaranty a return"?

19   A.    So that by my giving Mr. Meza $50,000, I would have

20   approximately 60, $65,000, or more, back by December, be

21   getting a 20 to 30 percent return on my money.

22   Q.    Did you understand that language meant you would

23   definitely receive your money back?

24   A.    Yes.

25   Q.    Was that understanding based on statements made to you

1   by the defendant?

2   A.   Yes.

3   Q.   Exhibit CC-3 also indicates your investment was secured

4   by a property located at 6152 North Ravenswood.

5   A.   Yes.

6   Q.   Is that the property you mentioned earlier that

7   defendant told you he would use as security for your

8   investment?

9   A.   Yes, it is.

10  Q.   What kind of property was that?

11  A.   I think a townhome, apartments complex.

12  Q.   During the discussions you had with defendant about this

13  investment, did defendant tell you how much that property was

14  worth?

15  A.   I think when I researched it -- I don't recall him

16  telling me how much it was worth.  But the reason there is

17  some splotches on this page is because I did a little

18  research, and it seemed to be in excess of $200,000 at the

19  time, easily.  229, if I remember correctly.

20  Q.   Did you ultimately invest $50,000?

21  A.   I did.

22  Q.   How did you make that payment?

23  A.   It was a wire transfer to Mr. Meza's account with

24  Milwaukee McPherson and his bank.

25  Q.   How did you know where to wire the money?

1    A.    He told me where to wire it.  He gave me instructions.

2    Q.    What caused you to decide to invest with the defendant?

3    A.    Well, this is where he said he was bringing me into his

4    business, you know, which he had been somewhat quiet about.

5    But that due to our friendship and the challenges with, well,

6    first investment, that this was a sure thing for me and my

7    family to help us out.

8    Q.    Did the fact that defendant personally guaranteed your

9    investment impact your decision?

10   A.    Absolutely.

11   Q.    Would you have invested if you had known that part of

12   your money would be used for defendant's personal or business

13   expenses?

14   A.    Absolutely not.

15   Q.    Did you receive your promised return by December 1st,

16   2012?

17   A.    No, I did not.

18   Q.    Did you ever receive any money back on your $50,000

19   investment?

20   A.    No.

21   Q.    Did you have conversations with defendant after the

22   deadline of December 1st, 2012, about your returns?

23   A.    Yes, I did.

24   Q.    Do you remember every specific conversation you had, or

25   do you have more of a general recollection of those

1  discussions?

2  A.   Definitely more general recollection.  There are many.

3  Q.   Approximately how many conversations did you have with

4  the defendant after the deadline?

5  A.   It would be dozens.  I mean, a dozen, or two.  Usually

6  every day after church he would pull me aside and give me

7  updates on things, and we'd have conversations in his car.

8  When I say every day, I mean every Sunday, when we'd meet at

9  church.  So that's when I'd usually get updates, or he would

10  pull up in front of my house, and I would go out and sit in

11  his car, he would give me updates, things like that.

12  Q.   So these were in-person conversations?

13  A.   They were, yes.

14  Q.   And you said they took place at church or in defendant's

15  car?

16  A.   Yes.

17  Q.   Did anyone else participate in any of these

18  conversations?

19  A.   No.

20  Q.   What do you generally recall defendant saying about the

21  returns on your $50,000 investment during these discussions?

22  A.   Well, in the beginning, everything looks fine.  It's

23  right.  But as soon as the due date happens, there is

24  problems with Mr. Adams, with the money and Renaissance

25  Capital.  There is challenges.  And there is all a myriad of

1    the different excuses as to why the money didn't come

2    through.

3    Q.    During these discussions, did you ever ask defendant to

4    sell the property at 6152 North Ravenswood?

5    A.    No.

6    Q.    At any point in these conversations did defendant

7    express doubt that Bob Adams would pay the returns?

8    A.    Towards the end he did complain about Bob Adams to a

9    degree.  But he also told me he had insurance on this deal

10   and that it would come through eventually so I would get

11   every penny back, as well as his personal guaranty.  So

12   that's how he dealt with it.

13   Q.    Did you understand that defendant had insurance or Bob

14   Adams had insurance?

15   A.    I believed it was the defendant that had insurance on

16   this investment, yes.

17   Q.    Okay.  Let's move now to July 2013.  At or around this

18   time, did you have a discussion with the defendant about a

19   second investment?

20   A.    Yes.

21   Q.    Where did that discussion occur?

22   A.    In his car.

23   Q.    Was there anyone else present?

24   A.    No.

25   Q.    How did that discussion begin?

1    A.   It began -- well, we -- we had talked about my career,

2    and unfortunately what -- let's see, that I had lost my job.

3    And then he got a phone call from Terry Barnes, and I saw it

4    on the caller ID, and that there was this incredible

5    opportunity if we moved right away to have a great return

6    that would help me with my family so that I wouldn't have to

7    work again and I wouldn't have the pressures of what would

8    happen, you know, by not being employed.  So that's what --

9    how the conversation started.

10   Q.   What happened after the phone call?

11   A.   So after the phone call, he started asking me all

12   different ways of where he could get the money, $250,000 that

13   would guaranty a great return.  He asked me if my father

14   could invest in the money.  I said I'm not comfortable, I

15   will not go to my father for this.  And then I said, I'm

16   unemployed, Carlos, I can't give you the money, I don't have

17   it.  And we kept talking.  And eventually my retirement funds

18   came up.  And because, when you are unemployed, you have

19   access to your funds for up to three months, and that I could

20   get the funds, invest, and before they were due back into my

21   retirement fund account, he would have -- at least the

22   initial return would be there so that I wouldn't have any

23   risk in my investment.

24   Q.   And this was during your initial conversation in

25   defendant's car about the investment?

1   A.   Yes.

2   Q.   During that discussion, did defendant tell you anything

3   about the risk associated with this investment?

4   A.   No.

5   Q.   Did you discuss with defendant at that time that you had

6   already given him $50,000 for which you had not been paid?

7   A.   Yes.

8   Q.   What was his response?

9   A.   His response was that he knew there was problems with

10  the Bob Adams investment, that this was his chance to make

11  everything right, to pay everyone back the money that he owed

12  them, including myself, and that this is -- he now knew how

13  to do these investments on his own, and he could control

14  100 percent of this investment to make sure that it would go

15  through, no problem, so.

16  Q.   Did he indicate how he could 100 percent control the

17  investment?

18  A.   No.

19  Q.   After this initial conversation where you declined to

20  invest more, did you have additional discussions with

21  defendant about this investment?

22  A.   Yes.

23  Q.   Approximately how many conversations?

24  A.   At least half a dozen, or so, regarding it.

25  Q.   So half a dozen conversations over how long a period of

1    time?

2    A.   Well, I would say probably a two-week period.

3    Q.   Were these conversations in person or over the phone?

4    A.   In person.

5    Q.   Where did these conversations take place?

6    A.   With Mr. Meza in his vehicle.  And sometimes -- I think

7    a couple were in his basement where he had his office set up,

8    and then at church.  We would discuss after church, too.

9    Q.   Anyone else present for these conversations?

10   A.   No.

11   Q.   Do you have a specific recollection of every single one

12   of these conversations, or more of a general recollection?

13   A.   General recollection.

14   Q.   Who typically initiated these conversations?

15   A.   Mr. Meza.

16   Q.   Tell us what was said during these discussions.

17   A.   So, again, he would -- he would use every aspect of my

18   life, of my family, my situation, that, what I'm in, and how

19   he wanted to help me with -- this was one that was -- we

20   spoke in both Spanish and English because, you know, I lived

21   in South America for a couple years.  So part of the

22   friendship between Mr. Meza and myself was that connection

23   with the Spanish culture, the culture down in South America,

24   soccer, things like that, and talking.  So we talked both

25   languages, *cien por ciento*, 100 percent chance that this

1    investment would go forward, and it is there to make good on

2    everything that had gone wrong before.  And that if he could

3    get this right away, we could take care of it, even while my

4    wife was on vacation visiting my family in California.  That

5    by the time she got back, we could get the first return and

6    everything would be great.  And, you know, it would basically

7    turn my life around at that point.  Again, we're talking 12

8    plus years of friendship together, you know, and direct

9    church association, vacationing together, all those things,

10   with families.  My wife even put his wife on as a reference,

11   you know, and referral for things that she did.  So it's

12   like, we were as close as you could pretty much be as

13   friends.  And all that was mentioned.  Along, again, you

14   know, he loved my daughter, Sara, particularly out of all my

15   kids, that this was all for them and for me to make sure that

16   things were good going forward for my family.

17              He said he had access to professional traders that

18   were very, you know, hard to find, so to speak, you know,

19   top, elite, in the world.  That these were kind of the trades

20   that go on behind the trades, you know, in this inner circle

21   that he has access to.

22              He mentioned later on that some of these had to do

23   with t-bills being hedged overseas, you know, when the t-bond

24   market was changing, very fluctuant back in that time.  So

25   every aspect of my life was used to show that this would be a

1    good investment for me, you know.

2    Q.   What, if anything, did defendant tell you about the risk

3    associated with this investment?

4    A.   Like I said, *cien por ciento*, 100 percent, this is a

5    deal.  He had full control.  My monies would be used as

6    collateral in an attorney IOLTA account so they would not be

7    at risk with the funds.  That way that he could be sure I

8    could get back my money and it would always be available to

9    me.

10   Q.   Did you discuss during these conversations how you would

11   come up with the money to invest $250,000?

12   A.   Yes, because I didn't have it.  I said the only way I

13   could do this, Carlos, is through my retirement funds and my

14   future education fund for my children, you know, to get the

15   money.  That would be the only way it could happen.  And I'd

16   have to have the money back within three months; otherwise,

17   there is absolutely no way.

18   Q.   What was defendant's response to that?

19   A.   That that would not be a problem, he could definitely --

20   he could assure that I would at least get back that first

21   payment to cover my initial investment as things matured.

22   And that was written in our document, too, as you'll get to,

23   I'm pretty sure, but.

24   Q.   Did you ultimately agree to make this investment?

25   A.   Unfortunately I did, yes.

1    Q.    What caused you to invest again with defendant?

2    A.    As I've -- yeah, it was -- it was really about that

3    trust that you develop over years, and his saying that he

4    would not --

5                 THE COURT:  This is getting repetitious.

6    A.    He would not allow --

7                 THE COURT:  Counsel, you've already asked that.

8    BY MS. KLAMANN:

9    Q.    How much did you agree to invest?

10   A.    $250,000.

11   Q.    Where did you get the money?

12   A.    From my retirement fund, my 401ks.

13   Q.    Was this $250,000 investment memorialized in writing?

14   A.    It was, yes.

15   Q.    By whom?

16   A.    By myself and Mr. Meza.

17   Q.    Mr. Crane, I'm showing you what's been marked as

18   Government Exhibit CC-6.  Take a moment to review it.  Have

19   you seen Exhibit CC-6 before?

20   A.    I have.

21   Q.    What is it?

22   A.    This is a summary of agreements between Mr. Meza and

23   myself up to this time of every -- all the funds I gave him

24   within all of our dealings, the loan investments, et cetera.

25   Q.    Did you create Exhibit CC-6?

Case: 1:17-cr-00281 Document #: 74 Filed: 01/18/19 Page 124 of 134 PageID #:457
Crane - direct by Klamann
124

1    A.    I did.

2    Q.    And is that your signature -- your signature near the

3    bottom of the exhibit?

4    A.    It is.

5          MS. KLAMANN:  Your Honor, government moves to admit

6    Government Exhibit CC-6 in evidence and request permission to

7    publish.

8          THE COURT: Any objection?

9          MS. ZARDKOOHI:  No objection.

10         THE COURT:  All right.  It's admitted, you may.

11         (Said exhibit received in evidence.)

12   BY MS. KLAMANN:

13   Q.    Mr. Crane, what's the date on Exhibit CC-6?

14   A.    July 7, 2013.

15   Q.    And is that your handwriting?

16   A.    It is.

17   Q.    Is that the day that you and defendant signed this

18   agreement?

19   A.    It is.

20   Q.    And you have three items listed here; is that right?

21   A.    Yes.

22   Q.    Let's start by looking at Item No. 1.  Item No. 1

23   states:  "IUT investment of $10K per note signed and

24   notarized.  Payment is past due, and in lieu of final

25   disbursement, interest payments of $500 monthly are being

1   received."

2       Mr. Crane, what is the IUT investment that you're

3   referring to here?

4   A.   That was -- Mr. Meza went through his company Novoa,

5   Inc., and that was his business partner, Intra United

6   Trucking, to which the funds, he told me they went to them,

7   to help him with their business.  The initial loan -- Oh, the

8   initial loan that I made with Mr. Meza to support a business

9   partner of his --

10      MS. ZARDKOOHI:  Objection, your Honor.  Relevance.

11  We discussed this limited to --

12  BY THE WITNESS:

13  A.   That's what it is.

14      THE COURT:  Well, this is where we're going to end

15  up, that it's going to have to be explained.  Go ahead.

16      THE WITNESS: So continue with what this was?

17      THE COURT:  Or you can just --

18  BY MS. KLAMANN:

19  Q.   So the IUT investment refers to a $10,000 investment

20  that you made previously with the defendant?

21  A.   Yeah, it was a note that I made with him, the first one,

22  yes.

23  Q.   Did you make that loan prior to your $50,000 investment?

24  A.   Yes.

25  Q.   And does Exhibit CC-6 indicate that you still have not

1   been paid on that loan?

2   A.   Yes, it does.

3   Q.   Let's look at Item No. 2.  Item No. 2 states:  "Bob

4   Adams investment - $50K plus additional payment of $6,500 and

5   $10K.  Return expected of $250K tax free.

6            "Note backing this up with properties of Mr. Meza?"

7            Does Item 2 refer to your $50,000 investment with

8   Bob Adams?

9   A.   Yes.  Well, mine was with Mr. Meza, who he indicated

10  would be through Mr. Adams, which is his partner.

11  Q.   Item 2 references two other payments that you made to

12  the defendant, a payment of $6,500, and a payment of $10,000.

13  When did you make the $6,500 payment?

14  A.   I believe it was January of 2013.  We were at -- I was

15  with Mr. Meza in his car.  He had -- go ahead.

16  Q.   What was the $6,500 payment for?

17  A.   He told me that it was to prepay the taxes on the

18  $50,000 investment so that it would be a tax-free investment.

19  Q.   So this was a payment related to your $50,000

20  investment?

21  A.   Correct.  And he would use that money to enhance the

22  investment to make sure it was tax free, as we had discussed.

23  Q.   Did you give defendant the $6,500?

24  A.   I did.

25  Q.   Why?

1   A.   Well, he also mentioned that everything would be in

2   jeopardy if he didn't get it.  He was quite insistent.  And

3   he still -- at the time, I considered him my friend.  And

4   he -- I wanted him to be successful in his dealings, just as

5   I wanted to be successful in mine.  So I -- Mr. Meza drove me

6   to my bank, took out -- well, got the money and --

7   Q.   How did you make the payment?

8   A.   So I went with Mr. Meza to my bank, drafted a check to

9   cash, which I then went with Mr. Meza to his bank, and then

10  we created the cashier's check that he needed for his

11  dealings.

12  Q.   Mr. Crane, I'm showing you Government's Exhibit CC-4.

13  Is Exhibit CC-4, the $6,500 check he wrote to cash?

14  A.   Yes, it is.

15  Q.   Is that your signature on the signature line?

16  A.   It is.

17       MS. KLAMANN:  Your Honor, government moves to admit

18  Government Exhibit CC-4 into evidence and request permission

19  to publish.

20       MR. KUTNICK:  No objection, your Honor.

21       THE COURT:  It's admitted.

22       (Said exhibit received in evidence.)

23  BY MS. KLAMANN:

24  Q.   Mr. Crane, what is the date on this check?

25  A.   It's January 4th, 2013.

1   Q.   So you made this payment a few months after your $50,000

2        investment?

3   A.   Yes.

4   Q.   Can you please read the memo line of this check for us?

5   A.   It says, C. Meza, investment fees, I believe.

6   Q.   And you indicated that after you wrote this check you

7        and defendant went to the bank and cashed it together?

8   A.   Yes.

9   Q.   What happened next?

10  A.   So I took the cash --

11           MR. KUTNICK:  Objection, asked and answered.

12           THE COURT:  Sustained.

13  BY MS. KLAMANN:

14  Q.   You stated you took the cash to Bank of America to get a

15       cashier's check; is that right?

16  A.   Yes.

17  Q.   And did you actually see the cashier's check that you

18       got from Bank of America?

19  A.   Yes, I did.

20  Q.   Mr. Crane, I'm showing you what's been marked as

21       Government's Exhibit CC-5.  Is Exhibit CC-5 the $6,500

22       cashier's check that you witnessed the defendant purchase at

23       Bank of America?

24  A.   Yes, it is.

25           MS. KLAMANN:  Your Honor, the government moves to

Crane - direct by Klamann    129

1    admit Government Exhibit CC-5 into evidence and request

2    permission to publish.

3              MS. ZARDKOOHI:  No objection.

4              THE COURT:  It's admitted.

5    BY MS. KLAMANN:

6    Q.   Mr. Crane, the cashier's check is made out to Golan &

7    Christie LLP.  At the time, what was your understanding as to

8    who Golan & Christie was?

9    A.   It was like a legal partner that was going to handle the

10   arrangements with these funds to work with the Renaissance

11   Capital team.

12   Q.   So it's your understanding that Golan & Christie was

13   involved with the investment?

14   A.   Yes.

15   Q.   And why did you think that?

16   A.   Because Mr. Meza said it was through his attorney

17   partner.  At the time I didn't really know who Golan &

18   Christie was, but just that he said it was through his

19   attorney partner.

20   Q.   Okay.  Let's return to Exhibit CC-6.  Exhibit CC-6,

21   Item 2 references a second payment of $10,000.  When did you

22   make the $10,000 payment to defendant?

23   A.   I believe that was in the June timeframe, that summer.

24   Q.   What was the $10,000 payment for?

25   A.   So Mr. Meza said he needed to have a continued flow for

1   this Bob Adams investment with Renaissance Capital, and he

2   would show me -- he needed a little bit more money to make

3   more of the investment that he needed.  He showed me a stack

4   of credit cards.  Well, I'm just saying he needed more money

5   for it, and so he showed me a stack of credit cards that

6   he -- that he went to his associate at Highland Park Auto,

7   and he took me there with him, and I took out one of my

8   credit cards, and it was used to give Mr. Meza $10,000.

9   Q.   What benefit, if any, did you receive for paying an

10  additional $10,000?

11  A.   So, first, Mr. Meza agreed to give it back to me right

12  away, and that didn't happen.  We had further discussions,

13  and he said because I helped him with the Renaissance

14  continuation that we would enhance my return on the $50,000

15  to $250,000.

16  Q.   So that's in reference to your first $50,000 investment?

17  A.   Correct, yes.

18  Q.   And the returns were 20 to 30 percent and the benefit

19  was that it would increase to $250,000; is that right?

20  A.   Correct, yep.

21  Q.   And is that why Exhibit CC-6 references $250,000 tax

22  free?

23  A.   It is.

24  Q.   As of the date that you signed Exhibit CC-6, have you

25  been paid back for either of the $6,500 or the $10,000?

Case: 1:17-cr-00281 Document #: 74 Filed: 01/18/19 Page 121 of 134 PageID #:464
Crane - direct by Rasmann
131

1  A.    Not a penny.

2  Q.    Let's look at Item No. 3.  Item No. 3 states:

3            "Subsequent investment of the $250K for yield of

4  $5 million paid monthly for the next five months in equal

5  increments of $1 million each.

6            "Mr. Meza, via his company, Milwaukee McPherson,

7  will make the investment.

8            "First payment will be returned within two weeks?"

9            Does Item 3 memorialize your agreement with respect

10 to the $250,000 investment with defendant?

11 A.    It does.

12 Q.    What did you mean when you stated that, "Mr. Meza, via

13 his company, Milwaukee McPherson, will make the investment"?

14 A.    Just as it states.  That, again, Carlos had total

15 control of this investment, and that he would make it via his

16 company, Milwaukee McPherson, instead of going through

17 Renaissance Capital, or anything like it.

18 Q.    Who set the deadline for the first returned payment

19 within two weeks, was that you or the defendant?

20 A.    The defendant.

21 Q.    Mr. Crane, is that your signature right there above your

22 name?

23 A.    Yes, it is.

24 Q.    And is that defendant's signature above his name?

25 A.    Yes.

1    Q.   Did defendant sign this document in your presence?

2    A.   He did.

3    Q.   You stated that you ultimately did invest $250,000 with

4    defendant.  How did you make that payment?

5    A.   They were two wire transfers from separate 401K

6    accounts.

7    Q.   To whom did you make the wire transfers?

8    A.   Mr. Meza gave me specific instructions to send it to his

9    attorney, Palmore -- I think -- Associates.

10   Q.   At the time you made the payments, who did you

11   understand Palmore to be?

12   A.   Again, his -- his agent, lawyer, that was handling these

13   investments directly.  And it would be used -- he

14   specifically told me to put it in an IOLTA account which --

15   and reference that in the wires, which I did, so that it

16   would be protected.

17   Q.   Were you paid the first $1 million installment within

18   two weeks of signing this agreement?

19   A.   No, ma'am.

20   Q.   Were you ever paid any amount of money on your $250,000

21   investment?

22   A.   No.

23   Q.   After the deadlines passed, did you have conversations

24   with defendant about your returns on your $250,000

25   investment?

1    A.   I did.

2    Q.   How often did you speak with defendant following your

3    investment about the returns?

4    A.   Very frequently.  But at least every week, pretty much.

5    Sometimes it would maybe be two weeks in the beginning, but

6    more frequently as --

7    Q.   Were these in-person conversations?

8    A.   They were.

9    Q.   Where did the in-person conversations take place?

10   A.   Usual places of after church, and in his car, in front

11   of my house.

12             THE COURT:  Okay.  We're going to stop now.  We

13   stop at 4:30.  Some people come from long distances.

14             Okay.  The issue is what time we will resume

15   tomorrow.  It's really up to you people.  Sometimes people

16   like to start early.  Would you be comfortable starting as

17   early as 9:00?  If that's too early for anybody, just say so.

18   Is that good?  All right.  There will be -- you can get here

19   whatever time you want.  The jury room will be open.  There

20   will be coffee and donuts and bagels for you.  But we will

21   begin, then, tomorrow morning at 9:00.

22             And I simply remind you that -- two things:  One,

23   that all you can tell anybody is you're on a jury.  The other

24   thing is, apparently the court is -- everything is going to

25   be closed on Wednesday, so you will not be here on Wednesday.

1    Okay.  Have a nice night.  Do leave your notebooks

2    here.  Leave them in the jury room, or someplace.   Thank

3    you.  Goodnight.

4         (Jury out at 4:37 p.m.)

5         THE WITNESS:  What would you like me to do with

6    these?

7         THE COURT:  Leave it there.  If they want to move

8    it, they will move it.

9         We will see you in the morning.  I would ask that

10   you be here ideally at a quarter of 9:00 so I know you're

11   here and you're ready.

12        MR. KUTNICK:  I will be here at 7:30, Judge.

13        THE COURT:  Okay.  I will see you at 7:30.  Okay.

14        (Trial adjourned at 4:37 p.m.)

15                         CERTIFICATE

16        I certify that the foregoing is a correct transcript

17   from the record of proceedings in the above-entitled matter.

18

19   /s/ *SANDRA M. MULLIN*              January 11, 2019

20   SANDRA M. MULLIN, CSR, RMR, FCRR
     Official Court Reporter
21

22

23

24

25