```
 1              IN THE UNITED STATES DISTRICT COURT
                NORTHERN DISTRICT OF ILLINOIS
 2                    EASTERN DIVISION

 3                              )
     UNITED STATES OF AMERICA,  )   Case No. 17 CR 281
 4                              )
                    Plaintiff,  )
 5                              )
            vs.                 )   Chicago, Illinois
 6                              )   December 4, 2018
     CARLOS R. MEZA,            )   8:48 a.m.
 7                              )
                    Defendant.  )
 8

 9                         VOLUME 2
          TRANSCRIPT OF PROCEEDINGS - Jury Trial
10      BEFORE THE HONORABLE ELAINE E. BUCKLO, and a Jury

11
     APPEARANCES:
12
     For the Plaintiff:        MR. JOHN R. LAUSCH, JR.
13                             UNITED STATES ATTORNEY
                               BY:  MR. RICK D. YOUNG
14                                  MS. KAITLIN KLAMANN
                               Assistant United States Attorneys
15                             219 South Dearborn Street
                               Chicago, Illinois  60604
16
     For the Defendant:        MR. JOSHUA B. KUTNICK
17                             900 West Jackson Boulevard # 5
                               Chicago, Illinois  60607
18
                               AND
19
                               LAW OFFICE OF MINA ZARDKOOHI
20                             BY:  MS. MINA ZARDKOOHI
                               53 West Jackson Boulevard
21                             Suite 1615
                               Chicago, IL 60604
22
23   Court Reporter:           SANDRA M. MULLIN, CSR, RMR, FCRR
                               Official Court Reporter
24                             219 S. Dearborn Street, Room 2260
                               Chicago, Illinois  60604
25                             (312) 554-8244
                               sandra_mullin@ilnd.uscourts.gov
```

1    (Proceeding heard in open court. Jury out.)

2              MS. ZARDKOOHI:  Good morning, Judge.

3              THE COURT:  Good morning.

4              MR. KUTNICK:  Good morning, Judge.

5              THE COURT:  Good morning.  All right.  Well, mostly

6    I wanted to make sure you people didn't have any issues.

7              MR. YOUNG:  No issues, your Honor.

8              MR. KUTNICK:  No, I don't think so.

9              THE COURT:  Although, you know, our witness

10   yesterday, I thought -- the last witness, he was laying on

11   some things pretty thickly that I don't think are really

12   issues, so.

13             MR. KUTNICK:  Can I ask what --

14             THE COURT:  There wasn't an objection, really, so.

15             MR. KUTNICK:  Could I ask what specifically you are

16   referring to, your Honor?

17             THE COURT:  If nothing is bothering you, it's not

18   going to bother me, but --

19             MR. KUTNICK:  Well, I think there was a lot of --

20             THE COURT: I mean, I don't know where there is --

21   what is supposed to be a representation because that's what

22   the jury is going to have to deal with is what

23   misrepresentations of fact were made.

24             MR. KUTNICK:  You know, our position, your Honor,

25   was that they're friends, they were good friends.  We didn't

1  have any objections in discussing that friendship.  He makes

2  a lot of representations about what Carlos said, and, you

3  know, we're going to hopefully try to address those things.

4  THE COURT:  Okay.  One thing that he said, I mean,

5  I went back over the motions in limine and the transcript,

6  and I didn't see any actual -- any conflict between what had

7  been said.  I wouldn't know what a jury was supposed to do

8  with it.  I don't think that it's intended as a

9  representation of fact, that his saying, he told me my

10  daughter would never be hurt, he would never hurt my

11  daughter.  I don't know that you're taking that as a

12  representation of fact; and if not, I hope I don't hear it

13  again.

14  MR. YOUNG:  All right, Judge.

15  THE COURT:  Okay.

16  MR. KUTNICK:  And that was the thing, your Honor,

17  that it did cross my ears, and I felt that jumping up was

18  calling more attention to it, and I just wanted to move on.

19  THE COURT:  Well, you know, that's always a

20  strategic thing.  And when he wanted to start repeating it

21  all, I think we cut it off.  Is he about done?

22  MS. KLAMANN:  Yes, your Honor.

23  THE COURT:  Okay.

24  MS. KLAMANN:  Maybe five to ten minutes more.

25  THE COURT:  Okay.

1     MR. YOUNG:  You Honor, and if we may, you know,

2 since he is on direct, have your permission just to talk to

3 him for the purpose of making sure -- I don't think it's

4 going to come out again, but just --

5     THE COURT:  Okay, yes, I think --

6     MR. YOUNG:  -- to inform him that he should not

7 repeat that.

8     THE COURT:  I think we've had enough things like

9 that.  Okay.

10     MR. YOUNG:  Okay.  Thank you, Judge.

11     THE COURT: Thank you.  That would be a good idea.

12     MR. KUTNICK:  Thank you, Judge.

13     Your Honor, one very, very fast issue.  I produced

14 about four or five recordings to the government.  I have not

15 filed an actual supplemental exhibit.  I just wanted to let

16 the court know and ask whether or not you actually want us to

17 file a supplemental exhibit in writing on those recordings,

18 which we're happy to do, if necessary.

19     MR. YOUNG:  I think counsel is just asking do we

20 need to update the exhibit list, your Honor.  But we'll

21 submit finalized exhibit lists at the end of trial.  And I'm

22 fine with, you know, if he lays a foundation with his client

23 with him introducing the tapes.

24     THE COURT: Okay.

25     MR. KUTNICK:  I just wanted to let you know, since

1    we hadn't filed something, Judge.  Thank you.

2              THE COURT: All right.

3              MR. YOUNG:  May I have Mr. Crane come in and take

4    the stand, or would you prefer for him to wait outside, your

5    Honor?

6              THE COURT:  He is welcome to take the stand.  I

7    hope this juror will be here in the next couple minutes, I

8    don't know.  We have a missing juror who is apparently on

9    public transportation.

10         (Recess from 9:02 a.m. to 9:21 a.m.)

11             THE COURT: The juror is here, so we should be

12   bringing them in.

13         (Jury in at 9:25 a.m.)

14             THE COURT: Please be seated.  Good morning.

15             You do understand that you are still under oath?

16             THE WITNESS:  I do.

17             THE COURT:  All right.  Please go ahead.

18      CORDELL CRANE, GOVERNMENT'S EXHIBIT, PREVIOUSLY SWORN,

19                  DIRECT EXAMINATION (Continued.)

20   BY MS. KLAMANN:

21   Q.   Good morning, Mr. Crane.

22   A.   Good morning.

23   Q.   Mr. Crane, when we broke yesterday, we were talking

24   about your $250,000 investment with defendant.

25   A.   Yes.

1    Q.   Can you remind the jury what your expected return was on

2    your $250,000 investment?

3    A.   Yeah.  The expected return was that I would receive

4    five, one-million-dollar payments from Mr. Meza starting as

5    soon as two weeks after the initial investment.  My funds

6    would be used for collateral and security for those

7    investments that he was making overseas.

8    Q.   And after your initial two-week deadline passed, did you

9    have conversations with defendant about your returns on your

10   $250,000 investment?

11   A.   Yes, I did.

12   Q.   How often did you speak with defendant following your

13   investment about the returns?

14   A.   It was usually about once a week.  As things drew closer

15   to my deadline to returning my retirement funds to their

16   different -- both organizations, they got expressly more

17   frequent.

18   Q.   What was the deadline for returning your retirement

19   funds?

20   A.   September.  I don't recall the exact date, but a date in

21   September, I believe.

22   Q.   Did these conversations about the returns on your

23   $250,000 investment take place in person?

24   A.   Yes.

25   Q.   Where did the conversations occur?

1  A.    They occurred at our church, as that was a frequent spot

2  where we were updating.  And then also in his car in front of

3  our house.

4  Q.    I assume you don't have a specific recollection of every

5  single one of those conversations.  Do you have more of a

6  general recollection of what was said during those

7  conversations?

8  A.    Yes.  Mr. Meza would explain that monies were tied up in

9  Europe, that there was an incorrect SWIFT code made for

10  international transfers.  There were problems with a VP not

11  signing or not being in town, on vacation.  Just a myriad of

12  reasons why things weren't there.  Finally, he said, well,

13  your funds are in New York.  He would flash me on his iPad

14  some very large deposits, you know, 50, $100 million.  And he

15  said, see, when we get two percent of that, you know, that's

16  like $2 million right there.  And so he would explain how

17  things were in process and how this could happen, given the

18  inside knowledge he had of that market through his exclusive

19  traders.  And so that's -- that's what he was explaining to

20  me, all the reasons of all the nuances that had to be

21  happened with signing, and lawyers, and others, you know,

22  authenticating, making sure that would happen.

23  Q.    And when the deadline passed for you to return your

24  retirement funds, did you speak to defendant then about where

25  your returns were?

1    A.    Oh, yes, I did.

2    Q.    What did he say?

3    A.    Well, he said, don't worry, it's still happening, you're

4    making enough money to make up all of your tax implications

5    with regards to this.  So you will have enough to -- you will

6    still be fine, and you won't owe, you know, the IRS.  And

7    even if you do, you owe the IRS, you will have enough money

8    to take care of it, et cetera.

9    Q.    Did defendant ever offer to repay you?

10   A.    He did, yes.  There were -- he offered several times

11   there was different -- after the deadline passed and we had

12   continued conversations, he said that he had some funds

13   overseas in an Ecuadorian account that -- that -- $400,000,

14   and that that money he could use to cover my initial

15   investment and tax penalty losses.

16   Q.    After your $250,000 investment, did defendant ever

17   attempt to repay you --

18   A.    No.

19   Q.    -- any amount of money?

20   A.    No, none.

21   Q.    Did you eventually stop communicating with defendant

22   about the investments?

23   A.    Well, there were conversations for, you know, up to two

24   years afterwards, you know, just about this.  Conversations

25   in his home, conversations, you know, at church.  And --

1      MR. KUTNICK:  Objection.

2      THE COURT:  Actually, the question had called for a

3  yes-or-no answer.

4  BY THE WITNESS:

5  A.    Okay.  Yes.  Sorry.

6  BY MS. KLAMANN:

7  Q.    Why did you stop speaking to defendant about your

8  investments?

9  A.    The last time I spoke with him about these investments

10  was in his home where I challenged him with his excuses and

11  reasoning.  We went through all myriad of the reasoning and

12  why he did this and what happened.  And I was in his home, we

13  were -- I was -- I had seen through all of these reasons and

14  challenged him on them directly.  As I was getting up to

15  leave from the home --

16      MR. KUTNICK:  Objection.

17  BY MS. KLAMANN:

18  Q.    Mr. Crane, I am going to stop you there.

19  A.    Okay.  All right. Sure.

20  Q.    Was that the last time you spoke with defendant?

21  A.    No.

22  Q.    What was the last time you spoke with defendant?

23  A.    I think in January of 2015, in that timeframe.  You

24  know, at that time he promised to return all of my initial

25  investment funds plus penalties and not -- foregoing the

1    large multimillion-dollar returns, but at least get back to

2    me the initial investment, plus the penalties I've incurred

3    due to it not being returned.

4    Q.   Now let's go back for a second to the time when you

5    first made your investment with defendant, your $50,000

6    investment.  At that time, how much experience did you have

7    in investing?

8    A.   I had done some stocks.  You know, from a financial

9    perspective, I actually was better than I thought at the

10   time, you know, through things.  I -- you always think you

11   can do better.  But I had some, you know, limited success

12   with stocks.  I didn't do any of the complicated overseas

13   transactions that he was referring that he had inside

14   knowledge of.  But I -- I had dabbled a little bit with, you

15   know, purchasing employee stock purchase plan, things like

16   that.

17   Q.   So before investing with defendant, approximately how

18   much money had you invested on your own?

19   A.   Well, I had my 401k, which, you know the amount.  I had

20   a few, probably 50,000, things of that nature, that I did.

21   Q.   So what caused you to invest over $300,000 with the

22   defendant?

23   A.   The absolute trust we had in our friendship.  That's

24   really what it came down to.  No way I would have done this

25   on a straight business transaction.  Absolutely no way.

1    Q.    Briefly, did defendant's apparent professional success

2    have any impact on your decision to invest with him?

3    A.    Yes.  His statements of how successful he was, his

4    persona, him being a leader in our church.  All those things

5    kind of compiled together to paint a picture of how he was

6    successful in many ways and he was to be trusted.

7    Q.    Did defendant's personal guaranty of your investment

8    impact your decision to entrust him with your money?

9    A.    Yeah, given the timeframe we had spent together,

10   barbecues, vacation, movies, you know, sporting events,

11   through talking -- you know, watching them on TV, et cetera,

12   it definitely had an impact on why I did it, no question.

13   And --

14   Q.    At the beginning --

15   A.    -- as I mentioned, my family earlier, too, so, yeah.

16   Q.    I apologize.

17   A.    Sorry.

18   Q.    At the beginning of your testimony, you mentioned that

19   you made three investments with defendant?

20   A.    Correct.

21   Q.    I just want to be clear.

22   A.    Yes.

23   Q.    The first investment that you were referring to, was

24   that the $10,000 loan that we briefly discussed?

25   A.    That was, yeah.

1    Q.   And your second investment was the 50,000 --

2    A.   $50,000.

3    Q.   -- investment?

4    A.   Correct.

5    Q.   Where did you get the money for the $50,000 investment?

6    A.   Both those first two, the 50,000 was from my savings.

7    Q.   And your last investment, $250,000, came from your

8    retirement fund.  Was that the entirety of your retirement

9    account?

10   A.   It is the majority, vast majority of it, yes.

11   Q.   Why did you use your retirement funds for that

12   investment?

13   A.   Because I had exhausted the other funds.  I was not

14   comfortable going to my father, as I told you, as he asked.

15   And given the circumstances that I had that three-month

16   window, and given that Mr. Meza said, hey, I can make things

17   right in that timeframe based on everything that's happened,

18   I was hopeful that that was the case, and I was convinced

19   that was the case at the time.

20   Q.   Did you also incur a monetary penalty for not returning

21   your retirement funds to the account within that period?

22   A.   A heavy penalty.  Yeah, there has been lots of loss,

23   personal and otherwise.  But the IRS, you know, is deeming

24   that it was, you know, removed prematurely, there is a

25   penalty of early withdrawal.  And then of how it has to be

 1    recorded as income and amounts due because of that.  And the

 2    amount is close to $200,000 in penalties from the IRS because

 3    of that, that fatal --

 4              MS. KLAMANN:  Your Honor, may I have a moment?

 5              THE COURT:  Yes.

 6              MS. KLAMANN:  Thank you, Mr. Crane.

 7              Your Honor, I tender the witness.

 8              THE COURT:  Okay.

 9                        CROSS-EXAMINATION

10    BY MS. ZARDKOOHI:

11    Q.   Good morning, Mr. Crane.

12    A.   Good morning.

13    Q.   Mr. Crane, you've known Carlos now for, would you say,

14    20 years, almost?

15    A.   Almost 15 plus, yeah.

16    Q.   Fifteen plus.  And during that time, you became friends?

17    A.   Yes.

18    Q.   You saw each other's families?

19    A.   He identified me as one of his best friends.

20    Q.   And you went to each other's houses?

21    A.   Correct.

22    Q.   You went to his house, you went to his basement, where

23    he has his office; correct?

24    A.   Yes.

25    Q.   Now, this wasn't a mansion; correct?

1  A.  It's all a matter of perspective, but I guess not.  My

2  perspective, no.

3  Q.  He lives in Lake in the Hills; correct?

4  A.  He does.

5  Q.  You live in Crystal Lake; correct?

6  A.  I do.

7  Q.  Mr. Carlos did not, around his house, and in his house,

8  have anything that would indicate that he is exceptionally

9  wealthy individual.

10       THE COURT:  Is that a question?

11  BY MS. ZARDKOOHI:

12  Q.  Correct?

13  A.  Um.

14  Q.  It's a yes or no.

15  A.  Well, he had, you know, trucks at some times, very nice

16  vehicles, you know, and --

17  Q.  Well, in -- in the house, Mr. Crane.

18  A.  He had an ATV, you know, in his garage.

19  Q.  In the house, Mr. Crane.

20  A.  Okay, in the house.  He had extremely expensive

21  photocopying equipment and computer equipment.

22  Q.  Okay.  He is in business; correct?  He is a businessman?

23  A.  He had far more than he needed for --

24  Q.  Mr. Crane, I would really appreciate it if you could

25  just stick to the --

1    A.   So what was the question?  I'm sorry.

2    Q.   In the house, did he have anything that would indicate

3    that he is an exceptionally wealthy individual; correct?  He

4    didn't have anything that would indicate that he is

5    exceptionally wealthy individual?

6    A.   I'll stand by what I said.  I mean, he had -- he had

7    good things, he had nice things.  But did he have, like,

8    million-dollar items sitting on his, you know, countertop

9    there that I knew of?  No.  Okay, no, not that.

10   Q.   Okay.  You are in IT business right now; correct?

11   A.   Yes.

12   Q.   Do you have your own business, or are you working for

13   somebody?

14   A.   I'm working for someone.

15   Q.   What's the name of the company?

16   A.   Dell Technologies.

17   Q.   Dell Technologies?  How long have you been with them?

18   A.   Today is my second day.

19   Q.   Oh, okay, well, congratulations.

20   A.   Thanks.

21   Q.   Before that, where did you work?

22   A.   I worked for Insight Enterprises.

23   Q.   How long were you with them?

24   A.   About two years.

25   Q.   And before that?

1   A.   Before that I was with Avinade.

2   Q.   Also IT?

3   A.   Yeah.  Yeah.

4   Q.   Okay.  When you made your first investment, that was

5   September 2012, correct, it was for $50,000?

6   A.   No, it's not correct.  I --

7   Q.   Your first investment, that went for this purpose of

8   Mr. Carlos -- to Mr. Carlos' account for Renaissance

9   investment; correct?

10  A.   For Renaissance, that is correct.

11  Q.   Yes, $50,000 in September of 2012.  That was an

12  investment, correct, it was not a loan?

13  A.   We talked about it in several ways.  So it was getting

14  into his business, in some aspects it was an investment.  In

15  others, it also was a loan because he personally guaranteed

16  it to me.

17  Q.   Okay.  That's where I'm getting at.  So, in your mind,

18  it was an investment; correct?

19  A.   No, it was much more of a sure thing than an investment.

20  Investment denotes risk, and I didn't think there was any

21  risk there.

22  Q.   So it was a loan because it was insured by a property?

23  A.   Like I said, it was a combination of the two, in my

24  opinion.  I mean, it was something that Mr. Meza said --

25  there were certainly investment principles in it because of

1    his partnership with Bob Adams and Renaissance Capital, but

2    also there was a personal aspect.

3    Q.   Yes, the personal aspect that it was insured by a condo,

4    his own condo; correct?

5    A.   That was part of his insurance he claimed, yes.

6    Q.   Okay.  That was what was written in, I believe it was

7    July -- June 2013, notice of agreement that the government

8    showed you, it's Government Exhibit CC-6, I believe.

9    A.   That was there, but it was also in the original document

10   that he provided for the 50,000.  So it's both places, the

11   Ravenswood location.

12   Q.   So it was secured by a condo, your investment or loan,

13   however you would want to call it?

14   A.   It was an added security for me, yeah, to make me feel

15   better about it, yes.

16   Q.   Okay. And you even did research at some point as to the

17   value of the condo, you said on direct; correct?

18   A.   I did, yeah.

19   Q.   And you came up with something like $229,000?

20   A.   I think -- yeah, I went through some notes, and that was

21   my recollection of what we saw for the property, yes.

22   Q.   And this --

23   A.   I don't know --

24   Q.   Go ahead, sorry.

25   A.   Yes, that's good.

Case: 1:17-cr-00281 Document #: 75 Filed: 01/18/19 Page 18 of 234 PageID #:485
Crane - cross - by Zaruoosh
152

1   Q.   Okay.  And this loan/investment, you understood it to

2   mean that Milwaukee McPherson would guarantee 20 to

3   30 percent return; correct?

4   A.   Yes.

5   Q.   By December 1st, 2012; correct?

6   A.   Correct.

7   Q.   And now my calculation is 20 to 30 percent return would

8   be something like 60 to $75,000; correct?

9   A.   That's what I said on direct, yeah, on that, yeah.

10  Q.   Yeah.  So December 1st came, 2012, and no returns were

11  there; correct?

12  A.   Right.

13  Q.   And at this point, you chose not to exercise your right

14  to the condo that was owned by Mr. Meza; correct?

15  A.   No, I actually asked him about it, and I said, hey,

16  what's happening here.  And I even -- at some point I went

17  down to actually look to see if I could put a lien on the

18  property, but it was already liened out several times in my

19  records that I saw.

20  Q.   So despite -- even with that you decided not to exercise

21  it.  You could still exercise, theoretically, you can put --

22  you can get -- there were liens you can get in the line --

23  A.   True.

24  Q.   -- down the road, true; correct?

25  A.   Yeah.

1    Q.    True, correct, okay.
2               In fact, you at that point invested, again, should
3    I say, you gave on December 1st, 2012, additional money --
4    sorry, the January 2013, additional money to Mr. Meza,
5    correct, $6,500 --
6    A.    Yes.
7    Q.    -- in cash.  And you together went to the bank?
8    A.    Yes.
9    Q.    And Mr. Meza used that check to purchase a cashier's
10   check; correct?
11   A.    Yes.
12   Q.    And it was payable to law firm Golan & Christie;
13   correct?
14   A.    Yes.
15   Q.    You knew it was a law firm at the time?
16   A.    No.
17   Q.    On direct you said you were aware that Golan -- well,
18   you knew that --
19   A.    I said there was a legal agent, I think is what I said.
20   But I didn't know the implications of what they did, and I
21   didn't know they were covering Mr. Meza's bankruptcy for his
22   company, Milwaukee McPherson, at the time, which I learned
23   later, so.
24   Q.    Did you know that Mr. Meza hired an attorney to go over
25   the Renaissance contract?

1    A.   No, he did not state directly that this -- but he did

2    take me to some attorneys sometimes that he had downtown,

3    yeah.  Lot of different aspects of his business I was getting

4    familiar with.

5    Q.   Okay.  So that was -- that's happening in January of

6    2013, when you write a check for $6,500.  And now a few more

7    months pass; right?  Now we're in the summer of 2013,

8    correct, and no returns have shown up --

9    A.   Right.

10   Q.   -- at this point either?

11   A.   Right.

12   Q.   And, again, you're not trying to exercise the note that

13   you have on the condo?

14   A.   Well --

15   Q.   Yes or no?  Have you exercised it?  Have you tried, have

16   you not tried?

17   A.   There is a lot of reasonings there, but, no, I did not

18   at that time.

19   Q.   No, you did not.  That's all I --

20   A.   At the end, I did try, though, as I said --

21   Q.   We will get to that, sir.

22        In June, 2013, in fact, you decide to loan another

23   $10,000 to Mr. Meza?

24   A.   Yes.

25   Q.   You said that on -- that you went to a Highland Auto;

1    correct?

2    A.    Yeah, Ray, the owner, at Highland Park Auto.

3    Q.    That's Ray Yacoub; correct?

4    A.    You know, I never got his last name.

5    Q.    Great, we will call him Ray.  And on direct you also

6    said that your card -- card was run at Highland Auto;

7    correct?

8    A.    Correct.

9    Q.    You also said that, my card was used to give Meza

10   $10,000?

11   A.    Yes.

12   Q.    Did you see those $10,000 pass hands between Ray and

13   Meza?

14   A.    No, because it takes a couple of days, Carlos told me,

15   to get the money back from the credit card company.

16   Q.    So you -- that card was run, and that's all you saw?

17   A.    Correct.

18   Q.    Okay.

19   A.    And I had a conversation with Ray, too.

20   Q.    Okay.  Just a month later, in July of 2013, no

21   investments, investment returns, have come back, you make

22   another investment; correct?

23   A.    Uh-huh.

24   Q.    This time you are in the car with Mr. Meza?

25   A.    Yes.

1   Q.   And he receives a phone call from somebody; correct?
2   A.   Yes.
3   Q.   And you see on the phone call, the ID, the caller ID,
4   that it was Mr. Terry Barnes?
5   A.   Yes.
6   Q.   And you overhear them talking; correct?
7   A.   I did, and I think it was on purpose.  But, yeah, yeah.
8   Q.   You overhear them talking, and at that point, without
9   going into details of what you heard exactly, you basically
10  overhear one part of the conversation; correct?
11  A.   Yes.
12  Q.   Okay.  It is following this car ride and this
13  conversation that in the same month in July of 2013, you
14  decide to invest -- you decide to invest additional $250,000?
15  A.   I did, yeah.
16  Q.   Okay.  This time the money was not wired into Milwaukee
17  McPherson; correct?
18  A.   Correct.
19  Q.   Unlike the first $50,000 investment with Renaissance.
20  A.   Right.
21  Q.   This time the money was wired in two installments to
22  Palmore Legal Services; correct?
23  A.   Yes, at his direction.  Yep.
24  Q.   Yes.  It didn't go through Carlos' personal account
25  either, it went directly to someone else; correct?

1    A.    Yes, based specifically on him telling me where to put

2    it, yeah.

3    Q.    Now, so, you're sending your 401k somewhere out there.

4    Did you ever consider having a written contract with that

5    someone out there, Palmore Legal Services, whoever is --

6    A.    In the same manner you consider, know your client;

7    right?  You know, the attorney needs to know their clients.

8    I had absolute trust in Mr. Meza at the time.  You know,

9    we're talking about affinity fraud here which deals with

10   personal issues as well as --

11   Q.    I do appreciate everything that you have to say but --

12   A.    -- direct issues.  Right, yep, okay.

13   Q.    -- just yes or no?

14   A.    So repeat the question for me.

15   Q.    It didn't go through Mr. Carlos Meza; correct?  It went

16   directly to Palmore, correct, the wire?

17   A.    At the direct instructions of Mr. Meza, but, yeah, the

18   wire was directly to --

19   Q.    I'm just asking about the wire itself.

20   A.    Yeah, the wire went directly to Palmore, and I actually

21   put Carlos' name on it too, so, yeah.

22   Q.    And you also did not sign any contract or agreement or

23   had anything in written form with Palmore Services?

24   A.    No, I did not.

25   Q.    Okay.  You said at some point that you were willing, on

1  direct, that you were willing to risk all that because of
2  Mr. Carlos' persona; correct?  Your friendship?
3  A.    I think I said there was no risk because of everything.
4  I mean, I -- that's an interesting perspective on how to
5  rephrase what I said, but I still trusted Mr. Meza to that
6  point where he wanted to make it right with all of the other
7  investments and do right by my family, and I believe that's
8  what I said.  And I was hopeful that his experience and his
9  expression of his experience would come to fruition there,
10 yes.  We're talking 15 years here.
11 Q.    Throughout all of this, when the money was not coming
12 in, Mr. Carlos kept you -- well, let's rephrase it.  He gave
13 you updates on -- on things; right?  You said on direct that
14 he -- Carlos typically initiated the conversations regarding
15 what's going on with the investments?
16 A.    No, I initiated several just as much as --
17 Q.    Did he initiate any conversations?
18 A.    Did I?
19 Q.    He did?  He did, okay.
20 A.    Oh, did he?  Yes, he did, too, yes.
21 Q.    Okay.  So would you -- is it safe to say that he kept
22 you in the loop?
23 A.    He kept the deception alive, yes.
24 Q.    Sir, I really, at this point, just yes or no.
25 A.    Yeah.  No.  At times I would say no, especially -- I had

1   to really dig to get more information.  So in the beginnings,

2   of course, because -- there would have been deadlines.  But

3   later --

4   Q.   But we're talking about a few years.

5   A.   -- it became more and more that I had to go to him to

6   get anything out of him, yeah.

7   Q.   He even played some recordings to you that -- that he

8   personally recorded in his conversations with Bob Adams; is

9   that correct?

10  A.   I don't recall any recording.  I do -- not that I knew

11  it was directly Bob Adams, no.

12  Q.   But he played some recordings about the investments to

13  you?

14  A.   I think there was a couple times partial recordings of

15  something.  But, no, there was nothing that was substantial

16  that was different than what he was telling me.

17  Q.   But was the recording about investments that you made?

18  A.   No, I don't recall that.

19  Q.   Okay.  You -- at this point, you don't consider yourself

20  an investor; correct?

21  A.   Nope.

22  Q.   But you did say on direct that you did invest in some

23  stocks; correct?

24  A.   Yes.  Most people do.

25  Q.   And you have a 401k; correct?

1    A.   Correct, I do.

2    Q.   And those stocks and that 401k fluctuates, the value of

3    those stocks and the 401k; correct?

4    A.   I'm very aware of that.  I lost a lot because I gave him

5    that money.

6    Q.   Even as a layperson, a known expert investor, you are

7    aware there is no such thing as risk-free investment?

8    A.   He represented it was a sure thing.

9    Q.   Sir?

10   A.   But --

11   Q.   Is there a risk-free -- would you say now to me there is

12   such a thing as on the market risk-free investment?

13   A.   Yes.

14   Q.   Okay.

15   A.   Because you can have FDIC-secured funds, and stuff;

16   right?  So, yeah.

17   Q.   With 100 percent guaranteed.

18   A.   That's what I was thinking in my mind.  I mean, you're

19   talking -- I would say 99, 98, yes.  But 100 percent, I guess

20   you would have to say very few things are 100 percent

21   guaranteed, true.

22   Q.   And what gave you the 100 percent guarantee is the fact

23   that, well, there was that condo; right?  Condo that you

24   thought was valued at $225,000; correct?

25   A.   That was gravy compared to the word of Carlos Meza at

1    the time.

2    Q.    But that gave you some guarantee; correct?

3    A.    It did, yes.

4    Q.    And you never attempted to exercise your right to that

5    condo?

6    A.    By the time I did, it was already gone.

7    Q.    It was too late by that point.

8    A.    Yeah, yeah.  Mr. Meza did not preserve it for me, nor

9    notify me that it was leaving or being gone or any way

10   whatsoever.

11   Q.    So you were rightfully disappointed?

12   A.    Oh, well, sure, yeah.

13   Q.    Angry, maybe?

14   A.    There is points you go through all types of emotions

15   over the last five years of this, no question.

16   Q.    Anger.  Would anger be one of them?

17   A.    Sure.  You're frustrated, you're angry.  And -- at

18   times, sure.

19   Q.    Have you ever sued Carlos?

20   A.    No.

21   Q.    How about Bob Adams?

22   A.    Never dealt with Bob Adams.  It was all based with

23   Carlos.  So every time I threatened legal action with Carlos,

24   he would threaten me back very heavily with, I'm going to

25   lawyer up and get -- just like he has done other people that

1    he told me about.

2    Q.   But you are a grown man, you had a right to sue, you

3    knew how to do that; correct?

4    A.   That's why I am here today.  You know, I didn't have the

5    funds.  I had met people that had tried to sue him.

6    Q.   Sir?

7    A.   And --

8    Q.   You had the right to sue civilly; correct?

9    A.   No question I did, yes.

10          MS. ZARDKOOHI:  Okay. Just one second.

11   BY MS. ZARDKOOHI:

12   Q.   Just to clarify one point.  The investment, the $250,000

13   investment that you wired to Palmore Legal Services?

14   A.   Yes.

15   Q.   Ultimately went to a corporation named Carso; correct?

16   A.   I have no idea.

17   Q.   You have no knowledge of that; correct?

18   A.   No.

19   Q.   And, to your knowledge, any of these funds, they didn't

20   come back to you, we already clarified that; correct?

21   A.   Yeah.

22   Q.   But they didn't come back to Carlos, to your knowledge;

23   correct?

24   A.   I have no idea, no.

25          MS. ZARDKOOHI:  Okay. That's it, your Honor.  Thank

1    you.

2            THE COURT:  Thank you.  Any more?

3            MS. KLAMANN:  Just brief redirect, your Honor.

4                    REDIRECT EXAMINATION

5    BY MS. KLAMANN:

6    Q.   Mr. Crane, you were just asked on cross if your $50,000

7    was a loan or an investment.  Was it your understanding that

8    that money was going to Renaissance Capital?

9    A.   Absolutely, yes.  Bob Adams.

10   Q.   Would you have wanted to know if your money was going

11   somewhere else?

12   A.   Yes.

13           MS. KLAMANN:  No further questions, your Honor.

14           MS. ZARDKOOHI:  Just briefly.

15                    RECROSS EXAMINATION

16   BY MS. ZARDKOOHI:

17   Q.   That $50,000, that's the one we discussed as being a

18   combo of an investment and loan?

19   A.   Right, yeah.

20   Q.   Correct?

21   A.   Personal -- you know, right, correct.  Correct.

22           MS. ZARDKOOHI:  That's all.  Thank you.

23           THE COURT:  All right.  You're excused.  Thank you.

24           THE WITNESS:  Okay, thank you.

25       (Witness excused.)

```
 1                    MR. YOUNG:  Your Honor, the United States calls Ray
 2       Yacoub.
 3                    COURT SECURITY OFFICER:  Sir, all the way up this
 4       way.
 5                    THE COURT:  Raise your right hand, please.
 6            (Witness sworn.)
 7                    THE COURT:  Please be seated.
 8                    MR. KUTNICK:  Your Honor, excuse me, could I have
 9       that water -- I can't see the witness because of the --
10                    THE COURT: Oh, sure.
11                    COURT SECURITY OFFICER:  We will move it
12       accordingly.
13                    MR. KUTNICK:  Thank you.
14                    MR. YOUNG:  May I proceed, your Honor?
15                    THE COURT:  Can you see?
16                    MR. KUTNICK:  Thank you, yes, your Honor.
17                    MR. YOUNG:  May I proceed, your Honor?
18                    THE COURT:  Yes, you may.
19                    RAY YACOUB, GOVERNMENT'S WITNESS, SWORN,
20                         DIRECT EXAMINATION
21       BY MR. YOUNG:
22       Q.   Good morning, Mr. Yacoub.  Could you please state your
23       first and your last name and spell it for the court reporter.
24       A.   My first name is Ray, R-a-y.  Last name is Yacoub,
25       Y-a-c-o-u-b.
```

 1   Q.   Mr. Yacoub, can you tell us what you do for a living?

 2   A.   I'm an auto repair mechanic.  I own an auto repair shop.

 3   Q.   What is the name of the auto repair shop that you own?

 4   A.   Highland Park Auto Clinic and Sales.

 5   Q.   How long have you owned that shop?

 6   A.   Over 20 years.

 7   Q.   Are you familiar with the defendant, Carlos Meza?

 8   A.   Yes, I am.

 9   Q.   Was Mr. Meza a customer at your shop?

10   A.   Yes.

11   Q.   Do you see Mr. Meza in court today?

12   A.   Yes, I do.

13   Q.   Can you tell us where it is you see him?

14   A.   He is sitting over there with glasses.

15   Q.   Are you referring to the table to my right?

16   A.   Yes, sir, to my right.

17   Q.   There are two gentlemen with glasses.  Can you tell us

18   which one he is?

19   A.   The one on the far right.

20          MR. YOUNG:  Your Honor, may the record reflect that

21   the witness has identified the defendant?

22          THE COURT:  Yes.

23   BY MR. YOUNG:

24   Q.   Can you tell us how long Mr. Meza was a customer at your

25   shop, Highland Park Auto?

1  A.  I believe it goes back from 1996.

2  Q.  Is he still a customer at your shop?

3  A.  Yes.

4  Q.  How often would you say you would see Mr. Meza over the

5  years?  A few times, or so, would that be a rough --

6  A.  Quite a few times, yeah.

7  Q.  Would he bring his personal cars to the shop?

8  A.  Yes.

9  Q.  Would he bring any other types of vehicles or car to the

10  shop?

11  A.  Well, yeah, he would bring car -- pickups for, like,

12  work, plow trucks, and stuff like that, so, yes.

13  Q.  What was your understanding of what type of work it was

14  that Mr. Meza did in connection at least with respect to

15  these vehicles?

16  A.  He was a, from my understanding, association president

17  of a place called Old Willow, something like that, yeah.

18          THE REPORTER:  I'm sorry, can you repeat that?

19  BY THE WITNESS:

20  A.  Old Willow Falls, I think it was called.

21  BY MR. YOUNG:

22  Q.  Old Willow Falls?

23  A.  I don't remember exactly, but it was on Old Willow in

24  Prospect Heights, so.

25  Q.  Over the years, did the defendant ever discuss otherwise

1    what he did for a living, if you recall?

2    A.    I believe he said he was an accountant too.  That's what

3    I remembered before.

4    Q.    Did you develop a personal relationship with the

5    defendant over the years?

6    A.    Yes.

7    Q.    Would you see him outside of the shop socially?

8    A.    Yeah, here and there, sure.

9    Q.    Did the defendant ever help you with buying or selling

10   any real estate?

11   A.    He helped me sell a piece of real estate, yes.

12   Q.    Can you tell us what type of real estate it was?  Was it

13   a home, a commercial property, or something else?

14   A.    No, it was a home.

15   Q.    Where was that home located?

16   A.    In Glenview.

17   Q.    Was that your personal residence, or was that an

18   investment property that you purchased?

19   A.    Well, it was -- it was a personal residence but with the

20   intent to rehab and sell.  So, yeah, it was personal

21   residence.

22   Q.    Did you ever loan any money to the defendant over the

23   years?

24   A.    I have before.

25   Q.    I'd like to now direct your attention to the summer of

1    2013, and particularly June of 2013.  Did the defendant

2    approach you around that time about making an investment?

3    A.    Yes.

4    Q.    Can you tell us how much money it was that the defendant

5    wanted you to invest?

6    A.    Well, I invested $50,000, so.

7    Q.    Can you tell us where you obtained the $50,000 from?

8    A.    It was from my company's account.

9    Q.    How was it that you provided that $50,000 to the

10   defendant or to someone else at the defendant's direction?

11            MR. KUTNICK:  Objection.

12   BY THE WITNESS:

13   A.    Well, we went to the bank and --

14            MR. KUTNICK:  Objection, your Honor.

15   BY MR. YOUNG:

16   Q.    How was it --

17            THE COURT:  Just a minute.

18   BY MR. YOUNG:

19   Q.    How did you provide that money?

20   A.    I went to the bank, and I wrote a check for it.  I

21   believe that's how it went.  I went to PNC Bank, and we wired

22   the money to a particular routing number and account number.

23   Q.    How did you get the information about where to wire the

24   payment to?

25   A.    Carlos gave it to me.  Or he was with me, actually, at

1  the bank, so he had all the information with him.

2  Q.  How many times did you talk to the defendant about this

3  $50,000 investment prior to going to the bank and wiring the

4  money?

5  A.  Two or three times.

6  Q.  Where did those discussions take place?

7  A.  At my work.

8  Q.  Did anyone else participate in those conversations other

9  than yourself and the defendant?

10  A.  No.

11  Q.  And can you tell us approximately when this was?  Was

12  this around the time of the investment, months before?

13  A.  Yeah, maybe months, a couple -- a month or two,

14  something -- I don't recollect exactly, but not long, long

15  before.

16  Q.  And can you tell us what it was the defendant said to

17  you that induced you to make this investment?

18  A.  Well, I guess you could say he said it was a good --

19  good investment.  It would be a good, sure thing, and, you

20  know.

21  Q.  Did the defendant explain to you where your money would

22  be going in connection with this sure thing?

23  A.  No, I just remember him saying it was a special account.

24  Q.  Other than the defendant telling you a sure thing, was

25  there any discuss of the risk involved in making this

1    investment?

2    A.   No.

3    Q.   Were you concerned about the $50,000?

4    A.   Yeah, I was.  I should be.  I was, yeah.

5    Q.   So then what led you to make this investment?

6    A.   Well, I kind of overheard Carlos talking to people on

7    the phone about investments and --

8    Q.   And what do you recall hearing during those

9    conversations that you heard while defendant was on the

10   phone?

11              MR. KUTNICK:  Objection.

12              THE COURT:  Sustained.

13   BY MR. YOUNG:

14   Q.   What do you recall the defendant saying during these

15   conversations?

16              MR. KUTNICK:  Objection.

17              THE COURT:  We need to talk about --

18        (At sidebar outside the hearing of the jury.)

19              THE COURT:  It's only representations to him that

20   could be at issue here and not what he overheard him saying

21   to someone else.

22              MR. YOUNG:  Well, your Honor, first of all, I mean

23   these were said in proximity of Mr. Yacoub.  I think the idea

24   of whether or not that was done purposely or not is a factual

25   one for the jury to decide.

1    MR. KUTNICK:  So --

2    MR. YOUNG:  These are party admissions, and they

3    are, they played a role in his decision to make the

4    investment.

5    THE COURT:  Party admission would be -- that would

6    be something else.  I don't know what it is, but he said,

7    well, I also -- I heard him saying things.

8    MR. YOUNG:  The defendant over the phone talking.

9    THE COURT:  What do you expect him to say?

10   MR. YOUNG:  He will say that he heard him talking

11   about like sort of large-dollar figures, and the like, which

12   led him to believe that the defendant was a very successful

13   investor.

14   MR. KUTNICK:  My response is that it's a one-sided

15   conversation.  We don't know who he was talking to, don't

16   know what was being said.  You know, I didn't object when he

17   said, I overheard him talking on the phone.  But as soon as

18   he starts getting into the content, that's when I have an

19   objection.

20   THE COURT:  This is just -- no.

21   MR. YOUNG:  I'll go on, Judge.

22   (Proceedings in open court in the hearing of the jury.)

23   MR. YOUNG:  May I continue, your Honor?

24   THE COURT: Yes, you may.

25   BY MR. YOUNG:

1    Q.   Did you and defendant talk about whether he had any

2    money involved in the transaction?

3    A.   Yes.  He said that he had most of his money invested in

4    this thing.

5    Q.   Did he say how much?

6    A.   No, not how much, but he said most of it.

7    Q.   Mr. Yacoub, you owned a business at the time.  Were you

8    an experienced investor?

9    A.   No, sir.

10   Q.   Had you ever made any types of investments in stocks or

11   bonds or commodities, or things like that?

12   A.   No, not at all, actually, sir.

13   Q.   Why was it you decided to make this investment?

14   A.   It sounded like a good thing, I guess, you know.

15   Q.   What was your understanding, if any, of how much your

16   return would be on this investment?

17   A.   Well, if I invested 50, I would get 250 back.

18   Q.   How was it you came to that understanding?

19   A.   I was told that.

20   Q.   Who were you told that by?

21   A.   By Carlos.

22   Q.   And how was that $250,000 to be paid to you, if that was

23   discussed?

24   A.   No, that was not discussed.

25   Q.   Did you receive a check?

1   A.   Yeah, he gave me a check.

2   Q.   What was the amount -- can you tell us why he gave you

3   that check?

4   A.   I guess to -- you know, as soon as he would tell me to

5   deposit it, I would deposit it.

6   Q.   How much was that check payable for?

7   A.   250,000.

8   Q.   Did the defendant prepare this check in front of you?

9   A.   Yes.

10  Q.   Do you recall the account it was drawn on?

11  A.   I don't recall the account, but it was a Bank of America

12  check.

13  Q.   Did you ever cash the check?

14  A.   No, sir.

15  Q.   Why not?

16  A.   Because I wasn't told to deposit it.  I don't want to

17  deposit that kind of a check in my account.

18  Q.   Why not?

19  A.   Well, I assumed it would bounce.

20  Q.   Did the defendant ever tell you how long it would take

21  to receive the return on your investment, the $250,000

22  return?

23  A.   It wouldn't take more than months.  That's what I was

24  told.

25  Q.   What happened after that, if anything, after that period

1  expired?  Did you have any additional conversations with the

2  defendant?

3  A.   Yeah, I would ask Carlos, what's going on, what's going

4  on, you know.

5  Q.   Where would these conversations take place?  Would it be

6  in your shop, would they be over the phone, or would they be

7  somewhere else?

8  A.   Both.  It would be on the phone, or he would come there.

9  I would ask him, what's going on, you know.

10  Q.   Would anyone else participate in these conversations?

11  A.   No, sir.

12  Q.   How long did these conversations go on, if you recall?

13  A.   Five, 10 minutes, maybe.

14  Q.   And for what period of time did they go on?  Was it a

15  couple -- are we talking a couple conversations or multiple

16  conversations?

17  A.   No, multiple, multiple.

18  Q.   Over what period of time?

19  A.   I don't recollect.  Maybe months.

20  Q.   And can you tell us what the defendant said to you

21  during these conversations about your investment and the

22  return that you had not received?

23  A.   Well, when I was told that it was going to still happen,

24  it's going to happen, it's happening, we're waiting for the

25  government to release the funds, they're being held in the

1    government -- the government is holding the funds, or

2    something like that, you know.

3    Q.    Did you ever receive any money back in connection with

4    your $50,000 investment?

5    A.    No, sir.

6         MR. YOUNG:  I have no further questions, your

7    Honor.

8         THE COURT:  Thank you.

9                    CROSS-EXAMINATION

10   BY MS. ZARDKOOHI:

11   Q.    Good morning, Mr. Yacoub.  You briefly touched upon

12   Mr. Meza helping you with your house, correct, on direct?

13   A.    That is correct.

14   Q.    He actually helped you with the short sale of the house;

15   correct?

16   A.    That is correct.

17   Q.    You were about to lose your property; is that correct?

18   A.    Excuse me?

19   Q.    Were you about to lose your property?

20   A.    The property was already lost.

21   Q.    But he helped you handle that; correct?

22   A.    That is correct, yes.

23   Q.    Okay.  And you said you'd known Mr. Meza for about,

24   well, my God, that's almost 20 something years; correct?  And

25   he is still your customer?

1    A.    Yes.

2    Q.    You have a personal relationship with him, you are

3    acquaintances; correct?

4    A.    Yeah, yeah.

5    Q.    More than that?

6    A.    Yeah, you can say we're more than that.

7    Q.    In the summer of 2013, June of 2013, you invested about

8    $50,000; correct?

9    A.    Yes.

10   Q.    And you wired that money; correct?

11   A.    Yes.

12   Q.    You wired it to Palmore Legal Services; correct?

13   A.    I guess that would be correct, yes.

14   Q.    Any communications with Palmore, any written contract

15   with Palmore Legal Services?

16   A.    For me, no.

17   Q.    Okay.  You said that you're not an investor; correct?

18   A.    Right.

19   Q.    But it sounded like a good thing, this investment;

20   correct?  You knew there was risk involved with it; correct?

21   A.    Sure.

22   Q.    As in with any investment out there; correct?

23   A.    I agree with you.

24   Q.    You also mentioned on direct that Mr. Meza gave you a

25   certain check, about $250,000 check; correct?  You don't have

1   a copy of that check; do you?

2   A.   I don't.

3   Q.   And you never deposited that check?

4   A.   No.

5          MS. ZARDKOOHI:  Okay.  Just a second, your Honor.

6   No more questions, your Honor.

7          MR. YOUNG:  No further questions, your Honor.

8          THE COURT:  All right.  You're excused.  Thank you.

9       (Witness excused.)

10         MR. YOUNG:  Your Honor, the United States calls

11  Steven Tremaglio.

12         COURT SECURITY OFFICER:  All the way up, sir.

13      (Witness sworn.)

14         THE COURT:  Please be seated.

15         THE WITNESS:  Thank you.

16      STEVE TREMAGLIO, GOVERNMENT'S WITNESS, SWORN,

17                  DIRECT EXAMINATION

18  BY MR. YOUNG:

19  Q.   Good morning, Mr. Tremaglio.

20  A.   Good morning.

21  Q.   Can you please state your name and spell your first and

22  your last name for the record.

23  A.   Steve Tremaglio.  First name is spelled S-t-e-v-e.  Last

24  name, T, as in Tom, r-e-m-a-g-l-i-o.

25  Q.   Can you tell us who you work for, Mr. Tremaglio?

Case: 1:17-cr-00281 Document #: 75 Filed: 01/18/19 Page 44 of 234 PageID #:511
Trembczynski - direct by Young
178

1    A.    US Attorney's office.

2    Q.    Can you tell us what you do for the US Attorney's

3    office?

4    A.    I'm an auditor for the US Attorney's office, which means

5    I review and summarize financial records, a variety of

6    records.

7    Q.    How long have you been an auditor with the US Attorney's

8    office?

9    A.    Almost four years.

10   Q.    Can you just very briefly give us an idea of your job

11   experience before you joined the US Attorney's office as an

12   auditor?

13   A.    Yes.  I have a number of years of experience.  My

14   previous employment was with Northwestern University, working

15   in the auditing department.  I was the manager of compliance.

16   I did a variety of auditing-type engagements, as well as

17   manage their ethics point hotline.

18          Prior to that, I worked for a number of consulting

19   accounting firms here in the City of Chicago, auditing

20   financial records, as well as a variety of records, and

21   providing work product to a number of different clients.

22   Q.    Were you asked to review a series of financial records

23   and other business records in this case?

24   A.    Yes, I was.

25   Q.    Did that include various records related to accounts

1    held in the name of Milwaukee McPherson, Renaissance Capital

2    Corporation and other individuals and entities?

3    A.   Yes.

4    Q.   After -- or based upon your review of those various

5    financial and business records, did you prepare certain

6    summary charts?

7    A.   Yes, I did.

8    Q.   There is a box that should be right at your feet,

9    Mr. Tremaglio, if you see it.  And contained in that box are

10   a number of exhibits that I am going to read out very

11   quickly.

12        Government Exhibit ACB-1, Government Exhibit BCU-1.

13   Government Exhibit BOA-1 through 3.  Government Exhibit

14   CLC-1.  Government Exhibits COB-1 through 3.  Government

15   Exhibits CB-1 through 5.  Government Exhibit FRB-1.

16   Government Exhibit MBFB-1.  Government Exhibits PNC-1 and 2.

17   Government Exhibit SNSC-1 and Government Exhibit WFB-1.

18        Are those the documents, or at least some of the

19   documents, that you have reviewed in connection with this

20   case?

21   A.   Yes.

22   Q.   And are those the documents that you have reviewed

23   particularly for purposes of preparing charts in connection

24   with this case?

25   A.   Yes.

 1            MR. YOUNG:  Okay.  Your Honor, the government would

 2   move to admit the exhibits I had just listed pursuant to the

 3   motion and the 902(11) certification form that was previously

 4   filed by the government, with the exception of Government

 5   ACB-1, which is already in evidence.  But I would otherwise

 6   move in all the other documents, your Honor.

 7            MR. KUTNICK:  No objection, your Honor.

 8            THE COURT:  They're admitted.

 9         (Said exhibits received in evidence.)

10   BY MR. YOUNG:

11   Q.   I'd like to direct your attention specifically now to

12   Government Exhibits PNC-1 and PNC-2.  Do those records relate

13   to an account maintained on behalf of a particular entity or

14   company?

15   A.   Yes, they do.

16   Q.   What is the name of that company or entity?

17   A.   PNC-1 relates to Milwaukee McPherson LLC and PNC-2 also

18   relates to Milwaukee McPherson LLC, I believe.

19   Q.   Can you tell us the name of the signatory on the

20   Milwaukee McPherson account that was held at PNC Bank?

21   A.   Yes.  Carlos R. Meza.

22   Q.   And based upon your review of that account, were funds

23   wired into that account at any point in time?

24   A.   Yes, there were funds wired into that account, yes.

25   Q.   Did that include funds from a Scott Spencer and a

1    Cordell Crane?

2    A.   Yes.

3    Q.   Mr. Tremaglio, I've just handed you what has been marked

4    as Government Exhibits SC-1 through SC-5.  Are those the

5    charts that you have prepared in connection with this case?

6    A.   Yes, they are.

7    Q.   Okay.  And they're based upon that big box of records

8    sitting right in front of you; is that correct?

9    A.   Yes, they are.

10   Q.   And I'd like to direct your attention first to

11   Government Exhibit SC-5.  Are you familiar with that chart?

12   A.   Yes.

13   Q.   And that chart, in particular, summarizes information

14   contained in the Milwaukee McPherson account records?

15   A.   Yes.

16   Q.   And does that chart fairly and accurately summarize

17   information contained in the Milwaukee McPherson account

18   records that had been entered as Government Exhibits PNC-1

19   and PNC-2?

20   A.   Yes.

21            MR. YOUNG:  Your Honor, the government would move

22   to admit into evidence Government Exhibit SC-5.

23            MR. KUTNICK:  No objection, Judge.

24            THE COURT:  It's admitted.

25        (Said exhibit received in evidence.)

1          MR. YOUNG:  May I publish the exhibit, your Honor?

2          THE COURT:  Yes.

3     BY MR. YOUNG:

4     Q.   Directing your attention to the first page of Government

5     Exhibit SC-5.  This relates to the Milwaukee McPherson 5392

6     account.  Can you tell us the information that this chart

7     summarizes, the type of information that this chart

8     summarizes?

9     A.   Yes.  In the top row -- well, first, there is a header

10    title which shows the bank -- the bank information.  So PNC

11    Bank, and what account it relates to, as well as the

12    signatory on the account.  The account number is -- the last

13    four of the account number is 5392, and the period of time

14    that the chart details, so 5/14, 2012 to 11/30, 2012.  The

15    header information on the chart is -- the first column

16    relates to a number reference for each row, the date the

17    transaction was posted, the particular description for each

18    of the transactions, the deposit amount and withdrawal

19    amounts, as well as the balance on each particular day.

20    Q.   Did each transaction receive a different number, 1, 2,

21    3, 4, 5?

22    A.   Yes.

23    Q.   How many different transactions are summarized on this

24    chart?

25    A.   I can't see.  Let's see, I can tell you here.

1   Q.   Flip to the last page of the document in front of you.

2   A.   Yep.

3   A.   One hundred and -- let's see here.  So particular

4   transactions, there would be 177 transactions.  The last two

5   items are related to balances.

6   Q.   Okay.  Directing your attention back to the Page 1 of

7   the chart.  You stated that the chart covers a period

8   beginning with May 14th of 2012.  Did your review of records

9   related to this account reflect when the account was opened?

10  A.   Yes.

11  Q.   And when was that?

12  A.   May 14, 2012.

13  Q.   And is that reflected on your chart?

14  A.   Yes, it is.

15  Q.   What item number is that reflected on?

16  A.   No. 1.

17  Q.   Can you tell us what the balance of the account was at

18  the time it was opened on May 14th of 2012?

19  A.   Zero balance.

20  Q.   You indicated that there were a number of transactions,

21  I've already forgotten.  But going to the last page of the

22  exhibit, the chart covered the period through November 30th

23  of 2012.  Was the account closed on that date?

24  A.   I don't know if it was closed.  There was a -- I would

25  say no because there was a zero balance, but the statements

 1   continued.

 2   Q.   And the balance on the account was zero?

 3   A.   That's correct.

 4   Q.   Okay.  Going back to Page 1 of the exhibit.  As part of

 5   your review of these account records, did you particularly

 6   look for transfers made into the account that appeared to

 7   emanate from Scott Spencer and Cordell Crane?

 8   A.   Yes.

 9   Q.   Do you recall approximately how many such transfers into

10   the account you saw emanating either from Mr. Spencer or

11   Mr. Crane?

12   A.   There were five deposits from Mr. Spencer and one

13   deposit from Mr. Crane.

14   Q.   Did you mark or highlight those deposits or transfers

15   into the account in some manner on this chart?

16   A.   Yes, I did.  I highlighted them in yellow.

17   Q.   Directing your attention now back to Page 1 of

18   Government Exhibit SC-5, and particularly drawing your

19   attention to Item No. 3, which is highlighted.  Was that one

20   of the transfers made into the account?

21   A.   Yes.

22   Q.   Can you tell us who originated that transfer based upon

23   your review of the records?

24   A.   Scott Spencer.

25   Q.   Can you tell us the amount?

1    A.    $200,000.

2    Q.    Can you tell us the date that that transfer was made

3    into the account?

4    A.    May 16, 2012.

5    Q.    And I've been using the word transfer.  How was the

6    transfer made into the account for the deposit?

7    A.    Fedwire.

8    Q.    Can you tell us what the account balance was on the date

9    Mr. Spencer wired the $200,000 into the account?

10   A.    So it was zero balance when he transferred.  And after

11   the transfer went through, it was 200,000.

12   Q.    And you indicated earlier that the account had been

13   opened prior to that.  How many days prior to the wiring of

14   Mr. Spencer's $200,000 deposit had the account been opened?

15   A.    Two days.

16   Q.    Were there any withdrawals made from the account

17   following the deposit of Mr. Spencer's $200,000 on May 16th

18   of 2012?

19   A.    Yes, there were.

20   Q.    Directing your attention now to Items 4, 5, 6 -- I'm

21   sorry, directing your attention first to Items 4 and 5.  Are

22   those some of the withdrawals you saw in the account records

23   following the deposit of Mr. Spencer's money?

24   A.    Yes.

25   Q.    And can you tell us how the withdrawals summarized on

1    those lines, 4 and 5, were made, if you know?

2    A.    There were -- there were -- can you repeat that

3    question?

4    Q.    Sure.  Do you know how those withdrawals were made?

5    A.    Not exactly, no.  There was just withdrawals of money on

6    each of those two days.

7    Q.    Can you tell us the amounts of the money?

8    A.    Yes.  On May 17th, $2,500 was withdrawn from the

9    account.  And the following day, on 5/18, $1,500 was

10   withdrawn.

11   Q.    Directing your attention to the next three items, the

12   items summarized on 6, 7 and 8, do those lines also summarize

13   withdrawals that you found in the account following the

14   deposit of Mr. Spencer's money?

15   A.    Yes.

16   Q.    Can you tell us when those withdrawals were made, or at

17   least posted to the account?

18   A.    Yes.  The $800 withdrawal was made on May 22nd, 2012.

19   $285.01 was made on May 23rd, 2012, and $450 was withdrawn

20   from the account on May 24, 2012.

21   Q.    How were those withdrawals made?

22   A.    By check.

23   Q.    Who were those checks made payable to?

24   A.    On May 22nd, it was -- the check was made payable to

25   Thomas Czajka.  On May 23rd, the check was made payable to

1    ABT.  And on May 24th, the check was made payable to Itzel

2    Carreon.

3    Q.   Directing your attention now to Line Item No. 9.  Does

4    that line item reflect another withdrawal made on the

5    account?

6    A.   Yes, it does.

7    Q.   Can you tell us the amount of that withdrawal?

8    A.   $28,012.65.  And it was a cashier's check made out to

9    ALSJ, Incorporated.

10   Q.   It looks like the next line item reflects a deposit.

11   How much was deposited?

12   A.   $1,500.

13   Q.   And did your review of records reflect the source of

14   that deposit?

15   A.   Yes, it does.

16   Q.   What was the source?

17   A.   There were two checks for $750 each from The Church of

18   Jesus Christ of Latter-Day Saints.

19   Q.   Can you tell us what the balance was in the account

20   prior to that deposit of $1,500?

21   A.   $166,452.34.

22   Q.   And following the deposit of that check, were there

23   additional withdrawals made from the account, according to

24   your review?

25   A.   Yes, there were.

1  Q.   And are those withdrawals summarized in Items 11 through

2  21?

3  A.   Yes, they are.

4  Q.   Drawing your attention particularly to Line Item No. 13,

5  can you tell us how much was withdrawn as summarized on that

6  line item?

7  A.   $22,756.

8  Q.   And can you tell us when that withdrawal of $22,756 was

9  posted to the account?

10  A.   On May 30, 2012.

11  Q.   Can you tell us how that withdrawal was made?

12  A.   By cashier's check made out to Crystal Lake Chrysler

13  Jeep.

14  Q.   In connection with your testimony here today, have you

15  also reviewed records obtained from Crystal Lake Chrysler

16  Jeep?

17  A.   Yes, I have.

18  Q.   Okay.  Directing your attention to Government Exhibit

19  CLC-1, which would be in the box sitting before you, but I

20  will also post it -- publish it on the screen, if you give me

21  a moment.  Is that the first page of Government Exhibit

22  CLC-1?

23  A.   Yes, it is.

24  Q.   And does this relate to a deal that occurred at Crystal

25  Lake Chrysler Jeep Dodge in May of 2012?

1  A.  Yes.

2  Q.  Okay.  And specifically does it relate to a transaction

3  that occurred on May 29th of 2012?

4  A.  Yes.

5  Q.  Can you tell us what type of vehicle was purchased in

6  connection with this transaction?

7  A.  2008 Nissan Quest.

8  Q.  Can you tell us the name of the purchaser as reflected

9  on the documentation?

10  A.  Dwinell I. Meza.

11  Q.  Can you tell us the amount that was due by the purchaser

12  on the date of the purchase of this Nissan Quest?

13  A.  Yes, $22,756.02.

14  Q.  Did the records related to this transaction also include

15  a check?

16  A.  Yes.

17  Q.  Directing your attention to Page 3 of the exhibit, is

18  that the check that you just referenced?

19  A.  Yes, it is.

20  Q.  And is this a cashier's check?

21  A.  Yes, it is.

22  Q.  Can you tell us the bank that this cashier's check is

23  drawn upon?

24  A.  PNC Bank.

25  Q.  And can you tell us the amount of this cashier's check?

Case: 1:17-cr-00281 Document #: 75 Filed: 01/18/19 Page 56 of 234 PageID #:523
Tremaglio - direct by Young
190

1    A.    $22,756.

2    Q.    Directing your attention now back to SL -- I'm sorry,

3    SC-5.  My apologies.  There are too many initials in this

4    case with the exhibits.

5          All right.  Back to Government Exhibit SC-5 and the

6    first page thereof.  Looking below, Line Item No. 13, which

7    was the Crystal Lake Chrysler transaction, are there

8    additional withdrawals reflected on the account?

9    A.    Yes.

10   Q.    With respect to Item No. 16, the withdrawal in the

11   amount of $3,000, can you tell us how that withdrawal was

12   made?

13   A.    It was a check withdrawal to Golan & Christie LLP.

14   Q.    And there is a reflection on the line item for legal

15   fees.  Where was that information obtained from?

16   A.    The memo line of the check.

17   Q.    There are -- there is also a check withdrawal summarized

18   in Line 18.  Could you tell us who that check was made

19   payable to?

20   A.    Animal Care Clinic.

21   Q.    Can you tell us what the balance was of the account

22   following the withdrawal of the check made payable to the

23   Animal Care Clinic?

24   A.    $129,454.23.

25   Q.    And at this point in time the only deposits had been the

1    Spencer money and the $1,500 from the church; is that

2    correct?

3    A.    That's correct.

4    Q.    There are additional withdrawals reflected in Items 20

5    and 21, and they're reflected as ACH Web.  Can you describe

6    what kind of withdrawals those would be?

7    A.    That's an electronic withdrawal.  Um, yes, it's an

8    electronic withdrawal.

9    Q.    Can you tell us who those electronic withdrawals were

10   paid to based upon your review of the records and as

11   summarized in this chart?

12   A.    To Vonage.

13   Q.    Do you know what Vonage is?

14   A.    Vonage is a phone and a media provider, an internet

15   media provider.

16   Q.    Directing your attention now to Page 2 of the exhibit,

17   there are some additional withdrawals reflected, but I want

18   to direct your attention specifically to Item No. 24, a

19   withdrawal in the amount of $100,000 that occurred on

20   June 11, 2012.  Can you tell us who that money was sent to?

21   A.    It was sent to Stubbs Alderton & Markiles LLP.

22   Q.    Can you tell how that withdrawal was made from the

23   account?

24   A.    Via Fedwire.

25   Q.    Can you tell us what the balance was -- can you tell us

1    what the balance in the account was prior to the withdrawal

2    of the wiring of the $100,000 to -- I'll just call them

3    Stubbs, to Stubbs?

4    A.    $127,696.43.

5    Q.    What was the balance after?

6    A.    $27,696.43.

7    Q.    And the entry reflects that the payment was for

8    attorney-client trust.  Where was that information obtained

9    from?

10   A.    That information was obtained from the Fedwire -- from

11   the Fedwire.

12   Q.    What is an attorney-client trust?

13   A.    It is a specific account or trust for holding client

14   funds.

15   Q.    There is another deposit on Line 26 in the amount of

16   $9,000.  Are you able to determine the source of that deposit

17   or the source of those funds?

18   A.    No, but it -- besides being cash, no.

19   Q.    Directly below that there is a withdrawal for the amount

20   on Line 27 of $8,000.  Can you tell us who that money was

21   paid to and how it was paid?

22   A.    It was paid to Ray Yacoub by check.

23   Q.    Directing your attention now to another one of the

24   highlighted transfers into the account, specifically Line 30.

25   Can you tell us how much was transferred in on the -- in

1    connection with the transaction summarized on that line?

2    A.    $80,000.

3    Q.    Can you tell us where -- who that money was provided

4    from, or by?

5    A.    It was provided from Scott Spencer via Fedwire.

6    Q.    What was the date of that transfer into the account?

7    A.    June 18, 2012.

8    Q.    What was the balance of the account at the time the

9    transfer of $80,000 was received into the account?

10   A.    It was $15,557.01.

11   Q.    It appears there is -- okay.  There is a withdrawal

12   right underneath the transfer, but I want to direct your

13   attention two lines down to another withdrawal from the

14   account as reflected on Line 32.  Can you tell us the amount

15   that was transferred out of the account as summarized in that

16   line?

17   A.    $80,000.

18   Q.    And where was that money sent to?

19   A.    Stubbs Alderton & Markiles LLP.

20   Q.    And how was it sent?

21   A.    It was sent via Fedwire.

22   Q.    Can you tell us what the balance was in the account

23   following the wiring of the $80,000 to Stubbs on June 19th of

24   2002?

25   A.    $14,357.01.

Case: 1:17-cr-00281 Document #: 75 Filed: 01/18/19 Page 60 of 234 PageID #:527
Tremaglio - direct by Young
194

1    Q.   And there are some additional withdrawals summarized on

2    the account records, is that correct, below that?

3    A.   That's correct.

4             MR. YOUNG:  I'm sorry, your Honor, may I have a

5    moment?

6             THE COURT:  Yes.

7    BY MR. YOUNG:

8    Q.   And it looks like, among other withdrawals, there is

9    a -- oh, I'm sorry.

10   A.   You're good, go ahead.

11   Q.   Among other withdrawals, I won't go over them, but there

12   is another check payable to ALSJ, Inc.; is that correct?

13   A.   Yes.

14   Q.   In addition to the $28,000 check we talked about

15   previously?

16   A.   Yes.

17   Q.   And flipping now to Page 3, it appears there are a

18   number of withdrawals summarized -- or on the top portion of

19   that exhibit; is that correct?

20   A.   Yes.

21   Q.   Okay.  And, among others, there were additional checks

22   written, as well as additional ACH transactions?

23   A.   Yes.

24   Q.   The ACH transactions include payments to Allstate, as

25   summarized in 47, 48, and 51?

1    A.    That's correct, yes.

2    Q.    And are there also checks payable to Olympia Carpet,

3    Logan Square Pest Control and Highland Park Auto?

4    A.    Yes.

5    Q.    All right.  If I could direct your attention now down to

6    the highlighted items appearing towards the bottom of Page 3,

7    specifically Items 59 and 60.  Are those two additional

8    transfers into the account?

9    A.    Yes.

10   Q.    Who are those transfers from?

11   A.    Both transfers were from Scott Spencer via Fedwire.

12   Q.    And can you tell us the amounts of those two transfers

13   into the account from Scott Spencer?

14   A.    Both on the same day for $20,000 and $15,000.

15   Q.    What was the date that they were transferred into the

16   account, or wired in?

17   A.    August 21st, 2012.

18   Q.    What was the balance on the account prior to the receipt

19   of these two wires totaling $35,000 from Scott Spencer?

20   A.    $2,375.15.

21   Q.    What was the balance after receiving these two wires?

22   A.    $37,375.15.

23   Q.    Can you see any withdrawals made from the account

24   following the deposit of these funds from Mr. Spencer?

25   A.    Yes, I did.

1    Q.    Is one of those withdrawals summarized on Line 61?

2    A.    Yes, it is.

3    Q.    Can you tell us the amount of that withdrawal and how it

4    was made?

5    A.    $10,000 made via check to Golan & Christie, LLP.

6    Q.    And what date was that check posted?

7    A.    August 22nd, 2012.

8    Q.    And did the check indicate in the memo line what the

9    payment was for?

10   A.    Yes.   It was for escrow for 2715 North Milwaukee, LLC.

11   Q.    Directing your attention now to the next page of the

12   exhibit, Page 4 of Government Exhibit SC-5, and particularly

13   the item summarized on the top-hand portion of the document.

14   Directing your attention to Line Item 62, does that reflect

15   another withdrawal that was made from the account?

16   A.    Yes, it does.

17   Q.    What was the date of that withdrawal?

18   A.    August 22nd, 2012.

19   Q.    And how were those funds withdrawn?

20   A.    Via Fedwire.

21   Q.    And can you tell us the amount of the wire and to whom

22   the wire was sent?

23   A.    The amount was $11,250 to Renaissance Capital Group,

24   LLC.

25   Q.    And are there additional wires reflect -- or additional

 1    withdrawals reflected beneath that entry?

 2    A.    Yes.

 3    Q.    I'd like to direct your attention now to Line Item 67.

 4    Was this -- does Line Item 67 summarize a deposit or

 5    withdrawal from the account?

 6    A.    A deposit.

 7    Q.    How much?

 8    A.    $50,000.

 9    Q.    And how was that deposit made to the account?

10    A.    Via Fedwire.

11    Q.    And can you tell us what the balance of -- can you tell

12    us what the balance of the account was prior to receiving the

13    deposit of $50,000?

14    A.    $12,537.95.

15    Q.    And when was that deposit of $50,000 received or posted

16    to the account?

17    A.    August 27, 2012.

18    Q.    What was the source of that deposit of $50,000?

19    A.    It was from ALSJ, Incorporated.

20    Q.    Directing your attention to Item 69 and 70, do those

21    lines relate to withdrawals made from the account?

22    A.    Yes, they do.

23    Q.    Can you tell us how those withdrawals were made?

24    A.    They were both made via Fedwire.

25    Q.    Were they made on the same date?

1    A.   Yes, they were.

2    Q.   What was that date?

3    A.   August 27, 2012.

4    Q.   What is the total amount of the two wires summarized in

5    Lines 69 and 70?

6    A.   Total of $50,000.

7    Q.   Can you tell us who that $50,000 was sent to --

8    A.   It was sent to --

9    Q.   -- if it was to the same entity or person?

10   A.   It was sent to Renaissance Capital Group, LLC.

11   Q.   And what was the balance left in the account following

12   the transfer of the $50,000 to Renaissance Capital Group?

13   A.   $12,076.16.

14   Q.   And there are additional withdrawals reflected on the

15   remainder of Page 4; is that correct?

16   A.   Yes.

17   Q.   And it includes, among other things, additional payments

18   made to ALSJ, Inc.?

19   A.   Yes.

20   Q.   Directing your attention now to Page 5 of the exhibit,

21   and there are additional withdrawals as well as a deposit

22   reflected on the top-hand portion of the document; is that

23   right?

24   A.   Yes.

25   Q.   And can you tell us the amount of the deposit that is

1    reflected on Line 83?

2    A.   Total of $3,475.46.

3    Q.   And there is additional withdrawals reflected as you go

4    down the page; is that correct?

5    A.   Yes.

6    Q.   I'd like to direct your attention now to the line items

7    appearing towards the bottom of the document, and

8    specifically Line Item No. 57.  Is that another one of the

9    highlighted transfers into the account?

10   A.   Yes, on Line Item No. 97, yes.

11   Q.   I'm sorry, did I say -- I may have misspoke.

12   A.   I think you said 57.

13   Q.   My apologies.  Can you tell us the date of that transfer

14   into the account?

15   A.   September 19, 2012.

16   Q.   And can you tell us the source as reflected in the

17   records for that $50,000 wire?

18   A.   Cordell and Starley Crane.

19   Q.   Can you tell us what the balance was in the account at

20   the time this $50,000 was transferred in from Cordell and

21   Starley Crane?

22   A.   It was a negative balance of $71.62.

23   Q.   Were there withdrawals made from the account following

24   the deposit of $50,000 from the Cranes?

25   A.   Yes.

Q.    And if I could direct your attention to one of those

withdrawals in particular, and that is the one appearing on

Line No. 100.  Can you tell us the date of that withdrawal?

A.    It was the same date of September 19, 2012.

Q.    Can you tell us how that withdrawal was made?

A.    It was made via a cashier's check to ALSJ, Inc.

Q.    Can you tell us the amount that that cashier's check was

issued in?

A.    $47,500.

Q.    What was the balance in the account following the

posting of the cashier's check for $47,500?

A.    $2,378.38.

Q.    Okay.  There are additional withdrawals and deposits

reflected on Page 6; is that correct?

A.    Yes.

Q.    With one of the deposits being as high as $5,500; is

that correct?

A.    Yes.

Q.    Directing your attention to Page 7 of the chart, and

particularly Line Item 135.  Is there another withdrawal from

the account summarized on that line?

A.    On Line Item 135?

Q.    Yes, sir.

A.    Yes, there is.

Q.    Can you tell us how that withdrawal was made?

Case: 1:17-cr-00281 Document #: 75 Filed: 01/18/19 Page 67 of 234 PageID #:534
Fremgen - direct by Young
201

1    A.    It was made via check to Golan & Christie, LLP.

2    Q.    Did the check reflect what it was for in the memo line?

3    A.    It did.  2715 North Milwaukee.

4    Q.    And how much was that check made payable for?

5    A.    $7,500.

6    Q.    All right.  Directing your attention to Line Item

7    No. 139, which is another one of the highlighted line items.

8    Does that reflect another one of the transfers into the

9    account?

10    A.    Yes, it does.

11    Q.    Can you tell us the amount of that transfer into the

12    account?

13    A.    $418,752,00.

14    Q.    What was the date of that transfer?

15    A.    October 18, 2012.

16    Q.    And can you tell us who that transfer was made by or

17    obtained from?

18    A.    Guaranty National Title Company.

19    Q.    The last line item on that line, or the last item

20    reflected on that line is a reference.  Can you read that for

21    us?

22    A.    Mortgage 14 Lake Marian proceeds.

23    Q.    Were there withdrawals made from the account following

24    this deposit of $418,000 in October 2012?

25    A.    Yes, there was.

1  Q.  And are those reflected, in part, on Line Items 140 and
2  141?
3  A.  Yes.
4  Q.  Directing your attention to Line Item 140, can you tell
5  us how much was withdrawn from the account on the date
6  reflected in that line item?
7  A.  Yes.  400,000.
8  Q.  What was the date?
9  A.  October 18, 2012.
10  Q.  The same day as the transfer in of the money from
11  Guaranty National Title Company?
12  A.  Yes.
13  Q.  And based on your review of records, was that -- did
14  that money emanate from Scott Spencer?
15  A.  Yes, it was.
16  Q.  And who was the $400,000 sent to on October 18, 2012?
17  A.  It was sent to Renaissance Capital Group LLC via
18  Fedwire.
19  Q.  Was a portion of the $418,000 also returned to
20  Mr. Spencer?
21  A.  Yes, it was.
22  Q.  Is that reflected in Line Item 141?
23  A.  Yes.
24  Q.  Can you tell us how much was transferred back to
25  Mr. Spencer?

1    A.    $18,750.

2    Q.    There are additional transactions from the account

3    reflected on Pages 8 and 9; is that correct?

4    A.    Yes.

5    Q.    And as we said before, it ends in November of 2012; is

6    that correct?

7    A.    Yes.

8    Q.    All right.  You testified earlier that approximately

9    $180,000 was sent from the Milwaukee McPherson's account to

10   the entity Stubbs Alderton & Markiles.  Do you recall that

11   testimony?

12   A.    Yes, I do.

13   Q.    As part of your -- or in preparation for your testimony

14   here today, did you also review records related to the

15   account held by Stubbs Alderton & Markiles?

16   A.    Yes.

17   Q.    And did those records include the records that had been

18   marked into evidence and now entered into evidence as

19   Government Exhibits FRB-1?

20   A.    Yes.

21   Q.    Now, in addition to the chart we've been looking at, did

22   you prepare other summary charts?

23   A.    Yes, I did.

24   Q.    And those summary charts have been marked and are

25   sitting in front of you as Government Exhibits SC-1 through

1    SC-4; is that correct?

2    A.   Yes.

3    Q.   And do those charts summarize the deposits made by

4    Mr. Crane and Mr. Spencer that we've been talking about?

5    A.   Yes.

6    Q.   Do they also describe or summarize other information

7    related to deposits and withdrawals from the accounts that

8    we've been talking about and that are reflected in the

9    exhibit sitting in front of you?

10   A.   Yes.

11   Q.   And those deposits and withdrawals are all in relation

12   to deposits made by Mr. Crane and Mr. Spencer; is that

13   correct?

14   A.   Yes, they do.

15   Q.   Were there also transfers made from a Mr. Yacoub as

16   well?

17   A.   Yes.

18   Q.   And that's reflected in at least one of your charts; is

19   that correct?

20   A.   Correct, yes.

21   Q.   Do the charts marked as Government Exhibits SC-1 through

22   SC-4 fairly and accurately summarize some of the information

23   that is contained in the exhibits that are sitting in front

24   of you?

25   A.   Yes, they do.

1          MR. YOUNG:  Your Honor, the government would move

2     to admit Government Exhibits SC-1 through SC-4.

3          THE COURT:  Any objection?

4          MR. KUTNICK:  One moment, please, your Honor.

5          Your Honor, I would just object because they're not

6     complete.  They're not the complete picture.  They're just a

7     segment of --

8          THE COURT:  We will take a sidebar.

9          We started late, so I hadn't taken a break.  But if

10    you would like a break -- would you like a break?  Anybody

11    want one?  If not, okay, we will keep going.

12        (At sidebar outside the hearing of the jury.)

13         THE COURT:  I mean, you've seen these exhibits

14    before.

15         MR. KUTNICK:  Yes, I've seen them.  I've seen them,

16    but I just object to the extent that they are not the

17    complete picture, as Mr. Young just asked in his question:

18    Are these portions of what you prepared?

19         MR. YOUNG:  Well, your Honor, I'm sorry --

20         THE COURT:  Okay.  I'm just not sure why we're

21    needing to do this now.  Didn't you have these at the time of

22    the pretrial?

23         MS. ZARDKOOHI:  No, they were --

24         MR. KUTNICK:  No, we got them afterwards, actually.

25         MR. YOUNG:  Your Honor, they have been getting

1    versions of these over time, and we pared them down.  The

2    Rule 1006 clearly contemplates you don't have to summarize

3    the entire exhibit.

4              THE COURT:  Of course, I think it was the way the

5    question was phrased.

6              MR. YOUNG:  They have the entire chart.  We've

7    talked about that they want it admitted or use it with

8    Mr. Tremaglio, they're free to do so.  It basically

9    simplifies the information focused on certain transaction.

10             THE COURT:  In what way is it misleading?

11             MR. KUTNICK:  It doesn't show the complete picture.

12             MS. ZARDKOOHI:  There is no --

13             MR. KUTNICK:  It doesn't show all the money that's

14   going up into Robert Adams.  It doesn't show where the

15   money -- that the money goes somewhere else from Robert

16   Adams.

17             MS. ZARDKOOHI:  Other deposits, one piece of that

18   deposit, is actually from Meza's company.  It just says other

19   deposits instead of showing his, how small contribution to

20   the --

21             MR. KUTNICK:  Same here with other, other

22   withdrawals.

23             MS. ZARDKOOHI:  I mean, you can go into all of that

24   eventually.

25             MR. YOUNG:  I think it goes to weight more than

1    admissibility, your Honor.

2         THE COURT:  Sounds like it.  Okay.  I will leave

3    it, then, subject to cross-examination.

4         MR. YOUNG:  May I publish the exhibits?

5         THE COURT: Yes, you may.

6         (Proceedings in open court in the hearing of the jury.)

7    BY MR. YOUNG:

8    Q.   Mr. Tremaglio, directing your attention to Government

9    Exhibit SC-1 first, which I will pull up on the screen.

10        Does this chart summarize the flow of certain

11   funds -- well, certain funds reflected in the records that

12   you have reviewed?

13   A.   Yes, it does.

14   Q.   And directing your attention to the lower portion of the

15   chart, does it summarize the deposits of $280,000 made by

16   Mr. Spencer on May 16th of 2012, and June 18th of 2012?

17   A.   Yes.

18   Q.   Does it also summarize the withdrawal of certain funds

19   from the Milwaukee McPherson account that we've been talking

20   about?

21   A.   Yes.

22   Q.   It does not reflect or summarize all the withdrawals;

23   does it?

24   A.   That's correct.

25   Q.   Does this chart also reflect the withdrawal or the

1   transfer of 180,000 out of the account to Stubbs Alderton &

2   Markiles that we've been talking out of the Milwaukee

3   McPherson account?

4   A.   Yes.

5   Q.   Can you tell us where on the chart that is summarized?

6   A.   It's in the middle of the page above Milwaukee McPherson

7   LLC.

8   Q.   And can you remind us of the dates of the transfers from

9   Milwaukee McPherson to Stubbs Alderton & Markiles as

10  reflected on this chart?

11  A.   Yes.  $100,000 on June 11, 2012, and $80,000 on June 19,

12  2012.

13  Q.   Now, in addition to other records that you reviewed and

14  summarized, you reviewed records relating to accounts held by

15  Renaissance Capital Corporation; is that correct?

16  A.   Yes.

17  Q.   And does that include an account held by Renaissance

18  Capital Group at Bank of America?

19  A.   Yes.

20  Q.   And that -- those records are contained in one of the

21  BOA exhibits that we referenced earlier; is that correct?

22  A.   Yes.  Yes.

23  Q.   Can you tell us the signatory on the Renaissance Capital

24  Group as summarized on this chart and reflected in the

25  records you reviewed?

1   A.   Yes.  One of the signatories is Robert A. Adams.

2   Q.   Did your review of records reflect that funds were

3   transferred from the Stubbs Alderton & Markiles account to

4   Renaissance Capital following the receipt of funds from Scott

5   Spencer?

6   A.   Yes.

7   Q.   Can you tell us how much was transferred to Renaissance

8   Capital Corporation from Stubbs Alderton & Markiles following

9   this deposit of Mr. Spencer's money?

10  A.   $150,000 on June 19, 2012.

11  Q.   Did you find that funds were also sent from the Stubbs

12  Alderton & Markiles account to another source on that same

13  day?

14  A.   Yes, for in the amount of $30,000.

15  Q.   And who were those funds sent to?

16  A.   SN Servicing Corporation.

17  Q.   Now, records related to the Stubbs Alderton & Markiles

18  account had been entered into evidence, but this chart does

19  not summarize all the deposits into or out of that account;

20  does it?

21  A.   No, it doesn't.

22  Q.   Now, in connection with your review of records and in

23  preparation for your testimony today, did you obtain records

24  from SN Servicing Corporation?

25  A.   Yes.

1    Q.   And do you know what SN Servicing Corporation is?

2    A.   It is a loan provider.

3    Q.   Directing your attention to Government Exhibit SNSC-1.

4    A.   Let me just correct what I just said.  I believe it's a

5    loan servicing or administrator that accepts payments for

6    loans.

7    Q.   Directing your attention to what was entered into

8    evidence earlier in your testimony, Government Exhibit SNC-1,

9    is this one of the records obtained from SN Servicing

10   Corporation?

11   A.   Yes, it is.

12   Q.   And does it relate to the $30,000 wire we've just been

13   talking about on June 19th of 2012?

14   A.   Yes.

15   Q.   Okay.  And does it indicate that it was applied to a

16   particular account?

17   A.   Yes, an account in the borrower's name of Gladys

18   McPherson.

19   Q.   You also prepared Charts 2 through 4 summarizing

20   deposits or transfers made by Mr. Spencer, Mr. Crane and

21   Mr. Yacoub; is that correct?

22   A.   Yes.

23   Q.   And I want to jump forward for the purpose of saving

24   some time to Government Exhibit SC-3.  Give me a moment, I

25   will put it up on the screen as well.

1          Does this chart summarize the flow of certain funds

2      between September 19th of 2012, and November 30th of 2012?

3      A.    Yes.

4      Q.    And does it more particularly summarize funds being

5      deposited into and withdrawn from the Milwaukee McPherson

6      account?

7      A.    Yes.

8      Q.    Directing your attention to the lower portion of the

9      document, does it reflect the deposit of $50,000 and $418,000

10     by Mr. Spencer and Mr. Crane that we previously talked about?

11     A.    Yes.

12     Q.    And does it also reflect the withdrawal of those funds

13     or the withdrawal of certain funds around the time that those

14     funds were placed into the account?

15     A.    Yes, it does.

16     Q.    Okay.  And do the withdrawals include the transferring

17     of $400,000 to Renaissance Capital Corporation on

18     October 18th of 2012?

19     A.    Yes.

20     Q.    Directing your attention now to Government Exhibit SC-4.

21     We've been talking about the Milwaukee McPherson account.

22     Does this summary chart reflect the transfer into, or at

23     least some of the transfers into, and transfers out of

24     another account?

25     A.    Yes, it does.

1     Q.    And can you tell us the name of that account or the
2     account holder for that account?
3     A.    The name of the account is Palmore Legal Services, PLLC
4     IOLTA.  And the name on the -- signatory on the account is
5     Chiketa R. Palmore-Bryant.
6     Q.    And that account was held at what bank?
7     A.    Chase.  JP Morgan Chase Bank.
8     Q.    Do you know what an IOLTA account is?
9     A.    It's an attorney account.
10    Q.    And does the chart reflect the deposit of certain funds
11    by Mr. Crane, his wife, and Mr. Yacoub into the Palmore
12    account?
13    A.    Yes, it does.
14    Q.    Can you tell us, as summarized on this chart, how much
15    was transferred into the account by Ray Yacoub?
16    A.    $50,000.
17    Q.    And can you tell us the date that that transfer was
18    made?
19    A.    June 24, 2013.
20    Q.    And are there also transfers into that account from
21    Mr. Crane and his wife?
22    A.    Yes.
23    Q.    Or accounts associated with Mr. Crane and his wife, I
24    should say.
25    A.    Yes.

1    Q.   Can you tell us the dates of those transfers?

2    A.   Both of the other two transfers are on July 9, 2013, one

3    in the amount of 100,000, and the other one is 150,000.

4    Q.   And does the chart also reflect, you know, certain

5    withdrawals made from that account, you know, around the time

6    of the transfers in that we've been talking about?

7    A.   Yes.

8    Q.   And are those summarized on the top-hand portion of the

9    document?

10   A.   Yes.

11   Q.   I'm sorry, I lost the zoom function.  One moment.

12               Are those summarized on the top-hand portion of the

13   document?

14   A.   Yes, they are.

15   Q.   Is there also -- directing your attention to the lower,

16   left-hand corner of the document, is there a -- does that

17   summarize a deposit made by Scott Spencer?

18   A.   Yes.

19   Q.   The $400,000 deposit?

20   A.   $40,000 deposit, yes.

21   Q.   I'm sorry, I misspoke.  Does that reflect where that

22   money was transferred to?

23   A.   Yes, Virginia Worldwide Group LLC.

24   Q.   Does it reflect the date of the transfer of that $40,000

25   by Mr. Spencer?

1    A.    Yes, April 19, 2013.

2    Q.    Does it also reflect where that money ultimately went,

3    or, I'm sorry, does it reflect a transfer out of that account

4    after that date?

5    A.    Yes, it does.

6    Q.    And can you tell us where that transfer is summarized?

7    A.    It's on the middle to the left portion of the screen.

8    Q.    And can you tell us how much was transferred on the date

9    we're referring to?

10   A.    $45,000.

11   Q.    What was that date?

12   A.    May 28, 2013.

13   Q.    Last two exhibits, Mr. Tremaglio.  I've handed you what

14   have been marked as Government Exhibits IRS-1 and IRS-2.  Are

15   those both certified copies of tax returns?

16   A.    Yes.

17   Q.    And can you tell us who those tax returns or what years

18   those tax returns relate to?

19   A.    2012 and 2013.

20   Q.    Can you tell us the -- are those individual returns or

21   are those corporate returns?

22   A.    These are individual returns.

23   Q.    Can you tell us the filers that those returns relate to?

24   A.    The filers are Carlos Meza and Dwinell Meza.

25              MR. YOUNG:  Your Honor, the government would move

 1    to admit Government Exhibits IRS-1 and IRS-2 as certified

 2    public records.

 3              MS. ZARDKOOHI:  No objection.

 4              THE COURT:  They're admitted.

 5          (Said exhibits received in evidence.)

 6              MR. YOUNG:  May I publish, your Honor?

 7              THE COURT:  Yes.

 8    BY MR. YOUNG:

 9    Q.   Directing your attention to Government Exhibit IRS-1,

10    and particularly the top portion of the exhibit, you

11    indicated that the filers were Carlos Meza and Dwinell Meza.

12              Does this return reflect Mr. Meza and Ms. Meza's

13    filing status?

14    A.   Yes, it does.

15    Q.   And can you tell us what that filing status was?

16    A.   Married filing jointly.

17    Q.   I'd now like to direct your attention to the middle

18    portion of the first page of the exhibit and particularly the

19    portion that is titled, Income.

20              If I could direct your attention first to Line 7.

21    Does that line reflect the total wages, salaries, tips,

22    et cetera, reported by Mr. Meza and Ms. Meza for 2012?

23    A.   Yes, it does.

24    Q.   Can you tell us what that amount was?

25    A.   $16,101.

1   Q.   Line Items 8A, B, 9A and 9B relate to interest and
2   dividends.  Are there any -- is there any interest income or
3   dividend income reported on any of those lines?
4   A.   No.
5   Q.   Line 12 relates to business income or loss.  Is there a
6   loss or gain reported from a business for this return?
7   A.   There is income of $11,253.
8   Q.   And directing your attention, then, to the bottom at
9   Line 22.  Does it reflect a total income being reported by
10  Mr. Meza and Ms. Meza for 2012?
11  A.   Yes.
12  Q.   Can you tell us what that income is as reflected on
13  Line 22 of the return?
14  A.   $27,354.
15  Q.   If I can now direct your attention to Page 4 of the
16  return.  It is entitled a Schedule C Profit or Loss.  Can you
17  tell us what a Schedule C is?
18  A.   It is a profit or loss statement for a business.  In
19  terms of this business, a sole proprietorship.
20  Q.   And does it indicate who the proprietor is for this sole
21  proprietorship?
22  A.   Carlos Meza.
23  Q.   Does it indicate the type of business that Mr. Meza is
24  engaged in as reported to the Internal Revenue Service?
25  A.   Contractor.

1    Q.    Does it report the address of that business?

2    A.    Yes, it does, on Line E, as 850 Old Willow Road,

3    Prospect Heights, Illinois, and then the zip code.

4    Q.    Directing your attention now to the portion of the

5    document entitled, Income.  Does it reflect gross income for

6    the business?

7    A.    Yes, it does.  An amount of -- a gross receipts of

8    101 -- $108,354.

9    Q.    What are gross receipts?

10   A.    Gross receipts are the gross income of the company.

11   Q.    And does it reflect -- then there is various expenses

12   listed on the return as well; is that correct?

13   A.    I'd like to -- I'd like to correct my former answer.

14   Gross receipts are the gross sales amounts that is reported

15   in the income section of the Schedule C.  Because you will

16   see that, on Line 7, there is a gross income and amount,

17   taking into consideration cost of goods sold and other

18   expenses.  And can you repeat the question, please?

19   Q.    I think you've answered it.  I'd like to direct your

20   attention to the lower portion of the document.  There is

21   varying expenses for the business listed; is that correct?

22   A.    Yes, it is.

23   Q.    And then is there a net gain or loss reported or net

24   income reported for the business after the deduction of

25   expenses?

1    A.   Yes.

2    Q.   Is that reflected on Line 31?

3    A.   Yes, it is.

4    Q.   And was that the amount that carried over to Page 1 of

5    the return?

6    A.   That's correct, yes.

7    Q.   And what was the gross gain for this contracting

8    business?

9    A.   $11,253.

10   Q.   And we made reference to there being no interest or

11   dividends, you know, reflected in the return.  Do you see any

12   other reference to stocks or bank accounts, or anything like

13   that, that would be interest-generating or

14   dividend-generating in the tax returns?

15   A.   No, I don't.

16   Q.   Directing your attention to Government Exhibit IRS-2.

17   Can you tell us the year that this return relates to?

18   A.   2013.

19   Q.   And directing your attention, again, to the middle

20   portion of the exhibit summarizing the income reported by

21   Mr. Meza and Ms. Meza for the 2013 year.  Can you tell us the

22   amount of wages that was reported for this year?

23   A.   $16,344.

24   Q.   Is there any indication of interest or dividends

25   reflected on this return?

1  A.   No.

2  Q.   Is there any -- direct your attention to Line 12.  Does

3  it report income flowing from a business?

4  A.   Yes, it does.

5  Q.   What is that amount?

6  A.   $10,252.

7  Q.   And directing your attention to the bottom, at line --

8  of that portion of the page, Line 22, does it report a total

9  income for the 2013 year for Mr. Meza and Ms. Meza?

10 A.   Yes, it does, an amount of $26,596.

11 Q.   If I can now direct your attention to Page 6 of the

12 exhibit.  If you give me a moment, I will flip there on the

13 computer, hopefully.  Here we go.

14         Is this the Schedule C for the 2013 year?

15 A.   Yes, it is.

16 Q.   And does it reflect that Mr. Meza is the proprietor of

17 the sole proprietorship?

18 A.   Yes.

19 Q.   And the contractor at the same address listed on the

20 earlier return?

21 A.   Yes.

22 Q.   Can you tell us what the gross receipts or sale for

23 Mr. Meza's contracting business was for this year as reported

24 to the Internal Revenue Service?

25 A.   $107,000 and -- $107,549.

1   Q.   And does the return, like the last return we looked at,
2   also describe various expenses for the business?
3   A.   Yes, it does.
4   Q.   And does it list a net profit for the business for 2013?
5   A.   Yes.  An amount of $10,252.
6   Q.   And like the last return, is there any indication of any
7   other bank accounts or stocks or dividends owned by Mr. Meza
8   or Ms. Meza on this return?
9   A.   No.
10               MR. YOUNG:  May I have a moment, your Honor?
11               THE COURT:  Yes.
12               MR. YOUNG:  Your Honor, I tender Mr. Tremaglio.
13               THE COURT:  Okay.  Go ahead.
14               MR. KUTNICK:  One moment, please, your Honor.
15               THE COURT:  Sure.
16                         CROSS-EXAMINATION
17   BY MR. KUTNICK:
18   Q.   Good morning, Mr. Tremaglio.
19   A.   Good morning.
20   Q.   Just give me one minute while I organize my charts.
21               Mr. Tremaglio, first I'd like to start off with
22   Government Exhibit SC No. 5, which you referenced, which is
23   the chart.  Do you have a copy of that in front of you?
24   A.   Yes, I do.
25   Q.   And I --

 1    Judge, do you mind, I am going to use the overhead
 2    projector for this, try to at least.
 3              THE COURT:  Sure, go ahead.
 4    BY MR. KUTNICK:
 5    Q.    Can you see that, Mr. Tremaglio?
 6    A.    No, I can't.
 7    Q.    Now can you?
 8    A.    No.
 9    Q.    No?  It's not up there?  Oh, they're going to put it
10    over there for you.
11    A.    There you go.
12    Q.    Okay.  So, Mr. Tremaglio, Mr. Young went through this
13    exhibit with you, and, I'm sorry, I want to see the whole
14    page, I want you to see the whole page.
15              So Mr. Young went through Government Exhibit SC-5,
16    and he went through all the withdrawals, mainly withdrawals
17    and some of the deposits that went into Mr. Meza's Milwaukee
18    McPherson account; isn't that correct?
19    A.    He didn't go through all of the withdrawals, but we went
20    through a good portion, yes.
21    Q.    Right.  Well, I'd like to go through some of the other
22    withdrawals.
23              So there is this withdrawal, I'm indicating in Line
24    10, and I'm pointing to for -- I mean deposits, rather.  I'm
25    talking about I want to discuss deposits --

1    A.   Oh, okay.

2    Q.   -- that went into the account other than Cordell Crane

3    or Scott Spencer.

4    A.   Okay.

5    Q.   So, first of all, No. 10, you have a deposit of $1,500;

6    correct?

7    A.   Yes.

8    Q.   Okay.  And that's unrelated to the investments, or

9    Mr. Crane, or Mr. Spencer; right?

10   A.   That's correct.

11   Q.   Okay.  And then you have another deposit here, Line 26,

12   on June 14th of $9,000; correct?

13   A.   Yes.

14   Q.   That's also unrelated to Mr. Crane or Mr. Spencer, in

15   your review of the financials; correct?

16   A.   That's -- not necessarily.  That's $9,000 in cash.  I

17   don't know what the source -- besides being cash, I don't

18   know what the source of the money is.

19   Q.   You have no information that that would have come from

20   either Mr. Crane's investment or Mr. Spencer's investment;

21   right?

22   A.   That's correct.

23   Q.   Or Mr. Yacoub's investment?

24   A.   I don't -- I don't know that exactly.

25   Q.   Well, none of Mr. Yacoub's investment ever went into the

1    Milwaukee McPherson account; correct?

2    A.    I would have to -- let me --

3    Q.    We'll get to that in a little while.  I'm going to get

4    to that in a little while.

5    A.    Okay.

6    Q.    Here is another deposit I'm indicating on Line 33,

7    June 20th, a $2,000 deposit from ALSJ, Inc.; correct?

8    A.    Yes.

9    Q.    Okay.  And you don't -- that's not related to Mr. Crane

10   or Mr. Spencer's investment; is it?

11   A.    It is from ALSJ.  I don't know if it's related or not.

12   Q.    Moving on to Page 3, here is another deposit, Line 57,

13   $2,375.15.  Do you know what that deposit is from?

14   A.    I do not, no.

15   Q.    And you don't -- and I'll ask you this for every one.

16   Do you believe that it's related to the investment of

17   Mr. Crane or Mr. Spencer?

18   A.    I don't -- I don't know that information.  And just to

19   point out that this money was transferred into and then taken

20   out of the account the same day.  So whatever the business

21   checking account was, it was basically a wash.

22   Q.    So noted.  Thank you.

23   A.    You're welcome.

24   Q.    Moving on to Page 4, no other -- there is this $50,000

25   deposit from ALSJ, Inc., on Line 67.  Do you know what that's

1    for?

2    A.   Besides that it's from ALSJ, Incorporated, no.

3    Q.   Do you know whether it's related to any of the

4    investments by Mr. Spencer or Mr. Crane?

5    A.   I don't know that information, no.

6    Q.   Moving on to Page 5, make sure everybody can see it.

7    Line 83, you have another deposit here, $3,475.46; right?

8    A.   Yes.

9    Q.   And it looks like these were various deposits from

10   individual checks or money orders; correct?

11   A.   Correct.

12   Q.   Do you know what that's from?

13   A.   Besides the names listed on each one of the money orders

14   or checks, no, I don't know.

15   Q.   Okay.  Could that be rental income from any Milwaukee

16   McPherson properties?

17   A.   I would need to take a look at the -- each individual

18   check if there is a -- if there is a memo line that could

19   give us more information.

20   Q.   Line 95, $600 cash.  Same question as before.  Do you

21   know where that deposit comes from?

22   A.   No, I don't, besides saying cash.

23   Q.   Any relation to Mr. Spencer and Mr. Crane?

24   A.   I don't know that information.

25   Q.   Line 115, $485 cash deposit, same questions.

Case: 1:17-cr-00281 Document #: 75 Filed: 01/18/19 Page 91 of 234 PageID #:558
Freeman - cross by Kutnick
225

1  A.   It's the same answer.  I don't know.  Besides being cash

2  in, I don't know what the source of that money is.

3  Q.   $100 cash deposit same day on Line 116.

4  A.   And if you're asking me the source besides being cash

5  in, I don't know what the source is.

6  Q.   Same thing for Line 117.

7  A.   It is a check from Marisol Gonzalez, an additional cash

8  in.  Besides that, I don't --

9  Q.   And that's unrelated to any investments by Mr. Crane or

10  Mr. Spencer?

11  A.   I don't know that information.

12  Q.   Do you have any information that it is related to those

13  investments?

14           MR. YOUNG:  Objection, your Honor, asked and

15  answered.

16           THE COURT:  He may answer.

17  BY THE WITNESS:

18  A.   I have no personal knowledge of that.

19  BY MR. KUTNICK:

20  Q.   We have another, Line 121, $3,800 deposit.  Is that

21  related to Mr. Crane or Mr. Spencer, as far as you know?

22  A.   I don't know.

23  Q.   Line 123, $5,500 deposit.  Do you know if that's related

24  to the investments?

25  A.   I don't know.  No, I don't know.

1    Q.    Line 129, $790 deposit?

2    A.    That was, just to point out, it's a check that said,

3    "For Rent."  But other than that, that's all I know.

4    Q.    Okay.  Well, you did learn that Milwaukee McPherson was

5    a company who was operating properties; correct?

6    A.    I have no personal knowledge of that.

7    Q.    But you learned that in your investigation; right?

8    A.    I learned that from what others have told me.  But in

9    terms of reviewing the financial information, no.

10   Q.    Okay.  So in the interest of time, I'm just going to

11   go -- I'm going to go through all of the remaining deposits

12   that I wanted to point out, and let's just -- I'll see what

13   your response is to that.

14   A.    Okay.

15   Q.    Nothing on this page, it seems.  The $3,984.41.

16   Actually, that's the last one.  So I'll ask you the same

17   questions:  That looks like rental income, correct, on

18   Milwaukee McPherson?

19   A.    I can't say for sure.  We can look at the checks and see

20   if there is any -- any additional information on the check.

21   Q.    So I guess the bottom line question is, there is money

22   going into this account that is not related to those

23   investments; correct?

24   A.    As I mentioned before, I can't say for sure if other --

25   other than -- there are monies being deposited into the

Case: 1:17-cr-00281 Document #: 75 Filed: 01/18/19 Page 93 of 234 PageID #:560
Tremaglio - cross - by Kuchick
227

 1    account from other individuals than the Cranes or the

 2    Spencers, yes.  And that's all I can say.

 3    Q.    Just quickly going back to Page 1 of Government Exhibit

 4    SC-5.  Lines 4 and 5, these cash withdrawals, you don't know

 5    what that's for; do you?

 6    A.    I don't, no.

 7    Q.    And you don't know -- well, sorry, strike that question.

 8    I'll move on.

 9            So, Mr. Tremaglio, you investigated -- or you did

10    the forensic accounting analysis of the money that was wired

11    to Milwaukee McPherson; correct?

12    A.    I reviewed the wire records in support for --

13    Q.    And you created Exhibits SC-1 through 4 -- there is

14    five.  SC-1 through 4, and 5, actually, what we just looked

15    at, to document -- well, one through four, not only documents

16    money that went into the Milwaukee McPherson, but also

17    documents money that went out; correct?

18    A.    That's correct.

19    Q.    Okay.  So let's take a look at that.

20            First I'm going to show you, this is SC-1.  So

21    Mr. Young asked you about the deposits we've talked about,

22    the deposits for Mr. Spencer that went into Milwaukee

23    McPherson; right?

24    A.    Yes.

25    Q.    There was 200,000 on 5/16 and another 80,000 on 6/18;

1    correct?

2    A.    Yes.

3    Q.    Okay.  Then you have a total of 180.  100,000 on 6/11

4    and 80 on 6/19 going to this Stubbs; correct?

5    A.    Correct.

6    Q.    And of the 180, 150 of it goes to Robert Adams and

7    Renaissance Capital Group; correct?

8    A.    There is $150,000 that leaves Stubbs Alderton and goes

9    to Renaissance.  It might not on the same date.

10   Q.    Not on the same date?

11   A.    That's correct.

12   Q.    It eventually -- it eventually makes it there?

13   A.    Well, you have to take into consideration -- the reason

14   why I'm hesitating, you have to take into consideration that

15   there could be other deposits and other -- the money could be

16   co-mingled at Stubbs Alderton.

17   Q.    Okay.  So this chart is not necessarily complete;

18   correct?

19   A.    The top portion of the chart does not list all of the

20   transactions, correct.

21   Q.    Okay.  When you say the top portion of the chart, that

22   means that there is even more money flowing to Renaissance

23   and Robert Adams than is reflected here; correct?

24   A.    That's correct.

25   Q.    I'm going to show you SC-2.  And, once again, you've

1    got -- you've got the payments made by Scott Spencer that I'm
2    indicating here, the 20,000 and the 15,000.  But on the top
3    portion, you have five, plus 45, plus 11-and-a-quarter, all
4    in August of 2012, which is right after these deposits going
5    up to Robert Adams and Renaissance Group; correct?
6    A.    That's correct.
7    Q.    By the way, this $10,000 that goes to Golan & Christie,
8    you don't know what that's for; do you?
9    A.    In the detailed sheet it gives a description for that
10   transaction.  I believe that -- I don't want to speculate.
11   We can look at the detailed transaction sheet, if you'd like
12   to know.
13   Q.    Well, I'd rather you not speculate, so I will just ask
14   the next question.
15          Showing you Government Exhibit SC-3.  There is the
16   label.  Now, this shows Scott Spencer's wire on 10/18 of '12
17   of $418,000; right?
18   A.    Right.
19   Q.    And the exact same day, Milwaukee McPherson wires 400 to
20   Bob Adams, Renaissance Capital Group; correct?
21   A.    That's correct.
22   Q.    And another -- the remainder, actually, besides $2, goes
23   to Scott -- back to Scott Spencer; correct?
24   A.    The following day, 18,000, yes, went to Scott Spencer.
25   Q.    So to kind of walk through chronologically how it all

1    happened, similar to the way that the prosecutor did it,

2    Scott Spencer made four different wire transfers to Mr. -- to

3    Milwaukee McPherson account, correct, beginning on May 16,

4    2012?

5    A.   I believe it was -- there was five total from Scott

6    Spencer.

7    Q.   Including, you're talking about the 50 also on 9/19 of

8    2012, including that?

9    A.   Hold on.

10   Q.   Oh, no, that's a Crane investment.  I'm sorry.

11   A.   Hold on for one second.  I can tell you exactly.  If you

12   look at SC-5, there was a $200,000 Fedwire on May 16th.  On

13   June 18th, there was a Fedwire for 80,000.  On August 21st,

14   there were two Fedwires for 20,000 and 15,000.  So that's

15   four.  And then the Guaranty Life, or Guaranty -- I think

16   it's Guaranty National Title Company on October 18th for

17   418,752, which makes it a total of five.

18   Q.   Okay.  The 418, correct.  So you were able to

19   track that -- the majority of those funds were eventually

20   transferred to Bob Adams and Renaissance Capital Group; isn't

21   that correct?

22   A.   There was a large portion of money that was -- that was

23   transferred to various entities.  If you want to -- if you

24   want me to talk about where all the money went to, I can -- I

25   can do that.

Case: 1:17-cr-00281 Document #: 75 Filed: 01/18/19 Page 97 of 234 PageID #:564
Tremaglio - cross by Gutierrez
231

1  Q.   Okay.  Well, let's start going through that.  We did --
2  you started a little bit with the prosecutor talking about on
3  June 11, 2012.  And then on June 19th, you have 100 plus 80,
4  180 to this Stubbs; right?  I think we already talked about
5  this.  180 went to Stubbs Alderton; correct?
6  A.   180,000, yes.
7  Q.   And then 150 of that on that -- on June 19th actually
8  did make it to Renaissance; correct?
9  A.   There was -- there was a withdrawal from Stubbs Alderton
10  and a deposit into Renaissance Capital Group of 150,000.
11  Q.   Mr. Tremaglio, did you learn that Robert -- in your
12  investigation that many entities besides Milwaukee McPherson
13  were sending money to Renaissance Group?
14  A.   Can you repeat that question?
15  Q.   Did you learn in your investigation that several other
16  entities, unrelated to Mr. Meza, unrelated to Milwaukee
17  McPherson, were sending large sums of money to Renaissance
18  Group and Robert Adams?
19  A.   In order to answer that question, I would need more
20  information to recollect.  I know that there were other
21  entities where Renaissance Capital Group was getting
22  deposits.
23  Q.   I'm going to show you what is, just for simplicity sake,
24  is already marked as Grand Jury Exhibit No. 8.  Would this
25  help you in answering my questions?

1    A.    Yes.

2    Q.    Okay.  What is that?

3    A.    This is an exhibit that was provided to the grand jury.

4    Q.    Did you create this?

5    A.    Yes, I did.

6    Q.    Does this exhibit show the -- well, a more complete

7    picture of the entire investment scheme than does Exhibits

8    SC-1 through 4?

9              MR. YOUNG:  I just object to the characterization

10   of the "investment scheme," that that would call for a legal

11   conclusion.

12             THE COURT:  Why don't you rephrase it.

13             MR. KUTNICK:  Sure, Judge, no problem.

14   BY MR. KUTNICK:

15   Q.    Would this -- would Grand Jury Exhibit 8 be a more

16   complete picture of the transactions that we've been

17   discussing than Exhibits SC-1 through 4 that you also

18   created?

19   A.    I don't think it provides more a complete picture.  I

20   think it adds additional information that may -- it just

21   provides more information.  It doesn't necessarily give more

22   information than what's been provided so far.  So, for

23   example, it provides other deposits into Renaissance Capital

24   Group that could or could not be related to what we're

25   discussing.

1    Q.   Okay.  So it shows Robert Adams was collecting money, or

2    Renaissance Capital Group, I'll use the terms

3    interchangeably, was having money sent to it from entities,

4    there is one called Rudius Holdings Group?

5    A.   I see Rudius Holdings Group on this chart.

6    Q.   Okay.  And you learned in your investigation and your

7    review of the documents in this case that this Rudius

8    Holdings Group sent close to $500,000 to Robert Adams;

9    correct?

10    A.   Yes, there was -- it appears that there were two wires

11    sent to Renaissance Capital Group in the amount of

12    approximately 470,000.

13    Q.   And there is a company called Sionyx Party Limited which

14    sent $260,000 during the same period of time to Renaissance

15    Group; correct?  Do you see that one?

16    A.   Yes, I'm just looking -- you had asked about the same

17    period of time?

18    Q.   Well, it's November 23, 2012, is that transaction.

19    A.   And I am trying to see what time period I looked at

20    these particular records.  And, yes, it appears that it was

21    in the same period of time.  And there was a $260,000 wire to

22    Renaissance Capital.

23    Q.   There is another one I'm seeing from a Timothy Stein,

24    Attorney at Law, $300,000 on October 17, 2012?

25    A.   Yes, I see that on this chart.

 1    Q.   Do you know anything about these investments?

 2    A.   I do not, no.

 3    Q.   Do you know whether these people ever got returns on

 4    their investments?

 5    A.   I don't know anything about -- besides the transactions

 6    that were posted to the account, I don't know.

 7    Q.   I'm also going to show you what's been previously marked

 8    as Grand Jury Exhibit 22.  Would this -- you can hold onto

 9    this one in case we need it again.

10    A.   Okay.  Thank you.

11    Q.   Actually, I need to get -- I will get my other copy of

12    that.  What is that chart, Exhibit 22?

13    A.   This is another exhibit provided to the grand jury.

14    Q.   I forgot -- I forgot one thing I want to go back to

15    Exhibit 8 before I -- I want to go back to eight.  I forgot

16    one question.  If you take a look -- you also -- you learned,

17    and this is kind of the deposits that we discussed in the

18    beginning of the cross-examination, that there were $31,000

19    of other deposits going into Milwaukee McPherson in addition

20    to the funds of Mr. Crane and Mr. Spencer; correct?

21    A.   That's correct.

22    Q.   Okay.  And that would kind of line up or come close to

23    the number we are talking about of all those deposits that I

24    listed through in the beginning; right?

25    A.   If you could just give me a minute, I will take a look.

Case: 1:17-cr-00281 Document #: 75 Filed: 01/18/18 Page 101 of 234 PageID #:568
Tremel - cross by Kutnick
235

1    And the reason why I'm looking is that there were a number of
2    deposits that were reversed.  But I think that this is an
3    actual -- I believe that this is an actual amount of
4    deposits.  Yes.
5    Q.   Okay.  So you -- you are aware that the allegations in
6    this case are that Mr. Meza -- one of the allegations is that
7    he made misrepresentations about Renaissance.  But the other
8    one is that he used some of this money for his own personal
9    expenses, and things of that nature; correct?
10   A.   From what I've been told.  I have no personal knowledge.
11   Q.   No, right.  But you work for the US Attorney's office;
12   right?
13   A.   Yes, I do.
14   Q.   And you have participated in the --
15           MR. YOUNG:  Judge, I'll just object because I think
16   if he would just ask the question related to the records as
17   opposed to characterizations of the indictment or what the
18   charges are.
19           THE COURT:  All right.  Either -- yes, just go on,
20   I mean, what's the point?
21   BY MR. KUTNICK:
22   Q.   The point is this:  There is other money going into
23   Mr. Meza's account or Milwaukee McPherson than just the
24   investment money; correct?
25   A.   There is.

1    Q.   And there is no --

2    A.   Yes.

3    Q.   -- way to determine -- and that money all got mingled

4    together in one -- one lump in the account; correct?

5    A.   Yes.

6    Q.   So there is no way to distinguish and tell whether or

7    not these "other deposits" that we've discussed was the money

8    that was used for these personal obligations or expenses; is

9    there?

10   A.   That's not accurate, no.

11   Q.   There is -- you can tell which -- whether he used these

12   other deposits for personal expenses?

13   A.   I can -- I can tell certain transactions, what money was

14   being used for what transaction.  So, for example, if you

15   want me to provide examples?

16   Q.   Well, you're basing it on dates of deposits and

17   withdrawals; correct?

18   A.   That's correct.

19   Q.   Okay.  Let's get on to -- let me ask you a couple

20   questions about Grand Jury Exhibit 22.  So Grand Jury

21   Exhibit 22 reflects what happened mainly, for our purposes,

22   to the Crane -- let's start with Cordell Crane's money, the

23   two payments of $100,000 on July 9th, and then the $150,000

24   on July 9th as well, two separate payments; correct?

25   A.   Yes.

1   Q.   Those went to Palmore Legal Services; right?

2   A.   That's correct.

3   Q.   And all of the money went to Palmore Legal Services,

4   correct, all of the $250,000?

5   A.   Yes.

6   Q.   Okay.  None of it was diverted to Milwaukee McPherson or

7   Carlos Meza; correct?

8   A.   Not initially, no.

9   Q.   Well, at any time?

10   A.   Yes.

11   Q.   When was that?

12   A.   It was September -- I mean, pardon me, it was July 10,

13   2013.

14   A.   So if you see -- if you look at the chart, the $250,000

15   was going up to Palmore, was deposited at Palmore, and then

16   $10,000 went to Milwaukee McPherson, Bank of America account

17   ending in 2209.

18   Q.   But Milwaukee McPherson also was contributing itself to

19   Palmore through Virginia Worldwide; isn't that right?

20   A.   I don't -- I don't know that to be -- Oh, are you

21   talking about --

22   Q.   The $10,000 wire had previously gone from Milwaukee

23   McPherson on May 3, 2013, to Virginia World --

24   A.   I see that.  I see that transaction.  I don't know if

25   it's related or not.

1    Q.   And then there is Chicago Trucking Company as well.  You

2    know that -- that's a company that is associated with

3    Mr. Meza; isn't it?

4    A.   I believe that that is his account.

5    Q.   Okay.  And Chicago Trucking also transferred -- on

6    May 22nd, 2013, they transferred $20,000 to Virginia

7    Worldwide; correct?

8    A.   That's correct.

9    Q.   And then right after that, like a week later, 5/28/13,

10   Virginia Worldwide sends 45,000 to Palmore; correct?

11   A.   That's correct.

12   Q.   Okay.  So McPherson and CH Trucking are Carlos Meza

13   businesses; correct?

14   A.   Which -- which -- when you say McPherson, which items

15   are you talking about?

16   Q.   I'm looking at the McPherson, $10,000 wire on 5/3 of

17   '13.

18   A.   Okay.  That's one of his accounts.  I recognize that

19   account number.

20   Q.   So he sent -- so -- so Carlos Meza, then, controlled

21   that McPherson account; correct?

22   A.   I would have to look at that signatory card to answer

23   that.

24   Q.   Then -- well, let's just call it McPherson, then.

25   A.   Okay.

1   Q.   Did wire --

2   A.   Actually, let me step back.  If you look at the

3   reference on the chart, that's a joint account.  So more than

4   one person were -- was the signatory on that account.

5   Q.   Ah, okay.  Good point.  But let me ask you about this CH

6   Trucking.  That is a company associated with this Mr. Meza;

7   correct?

8   A.   I believe so.  I would have to take a look at the

9   signatory card to tell you who the signatory is on that

10  account.

11          MR. KUTNICK:  Can I have one moment, please, your

12  Honor?

13          THE COURT:  Yes, you may.

14  BY MR. KUTNICK:

15  Q.   So you can -- as you testified previously, there was

16  10,000 that came out of Palmore and went to Milwaukee

17  McPherson on 7/10/13; correct?

18  A.   That's correct.

19  Q.   But the 20,000 deposited -- that was invested by CH

20  Trucking on 5/22/13, that never came out; right?

21  A.   I can't answer that question because I don't -- I don't

22  know -- you know, there were other transactions entering

23  Virginia Worldwide, and I can't tell you what happened to

24  that money, or if it was even related to the deposits that

25  you referenced prior.

1    Q.   Could you just tell us what happened to the money that

2    was deposited, and I'm talking all the money, to Palmore

3    Legal Services?  What happened to it?  Where did it go?

4    A.   If you look at SC-4, there was approximately $577,860

5    went to Carso Corporation.

6    Q.   Okay.  I'm going to go ahead and put that up here.  So

7    this is what you're talking about, the 577 -- after all this

8    money that I am indicating down on the bottom part, and we've

9    talked about all this, the Cranes' money, Mr. Yacoub's money,

10   that goes to Palmore, then this is what you're saying?

11   A.   Yes.

12   Q.   577,000 goes to something called Carso Corporation?

13   A.   Yes.

14   Q.   My next question is:  In your investigation, do you have

15   any information that Carlos Meza is involved with Carso

16   Corporation?

17   A.   I can't answer that question.  I don't -- I don't -- I

18   have no personal knowledge of that.

19   Q.   Okay.  But of all of the money that was deposited to

20   Palmore, which includes, by the way, Cranes' 145,000, plus

21   85,000 on July 9th, of all of that money, only 10,000 of it

22   went to Milwaukee McPherson; correct?

23   A.   Are you talking about the 100,000 and the 150,000, is

24   that what you're talking about?

25   Q.   Yes.

1   A.   Because I think you referenced two different things.

2   Q.   Yes, but then -- but it gets a little smaller as it

3   starts heading up to Carso; correct?

4   A.   What do you mean it gets a little smaller?

5   Q.   Well -- well, Crane invests 100 plus 150; right?

6   A.   Yes.

7   Q.   And then on actually the same day, Palmore transfers 145

8   plus 85 to Carso; right?

9   A.   Which are you looking at?

10  Q.   I'm looking at Grand Jury Exhibit 22.

11  A.   22?  That's correct, yes.

12          MR. KUTNICK:  One more minute, please, Judge.

13          THE COURT:  Sure.

14          MR. KUTNICK:  Your Honor, I am seeking permission

15  to publish Grand Jury Exhibit 8.

16          MR. YOUNG:  Your Honor, for the purposes of

17  expediency, I assume the defendant will want to introduce it

18  in his case, I have no objection.

19          MR. KUTNICK:  Right, I will seek to introduce it in

20  my case, but I want to be able to publish it because we've

21  been talking about it, and I would like the jury to be able

22  to see it.

23          THE COURT:  All right.

24      (Said exhibit published to the jury.)

25          MR. KUTNICK:  Thank you.  See if I can get the

1    whole picture.

2         THE COURT:  Are you going to have many questions

3    about it?

4         MR. KUTNICK:  No.  I'm actually really trying to

5    get towards the end of this, Judge, I'm almost done.

6         THE COURT:  Okay.

7         MR. KUTNICK:  It's -- okay.

8    BY MR. KUTNICK:

9    Q.   All right.  So the overhead is not going to let me show

10   you everything at one time.  We will start at the bottom and

11   work our way up quickly so the jury can understand what we've

12   got here.  So did you create this document, by the way?

13   A.   I did.

14   Q.   You created this whole document; right?

15   A.   Yes, I did.

16   Q.   And this shows more transactions than SC-1 through 4;

17   correct?

18   A.   Yes.  And I want to point out that this is a rough

19   draft.  This was never finalized.

20   Q.   Okay.  That's fine.  Okay.  But is it correct?

21   A.   What do you mean, is it correct?

22   Q.   Is it inaccurate in any way?

23   A.   I don't believe it is inaccurate, but not all of the

24   transactions that are listed on this chart -- as you -- as

25   you move up the chart, not all the transactions are listed.

1    Q.   All right.  Okay.  Fair enough.  Are all of the

2    transactions from SC-1 through 4 listed on this chart?

3    A.   Yes.

4    Q.   Okay.  All right.  So then let's start at the bottom and

5    work up here quickly.  So here you have the $50,000

6    investment by Crane; correct?  I'm pointing to it.

7    A.   Yes.

8    Q.   All right.  And then you've also got, from Spencer, 418.

9    We're becoming familiar with these numbers now; correct?

10   A.   Yes.

11   Q.   Okay.  Then you've also got from Spencer the combined

12   315.  We talked about this at the beginning of your

13   testimony; correct?

14   A.   Yes.

15   Q.   All right.  All of this money goes up to Milwaukee

16   McPherson; right?

17   A.   That's correct, yes.

18   Q.   Other funds are deposited to Milwaukee McPherson.  The

19   31,000 that we talked about briefly.  I'm pointing to it with

20   my pen; right?

21   A.   Yes, and some of those could be reversed.  We'd have to

22   take a look at that.

23   Q.   Okay.  But we did go through a list of a lot of

24   deposits; right?

25   A.   Yes.

1    Q.   Okay.  Now, this, outgoing funds, $810,000.  It works

2    its way here on this line that I am showing -- pull it

3    down -- up to Bob Adams; right?

4    A.   Not -- some of the money, yes.

5    Q.   A lot of the money.  Right?

6    A.   When you --

7    Q.   Majority?

8    A.   Yes.

9    Q.   810?

10   A.   You'd have to look at all of the withdrawals in order

11   to -- in order for me to answer that.

12   Q.   Okay.  Well, let's just concentrate on this area right

13   here, then, on the chart.

14   A.   Okay.

15   Q.   So you have $180,000 going to Stubbs; right?

16   A.   Yes.

17   Q.   And 150 of that goes up to Adams; correct?

18   A.   150,000 did go to Adams, yes.

19   Q.   Okay.  And then you've got this total of 461; correct?

20   A.   Yes.

21   Q.   And then that all goes up to Adams; correct?

22   A.   Yes.

23   Q.   Okay.  Even these other entities, Rudius Holdings Group;

24   right?

25   A.   Yes.

1    Q.   They send a large sum of money up to Adams; correct?

2    A.   Yes, there is deposits from Rudius Holdings, yes.

3    Q.   Okay.  Actually, almost $500,000; right?

4    A.   470 -- approximately 472, yes.

5    Q.   Okay.  So then you've got this Sionyx Party Limited;

6    correct?

7    A.   Yes.

8    Q.   They're sending money to Bob Adams; right?

9    A.   Yes.

10   Q.   So explain what I'm pointing to now.  What did Bob

11   Adams -- well, do you know what Bob Adams then did with the

12   money?

13   A.   Not exactly, no.

14   Q.   It's kind of a mystery; right?

15   A.   Well, it's a -- the money was co-mingled.  So if you see

16   where it shows money coming up to Renaissance Capital Group,

17   you see a total deposit of approximately 2.5 million.  There

18   is a number of sources, and that's why I listed it that way.

19   Because all of this money was co-mingled so you can't -- you

20   can't tell exactly where all the money went.

21   Q.   Are you aware whether or not anybody got their money

22   back from Robert Adams?

23   A.   I'm not aware of that, no.

24   Q.   In your investigation of all the financial documents in

25   this case, did you see any money where Bob Adams was

1    returning initial investments to investors?

2    A.    To which investors?  To Cordell Crane?

3    Q.    Any investors.  Yes, Cordell Crane.  Let's start with

4    that.

5    A.    No.

6    Q.    Okay.  Did you find any evidence that any money was

7    being returned to Scott Spencer?

8    A.    Let me preface it by saying, I didn't look at all of the

9    transactions in Cordell Crane or Scott Spencer's accounts, so

10   I can't completely answer that.  From a period of

11   approximately June 2012, to December 2012, I did not see any

12   money being returned to either Crane or Spencer.

13   Q.    And did you see any money -- of this money that we --

14   that flowed up to Renaissance, do you see any of that going

15   back to Carlos Meza or Milwaukee McPherson?

16   A.    No, I do not.

17          MR. KUTNICK:  Almost -- I'm getting there, Judge.

18   Your Honor, may I have permission to publish Grand Jury

19   Exhibit 22 to the jury?

20          THE COURT:  You may.

21          MR. YOUNG:  Yes, same as before, your Honor, they

22   will admit it in their case.  For expediency --

23          THE COURT:  Are you going to have questions about

24   it?

25          MR. KUTNICK:  Very -- just a few, your Honor.  And

 1 │ this is the the end of my questioning.

 2 │         THE COURT:  All right.  I am just trying to find

 3 │ out because, otherwise, we need to take a break for lunch.

 4 │         MR. KUTNICK:  I understand, your Honor.  I'm

 5 │ conscious of the time.  This is going to be my last thing I

 6 │ am going to talk about.

 7 │         THE COURT:  Is there some reason why you don't want

 8 │ to wait until after lunch?

 9 │         MR. KUTNICK:  Oh, I can wait until after lunch, no

10 │ problem.

11 │         THE COURT:  All right.  Let's do that.  We're going

12 │ to take an hour break.

13 │         MR. KUTNICK:  Yes, actually that would be great.

14 │ Thank you, Judge.

15 │         THE COURT:  1:00 o'clock.

16 │     (Jury out at 11:54 a.m.)

17 │         THE COURT:  Okay.  Have a nice lunch.

18 │         MR. KUTNICK:  Thank you, Judge.

19 │     (Recess from 11:54 a.m. to 1:00 p.m.)

20 │

21 │

22 │

23 │

24 │

25 │

```
 1                IN THE UNITED STATES DISTRICT COURT
                   NORTHERN DISTRICT OF ILLINOIS
 2                       EASTERN DIVISION

 3                              )
     UNITED STATES OF AMERICA,  )    Case No. 17 CR 281
 4                              )
                 Plaintiff,     )
 5                              )
             vs.                )    Chicago, Illinois
 6                              )    December 4, 2018
     CARLOS R. MEZA,            )    1:00 p.m.
 7                              )
                 Defendant.     )
 8

 9                           VOLUME 2
            TRANSCRIPT OF PROCEEDINGS - Jury Trial
10       BEFORE THE HONORABLE ELAINE E. BUCKLO, and a Jury

11
     APPEARANCES:
12
     For the Plaintiff:       MR. JOHN R. LAUSCH, JR.
13                            UNITED STATES ATTORNEY
                              BY:  MR. RICK D. YOUNG
14                                 MS. KAITLIN KLAMANN
                              Assistant United States Attorneys
15                            219 South Dearborn Street
                              Chicago, Illinois  60604
16
     For the Defendant:       MR. JOSHUA B. KUTNICK
17                            900 West Jackson Boulevard # 5
                              Chicago, Illinois  60607
18
                              AND
19
                              LAW OFFICE OF MINA ZARDKOOHI
20                            BY:  MS. MINA ZARDKOOHI
                              53 West Jackson Boulevard
21                            Suite 1615
                              Chicago, IL 60604
22
23   Court Reporter:          SANDRA M. MULLIN, CSR, RMR, FCRR
                              Official Court Reporter
24                            219 S. Dearborn Street, Room 2260
                              Chicago, Illinois  60604
25                            (312) 554-8244
                              sandra_mullin@ilnd.uscourts.gov
```

1          (Proceedings heard in open court.  Jury in.)

2                THE COURT:  Please be seated.

3                MR. KUTNICK:  May I?

4                THE COURT:  Sure.

5                     CROSS-EXAMINATION (Continued.)

6     BY MR. KUTNICK:

7     Q.   Good afternoon, Mr. Tremaglio.

8     A.   Good afternoon.

9     Q.   When we left off, we were about to look at Grand Jury

10    Exhibit No. 22; right?

11    A.   Okay.

12    Q.   And that's -- just to remind everybody, that's also a

13    chart that you created in relation to this matter?

14    A.   Yes.  A rough draft chart.

15    Q.   A rough draft chart.  Okay.  But, once again, is it

16    accurate?

17    A.   It's accurate, just not complete.

18    Q.   Just not complete.  And when you say not complete, is it

19    complete as it relates to this investigation?

20    A.   I believe so, yes.

21    Q.   Okay.  So what you're saying is that there are other

22    matters outside of this investigation that this chart also

23    covers as well; correct?

24    A.   Yes.

25    Q.   Okay.  So, just briefly, so these arrows down here

Case: 1:17-cr-00281 Document #: 75 Filed: 01/18/18 Page 116 of 234 PageID #:583
Tremaglio - cross by Kuznicki
250

1  reflect money coming from the victims, some of it, and then
2  going into Palmore Legal Services; correct?
3  A.  Yes, you -- you say victims.
4  Q.  Well, I'm talking specifically about in this -- in this
5  instance, Cordell Crane and Scott Spencer.
6  A.  Yes.  Then, yes.
7  Q.  Okay.  And so -- and their money comprised a portion of
8  this 517, which then went to Palmore Legal Services; correct?
9  A.  Let me see here.
10 Q.  517 to Palmore Legal Services.  I'm indicating with my
11 pen.
12 A.  I'm looking for -- so this -- this specific chart, the
13 517 I don't believe includes Scott Spencer because his money
14 went to Virginia Worldwide.
15 Q.  No, I think you're -- that's right, I stand corrected.
16 It would encompass Cordell Crane's, the $250,000; correct?
17 A.  That's correct, yes.
18 Q.  So, and then there is McPherson money that also goes to
19 Virginia Worldwide; correct?
20 A.  Yes.
21 Q.  There is Chicago Trucking money that also goes to
22 Virginia Worldwide; correct?
23 A.  Yes, CH Trucking, yes.
24 Q.  Okay.  There is -- Virginia Worldwide then makes a wire
25 transfer to Palmore Legal; correct?

1  A.   Correct.

2  Q.   And then Palmore Legal makes a large wire transfer up to

3  Carso Corporation and Terry Barnes; right?

4  A.   No, they make -- there is individual -- so there is a

5  number of individual transactions.  So if you look at the --

6  if you look at all of the activity in the middle of the

7  screen?

8  Q.   Yes.  Here?

9  A.   You see 530, there was $40,000 that went in, and then

10  610, there is fifty-five point one thousand.

11  Q.   Okay.  But those are for --

12  A.   It's not one large transaction, is my point.

13  Q.   Right.

14  A.   There is individual transactions.

15  Q.   But Palmore is taking this money that it has collected

16  and it wires it up here to Carco and -- Carso and Terry

17  Barnes; right?

18  A.   A portion of the money, yes.

19  Q.   Okay.  And, additionally, Virginia Worldwide is

20  forwarding money along this line that I am pointing to here,

21  up to Carso and Terry Barnes; correct?

22  A.   So, just to be specific, there is a wire on -- and let

23  me see what the date is, 5/1, 2013, I saw a wire from

24  Virginia Worldwide to Steven Gant.

25  Q.   Right.  Is this what you're referring to?

1    A.    And then -- yes, this -- yes.  And then there is an

2    additional wire from Steven Gant to Carso Corporation.

3    Q.    Okay.  But that money, well, basically comes directly

4    from Virginia Worldwide, and then --

5    A.    Again, this is one of those areas where the chart is not

6    complete because there is a number of transactions coming in

7    to this branch, banking and trust.  There is a number of

8    transactions coming into Virginia Worldwide.  There is a

9    number of transactions that are happening.  And this just --

10   this just captures a couple of transactions.

11   Q.    But it captures the flow of the money from the victims

12   that we've discussed through Palmore and up to eventually

13   reach Terry Barnes; right?

14   A.    That's -- I would say -- I believe so, yes.

15   Q.    And I know that I'm being somewhat general, but -- but,

16   generally, that is correct; right?

17   A.    Generally, yes.

18   Q.    Okay.  And, finally, you on direct examination had gone

19   through a couple different tax returns for Mr. Meza.  2012

20   and 2013.  IRS -- Government Exhibit IRS-1 and IRS-2; right?

21   A.    Yes.

22   Q.    And these are individual tax returns; right?

23   A.    That's correct.

24   Q.    These are not corporate tax returns; are they?

25   A.    No, and the -- what -- but I don't know if there is a

1    corporate tax return based on how he filed.

2    Q.   But just based on your knowledge of taxes, there is a

3    difference between corporate tax returns or commercial tax

4    returns versus personal; right?

5    A.   That's correct.

6              MR. KUTNICK:  Okay.  Can I have one moment, please,

7    your Honor?

8              THE COURT:  Yes, you may.

9              MR. KUTNICK:  No further questions, Judge.  Thank

10   you.

11             THE COURT:  Thank you.

12             MR. YOUNG:  No redirect, your Honor.

13             THE COURT:  Okay.  You're excused.  Thank you.

14             THE WITNESS:  Thank you, Judge.

15        (Witness excused.)

16             MS. KLAMANN:  Your Honor, the United States calls

17   Ms. Milena Markova.

18             THE COURT:  Okay.

19             COURT SECURITY OFFICER:  All the way up, please.

20   Just step up there, face her honor.

21        (Witness sworn.)

22             THE COURT:  All right.  Please be seated.

23        MILENA MARKOVA, GOVERNMENT'S WITNESS, SWORN,

24                   DIRECT EXAMINATION

25   BY MS. KLAMANN:

1    Q.    Good afternoon.

2    A.    Hi.  Good afternoon.

3    Q.    Please state your name for the jury.

4    A.    Milena Markova.

5    Q.    Can you spell your name for the court reporter, please.

6    A.    M-i-l-e-n-a, M-a-r-k-o-v-a.

7    Q.    Ms. Markova, are you employed?

8    A.    Yes.

9    Q.    What's your position, your current position?

10   A.    Bookkeeper.

11   Q.    Who do you work for?

12   A.    ALSJ, Incorporated.

13   Q.    What kind of business does ALSJ, Incorporated do?

14   A.    It is private lender.

15   Q.    How long have you worked at ALSJ?

16   A.    Since 2006.

17   Q.    Generally speaking, what are your responsibilities as a

18   bookkeeper?

19   A.    As a bookkeeper, my responsibility is to keep all files

20   and work with customer with bank, do transactions, record all

21   transactions, and get our file in good standing.

22   Q.    As part of your responsibilities, are you familiar with

23   ALSJ's business recordkeeping system?

24   A.    Yes.

25   Q.    Did ALSJ, Inc., provide records to the government in

 1  | this case?
 2  | A.   Yes.
 3  | Q.   I'm going to show you a few of those records now.
 4  |      Ms. Markova, let's begin with the exhibit marked
 5  | ALSJ-1.
 6  | A.   Yes.
 7  | Q.   Is this one of the records that ALSJ provided to the
 8  | government in this case?
 9  | A.   Yes.
10  | Q.   What kind of record is it?
11  | A.   That is our property ledger.
12  | Q.   What is a property ledger?
13  | A.   The property ledger is the sheet where we are keeping
14  | track when we buy or sell properties.  All the amounts, what
15  | we are buying/selling for, transaction, expenses.
16  | Q.   And who receives and enters the information that appears
17  | on a property ledger?
18  | A.   Sorry, I didn't hear.  Who?
19  | Q.   Who receives and enters the information that appears on
20  | a property ledger?
21  | A.   Actually, this one, that's me.
22  | Q.   And when do you fill out the ledger?
23  | A.   At the moment when we buy the property.
24  | Q.   What happens to the ledger after the information is
25  | added?

Case: 1:17-cr-00281 Document #: 75 Filed: 01/18/19 Page 122 of 234 PageID #:589
Markova - direct - by Klamann
256

1    A.   After -- we keep this record all the time, and when we

2    sell the property, then we just file the records, and we ask

3    our accountant for how long we have to save our files.

4    Q.   And was Exhibit ALSJ-1 made under the procedures that

5    you just described?

6    A.   Yes.

7            MS. KLAMANN:  Your Honor, the government moves to

8    admit Exhibit ALSJ-1 and request permission to publish.

9            MS. ZARDKOOHI:  No objection.

10           THE COURT:  It's admitted.  You may publish it.

11   BY MS. KLAMANN:

12   Q.   Ms. Markova, what property does this ledger relate to?

13   A.   That is property on 6152 Ravenswood Avenue, Unit One in

14   Chicago.

15   Q.   Is this a property that ALSJ purchased?

16   A.   Yes.

17   Q.   How much did ALSJ pay for the property, according to the

18   exhibit?

19   A.   Yes, according to the exhibit, we paid 21,311.58.

20   Q.   Did ALSJ renovate the property?

21   A.   Yes.

22   Q.   How much did your company spend to renovate the

23   property?

24   A.   The expenses for renovations, plus property taxes,

25   that's how we reported, is 6,766.22.

Case: 1:17-cr-00281 Document #: 75 Filed: 01/18/19 Page 123 of 234 PageID #:596
Markova - direct - by Klumann
257

1    Q.   What was the total amount of money that ALSJ spent on

2    this property?

3    A.   $28,692.78.

4    Q.   Directing your attention to the handwriting on the

5    right-hand side of the document.  Is this your handwriting?

6    A.   Yes.

7    Q.   Can you read to the jury what you've written here?

8    A.   Yes.  It says that, on May 25, '12, we sold the property

9    and received $28,012.65.  And from -- and the way how we

10   disbursed the amount, it says principal, $21,311.56 and

11   expenses, $6,701.09.

12   Q.   Thank you.  To whom did you sell the property?

13   A.   To Mr. Carlos Meza.

14   Q.   Ms. Markova, let's look now at Exhibit ALSJ-2.  Do you

15   have that in front of you?

16   A.   Yes.

17   Q.   What is ALSJ-2?

18   A.   That is actual check we received on May 25, '12, and

19   amount is $28,012.65.  That is the real check, plus deposits.

20   Q.   Ms. Markova, I'm sorry, I don't mean to stop you.  I

21   will ask you some questions once the jury can see the

22   exhibit.

23   A.   Sorry.

24   Q.   Does ALSJ-2 -- or does ALSJ, as part of its

25   recording-keeping practices, maintain records of checks that

 1    it receives for properties or loans?

 2    A.   Yes.

 3           MS. KLAMANN:  Your Honor, the government moves to

 4    admit Government Exhibit ALSJ-2 into evidence and request

 5    permission to publish.

 6           MR. KUTNICK:  No objection.

 7           THE COURT:  All right.  It's admitted.  You may

 8    publish it.

 9           (Said exhibit received in evidence.)

10    BY MS. KLAMANN:

11    Q.   Ms. Markova, what is the date on Exhibit ALSJ-2?

12    A.   The date of the check is May 25, 2012.

13    Q.   For how much money is the cashier's check?

14    A.   $28,012.65.

15    Q.   And who is the remitter of the check?

16    A.   The remitter is Milwaukee McPherson, LLC.

17    Q.   Is this the check that ALSJ received from Milwaukee

18    McPherson to purchase the property at 6152 North Ravenswood?

19    A.   Yes.

20    Q.   Ms. Markova, now let's take a look at ALSJ-3.  What is

21    Government's Exhibit ALSJ-3?

22    A.   That is our loan ledger.

23    Q.   What is a difference between a property ledger and a

24    loan ledger?

25    A.   There is not big difference.  When we have the property,

1    we have expenses.  So information relating to purchasing and

2    selling the property.  And loan is a little different ledger

3    because we have interest on the amount that we loaned, and it

4    shows how our amount received as the interest.

5    Q.   Was ALSJ-3, the loan ledger, created under the same

6    procedures that we discussed with respect to the property

7    ledger?

8    A.   Yes.

9            MS. KLAMANN:  Your Honor, the government moves to

10   admit Government Exhibit ALSJ-3 in evidence and request

11   permission to publish.

12           MS. ZARDKOOHI:  No objection.

13           THE COURT:  Any objection?

14           MR. KUTNICK:  No objection, your Honor.  My partner

15   said it, sorry.

16           THE COURT:  Okay.  It's admitted, and you may

17   publish it.

18       (Said exhibit received in evidence.)

19   BY MS. KLAMANN:

20   Q.   Ms. Markova, who is the borrower on this loan?

21   A.   Mr. Carlos Meza.

22   Q.   And how much money did he borrow?

23   A.   We lent him 54,000.

24   Q.   When did the loan period start?

25   A.   It start August 27, '12.

1    Q.   And what was the collateral?

2    A.   The collateral is 6152 Ravenswood, Unit 1, and 860 Old

3    Willow Road, Unit 232, in Prospect Heights.

4    Q.   And according to the exhibit, was the loan paid off?

5    A.   Yes.

6    Q.   Was there a payment made on this loan on September 19,

7    2012?

8    A.   Yes.  On September 19, 2012, we had received check for

9    47,500.

10   Q.   Okay.  Ms. Markova, let's move on to Exhibit ALSJ-4.

11   What is Exhibit ALSJ-4?

12   A.   That is the real check that we received for 47,500.

13            MS. KLAMANN:  Your Honor, the government moves to

14   admit ALSJ-4 in evidence and request permission to publish.

15            MR. KUTNICK:  No objection.

16            THE COURT:  It's admitted.

17       (Said exhibit received in evidence.)

18   BY MS. KLAMANN:

19   Q.   Ms. Markova, how much is that made out for?

20   A.   The check is for 47,500.

21   Q.   What is the date of the check?

22   A.   The date is September 19, 2012.

23   Q.   And who is the remitter listed on the check?

24   A.   The remitter is Milwaukee McPherson LLC.

25            MS. KLAMANN:  Your Honor, may I have just one

 1    moment?

 2                THE COURT:  Yes.

 3                MS. KLAMANN:  Your Honor, I tender the witness,

 4    thank you.

 5                THE COURT:  Thank you.

 6                        CROSS-EXAMINATION

 7    BY MS. ZARDKOOHI:

 8    Q.   Ms. Markova, hello.

 9    A.   Hi.

10    Q.   You stated that you're a bookkeeper for ALSJ; correct?

11    A.   Yes.

12    Q.   You've been there since 2006; correct?

13    A.   Yes.

14    Q.   ALSJ is a private lender; correct?

15    A.   Yes.

16    Q.   And the company is owned by Mr. Andrew Lee; correct?

17    A.   Yes.  He is the president.

18    Q.   Okay.  We talked about ledgers, various ledgers,

19    differentiating between property ledgers and loan ledgers;

20    correct?  So you also kept track of loan ledgers; correct?

21    A.   Yes.

22    Q.   We talked about Mr. Meza's loans, but you kept track of

23    other people's loans; correct?

24    A.   Yes.

25    Q.   For example, a loan made in October 2012, from $450,000

1   from ALSJ to Mr. Scott Spencer; correct?  Do you remember

2   that loan?

3   A.   I, really, I cannot remember.

4   Q.   You cannot remember, okay.

5   A.   I remember the name, but --

6   Q.   Would anything refresh your memory?

7   A.   No, I remember the name, he really was our customer, but

8   I cannot remember the date and amount.  That's long time ago.

9   But we have our records.  We have everything in the records.

10  Q.   So if you were to have a ledger of that loan, you would

11  be able to speak about it; correct?

12  A.   Yes, sure.

13  Q.   Okay.

14            MS. ZARDKOOHI:  That's it, your Honor.

15            THE COURT:  All right.  You're excused, then.

16  Thank you.

17        (Witness excused.)

18            MR. YOUNG:  May I have a moment, your Honor?

19            THE COURT:  Yes.  You can step down.

20            MR. YOUNG:  I apologize, we're just working on a

21  stipulation.  We're not anticipating any further witnesses,

22  just the reading of some stipulations.

23            MR. KUTNICK:  Your Honor, can we just have a

24  sidebar quickly?

25            THE COURT: Yes.

263

Stipulations

1      (At sidebar outside the hearing of the jury.)

2          MR. KUTNICK:  I was just going to say, your Honor,

3    I didn't want to do this in front of the jury because we were

4    having difficulty with Mr. Meza deciding whether to

5    stipulate.  It was getting a little bit long, I decided just,

6    let the judge know.  But it looks like now, based on

7    Mr. Young's proposal, that we will probably be able to reach

8    that stipulation.

9          MR. YOUNG:  Move to admit the document?

10          MR. KUTNICK:  Yes.

11          MS. ZARDKOOHI:  Yes.

12          MR. YOUNG:  Okay.

13          MR. KUTNICK:  Can we just double check with him,

14    then it should be fine.  But that was his objection.  Thank

15    you, your Honor.

16          THE COURT:  Okay.

17      (Proceedings in open court in the hearing of the jury.)

18          MR. YOUNG:  Your Honor, the government has some

19    stipulations to read.

20          THE COURT:  Go ahead.

21          MR. YOUNG:  The United States of America, by

22    John R. Lausch, Jr., the United States Attorney for the

23    Northern District of Illinois, through Assistant United

24    States Attorneys, Rick D. Young and Kaitlin Klamann, and

25    defendant, Carlos Meza, individually, through his attorneys,

1   Joshua Kutnick and Mina Zardkoohi, hereby agree and stipulate
2   as follows:

3        Stipulation No. 1:  As charged in Count One of the
4   indictment, an interstate electronic wire transfer of funds
5   was processed through the Federal Reserve Bank Fedwire Funds
6   Service network on or about May 16, 2012.  As part of this
7   interstate wire transfer, the Federal Reserve Bank
8   transferred $200,000 in funds from Scott Spencer's account at
9   American Chartered Bank to an account at PNC Bank held in the
10  name of Milwaukee McPherson.

11       Stipulation No. 2.  As charged in Count Two of the
12  indictment, on or about September 19, 2012, an interstate
13  electronic transfer of funds was processed through the
14  Federal Reserve Bank's Fedwire Fund Service network.  As part
15  of this interstate wire transfer, the Federal Reserve Bank
16  transferred $50,000 in funds from Cordell Crane's account at
17  JPMorgan Chase Bank to an account at PNC Bank held in the
18  name of Milwaukee McPherson.

19       Stipulation No. 3.  If called to testify, a
20  representative of Credit Suisse would state as follows:
21  Credit Suisse is a global investment bank and financial
22  services company headquartered in Zurich, Switzerland.
23  Credit Suisse was asked to search its records for an account
24  in the name of Renaissance Capital Group LLC, associated with
25  the purported Credit Suisse account statement marked as

1    Government Exhibit SS-5.  After conducting a search of its

2    records in Switzerland, Credit Suisse was unable to connect

3    that account statement with any existing customer account.

4             Stipulation No. 4.  If called to testify, Robert

5    Benjamin would testify as follows:

6             He was an attorney employed at the law firm of

7    Golan & Christie who specialized in commercial transactions

8    and bankruptcy.  In 2012, Mr. Benjamin and his firm

9    represented 2715 North Milwaukee LLC in a Chapter 11

10   bankruptcy proceeding.  The bankruptcy petition was filed in

11   February of 2012, and the case was ultimately dismissed in

12   May 2013.

13            2715 North Milwaukee LLC was a limited liability

14   corporation that owned an interest in real estate located at

15   2715 North Milwaukee Avenue in Chicago, Illinois.  The sole

16   member and manager of 2715 North Milwaukee Avenue was Gladys

17   McPherson, but Mr. Benjamin dealt primarily with her son,

18   Carlos Meza, in connection with the proceedings.

19            The purpose of a bankruptcy proceeding under

20   Chapter 11 is for the debtor to propose a plan of

21   reorganization to stay in business and pay its creditors over

22   time.  A debtor who successfully completes a bankruptcy may

23   be able to keep its primary assets.  In this case, 2715 North

24   Milwaukee Avenue had approximately $20 million in debt and

25   was seeking a plan to reorganize and keep its business,

1   namely, ownership and operation of the building.  The

2   bankruptcy petition in this case was ultimately dismissed

3   without successfully obtaining a plan to reorganize.

4           Golan & Christie was owed several thousand dollars

5   in legal fees for the services that it provided to 2715 North

6   Milwaukee LLC.  Mr. Benjamin reviewed two checks made payable

7   to Golan & Christie LLP.  Specifically, a check made payable

8   to Golan & Christie in the amount of $3,000, dated May 30th,

9   of 2012, and a check made payable to Golan & Christie in the

10  amount of $10,000, dated August 17, 2012.  Both of these

11  checks were issued on an account at PNC Bank and were

12  provided to the firm by Carlos Meza as payment for legal

13  services provided in connection with a Chapter 11 bankruptcy

14  proceeding filed on behalf of 2715 North Milwaukee LLC.

15          Government Exhibit BR-1 is a true and accurate copy

16  of the voluntary petition in the bankruptcy proceeding for

17  2715 North Milwaukee LLC in February of 2010 (sic.)

18          Stipulation No. 5.  If called to testify, Elan

19  Peretz would testify as follows:

20          He is the Managing Director of Barnett Capital,

21  Ltd.  Barnett Capital, Ltd., is an investment firm that

22  specializes in commercial financing.  Carlos Meza paid

23  Barnett Capital a legal deposit in the amount of $10,000 on

24  May 30th of 2012.  This payment was a refundable deposit for

25  legal fees associated with a prospective financing deal.

1           So stipulated?

2           MR. KUTNICK:  So stipulated, your Honor.

3           MR. YOUNG:  Your Honor, the government would move

4    into evidence, based upon the stipulations, Government

5    Exhibit BR-1, and pursuant to further agreement by the

6    parties, Government Exhibit BCF-1.

7           MR. KUTNICK:  No objection, Judge.

8           THE COURT:  All right.  They're admitted.

9        (Said exhibits received in evidence.)

10          MR. YOUNG:  Your Honor, with that, the government

11   rests.

12          THE COURT:  Okay.  Thank you.  I think we need to

13   take a little break.  Thank you.

14       (Jury out at 1:33 p.m.)

15          THE COURT: Okay.

16          MR. KUTNICK:  Your Honor, at the close of the

17   government's case, I would make a motion for acquittal.  Even

18   at this stage, in the light most favorable to the government,

19   they failed to meet their burden of proof, specifically in

20   regards to Mr. Meza's knowledge of the overall fraudulent

21   scheme and whether he used that knowledge and exploited his

22   relationships with the various victims in order to obtain --

23   well, to commit a fraud.  So we would ask you to grant our

24   motions.

25          THE COURT:  On the ground he didn't have knowledge?

1    MR. KUTNICK:  Correct, your Honor, that he did not

2    have knowledge of the overall fraudulent scheme.  I think

3    that even the witnesses have stated -- there has been no

4    direct -- no evidence stating that he was aware of what was

5    going on with the money that was being passed up to Virginia

6    Worldwide, to Renaissance Group, and to Carso Corporation.

7    No evidence has been produced to show that.  I think the

8    government's attempt is to show that, by some of these other

9    items, that that would somehow show that he did have

10   knowledge.  But we object to that, we disagree with that.  It

11   does not support that claim.  And, for that reason, your

12   Honor, we ask you to grant this motion.

13        THE COURT:  Response?

14        MR. YOUNG:  Your Honor, we believe the evidence

15   establishes that defendant committed the offense of wire

16   fraud.  There was a scheme to defraud investors.  You heard

17   from three of those investors, or victims, Mr. Spencer,

18   Mr. Crane, and Mr. Yacoub.  They outline specific

19   misrepresentations that defendant made to them to get their

20   money, and that is the essence of a mail fraud:  A scheme

21   intended to deceive and to cheat to obtain money.

22        Mr. Spencer told you that the defendant represented

23   to him that he, like Mr. Spencer, was putting money into

24   these contributions, yet -- into these investments, excuse

25   me.  Yet, the financial records show that the money was --

1   the only money going to Renaissance in connection with these

2   investments were that of Mr. Spencer.  Mr. Spencer testified

3   that that was a very important factor in his decision because

4   it indicated, and these were his words on the stand, that the

5   defendant had "skin in the game."

6          Mr. Crane and Mr. Spencer also both testified that

7   the defendant told them and misled them into believing that

8   their money were going towards these investments, whether it

9   was Renaissance Capital, or Virginia Worldwide, or Palmore.

10  That this was money going towards these investments.  When,

11  in fact, defendant was using portions of the money for his

12  own purposes.

13         With respect to Mr. Spencer, firstly, he provided

14  the defendant with $280,000 in funds in May and June of 2012.

15  He provided that money to the defendant under the belief that

16  that money was going towards the Renaissance Capital

17  investment.

18         THE COURT:  Okay.  I don't want to hear about his

19  belief as such.

20         MR. YOUNG:  Because he had been told that this

21  money was being used -- fair enough.

22         THE COURT:  Yes, I mean, I have to say --

23         MR. YOUNG:  He was being told that this --

24         THE COURT:  -- this is the most improbable victims

25  I've ever seen.  But I guess that doesn't mean that you can't

1  be defrauded, even if --

2          MR. YOUNG:  Absolutely, you can be defrauded, your

3  Honor, because its reliance --

4          THE COURT:  I mean, really, really, oh, I'm going

5  to give you $250,000, and you will get back millions?  There

6  really ought to be a -- unless you are developmentally

7  disabled or senile, there should be a limit.

8          MR. YOUNG:  Well, your Honor --

9          THE COURT:  But I realize the law doesn't give one.

10         MR. YOUNG:  Yeah, the law is that the victim -- you

11  know, the victims --

12         THE COURT:  On the other hand, I guess it -- you

13  know, the jury can decide what they want about their

14  credibility in this, but.

15         MR. YOUNG:  But, in any event, your Honor, they

16  were told the money was going towards the investment, and it

17  wasn't.

18         THE COURT: Okay.

19         MR. YOUNG:  280 was collected from the --

20         THE COURT:  So you're saying it wasn't because he

21  took some of it himself?

22         MR. YOUNG:  He was told the money was going towards

23  the investment and the defendant was keeping the money --

24  yes, the defendant was keeping portions of the money for

25  himself.

1          THE COURT:  Are they inconsistent?  Unless he is --

2     unless they were told, I'm going to take your $200,000, and

3     it's all going to it.  Did he have to say, gee, I'm going to

4     pay off some of my own debts?

5          MR. YOUNG:  Your Honor, raising money for an

6     investment, saying this money is going towards an investment,

7     and particularly that, we need to pay this fee, a fee of

8     $250,000, for the investment, that could not be clearer.  He

9     didn't say, I need $250,000.  He said, I have an investment.

10    In order to make this investment happen, there is a fee of

11    $250,000 that must be paid --

12         THE COURT:  Okay.

13         MR. YOUNG:  -- and there is an additional $30,000.

14    So I think to then require some type of additional disclaimer

15    or --

16         THE COURT:  No, I'm just asking you.

17         MR. YOUNG:  -- and that's what it's really for --

18         THE COURT: I'm not arguing.

19         MR. YOUNG:  Okay.

20         THE COURT:  I'm just asking what -- okay.  But

21    you're saying that is what they -- he says he was told,

22    that --

23         MR. YOUNG:  When you tell someone, I'm using your

24    money for X and you don't use it for X, that is a lie.  And

25    then not only did he not use it for X, he kept it for

1    himself.

2            Same with Mr. Crane.  In September of 2012, $50,000

3    is collected.  This is going towards the Bob Adams

4    investment, with the -- I mean, the returns actually in that

5    case were a little more believable, as opposed to --

6            THE COURT:  It was only 30, 35 percent.

7            MR. YOUNG:  20 to 30 percent, not as sort of higher

8    as it got later.  But, once again, 50,000 is collected,

9    47,500 goes to pay off a loan that the defendant obtained

10   from ALSJ.  Those -- there was a negative balance in the

11   account when that 50,000 came in.  There was no doubt that

12   was Mr. Crane's money.  The same is true with respect to

13   Mr. Spencer's money, I should add, as well.  Although, there

14   were some additional deposits coming from the account he

15   was -- he was taking out the money.

16           The lies later, as the scheme progressed, about the

17   lulling:  I have funds in Ecuador.  Don't worry, I can take

18   care of this, I can provide those funds to you.  When, in

19   fact --

20           THE COURT:  Is that part of a scheme?  He already

21   had the -- he already had the money, what difference would it

22   have made?

23           MR. YOUNG:  It's a lulling, your Honor, which is

24   part of the scheme.  To lull is part of a scheme.  There is

25   classic -- there is much authority on that.

273

1        We've seen his tax returns.  He didn't have any

2    assets, no bank accounts.  No -- no dividends, no stocks, no

3    indication of any accounts, let alone foreign accounts, your

4    Honor.

5        So if you'd like me to argue further, your Honor, I

6    can, but I believe the evidence is more than sufficient for

7    this to survive a motion in this stage of the proceedings.

8        THE COURT:  He was just arguing -- he just made his

9    motion on knowledge, is what you were --

10       MR. KUTNICK:  Knowledge and intent to defraud, your

11   Honor.

12       THE COURT:  Pardon me?

13       MR. KUTNICK:  Knowledge and also intent to defraud.

14       THE COURT:  Well --

15       MR. YOUNG:  He knew what he said.

16       THE COURT:  If you take money for an investment, I

17   mean, what I'm hearing is the fraud is that he was going

18   to -- he was intending to, and did, keep some portion for

19   himself.  Are you saying that wouldn't be fraud?

20       MR. KUTNICK:  Well, certainly Mr. Spencer agreed

21   that Mr. Meza was performing services doing jobs, spending

22   money.  He admitted all of that on the witness stand, that he

23   was doing all of those things on Mr. Spencer's behalf.  And

24   so that would be an indication that Mr. Meza reasonably

25   believed that he was entitled to pay himself for the

1  expenditures that he made and the work that he performed.

2  THE COURT:  Well, wouldn't that at least be a

3  question for the jury?

4  MR. KUTNICK:  Uh, it was --

5  THE COURT: I mean, you're saying the government

6  presented no evidence that would support the knowledge -- or

7  knowledge and intent requirement.

8  MR. KUTNICK:  I stand on that.  They showed no

9  evidence that Mr. Meza knew that he was collecting money from

10  these investors as a part of a fraudulent scheme.  There has

11  been no evidence to that effect.

12  THE COURT:  Well, that's just -- okay.  Let's

13  assume, and I don't know otherwise, that, at this point, that

14  he -- he also improbably believed that he could send all this

15  money and was going to get this vast return.  Then we have at

16  least three people that -- never mind.  I have trouble with

17  this, but.  But it wouldn't make any difference if whatever

18  he believed at that, if he is taking the money, thinking that

19  he really is going to make money for them, but he also is

20  thinking, I'm not going to send it all to them, I'm going to

21  keep, say, $20,000 of it to buy a new Jeep, or whatever.

22  MR. KUTNICK:  Judge, he -- he pitches the deal to

23  these people:  We can make so much money here.  I believe in

24  this, is what he says.  I believe.  And I think the evidence

25  has shown he believed.  And --

1    THE COURT:  Well, actually, the evidence hasn't

2    shown very much, other than, if he didn't believe it and he

3    didn't get any money back, then, gee, might as well have

4    taken off with the money himself.  But we don't actually know

5    what his relationship -- I don't know, I don't think the jury

6    has heard, anything about what his relationship was with

7    Renaissance, or whoever this guy is.

8    MR. KUTNICK:  But, I mean, taking the evidence in

9    the light most favorable to the government at this stage,

10    Judge, the charge is not the right charge.  It may be some

11    kind of conversion, or theft.  But the government has not

12    proven that he fraudulently obtained these people's money.

13    He may have done something after he obtained it that maybe he

14    shouldn't have done, such as theft or conversion.  However,

15    is that wire fraud, Judge?  It's not.  Wire fraud would be a

16    taking of the money by fraud, by fraudulent

17    misrepresentations.  And his, let's call it puffery, if

18    that's what the witnesses believed, was an effort to get

19    their partnership to go ahead and proceed with this deal.  It

20    was legitimate, it was not fraudulent, it was not false, it

21    was real, in his mind.

22    THE COURT:  Well, I'm going to deny your motion as

23    you have put it.  So what are you going to do now?

24    MR. KUTNICK:  Could I have a few minutes to talk to

25    my client and my team?

1           THE COURT:  Yes, you may.

2           MR. KUTNICK:  Thank you, your Honor.

3        (Recess from 1:46 p.m. to 1:59 p.m.)

4        (In open court.  Jury out.)

5           MR. KUTNICK:  Judge, he just wants to use the

6     restroom quickly, and then we'll be ready to proceed to make

7     a decision.

8           THE COURT:  Okay.  Have you decided whether you're

9     presenting a case or what you're doing?

10          MR. KUTNICK:  We are extremely, extremely close to

11    deciding about presenting a case.

12          THE COURT:  Okay.

13          MR. KUTNICK:  It's more about what is being

14    presented.

15          THE COURT:  Yes, okay.  All right.

16          MR. KUTNICK:  He wants to use the restroom.

17          THE COURT:  Okay.

18          MR. KUTNICK:  If we could just have a few more

19    minutes, we'd appreciate it.  Thank you.

20       (Recess from 2:00 p.m. to 2:06 p.m.)

21       (In open court. Jury out.)

22          THE COURT:  Is your client going to testify?

23          MR. KUTNICK:  Yes.  Otherwise, we wouldn't get the

24    audio in.

25       (Recess from 2:06 p.m. to 2:10 p.m.)

1              (In open court. Jury out.)

2              THE COURT:  Okay.  I think, I could be wrong, but I

3      think it has been about 40 minutes, this break, so I think

4      it's time your client comes in.

5              MR. KUTNICK:  Is it that long?  I'm sorry, we will

6      get him, and we will get this going.  We're ready to go.

7              THE COURT:  Okay.  Are we going to have an issue

8      about any of this coming in?

9              MR. YOUNG:  I'm sorry, Judge?

10             THE COURT:  Are we going to have an issue about any

11     of this coming in?

12             MR. YOUNG:  No, Judge.

13             THE COURT:  Okay.  I'm going to bring the jury in.

14             (Jury in at 2:18 p.m.)

15             THE COURT: Sorry for the long wait.  Please be

16     seated.  Okay.  Counsel?

17             MR. KUTNICK:  Thank you, your Honor.  At this time

18     the defense calls Carlos Meza.

19             THE COURT:  Okay.

20             COURT SECURITY OFFICER:  Right up here.  Step up

21     here, face her honor.

22             (Witness sworn.)

23             THE COURT:  Please be seated.

24                 CARLOS MEZA, DEFENDANT, SWORN,

25                     DIRECT EXAMINATION

```
 1   BY MR. KUTNICK:
 2   Q.   Carlos, please introduce yourself to the jury.
 3   A.   My name is Carlos Meza.
 4   Q.   How old are you?
 5   A.   55.
 6   Q.   Are you married or single?
 7   A.   I am married.
 8   Q.   How long have you been married?
 9   A.   Close to 30 years.
10   Q.   How many -- do you have any children?
11   A.   Yes.
12   Q.   How many?
13   A.   Three girls.
14   Q.   What are their ages?
15   A.   22, 20, and 14.
16   Q.   Where do you live?
17   A.   I live in Lake in the Hills.
18   Q.   How long have you lived there?
19   A.   18 years.
20   Q.   Do you live in a house, or apartment, or?
21   A.   I live in a house.
22   Q.   Okay.  Do you own that house or rent it?
23   A.   I own the house.
24   Q.   How long have you owned the house?
25   A.   Since -- 18 years.
```

1    Q.    Okay.  Are you a member of a church?

2    A.    Yes.

3    Q.    What church are you a member of?

4    A.    The Church of Jesus Christ of Latter-Day Saints.

5    Q.    How long have you been a member of that church?

6    A.    Since 1986, '85.

7    Q.    Where do you attend?

8    A.    Crystal Lake.

9    Q.    Is that where you've always attended?

10   A.    Yes.

11   Q.    What do you do for a living?

12   A.    I renovate and rehab properties.

13   Q.    Did you own a -- well, first of all, what's Milwaukee

14   McPherson?

15   A.    Milwaukee McPherson LLC is a company that my mother

16   owns, and I am the CEO of that company, I was the CEO.

17   Q.    You're the CEO?

18   A.    I am the CEO, yes.

19   Q.    Okay. So you operate the company?

20   A.    Yes.

21   Q.    What's the purpose of the company?

22   A.    For real estate.

23   Q.    Okay.  Did Milwaukee McPherson, back in 2012, it was

24   actually 2011, what was going on with that property,

25   financially?

1   A.   It was acquiring some properties.

2   Q.   No, what was going on with the property that you owned?

3   Were there any problems, financially?

4   A.   Yes.

5   Q.   What was the problem?

6   A.   It was taking -- it was going on foreclosure, the

7   property, and it was going to being taken by the FDIC.

8   Q.   Okay.  Now, Carlos, we all need to hear, so I really

9   want you to speak loudly.  Okay?

10  A.   All right.

11  Q.   Everybody, those people in the back row, need to hear

12  you.  Okay?

13  A.   Sure.

14  Q.   All right.  What did you -- you were going to lose the

15  property?

16  A.   Yes.

17  Q.   What did you do?  What did you want to do in order to

18  prevent from losing the property?

19  A.   Tried to obtain capital in order to keep the property.

20  Q.   You were going to refinance?

21  A.   Yes.

22  Q.   Okay.  Seek financing?

23  A.   Seek financing, is correct.

24  Q.   Okay.  Who did you call?

25  A.   I called several lenders.

1   Q.   Did you call a person by the name of Shelly Holmes?

2   A.   Yes, I did.

3   Q.   Who is Shelly Holmes?

4   A.   Shelly Holmes is a mortgage broker.

5   Q.   And after your -- were you able to secure financing with

6   Shelly Holmes?

7   A.   No.

8   Q.   After your conversation with Shelly Holmes, did you --

9   were you directed to another person?

10  A.   Yes.

11  Q.   Who was that?

12  A.   Alan Milton.

13  Q.   And did you have a conversation with Alan Milton?

14  A.   Yes.

15  Q.   After that conversation, did you come to meet on the

16  phone a person by the name of Robert Adams?

17  A.   Yes.

18  Q.   And what's Robert Adams' company?

19  A.   Renaissance Capital LLC.

20  Q.   Did you decide -- after talking to Robert Adams, did you

21  decide to invest in Renaissance LLC?

22  A.   Yes, we did.  Yes, I did.

23  Q.   Okay.  But you didn't have the money yourself to make

24  that investment; did you?

25  A.   No.

1    Q.    And so what did you want to do in order to get involved

2    in that investment?

3    A.    I'm not following you.

4    Q.    Did you ask -- did you -- did you ask your friends?

5    A.    Yes.

6    Q.    Okay.  So I want to call your attention to the date

7    of -- when you had phone conversations with Robert Adams, did

8    you ever record those conversations?

9    A.    Yes, I did.

10   Q.    Did you also have phone conversations with a person by

11   the name of Larry Gelfond?

12   A.    Yes, I did.

13   Q.    Who is -- what is Mr. -- is it Gelfond or Gelfond?

14   A.    I pronounce it Gelfond.

15   Q.    So let's say Larry Gelfond.  Did you have conversations

16   with him also regarding investments of this report?

17   A.    Yes.

18   Q.    What is his company?

19   A.    Carso LLC.

20   Q.    Larry Gelfond's is?

21   A.    Yeah.

22   Q.    What about Terry Barnes?

23   A.    Carso and Carco as well, I think.

24   Q.    Okay.  What about Virginia Worldwide, who is the

25   principal of that, as far as you know?

1    A.   I'm not sure.

2    Q.   Who referred you to Virginia Worldwide?

3    A.   Larry Gelfond.

4    Q.   Did you record various conversations that you had with

5    Robert Adams, Larry Gelfond and Terry Barnes?

6    A.   I believe so.

7    Q.   Well, did you or didn't you?

8    A.   Yes.  Yes.

9    Q.   Okay.  And why did you record those conversations?

10   A.   Some of the language they were talking about was a

11   little more complex that I was used to it.

12   Q.   Were these conversations generally about the investment

13   that you were going to be entering into?

14   A.   Yes.

15   Q.   Okay.  And so tell me again, why did you record them?

16   A.   I wanted to understand better and to keep better notes

17   as to what they were saying to me.

18   Q.   Okay.  So let's just go right to it.

19            On April 2nd -- or, I'm sorry, on June 13, 2012,

20   did you have a phone conversation with Alan Milton?

21   A.   Yes.

22   Q.   Did you record that conversation?

23   A.   Yes.

24   Q.   Okay.  I'm going to play an audio clip for you, and you

25   tell us if that is the recording.  Okay?

Case: 1:17-cr-00281 Document #: 75 Filed: 01/18/19 Page 150 of 234 PageID #:617
Meza - direct by Kutnick
284

1    A.    Okay.

2          (Audio played in open court.)

3    BY MR. KUTNICK:

4    Q.    Did you make that recording?

5    A.    Yes.

6    Q.    Who were you on the phone with?

7    A.    Alan Milton.

8    Q.    How did you record the conversation?

9    A.    I have -- carry two phones, and my phone.

10   Q.    Okay.  So you would be on the phone with -- on the phone

11   call with one of your phones; right?

12   A.    Yes.

13   Q.    And then you would use as a recorder on the other phone?

14   A.    Yes.

15   Q.    Okay.  And does that recording truly and accurately

16   depict the conversation that you had with Alan Milton on

17   June 13, 2012?

18   A.    Yes.

19   Q.    Okay.  Did you have another conversation this time with

20   Bob Adams, and the Ms. Robinson that you referred to, on

21   June 15, two days later, 2012?

22   A.    Yes.

23   Q.    I'm going to play that for you.

24         (Audio played in open court).

25   BY MR. KUTNICK:

1    Q.   I'm not going to keep pausing through and through, but

2    who is that talking?

3    A.   That's Robert Adams.

4    Q.   Okay.  Now I'll play the rest of the call.

5         (Audio played in open court).

6    BY MR. KUTNICK:

7    Q.   Is that a recording of the phone call that you had

8    between Ms. Robinson and Bob Adams on January -- on June 15,

9    2012?

10   A.   Yes.

11   Q.   And did you record that conversation?

12   A.   Yes.

13   Q.   And does that recording accurately reflect that

14   conversation?

15   A.   Yes.

16   Q.   Did you have a conversation on April 2nd, 2013, with

17   Larry Gelfond?

18   A.   Yes, I did.

19   Q.   Did you record that conversation?

20   A.   Yes.

21   Q.   And I'm going to play this for you, and let me know if

22   this is the conversation.

23        (Audio played in open court).

24   BY MR. KUTNICK:

25   Q.   Just, once again, who is that person talking?

1    A.    That's Larry Gelfond.

2    Q.    Who else is on the phone in this conversation?

3    A.    Me.

4          (Audio played in open court).

5    BY MR. KUTNICK:

6    Q.    Did you record that conversation?

7    A.    Yes.

8    Q.    Same way that we just talked about, with the other

9    conversations?

10   A.    Yes.

11   Q.    Does it truly and accurately reflect the conversation

12   that you had with Larry Gelfond on April 2nd, 2013?

13   A.    Yes.

14   Q.    By the way, did you play -- did you play this -- that

15   recording for anybody, ever?

16   A.    I played it for Scott and Cordell.

17   Q.    When?

18   A.    Whenever we -- whenever they -- when we met, so,

19   whenever.

20   Q.    Okay.  So they weren't together when you played it;

21   right?

22   A.    No, separate.

23   Q.    Okay.  So you -- you played that conversation to Scott

24   Spencer?

25   A.    Yes.

Case: 1:17-cr-00281 Document #: 75 Filed: 01/18/19 Page 153 of 234 PageID #:626
Meza - direct by Kutnick
287

1    Q.   Why?

2    A.   They wanted to know what was going on.

3    Q.   When you say "they," you mean Scott?

4    A.   Scott Spencer, yeah.

5    Q.   Okay.  And why did you play it for Cordell Crane?

6    A.   He wanted to know what was going on as well, constantly.

7    Q.   Okay.  What was your under -- let's move on to the next

8    one.  Did you have another conversation with Larry Gelfond a

9    couple weeks later on -- by the way, did that meeting ever

10   occur, face-to-face?

11   A.   Yes, it did.

12   Q.   Okay.  And when did that occur, before the next phone

13   call, or?

14   A.   I don't recall.  Right after that, something like that.

15   Q.   Right around that time?  Carlos, please remember to keep

16   your voice up.

17   A.   Right around that time.

18   Q.   Okay.  Thank you.

19   A.   Okay.

20   Q.   Did you have another phone conversation on April 16,

21   2013, with Larry Gelfond?

22   A.   Yes.

23       (Audio played in open court).

24   BY MR. KUTNICK:

25   Q.   Same questions as before, did you make that recording?

Case: 1:17-cr-00281 Document #: 75 Filed: 01/18/19 Page 154 of 234 PageID #:621
Meza - direct by Kulmick
288

1    A.   Yes, I did.

2    Q.   Did you make it the same way that we talked about it you

3    made it before?

4    A.   Yes, I did.

5    Q.   And does that recording accurately reflect the

6    conversation that you had with Larry Gelfond on April 16th --

7    April 16, 2013?

8    A.   Yes, I did.

9    Q.   Did you play that phone call, that recording, for Scott

10   Spencer?

11   A.   Yes.

12   Q.   When?

13   A.   Around the same time.

14   Q.   Okay.  Why?

15   A.   He wanted to know what was going on all the time.

16   Q.   Did you play that recording for Cordell Crane?

17   A.   Yes, I did.

18   Q.   When?

19   A.   Every time he would call me or we would meet.

20   Q.   Well --

21   A.   Around that same time, yeah.

22   Q.   Okay.  You didn't play him that recording every time;

23   right?

24   A.   No.

25   Q.   Okay.  Well, explain what you mean.  When would you play

1    these gentlemen the recordings?

2    A.   Around the same as they were calling me and asking me

3    questions, what was going on.

4    Q.   Okay.  So is it correct to say, then, that you would be

5    in communication with these individuals, like Larry Gelfond

6    and Robert Adams; is that right?

7    A.   Yes.

8    Q.   And they would give you information about the

9    investment?

10   A.   Yes.

11   Q.   And then you've got Scott Spencer and Cordell Crane

12   independently saying, hey, Carlos, what's going on here?  Did

13   that happen?

14   A.   Yes.

15   Q.   And then in response to that, you would play those phone

16   calls; is that correct?

17   A.   That is correct.

18   Q.   Okay.  I have one more phone call, it is the longest

19   one, so -- but it's with Robert Adams.  Okay?  But bear with

20   us.  It is the final phone call, but it's a little bit longer

21   than the others.

22              THE COURT:  What's the date?

23              MR. KUTNICK:  Yes, your Honor.  The date is

24   April 17, 2013.

25              (Audio played in open court).

1    BY MR. KUTNICK:

2    Q.   Who is that?

3    A.   Robert Adams.

4         (Audio played in open court).

5    BY MR. KUTNICK:

6    Q.   So not to narrate, but Robert Adams is now playing you a

7    conversation that he has; is that right?

8    A.   That is correct, yes.

9    Q.   Okay.

10        (Audio played in open court).

11   BY MR. KUTNICK:

12   Q.   Okay.  I'm going to now, as long as the government is

13   okay with it, which I think they would be, I'm going to jump

14   forward to where Robert Adams comes back on, and you will

15   tell us about that.  Okay?

16   A.   Okay.  Sure.

17   Q.   For the record, it's at 14 minutes and 2 seconds that I

18   am going to fast-forward to.

19        (Audio played in open court).

20   BY MR. KUTNICK:

21   Q.   Is that not Bob Adams talking?

22   A.   That is Robert Adams.

23   Q.   Okay.

24        (Audio played in open court).

25   BY MR. KUTNICK:

Case: 1:17-cr-00281 Document #: 75 Filed: 01/18/19 Page 157 of 234 PageID #:624
Meza - direct by Kutnick
291

1   Q.   Sorry, it's actually 12 minutes, for the record.

2        (Audio played in open court.)

3   BY MR. KUTNICK:

4   Q.   Same questions about the other calls.  Did you make that

5   recording?

6   A.   Yes.

7   Q.   And you made -- did you make it the same way that you

8   made the other ones?

9   A.   Yes.

10  Q.   And does that recording accurately reflect the

11  conversation that you had with Robert Adams on April 17,

12  2013?

13  A.   Yes.

14  Q.   With the exception of the fact that we fast-forwarded

15  through him playing you the call of the other person; right?

16  A.   Yes.

17  Q.   Did you play that call for Scott Spencer?

18  A.   Yes, I did.

19  Q.   When?

20  A.   Around the same time.

21  Q.   Did you play -- why?

22  A.   He wanted to know what was going on with the

23  investments, with the capital --

24  Q.   Did you play that?

25  A.   -- with Renaissance.

1    Q.   Did you play it for Cordell Crane?

2    A.   Yes, I did.

3    Q.   When?

4    A.   Around the same time.

5    Q.   Was it for the same reason?

6    A.   Yes.

7    Q.   Why didn't you just explain this stuff to them yourself?

8    A.   Because, after a while, repeating the same stories,

9    Adams was telling me they became repetitious, and -- and --

10   they just became repetitious for them, and they wanted to

11   hear from the real -- from the other source.

12   Q.   Okay.  Now, you had many, many, many other phone calls

13   relating to these investments; didn't you?

14   A.   Yes.

15   Q.   Well, we heard the one June 13, 2012, the one with

16   Mrs. Robinson; right?

17   A.   Yes.

18   Q.   Did you have a phone call -- and we also heard the

19   June 15, 2012, also with Robert Adams?

20   A.   Yes.

21   Q.   Did you have another phone conversation with Robert

22   Adams on December 3rd, 2012?

23   A.   Yes.

24   Q.   And without listening -- I'm not going to bore everyone

25   with all the dates, but would it sound right to you that

1  between June 13, 2012, and June 3rd, 2014, that you had

2  recorded --

3          MR. YOUNG:  I'll just object to the leading, your

4  Honor.

5          MR. KUTNICK:  I can rephrase, your Honor.

6          THE COURT:  Okay.

7  BY MR. KUTNICK:

8  Q.  Did you record -- well, during that time period, how

9  many conversations do you think you recorded?

10  A.  Several.

11  Q.  Okay.  More than ten?

12  A.  Yes.

13  Q.  Okay.  More than 20?

14  A.  Probably.

15  Q.  Did you record every conversation you had with Larry

16  Gelfond, Bob Adams and -- every conversation?

17  A.  No, not every one.

18  Q.  By the way, Carlos, did you have a misdemeanor theft

19  conviction in 2014?

20  A.  Yes, I did.

21  Q.  Okay.  Tell me how you met Cordell Crane.

22  A.  In church.

23  Q.  When?

24  A.  We moved in Lake in the Hills in 2000.  Probably we

25  start talking around, maybe around early -- between 2000,

Meza - direct by Kaufman                                    294

1    2005, something like that.

2    Q.   All right.  Carlos, I'm just going to say one more time

3    because I'm pretty close to you, I need you to talk a little

4    louder, please.  Okay?

5    A.   Okay.  Between 2000, 2005.

6    Q.   Okay.  How did you -- you became friends with him how?

7    A.   We would just see each other at church, that's it.

8    Q.   Okay.  But what made him different than other church

9    members who you became acquainted with?

10   A.   He was just closer to my house, that's it.

11   Q.   Okay.  How would you describe your relationship with

12   him?

13   A.   We were just friends at church and talked and

14   participated in church activities.

15   Q.   Okay.  What about Scott Spencer?  How did you meet him?

16   A.   Scott -- at church as well.

17   Q.   All right.  When?

18   A.   Probably when we moved in, in 2000.

19   Q.   Okay.  So, I mean, do you remember the first meeting?

20   Can you tell us about it?

21   A.   We probably saw him at church, but we really didn't

22   talk.

23   Q.   Okay.  So there -- in the end of 2011, did Scott Spencer

24   invite you to go anywhere with him?

25   A.   Yes, he did.

Case: 1:17-cr-00281 Document #: 75 Filed: 01/18/19 Page 161 of 234 PageID #:6289
Meza - direct by Kadrick
295

1  Q.   Where?

2  A.   He invited me to North Dakota.

3  Q.   Why?

4  A.   He wanted to get my opinion on the projects he was

5  getting involved in North Dakota, some house developments he

6  was -- he was -- he took upon himself to do it.  And he had

7  several projects he wanted me to get financing for -- for his

8  projects.

9  Q.   Okay.  So he wanted -- so in addition to getting --

10  okay.  When you say he wanted you to get financing for his

11  projects, what project did he want you to get financing for,

12  specifically?

13  A.   The first one was to purchase a crane.

14  Q.   Okay.  And what was that crane going to be used for?

15  A.   It was to be used for -- to operate in the North Dakota

16  area in the oil fields.

17  Q.   What did you do in an effort to obtain a crane?

18  A.   I went and shopped around, around the country, to see

19  where I can find the cheapest and good quality crane.  I

20  spent a lot of time doing that.

21  Q.   Okay.  Where did you go?

22  A.   I probably shopped around several parts around the

23  country and ended up finding one in Wisconsin.

24  Q.   Okay.  And did you -- well, how much was that Crane?

25  A.   Some were over a million.  The one that I found was

1    about 800,000.

2    Q.   Were you going to pay for it outright, or were you going

3    to obtain financing for it?

4    A.   We were going to get financing for that.

5    Q.   Okay.  How were you going to do that?

6    A.   He was going to provide some capital for those projects,

7    and I was going to put some of the equity of the condos that

8    I was planning to get.

9    Q.   Okay.  And you were going to secure a loan then?

10   A.   Correct.

11   Q.   For the crane?

12   A.   Yes.

13   Q.   Did you do anything else for Scott Spencer in relation

14   to the North Dakota property?

15   A.   I did -- I reviewed one of those projects in North

16   Dakota.  There was a lot of due diligence that he wanted me

17   to work on it.  He wanted me to also get his -- his friend,

18   Doug Pitt, get him papers and naturalized.  He wanted to use

19   him to drive the crane.

20   Q.   Whose -- okay, you've got to -- okay.  Listen to my

21   question, then.  Who is Doug Pitt?

22   A.   Doug Pitt is Scott's friend.

23   Q.   What's his job?

24   A.   Crane operator.

25   Q.   Why did you have to be involved?

1    A.    Scott wanted me to do work with him on his operation and

2    get him the crane and get him into working in the country.

3    Q.    Okay.  Why?  Why into the country?  Tell the jury

4    what -- why you -- what work you had to do to get Doug Pitt

5    into the country.

6    A.    Doug was a Canadian citizen who needed a permit to be

7    working legally in the states.  So he needed a permit to

8    obtain and to work out -- in order for him to work and

9    operate a crane and in the business.

10   Q.    Okay.  What did you do in order to help him get legally

11   into the country?

12   A.    I retained counsel here in Chicago, an immigration

13   lawyer.

14   Q.    Did you advance any funds yourself in relation to the

15   crane project?

16   A.    Yes.

17   Q.    By the way, the crane company had a name; right?

18   A.    Yes.

19   Q.    Performance Excavating?

20   A.    Yes.

21   Q.    Did you have any role formally in Performance Crane and

22   Excavating LLC?

23   A.    Yes.

24   Q.    What was your role?

25   A.    Well, other than they -- they assigned me, well, like,

1    one-third of the company.  My role was just to get the things

2    rolling because they were so busy doing all their stuff.

3    Q.   Were you a member of Performance Crane and Excavating

4    LLC?

5    A.   Yes.

6    Q.   Who were the other members?

7    A.   Scott Spencer and Tom Holiday.

8    Q.   Okay.  I'm going to show you what's been previously

9    marked as Defense Exhibit No. 16 for identification, I

10   believe.  Can you tell us what that is, please?

11   A.   It's a limited liability company authorization

12   resolution for Performance Crane and Excavating LLC.

13   Q.   Okay.  And what does that document basically say

14   overall?  You know that document; right?

15   A.   Yes.

16   Q.   Okay.  What does that document mean to you?

17   A.   It means that I have ownership in the company.

18   Q.   Okay.  But as -- these expenditures that you made, did

19   Scott Spencer reimburse you for those expenditures?

20   A.   Scott -- some of the money that he wired he told me to

21   proceed and use it from there.

22   Q.   Okay.  So you're talking about the money that he wired

23   to you?

24   A.   Yes.

25   Q.   All right.  So let's get specific into that, then.  So

1   Scott Spencer, in total -- well, first of all, he wired you

2   200,000; is that right?

3   A.   Yes.

4   Q.   On May 16, 2012?

5   A.   Yes.

6   Q.   Okay.  And is this the same time that you were talking

7   about the Renaissance deal with him?

8   A.   Yes.

9   Q.   Oh, by the way, did he ever -- did Scott Spencer buy a

10  Bobcat from you?

11  A.   Yes, he did.

12  Q.   Okay.  When was that?

13  A.   Around 2012.

14  Q.   And did he -- and did he -- how did he pay for that?

15  A.   He wired the money to Milwaukee McPherson LLC.

16  Q.   Okay.  So are you talking about the -- there is a

17  $20,000 payment and a $15,000 payment on August 21st?

18  A.   Yes.

19  Q.   Okay.  Now, we listened -- the last phone conversation

20  that we listened to, April 17, 2013, with Robert Adams.  Do

21  you recall hearing that conversation?

22  A.   Yes.

23  Q.   Okay.  After that conversation, what did you need to go

24  do?

25  A.   Pay him the fee, whatever he needed in order to stay in

1    the deal.

2    Q.   Okay.  Hadn't you already paid him some money before?

3    A.   Yes, but he needed more -- additional money for us to

4    stay in the deal and then to purchase -- to increase the

5    amount of money to 25 million so he can stay and be part of

6    the deal that he needed to be -- he needed to be in the

7    $100 million deal.

8    Q.   Okay.  So do you believe -- well, strike that.  Let me

9    move on.

10             Did -- how about this:  Describe to the jury your

11   understanding of how the Renaissance deal worked.

12   A.   Renaissance --

13   Q.   Simply, if you can.

14   A.   Renaissance was charging us a fee, Scott and I now, for

15   the -- to use his capital in order to go into some type of

16   trade program that they had worked out, or he was working out

17   with -- with Alan Milton and Mark Horton.

18   Q.   Okay.  Now, that 200,000 initial investment from Scott

19   Spencer, did you send that whole thing to Renaissance?

20   A.   No.

21   Q.   How much did you send?

22   A.   150.

23   Q.   All right.  Why?

24   A.   The other -- I talked to Renaissance, Bob, and I told

25   him I needed to acquire some vehicles.  So I obtained a loan

1    from -- from Renaissance for 30 to 60 days, that I would send

2    him the other 50 later on as I took financing from the

3    condos.

4    Q.   I'm going to show you what I've marked as Defendant's

5    Exhibit No. 24 for identification.  Will you take a look at

6    that and tell us what that is, please?

7    A.   This is Milwaukee McPherson - Carlos Meza Promissory

8    Note for the amount of 53,250.

9    Q.   So that's a loan; right?

10   A.   That is correct.

11   Q.   Okay.  You borrowed that money; is that right?

12   A.   Yes.

13   Q.   From who?

14   A.   From Bob Adams.

15   Q.   Okay.  So what was the arrangement for that loan?  Tell

16   the jury.

17   A.   Bob indicated to me to just send him 50 -- 150,000 and

18   to keep the 50,000, to use it for whatever I needed, or

19   whatever basically I needed at that time, and to repay him

20   within, what was it, 30, 60 days.

21   Q.   And Defense Exhibit No. 24 that you're holding there, is

22   that a copy of the promissory note that you entered into with

23   Mr. Adams for the 50,000?

24   A.   Yes, I did.

25   Q.   Did you repay that loan?

1   A.   Yes, I did.

2   Q.   So you just explained to the jury about how the

3   Renaissance investment worked; right?

4   A.   Yes.

5   Q.   Were you made any promises or guaranties about the money

6   that was securing the investment?

7   A.   I'm not following your question.

8   Q.   Okay.  Well, I'm going to show you Government Exhibit

9   SS-5.  Take a look at this and tell us what that is, please.

10  A.   It's a bank statement from Renaissance Capital Group LLC

11  from June -- July 23, 2012, indicating it had the balance of

12  10,700,802.60 euros at Credit Suisse.

13  Q.   Okay.  So that's the Credit Suisse account statement

14  that we talked about during this trial; is that right?

15  A.   That is correct.

16  Q.   All right.  Who provided that to you?

17  A.   Robert Adams.

18  Q.   When?

19  A.   Around this -- around this time, around the date.

20  Q.   The date on the statement?

21  A.   Yes.  Yes.

22  Q.   Did you share that with anybody?

23  A.   Yes, I did.

24  Q.   Who?

25  A.   Scott Spencer and --

Case: 1:17-cr-00281 Document #: 75 Filed: 01/18/19 Page 169 of 234 PageID #:636
Meza - direct by Kaeseberg
303

1    Q.    When?

2    A.    Whenever I got this.

3    Q.    Why?

4    A.    They wanted to know if it was -- you know, if it was

5    real or not.  They had -- they wanted to see something.

6    Q.    Did you share with anybody else?

7    A.    Cordell Crane.

8    Q.    Okay.  Same questions.  When?

9    A.    Around the same time.

10   Q.    Was it for the same reason?

11   A.    Yes.

12   Q.    I can take back these exhibits.

13         Cordell Crane, you -- he wired you $50,000 on --

14   first of all, did he wire you $50,000 on September 19, 2012?

15   A.    Yes, he did.

16   Q.    Okay.  Was that -- what was the nature of that wire?

17   Why did he do that?

18   A.    He wanted -- we made an agreement that he will loan me

19   that money in exchange for a condo, secured by a condo for

20   50,000.

21   Q.    Okay.  So was that 50,000 part of the Renaissance

22   investment?

23   A.    Yes.

24   Q.    Okay.  But he was -- okay.  Tell us about that.

25   A.    Prior to that, in order to pay Adams off, I took -- I

1    borrowed 50,000 from LSJ to pay, and bring current, the

2    amount of the note from Renaissance.  So following that, in

3    order for me to get rid of Andy because he was a hard lender,

4    I borrowed the 50,000 with -- from Cordell to pay LSJ, Inc.

5    Q.   I think you skipped a step.

6    A.   Okay.

7    Q.   Okay?  So you said Andy.  Who are you talking about?

8    A.   LSJ.

9    Q.   Okay.  Andrew Lee?

10   A.   Yes.

11   Q.   ALSJ, Inc.?

12   A.   Yes.

13   Q.   All right.  So, you know this, and maybe I know this,

14   but the jury doesn't know it.  They need to know it.

15   A.   Okay.

16   Q.   Tell us about that loan from LSJ, Inc.  How much was it

17   for?

18   A.   It was for $50,000.

19   Q.   And did you take out that loan?

20   A.   Yes, I did.

21   Q.   What did you do with that money?

22   A.   I took the proceeds and wired the money to Renaissance

23   and paid off -- canceled the note from Renaissance.

24   Q.   In order to cover the promissory note that we just

25   talked about, Defense Exhibit No. 24?

Case: 1:17-cr-00281 Document #: 75 Filed: 04/18/19 Page 171 of 234 PageID #:638
Meza - direct by Kaminick
305

1    A.   Yes.  And to be compliant with the amount of money that
2    Renaissance wanted.

3    Q.   So then how did you pay the loan to ALSJ, Inc., then?
4    A.   He's a hard lender, so, you know, I figure, I'd borrow
5    the money from Cordell Crane.

6    Q.   Okay.  And then that's how you paid off the ALSJ loan?
7    A.   That is correct.

8    Q.   Okay.  So how did you think you were going to pay back
9    Cordell Crane?

10   A.   I had a contract on Ravenswood property, which is a free
11   and clear condo, and I was planning to sell it.  I had a
12   contract on the property.

13   Q.   Well, didn't you believe that you were going to get
14   money -- a substantial sum of money on a return on investment
15   from the Renaissance deal?

16   A.   That is also true.  That's correct.

17   Q.   Okay.  So which one was it?  Was he going -- was he
18   going to take your property, or were you going to get him the
19   money on the deal?

20   A.   I was going to get him on -- on some part of the deal.

21   Q.   He never went after that property; did he?

22   A.   No.

23   Q.   By the way, you were working as the Chief Executive
24   Officer of Milwaukee McPherson during this time; weren't you?

25   A.   Yes.

Case: 1:17-cr-00281 Document #: 75 Filed: 01/18/19 Page 172 of 234 PageID #:638
Meza - direct by Kaminick
306

1   Q.   And Milwaukee McPherson owned many properties at that

2   time.  Tell us, how many properties did Milwaukee McPherson

3   own?

4   A.   At least 15 -- 15 properties, apartments.

5   Q.   And how was Milwaukee McPherson making money at that

6   time?

7   A.   Rental income -- rental income out of those properties.

8   Q.   So who would collect the rent?

9   A.   I would collect it.

10  Q.   What would you do with it?

11  A.   Whenever -- I would collect for and deposit in whichever

12  account needed the money, and to pay to -- cover the bills,

13  to pay the expenses of it.

14  Q.   Now, you heard Scott Spencer testify in this case;

15  correct?

16  A.   Yes.

17  Q.   And you -- are you aware that he took a loan from ALSJ,

18  Inc., in order to cover his $400,000 -- $450,000 loan from

19  ALSJ?

20  A.   Yes.

21  Q.   Why did he get that?

22  A.   He wanted to -- after listening to Adams' recordings, he

23  was excited, and receiving all the progress, he wanted -- he

24  decided to put this property and borrow money for short-term

25  from -- from LSJ, Inc.

1   Q.   What was he going to do with that money?

2   A.   He was going to take 450 and -- send 400,000 to

3   Robert -- to Renaissance Capital.

4   Q.   Okay.

5   A.   And whatever the balance to -- was supposed to be sent

6   out to his account, back.

7   Q.   So, in fact, did -- Scott Spencer did wire you $418,000

8   on October 18, 2012; is that right?

9   A.   Guaranty National Title wired me.

10  Q.   Okay.  But those were Scott Spencer's funds --

11  A.   Funds.

12  Q.   -- that he had borrowed; correct?

13  A.   Yes.  Yes.

14  Q.   And what did you do with that money?

15  A.   I followed his instructions, and I -- we received

16  418,000.  400 went to Renaissance and 18,000 went back to his

17  Chase account.

18  Q.   Did you pay any expenses or interest or payments on that

19  loan, on Scott Spencer's loan?

20  A.   Yes, I did.

21  Q.   Okay.  Specifically, on December 19, 2012, did you --

22  did you wire $7,000 to ALSJ, Inc., from your Milwaukee

23  McPherson account?

24  A.   Yes, I did.

25  Q.   What was that in payment of?

1  A.   It was in payment for interest on the -- LSJ was

2  charging on the loan of 450.

3  Q.   And I am going to show you what I will mark as -- I'm

4  going to mark this as Defendant's Exhibit No. 28 for

5  identification.  Would you take a look at this and tell us

6  what that is, please.

7  A.   It's a Milwaukee McPherson LLC, part of the bank

8  statement from Bank of America.

9  Q.   Okay.  Is that on December of 2012?

10 A.   Twelve -- yeah, it's from 12/4/12 through 12/31/12.

11 Q.   Does that reflect the interest payment that we just

12 talked about?

13 A.   Yes.

14 Q.   Okay.  How much was it?

15 A.   $7,000.

16 Q.   And how did you pay it?

17 A.   I wire-transferred to LSJ, Inc.

18 Q.   Thank you.  Did you make any other interest payments on

19 Scott Spencer's loan to ALSJ, Inc.?

20 A.   Yes.

21 Q.   What?

22 A.   I'm sorry, repeat.

23 Q.   What?  What was the payment you made?  And when?  Why?

24 A.   I believe the next month I paid 13,500.

25 Q.   Okay.  Why?

1    A.   To pay for the interest of the note.

2    Q.   By the way, your bank statement that you just looked at,

3    Defendant's Exhibit No. 28, does it reflect the actual --

4    that it went to Scott Spencer's loan?

5    A.   Yes.

6    Q.   And did -- the next payment you made, you said it was

7    the next month?

8    A.   I believe so.

9    Q.   Could it have been February, maybe a couple months

10   later?

11   A.   Yes.

12   Q.   Okay.  How much was that payment for?

13   A.   13,500.

14   Q.   How did you pay it?

15   A.   I believe that I put it in whatever Andy's, LSJ, he told

16   me to put it in an account of his.

17   Q.   Okay.  I'm going to show you what I'm going to mark as

18   Defendant's Exhibit No. 29 for identification.  Will you tell

19   us what this is, please?

20   A.   It's part of the bank statement from a Chase account

21   from Chicago Trucking and Properties LLC.

22   Q.   Okay. So what's Chicago Trucking?

23   A.   Chicago Trucking is an entity that I -- that I control,

24   or have -- had.

25   Q.   Okay.  So tell the jury how it is you made the $13,500

Case: 1:17-cr-00281 Document #: 175 Filed: 01/18/19 Page 176 of 234 PageID #:643
Meza - direct by Kulnick
310

1    payment.  I want to hear you back here because you keep --

2    A.   I withdrew the 13,500 for the account.

3    Q.   Okay.  Then what did you do with it?

4    A.   I paid the 13,500 in whichever account Andy directed me

5    to.

6    Q.   Okay.  Do you have any other documentation or proof that

7    you actually -- that you made that payment to ALSJ, Inc.?

8    A.   I'm not sure.  No.

9    Q.   Just that you took the money out?

10   A.   Just took the money out, right.

11   Q.   On May 31st, 2012, did you pay legal fees to Golan &

12   Christie for -- did you?

13   A.   Yes.

14   Q.   Okay.  Do you remember, what was that for?

15   A.   Legal fees that Milwaukee McPherson had -- whatever --

16   Golan & Christie was the legal representative of Milwaukee

17   McPherson LLC.

18   Q.   Golan & Christie, that was your lawyer; right?

19   A.   That is correct.

20   Q.   And what did Golan & Christie do for Milwaukee McPherson

21   LLC?

22   A.   They took care of all the legalities for Milwaukee

23   McPherson LLC.

24   Q.   What do you mean?

25   A.   They were securing, they were protecting the building on

1    Milwaukee Avenue, and they were doing whatever all the legal

2    necessities that Milwaukee McPherson LLC needed to be --

3    needed to be protected.

4    Q.    On May 30, 2012, you purchased a vehicle; is that right?

5    A.    Yes.

6    Q.    Okay.  Explain to the jury the circumstances of your

7    purchase of that vehicle.

8    A.    When I borrowed the money from -- in -- Adams indicated

9    to me that I can borrow the 50,000, there was a deal -- there

10   was a -- the van was going for a low price, and my vehicle

11   broke down.  So at the time I took advantage of the lower

12   deal, so I went and purchased a van for the $22,000.

13          MR. KUTNICK:  One second, please, your Honor.

14   BY MR. KUTNICK:

15   Q.    After your trip to North Dakota with Scott Spencer, did

16   you -- what did you believe about his need for finances for

17   that project?

18   A.    He -- he had a lot of projects himself in -- many

19   projects, not just the one he was building.  He had like a

20   trailer park, he had like -- a lot of projects he was looking

21   into purchasing.  And he needed me to also give him, or

22   pretty much keep an eye on the current project of developing

23   the infrastructure of the homes that was taking place in

24   North Dakota, talking to their general managers who were

25   working or assigned to protect that project.  There was a lot

1   of tasks.  Making sure the appraisals were properly done.

2   Q.   He needed money; right?

3   A.   That is correct.

4   Q.   What about Cordell Crane?  What was going on with his

5   financial situation at the time?

6   A.   He -- he also needed -- he was -- he was also struggling

7   because he lost his job, and he needed help also on trying to

8   figure out a way to get some additional income.

9   Q.   Did you think you could help them?

10  A.   I -- you know, I always tried to help everybody,

11  including them.  So I always tried to help Cordell as well.

12  Q.   Did you believe that you were going to recoup the

13  investments that Scott Spencer gave you?

14  A.   Yes.

15  Q.   Why?

16  A.   Because of the constant -- well, Bob Adams kind of

17  pretty much sold it, that this was a done deal, that he had

18  many -- he has been dealing with all this, he put a good talk

19  at the time.  And I also, when Scott and I were doing due

20  diligence, we found out that he was also a church member of

21  the -- he had a high degree calling who believe he was a

22  trustworthy individual, who, at the time we believed that he

23  can actually provide the capital that he said that he can

24  provide it, in order for us to make additional money.  And I

25  believe he indicated that he was going to help us to get out

1    of our financial mess.

2    Q.   Did you intend to take these people's money?

3    A.   No.

4    Q.   Did you profit -- other than these expenses that were

5    paid, did you profit from this Renaissance investment?

6    A.   I didn't profit, not at all.

7    Q.   Did you profit from the Virginia Worldwide investments?

8    A.   No, I did not profit at all.

9    Q.   Do you have anything to do with Palmore?

10   A.   No, other than the contract that I signed -- that I

11   signed with them.

12   Q.   Okay.  You were referred to them?

13   A.   Yes.

14   Q.   Did you receive any compensation from Carco or Terry

15   Barnes in relation to these investments?

16   A.   No.  The only thing I received is, when I wired from the

17   Bank of America, I wired him $10,000.  And, just to test him,

18   I asked him to wire me back and to see if they were going to

19   send the money back.  And they did send it back, the $10,000.

20   Q.   Did you believe that Scott Spencer, Cordell Crane, and

21   Ray Yacoub were going to get their money back, and then some?

22   A.   Yes, I believe that they were going to make a lot of

23   money and the money was supposed to -- the money was secured

24   because the money was supposed to stay at the attorney's

25   IOLTA account and not move unless they signed it, or I signed

1    it.

2              MR. KUTNICK:  I don't have any further questions,

3    Judge.

4              THE COURT:  I think we will take a brief break.  A

5    few minutes.

6         (Recess from 3:32 p.m. to 3:43 p.m.)

7         (Jury in at 3:43 p.m.)

8              THE COURT: Please be seated.  All right.  Go ahead.

9                        CROSS-EXAMINATION

10   BY MR. YOUNG:

11   Q.   Mr. Meza, I want to start with the recordings that you

12   made of the conversations that you had with Mr. Adams,

13   Mr. Gelfond, and others.  If I understand your testimony

14   correctly, you indicated that you recorded those

15   conversations because they were involving complex matters; is

16   that right?

17   A.   Yes.

18   Q.   You were talking to a lot of different people; weren't

19   you?

20   A.   Okay.

21   Q.   You were talking to a lot of different people.  Isn't

22   that true?

23   A.   Yes.

24   Q.   And they were saying a lot of different things to you;

25   weren't they?

1   A.   Yes.

2   Q.   And things would often change; wouldn't they?

3   A.   They changed regularly.

4   Q.   A lot of different names, a lot of different programs;

5   isn't that right?

6   A.   Yes.  Bob was in different programs, yes.

7   Q.   And these were complex, and you were confused by some of

8   the things they were saying to you; weren't you?

9   A.   Some of them, yes.

10  Q.   And you didn't know all the people they were talking

11  about on these calls; did you?

12  A.   No.

13  Q.   You didn't know all the programs they were discussing;

14  did you?

15  A.   No, other than whatever they tried to explain to me on

16  the phone, or whatever they were trying -- or Alan Milton

17  would explain to me.

18  Q.   And you had actually been dealing with Mr. Milton for a

19  period of time before you started recording these calls;

20  isn't that right?

21  A.   Yes.

22  Q.   You started dealing with Mr. Milton way back when, in

23  about August of 2011; isn't that right?

24  A.   Whenever Shelly -- Shelly Holmes introduced me to.

25  Q.   And you were relying on these people, and you were

1    relying on things they told you, if I understand your

2    testimony correctly?

3    A.    Relying on Mark and Alan.  They indicated that they were

4    experts on the matter, and that they knew Renaissance Capital

5    very well.

6    Q.    But you represented to Mr. Spencer that you were an

7    accredited investor, didn't you, and that your company was an

8    accredited investor?

9    A.    On the contract that Renaissance sent over, that's what

10   it says there.  However, towards Scott, it was just

11   between -- it was day-to-day of communicate, or operate,

12   talking to each other as friends and to see what was going on

13   and reviewing whatever -- the contract came from Renaissance.

14   We would discuss it in his home or in his office.  And he

15   went through the entire contract itself.  Himself and I would

16   communicate.  And some of the stuff, like, he would

17   understand and some stuff I would not understand it, so we --

18   Q.    The contract said Milwaukee McPherson was an accredited

19   investor; did it not, Mr. Meza?

20   A.    Yes, that's what it says.

21   Q.    And you sent that to Mr. Spencer; didn't you?

22   A.    Whatever e-mail came from Adams, I'll forward it to

23   Scott.

24   Q.    You gave it to Mr. Spencer when you were talking about

25   getting him to invest his money in Renaissance; isn't that

Case: 1:17-cr-00281 Document #: 75 Filed: 01/18/19 Page 183 of 234 PageID #:656
Meza - cross by Young
317

1    right?

2    A.    It was -- it was a decision between him and I to decide

3    to participate.

4    Q.    Did you give him the contract, yes or no?

5    A.    Yes.

6    Q.    When did you send it?

7    A.    Around the time that Adams sent the contract over to me,

8    I forward him the e-mail.

9    Q.    Which was the spring of 2012; wasn't it?

10   A.    Yes, around there, right.

11   Q.    Right before Mr. Spencer made his investment; isn't that

12   correct?

13   A.    That is correct.

14   Q.    So prior to the time Mr. Spencer made his investment,

15   you sent him documentation indicating that your company, the

16   company that you are the COO of, was an accredited investor;

17   right?

18   A.    That was one of the requirements Adams wanted it, yes.

19   Q.    But that wasn't true; was it?

20   A.    That was the requirement of Adams.  He prepared the

21   contract.

22   Q.    My question was, sir --

23   A.    No.

24   Q.    -- that wasn't true?

25   A.    No.

1   Q.   Your company had been accredited by no one; isn't that
2   right?
3   A.   That is correct.
4   Q.   And you had virtually no experience in any type of
5   trading or investment; did you?
6   A.   No.
7   Q.   You didn't know anything about international currency
8   transactions; did you?
9   A.   No.
10  Q.   But you never shared that information with Mr. Spencer;
11  did you?
12  A.   No, Scott was aware of everything, what was going on
13  every time.
14  Q.   Scott was aware of everything?
15  A.   Yes.
16  Q.   You told him you had no idea what these transactions
17  were about?
18  A.   It was a mutual decision.  We both made the decision to
19  go ahead and do -- to go and sign the contract.
20  Q.   Mr. Meza, that wasn't my question.
21  A.   Yeah.
22  Q.   My question was, you told -- is it your testimony that
23  you told Mr. Spencer that you had no idea what these
24  investments entailed or what they were about?
25  A.   Can you repeat the question again, please?

1    Q.   Is it your testimony here today that you explained to

2    Mr. Spencer that you didn't understand how these investments

3    worked?

4    A.   Like I said, we -- we talked each other out, and I

5    explained to him whatever I -- my understanding was of the

6    transaction.

7    Q.   But you didn't tell him you were recording these

8    conversations, did you, until much later?

9    A.   I only recorded after the -- after the -- the constant

10   promises and the notes, and it got complex.  And they kept

11   repeating the same thing over and over again.

12   Q.   You only began recording after the constant notes?  But

13   you began recording these conversations, Mr. Meza, as early

14   as June of 2012; isn't that right?

15   A.   I think -- I guess, if that's what it says.  You know,

16   maybe earlier.

17   Q.   That was after Mr. Spencer's first investment of 200,000

18   but before his second investment of $80,000; wasn't it?

19   A.   The 200,000 -- yes, the $88,000 was for the other

20   projects with the excavating.

21   Q.   Oh, the 80,000 was -- well, we will talk about that.

22   A.   Okay.

23   Q.   Did you share with Mr. Spencer your confusion and all

24   the constant noes that you were getting in June of 2012, when

25   you began recording these conversations, only two weeks after

1    his first investment?

2    A.    I shared with Scott everything that -- whatever I

3    received, I shared with him.

4    Q.    You shared the recordings?

5    A.    Whatever I received, whatever I got, whatever documents

6    I received, I shared with him.

7    Q.    So on direct examination, Mr. Meza, you testified that

8    you began playing recordings for Mr. Crane and Mr. Spencer in

9    the spring of 2013, when they started asking you questions,

10   when they started challenging you about all the delays?

11              MR. KUTNICK:  Objection, your Honor, just to the

12   date.  It was the wrong year.  I think you said '13, it's

13   '12.

14              MR. YOUNG:  No, it is.

15              MR. KUTNICK:  I'm sorry, then.  Oh.

16              MR. YOUNG:  2013.

17              MR. KUTNICK:  2012?  Correct?  Oh, that's the first

18   call.

19   BY MR. YOUNG:

20   Q.    On direct examination, you testified that you played

21   Call No. 3 for Mr. Spencer and Mr. Crane; is that correct?

22   A.    Yes.

23   Q.    And that call was made on April 2nd of 2013; is that

24   correct?

25   A.    Around that time, whatever.

1  Q.   And you said you played that call, as well as the calls
2  after that were played here in court, because they were
3  challenging you about what was happening with their money; is
4  that right?
5  A.   They were concerned of what was happening with their
6  money, yes.
7  Q.   But it's now your testimony that you were playing these
8  calls all the way back when you first started recording them
9  in June of 2012?
10 A.   In June 2012, the only one that was listening was Scott.
11 Q.   And you heard his testimony in court.  He has forgotten
12 all these calls you played for him.  Is that your testimony?
13 A.   I assume so.
14 Q.   But you never played them, then, for Mr. Crane before he
15 made his investment in September of 2012; is that right?
16 A.   No, I -- he -- he knew -- he came to my house on a
17 regular basis, and he would listen to phone calls and
18 conversations that -- that when Adams or Alan Milton would
19 call me, or Mark Horton.
20 Q.   So if you played all the calls for Mr. Spencer and
21 Mr. Scott, you would have played the call on September 24 of
22 2012, where you asked Mr. Adams, I just want to know how
23 these things work.  Is that your testimony?
24 A.   I guess.  Whatever I was asking him at the time, that's
25 what it came.  Because every time they changed it.

1    Q.   If you played all the calls for Mr. Spencer and

2    Mr. Crane -- I'm sorry, I may have said Mr. Scott before, my

3    apologies -- Mr. Crane, you would have played the call from

4    that same date when you said, on tape, to Mr. Adams, my wife

5    is ready to kill me, she thinks this whole thing is baloney?

6              MR. KUTNICK:   Objection.  It's not impeaching.

7              THE COURT:   The jury will decide.

8    BY MR. YOUNG:

9    Q.   If you played -- is that your testimony, you would have

10   played that call?

11   A.   Whatever I played, whatever I said is on the recording,

12   so.

13   Q.   Okay.  And so it would be your testimony that you also

14   would have played the call on that same day when you said, my

15   partners would think I'm nuts if I told them the actual

16   proceeds that we're talking about from these deals.  You

17   would have played them that call as well, then, sir?

18   A.   Yeah, I think so.

19   Q.   And there is --

20   A.   Scott was the one that was aware of everything, most of

21   it.  Most of all the phone calls, he listened to every one of

22   them.

23   Q.   Your attorney played excerpts or complete portions of

24   about five calls.  There is actually about 120 that you

25   recorded between June of 2012, and sometime into 2013.  Does

1    that sound about right?

2    A.   Yes.  Whatever you have.

3    Q.   And it's your testimony that you shared all those calls

4    with Mr. Crane and Mr. Spencer, is that right, Mr. Meza?

5    A.   I believe so.

6    Q.   A lot of people were telling you this was a risky deal;

7    weren't they?  This is a deal that might be fraudulent; isn't

8    that correct?

9    A.   Not Adams and Gelfond.

10   Q.   But in addition to your wife, you also consulted an

11   attorney; is that correct?

12   A.   Yes.

13   Q.   And you talked a little bit about that attorney on

14   direct examination; isn't that right?

15   A.   Yes.

16   Q.   And --

17            MR. KUTNICK:  Objection, your Honor.

18            THE COURT:  We will take a sidebar.

19       (At sidebar outside the hearing of the jury.)

20            MR. KUTNICK:  Privilege.  It's communications

21   between him and his attorney.

22            MR. YOUNG:  And I have an e-mail that I can bring

23   your Honor.  He consulted with an attorney, I won't go into

24   the substance of that.  But his attorney sends him an e-mail,

25   basically saying that, this sounds like a scam, and attaches

1  an email article that Mr. Meza then receives and sends to

2  Mr. Adams, and then to Mr. -- I believe it would be Milton.

3            MR. KUTNICK:  Milton.

4            MR. YOUNG:  So its waiver.

5            THE COURT:  What's the date we are talking about?

6            MR. YOUNG:  During the time period, spring.

7            THE COURT:  '13?

8            MR. YOUNG:  Spring 2012, April or May.

9            THE COURT:  If he sent the -- well, of course, the

10  privilege goes to -- it's really his communication with his

11  attorney.

12            MR. KUTNICK:  Or advice that was given to him by

13  his attorney.

14            THE COURT:  Well, technically it's only if it

15  discloses his communication to his attorney.  But it

16  presumably would on that.  But if he then sends the

17  communication off to somebody, that's got to be a waiver.

18            MR. YOUNG:  And he has talked about this during

19  interviews previously with the government.  I don't know if

20  you were representing him at the time.

21            THE COURT:  That part, I don't --

22            MR. YOUNG:  Fair enough.

23            MR. KUTNICK:  During the proffer?

24            MR. YOUNG:  Proffers, yes, in terms of waiver.  But

25  I won't go into the proffer.

1     THE COURT:  Well, I won't go into the status of any

2   of those, you would have to tell me --

3     MR. YOUNG:  He is waiving by sending the e-mail to

4   Mr. Adams and Mr. Milton.

5     THE COURT:  Why wouldn't that be the case?  I mean,

6   I don't know about anything else about that communication,

7   but at least that particular thing.

8     MR. YOUNG:  That he sent him an article describing,

9   this is fraud.  That's what I was going to ask him about.

10     MR. KUTNICK:  Because, as Carlos has testified, he

11   uses these communications with, for instance, the recordings

12   to communicate with the, "victims."  He is using the e-mail

13   from his lawyer to do the same thing to say, hey, listen

14   because his words aren't -- his own words don't do it for

15   him; so, therefore, he is using the words of other people.

16   It's the exact same thing that he is doing in this situation.

17   He is using the words that he was told -- he is mimicking

18   things that he is told.

19     THE COURT:  Okay.  But why isn't it a waiver of at

20   least, what, it's just the article and, what is it, an

21   e-mail, or something, from his attorney?

22     MR. YOUNG:  It's an article from his attorney.  I

23   believe the message is, this sounds a lot like your

24   investment, or this sounds like what you're talking about.

25   And then attached to it is a page from like an internet

1  article talking about fraudulent insurance scams promising

2  low-risk, guaranteed returns.

3          THE COURT:  Just exactly what did he send off to

4  him -- what he sent off to them?

5          MR. YOUNG:  I will -- I will get it.

6          That's the e-mail that Mr. Meza gives -- he then

7  flips it, and then they --

8          MR. KUTNICK:  Can I --

9          THE COURT:  Okay.  So what is it that -- he sent --

10         MR. YOUNG:  I'm sorry, yes.

11         THE COURT:  Where is his e-mail?

12         MR. YOUNG:  This is the e-mail.

13         THE COURT:  Oh, no, but this is from Alan Milton,

14  Bob Adams.

15         MR. YOUNG:  I'm sorry, Judge, if I can explain.

16  This is the e-mail from the attorney to Mr. Meza.  This

17  sounds like a --

18         THE COURT:  Yes, I understand.

19         MR. YOUNG:  Mr. Meza then flips it to Bob Adams.

20  Bob Adams then flips it to Alan Milton.

21         MR. KUTNICK:  Your Honor, I also believe that it's

22  hearsay and it's not a party admission.  It's being used

23  to -- or for the proof of the matter asserted, which is

24  that --

25         MS. ZARDKOOHI:  It's a scam.

Case: 1:17-cr-00281 Document #: 75 Filed: 01/18/19 Page 193 of 234 PageID #:666
Meza - cross by Young
327

1          MR. KUTNICK:  -- Carlos believed it was a scam, or

2    there was a scam, in fact, a scam.  So it's hearsay.

3          THE COURT:  I know this is useful, but I don't

4    think it's --

5          MR. YOUNG:  I'll go on, your Honor.

6          THE COURT:  -- necessary.

7          MR. KUTNICK:  Thank you, Judge.

8          (Proceedings in open court in the hearing of the jury.)

9     BY MR. YOUNG:

10   Q.   You testified that, back in the spring of 2012, you

11   needed money; isn't that right, Mr. Meza?

12   A.   Yes, we needed to secure the -- our building -- the

13   building.

14   Q.   The building at 2715 North Milwaukee; is that correct?

15   A.   Yes.

16   Q.   You had an ownership interest in the building?

17   A.   Milwaukee McPherson LLC has an interest ownership in

18   there.

19   Q.   Milwaukee McPherson, or was it 2715 North Milwaukee LLC

20   that had the ownership interest?

21   A.   Milwaukee McPherson had an interest on 2715 North

22   Milwaukee LLC.

23   Q.   And the building was in some financial trouble; isn't

24   that right?

25   A.   That is correct.

1   Q.   Okay.  You were behind on the note, or the entity that

2   owned it was behind on the note, and you were facing

3   foreclosure; is that right?

4   A.   The building was facing foreclosure.

5   Q.   By fall or spring of 2013, you were looking at a

6   sheriff's sale on that building; is that right?

7   A.   Probably so.  But I think the -- the property around

8   that time probably, the building, was in bankruptcy

9   protection.

10  Q.   The bankruptcy began in beginning of 2012; is that

11  right?

12  A.   Something like that, yeah.

13  Q.   And you had some work invested in the property as well

14  as money; is that right?

15  A.   On the 27 -- on the Milwaukee property?

16  Q.   Yes, sir.

17  A.   Yes, I -- yes.

18  Q.   You thought that was a very valuable building?

19  A.   Yes.

20  Q.   You wanted to save that building; is that right?

21  A.   That is correct, yes.

22  Q.   Now, you said you were the -- you were the COO of

23  Milwaukee McPherson, but your mother is the owner; is that

24  correct?

25  A.   Yes.

1    Q.   Does she have -- is she invested in the company, or do

2    you just use her name?

3    A.   She helps me out.

4    Q.   You use her --

5    A.   Yes.

6    Q.   You use her name --

7    A.   Yes.

8    Q.   -- on the company paperwork because you had problems

9    with your credit around the same time; correct?

10            MR. KUTNICK:  Objection.  Relevance and scope, your

11   Honor.

12            MR. YOUNG:  Your Honor, it goes to setting up his

13   financial desperation at the beginning of the scheme, the

14   alleged scheme.

15            THE COURT: It's not necessary.  Sustained.

16            MR. YOUNG:  I'm sorry, your Honor, I didn't hear

17   you.

18            THE COURT:  I'm sustaining the objection.

19   BY MR. YOUNG:

20   Q.   You wanted to save the building.  You made attempts to

21   obtain financing; didn't you?

22   A.   Yes, and we were successful in obtaining financing for

23   the property.

24   Q.   You were successful in obtaining financing for the

25   property?

Case: 1:17-cr-00281 Document #: 75 Filed: 01/18/19 Page 196 of 234 PageID #:663
Meza - cross by Young
330

1    A.   Yes.

2    Q.   In this frame of 2012?

3    A.   I believe so.

4    Q.   While it was in bankruptcy?

5    A.   Yes.

6    Q.   A bankruptcy that was ultimately discharged and

7    dismissed?

8    A.   The bankruptcy was discharged, but the objective was to

9    purchase the note of the property, of the lender who

10   controlled the note and the asset.

11   Q.   Wasn't it your testimony that you needed money for the

12   property?

13   A.   Yes, to purchase the note.

14   Q.   You attempted to secure financing through Barnett

15   Capital Company, didn't you, to purchase the property?

16   A.   One of them, yes.

17   Q.   And that fell through; is that correct?

18   A.   No, they provided a commitment on it, on the property

19   and -- but that didn't take the -- that was high.  So there

20   was several other opportunities, and I took the one that was

21   the best for the building, for the note, purchase.

22   Q.   And when was it exactly that you financed the property?

23   A.   I purchased the note from L & B -- L & B, I believe

24   someone -- I'm not sure.  I don't recall the date.  But the

25   lender became the FY Development LLC.

1    Q.   The property was in bankruptcy and there was massive

2    debt on the property; wasn't there, sir?

3    A.   Yeah, the property -- yes.

4    Q.   And the property, 2715 Milwaukee -- North Milwaukee LLC

5    filed a Chapter 11 bankruptcy proceeding; isn't that correct?

6    A.   2715 filed for bankruptcy to protect -- yes.

7    Q.   And your mother filed that petition; is that correct?

8    A.   Yes.

9    Q.   And that petition, those proceedings lasted for about a

10   year; isn't that correct?

11   A.   I assume so, yes.

12   Q.   And during your calls with Mr. Adams and Mr. Gelfond, or

13   Gelfond, I'm sorry, you would tell them that you needed money

14   for the building, to purchase the note on the building; isn't

15   that right?

16   A.   Yes, that is correct.

17   Q.   Because you did need money.  As late as the spring of

18   2013, you were still -- you were looking for $5.5 million to

19   purchase the note on the building; isn't that right?

20   A.   Yes.  Like I said, I secured the note for $2.6 million

21   from L & B.

22   Q.   Let's talk about Mr. Spencer's investments in May and

23   June of 2012.

24   A.   May and June, okay.

25   Q.   He gave you $200,000 in May; is that correct?

332

1   A.   Yes.

2   Q.   You sent $100,000 of that money to the escrow company,

3   Stubbs Alderton and Markiles, in early June; isn't that

4   correct?

5   A.   Yes.

6   Q.   You did not send the other $100,000; is that right?

7   A.   No.

8   Q.   You kept that money?

9   A.   It was -- Mr. Spencer put the money at my discretion and

10  to use it to whatever I -- how I see it fit in the business

11  deal.

12  Q.   Mr. Spencer told you you can keep that money and use it

13  for whatever reason you want?

14  A.   No, Mr. Spencer told me to use it to whatever I needed,

15  or the business needed, to operate, like, and satisfy all the

16  needs, including securing the crane, securing all the other

17  assets that we wanted to obtain, and making sure that the

18  note from Renaissance Capital was secure as well.

19  Q.   You told Mr. Spencer that the $200,000 was for the

20  Renaissance Capital investment; isn't that true?

21  A.   Mr. Spencer sent $200,000 for that, but, yes, for the

22  Renaissance Capital contract.

23  Q.   But you used that money for other purposes; isn't that

24  right?

25  A.   I used it for whatever it was needed at the time.

1    Q.    You never told Mr. Spencer that you were using that

2    money for whatever purposes you needed it for at the time;

3    did you?

4    A.    Mr. Spencer was always busy doing many things on other

5    projects, or whatever he was doing, and he -- I was in charge

6    of doing everything, pretty much, at the -- on my own

7    discretion.

8    Q.    He gave you discretion to do whatever you wanted to do

9    with $100,000.  Is that your testimony?

10   A.    No, whatever -- he would assign me, for example, secure

11   the crane, get these projects done, get appraisals done.

12   Secure -- secure my notes, clean my title, get my property

13   title served.  Many things he assigned to do the things.  And

14   he will assign me -- all these things cost money.  So he gave

15   me discretion to make sure that -- his main goal was to make

16   sure that I secure the crane, all the little -- all the

17   things that he asked me to do.  And, at the same time, make

18   sure that we were still -- we would never lose the contract

19   from Renaissance Capital.

20   Q.    But you didn't spend that money on a crane or other

21   things related to North Dakota; did you?  You spent it on --

22   may I publish from the document camera, please.

23         You had his $200,000 on May 16th of 2012, and you

24   made two cash withdrawals for about $4,000 within a day or

25   two.  Was that related to North Dakota?

1  A.    It was probably related to one of the immigration

2  lawyers and other miscellaneous expenses that he wanted me to

3  do to getting the -- things done.

4  Q.    And then you wrote checks to a Thomas Czajka, I

5  apologize if I mispronounce that.  ABT, Itzel Carreon.  Are

6  those all related to North Dakota?

7  A.    Again, they're -- it's more than North Dakota he was

8  seeking for, that he -- he had me doing for many things.

9  Q.    Well, what were those for?

10 A.    I don't recall without seeing the actual at the time.  I

11 don't recall what those were for.

12 Q.    Well, then, your next withdrawal from the account -- and

13 at this point the only deposit into the account is

14 Mr. Spencer's money -- is 28,000 for ALSJ, for you to buy

15 that condominium.  Please explain to us how that was related

16 to the work you were doing for Mr. Spencer.

17 A.    Renaissance Capital gave me -- when Renaissance Capital

18 gave me the note for the $50,000, I told them that I needed

19 to purchase and paying off the condo because LSJ wanted to

20 get out of the condo, that condo.  It -- originally purchased

21 that condo with him on partnership, and he wanted to get out.

22 And since I saw the equity on it, so I went and proceeded and

23 paid that off by using the note from the 50,000.

24 Q.    Well, the note that was entered as Defense Exhibit 24 is

25 dated June 19, 2012, after you received the $80,000.  So you

1   didn't have a note at the time you used that $28,000 of

2   Mr. Spencer's to buy your condo.  So is it your testimony

3   that you were incorrect?

4   A.   No.  Renaissance Capital already -- way before I was

5   engaged in the talkings about this.  And then I told him I

6   was going to be short $50,000 in advance.  June 19th is when

7   he e-mailed the note, or sent the note on that.

8   Q.   Did you ever tell Mr. Spencer that Mr. Adams was lending

9   you money, if you will?

10  A.   I don't remember saying that to him.

11  Q.   Although you weren't really lending money from

12  Mr. Adams, you were sending him an IOU.  But that was Scott

13  Spencer's money; wasn't it, Mr. Meza?

14  A.   That is Scott Spencer's funds, yes.

15  Q.   And it was Mr. Spencer's funds when you wrote a check

16  for $700 to Jim M'Lady Nissan.  Was that related to your work

17  for Mr. Spencer or the work in North Dakota?

18  A.   No.  Like I said to you, the condo, the Ravenswood condo

19  and the Nissan, the Ravenswood condo was to purchase on

20  behalf of Milwaukee McPherson LLC, the condo away from LSJ,

21  Inc.  And the $22,000 went to purchase the -- a van for my

22  family, for my own personal use.

23  Q.   And $10,000 to Barnett Capital, that was for 2715 North

24  Milwaukee; isn't that right?

25  A.   No, that was for -- that was for -- that was for many

1    projects that Scott also wanted to get financing for.

2    Q.   Oh, what projects?

3    A.   He wanted to get -- Barnett Capital was interested in

4    giving him a loan on the North Dakota projects and other

5    projects that Scott wanted to do as well.

6    Q.   You're saying it wasn't for the building on Milwaukee

7    Avenue?

8    A.   Like I said, Barnett Capital was -- you know, they knew

9    me as 2715 North Milwaukee LLC.

10   Q.   Directing your attention to Government Exhibit BCF-1,

11   which is a transaction detail by account from Barnett

12   Capital, reflects that your $10,000 payment related to legal

13   fees on 2715 Milwaukee; is that incorrect?  Is that your

14   testimony?

15   A.   That's how the -- I never seen this document, other than

16   what -- I am seeing it right now.  I never dealt with that

17   individual.  I only dealt with Daniel Sullivan for Barnett

18   Capital.  So I don't know whether internal -- their internal

19   procedures to how they -- how they set it up.

20   Q.   Now, in June, 2012, Mr. Spencer made another investment

21   or payment to you in the amount of $80,000; is that right?

22   A.   Yes.

23   Q.   Now, you sent that along to Renaissance within a couple

24   days, is that right --

25   Q.   Yes.

1  Q.  -- or you sent $80,000 along?

2  A.  Yes.

3  Q.  Okay.  So you collected 280, and you sent a total of 180

4  to the escrow company; is that right?

5  A.  Yes.

6  Q.  But not all that money from the escrow company went to

7  Renaissance Capital; did it?

8  A.  Only 1850 went to Renaissance Capital.

9  Q.  $30,000 went toward servicing a loan for -- or held in

10  your mother's name; is that right?

11  A.  It went to -- Milwaukee McPherson LLC was purchasing my

12  mother's condo because they had -- for $30,000 have equity,

13  or $100,000 of equity.  So it went to purchase our condo,

14  another condo.

15  Q.  So you sent 150,000 to Renaissance, along with a note

16  for $50,000; is that right?

17  A.  I sent $150,000, and the note for the $50,000 that

18  Renaissance had me sign for it.

19  Q.  So that is $200,000?

20  A.  Yes.

21  Q.  And that was the amount of money that Bob Adams told you

22  he wanted as his initial investment fee to rent his funds; is

23  that right?

24  A.  That is correct.

25  Q.  But you told Mr. Spencer that Bob Adams wanted 250,000;

1  isn't that right?

2  A.  No, I said $250,000 is the amount that Renaissance

3  Capital is requiring a monthly fee, which will be charged

4  upon successful delivery of whatever he contracted.

5  Q.  Then you also collected an additional $30,000; isn't

6  that right?

7  A.  Yes.

8  Q.  If Renaissance was collecting or wanted $250,000 a month

9  to rent its funds, who was going to be making all those

10  $250,000 payments?

11  A.  At the time, Renaissance Capital was very assuring that

12  the -- the contract was coming and within periods of two to

13  three months we were going to get paid.  So it was supposed

14  to be accrued interest, or income, and their books -- and

15  they continue to charge that.

16  Q.  You told Mr. Spencer in the summer and fall of October

17  that you were making those payments, didn't you?

18  A.  No.

19  Q.  You ended up getting a loan from ALSJ in order to cover

20  the $50,000 that you owed Mr. Adams; is that right?

21  A.  Yes.

22  Q.  And you then used the money from Cordell Crane in

23  September 2012, to pay off that loan, didn't you?

24  A.  Yes.

25  Q.  Okay.  You never told Mr. Crane that you were using that

1  money to pay off a loan to Andrew Lee; did you?

2  A.   I indicated to him that was to pay off the 50,000 that I

3  owed Renaissance Capital, and, you know, was paying high

4  interest on it.  I never indicated that I was paying the LSJ,

5  Inc.

6  Q.   You told him it was being invested in Renaissance

7  Capital; isn't that right?

8  A.   Yes.

9  Q.   But that money didn't go there, it went somewhere else;

10 didn't it?

11 A.   The $50,000 went to pay went to pay LSJ, Inc., which

12 loaned me the money to pay Renaissance Capital.

13 Q.   Now, you were talking about Mr. Crane and Mr. Spencer

14 becoming upset as time passed and the money wasn't coming.

15 You began playing tapes for them; is that right?

16 A.   Yes.

17 Q.   Okay.  And you also told them other things; didn't you?

18 A.   I'm not sure.

19 Q.   Told them the money was insured?

20 A.   I'm sorry, what was that?

21 Q.   You told them the money was insured; did you not?

22 A.   The money was -- was what?

23 Q.   The money was insured.  Their money, their investment,

24 was insured?

25 A.   Oh, insured, insured.

1    Q.    Yes.

2    A.    The one -- the money that was sent over to -- to

3    Renaissance Capital, the $400,000, was supposed to stay in

4    Renaissance Capital and not be moved.  So Adams stated to me

5    that, upon successful delivery of his contract, he will be --

6    that will become a fee.  If no contract will he get, he will

7    send the money back.

8    Q.    You told him that you had money in Ecuador that you can

9    bring up; didn't you?

10   A.    No.

11   Q.    You didn't?

12   A.    No.

13   Q.    Do you remember Mr. Spencer and Mr. Crane sending you

14   e-mails to that effect, that you had told them that?

15          MR. KUTNICK:  Objection, hearsay.

16          MR. YOUNG:  He didn't respond to the e-mails, your

17   Honor.  His silence in response to the e-mails is, I think,

18   probative.

19          THE COURT:  All right.  Go ahead.

20   BY MR. YOUNG:

21   Q.    Do you remember Scott Spencer sending you a series of

22   e-mails indicating that you had told him that you would bring

23   up money that you had in Ecuador?

24          MR. KUTNICK:  Objection, your Honor.

25   BY MR. YOUNG:

1    Q.    Is there anything that would -- oh, I'm sorry.

2              MR. KUTNICK:  Your Honor, objection.

3              MR. YOUNG:  It's the same question, your Honor.

4              THE COURT:  He may answer.

5    BY THE WITNESS:

6    A.    As the -- as the -- as the transaction became later and

7    later, it became noted to me they were going after me.  And

8    they start saying all this stuff, that that were, I think in

9    a coordinating effort, and they were sending to me e-mails

10   regularly that I did not appreciate it.

11   BY MR. YOUNG:

12   Q.    So is it your testimony that you do remember receiving

13   that e-mail?

14   A.    I received several nasty e-mails from Mr. Spencer and

15   Mr. Crane.

16   Q.    Well, would the e-mail I'm referring to, would seeing

17   the e-mail refresh your recollection, perhaps?

18   A.    Sure.  Yes.

19   Q.    So you remember Mr. Spencer sending you this e-mail and

20   saying this to you, but you didn't respond.  Why wouldn't you

21   respond to such an accusation?

22   A.    It's -- it was noted, like I said later -- as the

23   transaction came later and later, they were getting

24   frustrated.  And whatever I said, it was like they were

25   coordinating among themselves as to what to do and how to

1    target me.  So most of the stuff that was here, there was no

2    need for me to reply back on something that I never said or

3    agreed upon.  And, also, many times I told them to stop

4    sending me e-mails like that.

5    Q.    This e-mail was sent in August of 2013.  You continued

6    to have discussions with Mr. Spencer; didn't you?

7    A.    Yes.

8    Q.    Continued to make promises to him about ways that you

9    would reimburse him for his losses; didn't you?

10   A.    No.  No.  I had -- whatever -- whatever -- whatever

11   conversations I had with Robert Adams, I repeated to him.

12   And that was -- that was the extent.  And whatever the

13   contract said that he was supposed to deliver, I gave, like I

14   said to you, the 400,000 from Bob Adams, he was never

15   supposed to touch it.  Okay?  And I believe he touched it,

16   based on what I seen today.

17   Q.    You didn't have millions of dollars in Ecuador; did you?

18   A.    No.

19   Q.    You weren't a multimillionaire; were you?

20   A.    I have never said that I was a multimillionaire.

21   Q.    You never owned a company with 100 trucks; did you?

22   A.    I have never owned 100 trucks.

23   Q.    You owned, I think you said, about 15 condos around the

24   time; is that right?

25   A.    There was 15 condos we collected rent, but we still --

1    we still had -- we still had the interest at the Milwaukee

2    building, and plus all the other projects we were doing, that

3    I was doing.

4    Q.   Those condos were at the Old Willow building; is that

5    right?

6    A.   They were at the Old Willow, a few in Chicago.  Yeah.

7    Q.   And you were receiving some rent payments, but you were

8    not receiving rent payments for all those units; were you?

9    A.   No, I was receiving rents for all of them, pretty much.

10   Q.   Weren't you having problems making the assessment

11   payments back then on some of the properties?

12   A.   No.

13   Q.   You collected 700,000 from Mr. Spencer, approximately.

14   300,000 from Mr. Crane.  50,000 from Mr. Yacoub.  Mr. Yacoub

15   made his investment in June of 2013, the $50,000?

16           MR. KUTNICK:  Objection, your Honor.  Beyond the

17   scope.

18           THE COURT:  We will have to talk about that.

19       (At sidebar outside the hearing of the jury.)

20           MR. KUTNICK:  My objection is that I don't believe

21   we talked about Yacoub.

22           THE COURT:  You didn't ask him about him on direct.

23           MR. KUTNICK:  Right.

24           THE COURT:  That's true.

25           MR. YOUNG:  But he made broad allegations that, I

1  never profited, I never did anything -- he never did anything

2  wrong, your Honor.

3          THE COURT:  Yes.  Well, I mean, why --

4          MR. YOUNG:  And it goes to honesty on the day, your

5  Honor.  Well, first of all, I think it goes directly to the

6  scheme to suggest that something within -- I've never heard

7  the objection before that something was within the scheme is

8  not within the scope of cross-examination of defendant on the

9  stand as he denies the charges.  But apart from that, your

10  Honor, even if it was not otherwise appropriate, it would be

11  608(b) information.

12          MR. KUTNICK:  Your Honor, he has not denied these

13  transactions, he just denied knowing that there was some

14  fraudulent -- fraudulent purpose behind them.

15          MR. YOUNG:  And he is very much into, I believe, I

16  believe, I believe, you know, despite, as time goes on,

17  Mr. Yacoub was new to the transaction in 2013.

18          THE COURT:  That's okay.  I'm going to let you ask.

19  I think it's fair.

20          MR. KUTNICK:  Before we go away, can we just have

21  some direction about like how far this is going to go with

22  Mr. Yacoub, instead of like opening up the whole --

23          MR. YOUNG:  It's going to be --

24          MR. KUTNICK:  -- the subject of Yacoub.

25          MR. YOUNG:  It's going to be the timing of the

1    payments and what he was told, and the fact that he told him

2    that he had other money involved in the transaction, when he

3    didn't.

4              And, Judge, I'm also intending to go into two other

5    people who are within the same time period, Wade George and

6    David Tomlinson, who were members of the church, who were

7    approached and told that this money was for Renaissance

8    Capital in 2013, way after sort of all the false alarms, all

9    the concerns, and who never --

10             THE COURT:  All you'll be able to do on those at

11   this point is just ask him.

12             MR. YOUNG:  Yeah.

13             MR. KUTNICK:  I would object to him going into

14   those -- those instances.  Those witnesses did not testify.

15   There was no subject whatsoever in the direct.  He hasn't

16   made any denials, or anything, regarding those -- those

17   people.  And now we're opening up a whole big, like, rabbit

18   hole to go into all these other things.  And just because he

19   got on the witness stand, your Honor, that doesn't mean that

20   all these other things, where no witnesses testified to, the

21   government can now go into.  I have no problem with them

22   going into everything that we went into on direct.  I believe

23   the court's ruling stands on Yacoub, so, fine.  But these

24   other witnesses, they were not --

25             THE COURT:  I have to know what you're going to ask

1    on those, is really what it is.

2           MR. YOUNG:  It's tied to the time, your Honor.  Did

3    he tell them about how long this has been going on, all the

4    excuses and the false starts that he had received from

5    Mr. Adams and Mr. Gelfond at the time he solicited

6    investments from them in August of 2013.

7           THE COURT:  So you're going to say, did you solicit

8    investments from them?  Did you tell them that others --

9           MR. YOUNG:  Yeah.

10          THE COURT:  That really is --

11          MR. YOUNG:  It's within the charged scheme.  Even

12   if it wasn't, it would still be appropriate --

13          THE COURT:  Well, it is --

14          MR. YOUNG:  -- 608(b) because his whole thing is,

15   oh, I just --

16          THE COURT:  But the thing is, you're bringing in --

17   you're bringing in, then, additional parts of the scheme that

18   you hadn't entered on your case, you hadn't introduced any

19   evidence about.

20          MR. YOUNG:  Yes, but the defendant is -- I'll just

21   stop with Yacoub, your Honor.

22          THE COURT:  Okay.  By the way, you know, I don't --

23   we did start 25 minutes later than we intended this morning.

24          MR. KUTNICK:  Not my fault today.  I'm kidding,

25   Judge.

1      THE COURT:  No, it --

2      MR. KUTNICK:  I know.  Surely joking.

3      THE COURT:  I always hate to keep jurors very late

4  because we get some that are going way far away.  But

5  we'll -- we'll go on a little while and see.  But I think

6  we're probably not going to finish today, and we will just

7  have to deal with that, and we will have to finish up jury

8  instructions after they leave today.

9      MR. YOUNG:  Okay.

10     (Proceedings in open court in the hearing of the jury.)

11  BY MR. YOUNG:

12  Q.  We were talking about Mr. Yacoub who invested in June of

13  2013.  Do you remember Mr. Yacoub's testimony from earlier

14  today?

15  A.  Yes.

16  Q.  Did Mr. Yacoub give you $50,000 or send $50,000 to

17  Palmore at your direction?

18  A.  Yes, he did.

19  Q.  Did you play any of the recordings for Mr. Yacoub?

20  A.  I might have played only one or two to him.

21  Q.  You played one or two to him.

22  A.  Yeah.

23  Q.  Did you tell him about the months upon months of delays

24  that you had been experiencing at the time you had him send

25  the $50,000 to Palmore?

1   A.    My relationship with Ray was different.  I was his best

2   man on his wedding.  So there was a trust -- mutual trust

3   between that I would always do to protect the money that was

4   sent to Palmore.  So he kind of -- he trusted me more than

5   anything else, and I trusted him, whatever he did for me as

6   well.

7   Q.    So because he trusted you more than anything else, you

8   didn't tell him about all the problems you had been

9   experiencing with these investments and the failure for them

10  to generate any returns?

11  A.    No, Ray -- Ray pretty much knew there was something

12  going on, and he -- he is constantly busy at the shop, that

13  he -- he is constantly worried about taking care of business.

14  He kind of trusted me on whatever was there at disposal

15  and --

16  Q.    But my question, Mr. Meza, was, why didn't you tell him

17  about all the problems you had had with these investments

18  leading up to asking him to send $50,000 to Palmore?

19  A.    Ray knew there was some problem going on, including --

20  including the -- he was approached by some people already.

21  So that's when he found out there was a problem going on.

22  That's when he asked me what was going on, on a more serious

23  note.

24  Q.    You also told him that you had millions of dollars in

25  these transactions yourself; didn't you?

1    A.    No.

2    Q.    In fact, you had almost no money in any of these deals;

3    isn't that right?

4    A.    No, I had about $70,000, or 20 -- but at least -- at

5    least $70,000.

6    Q.    At least $70,000?

7    A.    Yeah.

8    Q.    In contrast to the million, or so, you collected from

9    other people?

10   A.    If you put it -- yes.

11   Q.    But you were going to share in the --

12          MR. KUTNICK:  Objection, your Honor.  Objection,

13   your Honor.  That was not in evidence, the million dollars.

14          MR. YOUNG:  Let me rephrase, your Honor.

15          THE COURT:  Go ahead.

16   BY MR. YOUNG:

17   Q.    You collected or directed Scott Spencer to send

18   approximately $750,000 to either Milwaukee McPherson or other

19   accounts; is that correct?

20   A.    One more -- repeat that question again for me, please?

21   Q.    Sure.  And I can go through the payments one by one, if

22   that would help.

23   A.    No.

24   Q.    In June of -- I'm sorry, in May 2012, Mr. Spencer put

25   in -- sent you $200,000; is that right?

Case: 1:17-cr-00281 Document #: 75 Filed: 01/18/19 Page 216 of 234 PageID #:683
Meza - cross by Young
350

1  A.  Yes.

2  Q.  In June of 2012, he sent you $80,000; is that correct?

3  A.  Yes.

4  Q.  In October of 2012, Mr. Spencer sent $400,000 to an

5  account to Milwaukee McPherson; is that correct?

6  A.  Yes.

7  Q.  And then in April of 2013, he sent $40,000 to Virginia

8  Worldwide at your direction; is that correct?

9  A.  Yes.

10 Q.  So if we do the math, that's approximately $700,000.

11 It's a little over $700,000; isn't that right?

12 A.  Yes, but the -- like --

13 Q.  My question was, $700,000 from Mr. Spencer.  And you

14 collected --

15       MR. KUTNICK:  Objection, your Honor.  He was

16 attempting to answer the question.

17       THE COURT:  Go ahead.

18 BY THE WITNESS:

19 A.  There was only two contracts that needed to be fulfilled

20 for Renaissance Capital.  $200,000 for the first contract,

21 for the first five million, and for the next 25, was supposed

22 to be $400,000 more, and plus whatever extra Renaissance

23 wanted.  So the Renaissance contract was supposed to be

24 611,250, plus -- plus -- that's for the Renaissance Capital.

25 That was sent over to them.  And he acknowledged and received

1    that.  And the other -- the other $40,000 was supposed to be

2    going to the Carso contract that was submitted.  And the

3    balance of the $80,000 was supposed to be allocated for

4    crane, miscellaneous expenses, and all the stuff that I --

5    that he assigned that to me.

6    Q.   Well, the 80,000 --

7    A.   And some other expenses that, you know, that -- whatever

8    they needed, to some of the expenses that was required.

9    Q.   That was sort of the unspoken discretion that he gave

10   you to spend his money, the 80,000?

11   A.   Like I said, there was mutual trust that he -- that, you

12   know, some of the stuff needed for me to move around and

13   operate, so.

14   Q.   So it was mutual trust, it wasn't something you told

15   him?

16   A.   No, he knew exactly -- he knew exactly from day one

17   that -- you know, what was going on.  I mean, he assigned me

18   way before to do all these other things as well, before the

19   Renaissance as well, that I was paying for out of my pocket.

20   Q.   Well, the 400,000 that he gave you in October wasn't for

21   mutual trust.  You told him that was to buy out someone who

22   was holding up the deal; isn't that right?

23   A.   It was to buy out and increase, based on Renaissance's

24   request was that someone was holding the transaction up and

25   that he needed to increase to 25 million, the capital.  So he

1    asked for $400,000 more to increase that and to -- and to --

2    in order to reach out to the $100 million so they could go

3    into trade.

4    Q.   The $400,000 was actually the monthly fee that you were

5    supposed to be paying to Bob Adams; isn't that right?

6    A.   No, the $400,000 went to issue the second contract which

7    was issued I believe on October, right when we sent the

8    funds.  And he believed he signed a contract for -- with

9    increase and a copy of the statement from Credit Suisse to 25

10   million.

11   Q.   But, in any event, Mr. Spencer provided you with

12   approximately $700,000 during the time we've been talking

13   about; is that correct?  Or sent it to someone at your

14   direction?

15   A.   As I mutually agreed upon.  I mean, I didn't -- you

16   know --

17            THE COURT:  Yes or no?

18   BY THE WITNESS:

19   A.   Yes.

20   BY MR. YOUNG:

21   Q.   And Mr. Crane gave you, you know, roughly $300,000; is

22   that correct? I'll go over them.  He gave you $50,000 in

23   September of 2012; isn't that right?

24   A.   He gave me $50,000, a loan, secure that, yes.

25   Q.   A loan.  Although, that's not how it was referred into

1  the documentation, it was referred as an investment; wasn't
2  it?
3  A.   And a loan as well.  Secured with a property,
4  Ravenswood.
5  Q.   But the paperwork literally explicitly stated
6  investment; didn't it, sir?
7  A.   That's what he wrote or he must have written on it, so,
8  but it was --
9  Q.   He wrote --
10  A.   It was a loan.
11  Q.   He wrote it -- he wrote that it was an investment, and
12  you signed that documentation; didn't you?
13  A.   I signed one document, yes, I did.
14  Q.   You could have scratched out "investment" and written
15  "loan." True?
16  A.   I guess whatever it was, so, I don't know.  Whatever I
17  did --
18  Q.   My question --
19  A.   Yes.  Yes.
20  Q.   But you didn't do that?
21  A.   No, I did not do that.
22  Q.   So he gave you the $50,000, and then he gave you the
23  $250,000 in July of 2013, the two wires that were sent to
24  Palmore, I believe.  Is that correct?
25  A.   The $250,000 that he gave out -- gave out after he

1    listened to the conversation when he was riding in the car,

2    and that was from Larry Gelfond calling that he needed

3    another 250.  And I believe Cordell got his own contract

4    that -- sent out by Carso directly to him -- to him.  And it

5    went directly to Palmore's IOLTA account.  I didn't have

6    anything to do with that.  I had my own contract separately

7    away from Cordell's contract.

8    Q.   But the $700,000 and the $300,000 is about a million

9    dollars; is it not?

10   A.   Yes.

11   Q.   You put in 70,000 in comparison to that, but you were

12   going to split the proceeds of all these, sort of, amazing

13   investments with them?

14   A.   Scott and I were going to go 50/50 split upon successful

15   delivery of the transaction.  Cordell Crane had his own

16   100 percent profit on the 250 from Carso LLC contract on his

17   own.  That's the 250 he had.  And, for me, the 50,000 was

18   just for -- as a loan secured by the condo.

19   Q.   Why would Mr. Spencer be sharing the proceeds with you

20   50/50 if he was putting in all the money?

21   A.   That was a choice, a mutual business agreement, that we

22   both made.

23   Q.   So he was just giving you half of the proceeds out of

24   the goodness of his heart?

25   A.   Yes.  Just like he gave me the crane company as well,

1    the assignment, the interest of the crane company as well.

2    Q.   But to the extent you did anything for him, you expected

3    to be paid?

4    A.   No, I expected -- whatever expenses that I was

5    receiving, I was supposed to be covering some of those

6    expenses as well.

7    Q.   Counsel asked you about a misdemeanor conviction; is

8    that correct?

9    A.   Yes.

10              MR. KUTNICK:  Objection.

11              THE COURT:  Careful.

12   BY MR. YOUNG:

13   Q.   On September 26th of 2014, you were convicted of theft

14   by deception; is that correct?

15   A.   Yes.

16   Q.   You were sentenced on that same date; is that correct?

17   A.   Yes.

18   Q.   You were sentenced to a term of two years probation; is

19   that correct?

20   A.   Yes.

21              MR. YOUNG:  I have no further questions, your

22   Honor.

23              THE COURT:  Do you have any more?

24              MR. KUTNICK:  Yes, I do have short, briefly, Judge.

25                   REDIRECT EXAMINATION

Case: 1:17-cr-00281 Document #: 75 Filed: 01/18/19 Page 222 of 234 PageID #:688
Meza - redirect by Kutnick
356

1  BY MR. KUTNICK:

2  Q.  Carlos, Mr. Young asked you -- I don't have it here with

3  me, but you remember, he asked you about the partnership

4  agreement between Milwaukee McPherson and Renaissance Group.

5  Do you recall that?

6  A.  The partnership agreement, yes.

7  Q.  The partnership agreement, correct.

8  A.  Yeah.

9  Q.  Do you recall that he asked you questions about that

10  just now?

11  A.  Yes.

12  Q.  Okay.  And did -- he mentioned that it says in that that

13  Milwaukee McPherson is an accredited investor.  Do you

14  remember that question?

15  A.  Yes.

16  Q.  Okay.  Did you draft that document?

17  A.  No, I did not.

18  Q.  Okay.  Did you have any sense of what it meant to be an

19  accredited investor?

20  A.  No, I did not.

21  Q.  You were investing with Renaissance Group; correct?

22  A.  Yes.  Milwaukee McPherson was investing with Renaissance

23  Group.

24  Q.  I'm sorry, Milwaukee McPherson was.

25  A.  Yes.

1    Q.   You never told Scott Spencer that you had any training
2    in investments; did you?
3    A.   No.
4    Q.   You never told Scott Spencer that you understood all the
5    details of this investment; did you?
6    A.   No.
7              MR. YOUNG:  Objection, leading.  Redirect.
8              THE COURT:  Well, try not to lead.  It's redirect.
9              MR. KUTNICK:  I will try, your Honor.
10             THE COURT:  You can just ask it.
11   BY MR. KUTNICK:
12   Q.   What did you explain to Scott Spencer about your
13   understanding of the Renaissance deal?
14   A.   I understood that Robert Adams and Renaissance Capital
15   was going to provide capital for each one of us for -- was
16   going to provide their capital, that they own, and that they
17   were going to invest in some type of trading program that was
18   going to be a great tool for us to get rid of our -- his
19   financial mess and my financial mess.
20   Q.   Did you understand all the nuts and bolts of the
21   Renaissance investment?
22   A.   No.
23   Q.   When you didn't understand details, what did you do in
24   order to explain to Mr. Spencer?
25   A.   I e-mailed the contract directly to him, and I also -- I

1    forwarded the contract to the law firm.

2    Q.   Okay.  Did you refer him to Mr. Adams himself?

3    A.   He knew from day one where Bob Adams -- he had all the

4    contact information from day one because, on the e-mails that

5    I forwarded to him from the beginning, it has got all the

6    contact phone numbers, e-mail, everything.

7    Q.   Didn't Scott Spencer do his own investigation of Bob

8    Adams?

9    A.   Yes.

10              THE COURT:  How much more do you have?

11              MR. KUTNICK:  Not much, Judge.  Within minutes.

12   It's very brief.

13   BY MR. KUTNICK:

14   Q.   Mr. Young asked you a question about a phone call from

15   September 24, 2012, where he represented to you that the call

16   said something about, do you think I'm nuts if I told them

17   about the proceeds.  Do you remember him asking you that

18   question?

19   A.   Yes.

20   Q.   Can you explain that, please?

21   A.   Well, it's -- as Adams explained it, they said that they

22   had a contract that was going to produce huge amounts of

23   money, millions on it, and that the main capital that he was

24   providing, he was given, I believe, 20 or 30 percent.  And

25   the remaining was supposed to go to Milwaukee McPherson,

Case: 1:17-cr-00281 Document #: 75 Filed: 01/18/19 Page 225 of 234 PageID #:693
Meza - redirect - by Kutnick
359

1    along with the other parties that were -- or parties that
2    were involved.
3    Q.   Were you excited about the deal?
4    A.   Yes.
5    Q.   Did you think that you were going to make --
6         MR. YOUNG:  Objection, leading.
7    BY MR. KUTNICK:
8    Q.   What did you think you were going -- you and Mr. Spencer
9    and Mr. Crane were going to get out of this?
10   A.   Spencer was going to get, like, 50 percent, or whatever,
11   paid from Renaissance Capital, and I was going to make 50.
12   And then Cordell was going to get paid, plus get some extra
13   on it.
14   Q.   Mr. Young asked you about a Barnett Capital document.
15        THE COURT:  You know, I think we're going to have
16   to stop.  This isn't going to get done in the next --
17        MR. KUTNICK:  Judge, if I can tell you I can do it
18   within -- less than five minutes?
19        THE COURT: That doesn't mean he won't have more.
20        MR. KUTNICK:  True.
21        THE COURT:  I think we should stop so you can get
22   trains, and all.  I will remind you that you may not discuss
23   this, and we will not be here tomorrow.  So let me -- I think
24   we should easily finish Thursday.
25        But let me ask you what time you want to start.

1    You do, all of you, understand that, of course, we can't

2    start until everybody is here.  Do you want -- some of you I

3    know liked, and it's typical of people who come from out that

4    just as soon start early.  Would you like to start at 9:00?

5              JURORS:  Yes.

6              THE COURT:  Is there anybody who thinks they can't

7    get here by 9:00?

8         (No response.)

9              THE COURT:  Okay.  Then we will start it at 9:00.

10   I just ask that you look into your transportation and make

11   sure that you can be here at least by then.  We certainly try

12   to make you comfortable if you come earlier than that the

13   best that we can.  So we will see you Thursday morning.

14             MR. KUTNICK:  Your Honor, may I please -- I need to

15   address the court on something important before the jury is

16   dismissed, please?

17             THE COURT:  We have a lot to discuss but --

18             MR. KUTNICK:  Before the jury is dismissed, please,

19   very briefly.

20        (At sidebar outside the hearing of the jury.)

21             MR. KUTNICK:  So my client being on the witness

22   stand, I would not be able to discuss anything with him

23   tomorrow on the day of in preparation as for --

24             THE COURT:  Why do we need the jury here for this?

25             MR. KUTNICK:  Because I think I can finish this

 1   really quickly.  I mean, I have, like, three questions left,

 2   and it would -- it would be --

 3          MR. YOUNG:  Judge, if it's three questions, I

 4   wouldn't object to him talking to his client tomorrow, if

 5   we're coming back Thursday morning for five minutes of

 6   redirect and one or two cross questions.

 7          THE COURT:  That's the problem.

 8          MR. KUTNICK:  I don't want to violate any orders.

 9          MR. YOUNG:  I'll allow him.  It's substantially

10   over right now, I mean, examination.

11          MR. KUTNICK:  I agree, it really is.

12          THE COURT:  All right.  All right.  So it's okay

13   with you if he talks to him?

14          MR. YOUNG:  Yes.

15          THE COURT:  Okay.

16          MR. KUTNICK:  Thank you, your Honor.

17      (Proceedings in open court.  Jury out at 4:48 p.m.)

18          THE COURT:  Okay.  We need to -- I've looked at

19   the -- if you will grab your jury instructions, I think I've

20   tabbed all the ones where we just have to make sure that

21   we're finished, and then someone, I guess probably the

22   government, will take charge of getting these in order.

23          MR. YOUNG:  Yes, your Honor.

24          THE COURT:  Okay.  Tell me when you have them.

25          MR. KUTNICK:  I have them.

362

1           MR. YOUNG:  The government does as well, your

2      Honor.

3           THE COURT:  I'm going by the ones we've said they

4      were agreed, we agreed that they were.  But there is some

5      where there is brackets, and things, so we just need to make

6      sure.

7           MR. YOUNG:  Yes, your Honor.

8           THE COURT: The first one should be Instruction

9      Number 1, just take out the brackets.

10          The next one that I see is -- just a minute.  Oh, I

11     didn't know if there were going to be stipulations, but there

12     were.

13          The next one, then, is Number 7.  I assume we

14     should leave the bracketed part in and take out the brackets.

15     Is that agreed?

16          MR. YOUNG:  That's fine, your Honor.

17          MR. KUTNICK:  Yes.

18          THE COURT:  Okay.  Number 8 should come out.

19          MR. KUTNICK:  Agreed.

20          THE COURT:  Number 9, you should take out the

21     bracket.

22          MR. YOUNG:  Judge, I just noticed on the last

23     bullet point, inconsistent or consistent statements or

24     conduct by the witness.  Do you want the brackets removed

25     there?  I don't know if there were consistent statements,

363

```
 1    but --
 2            THE COURT:  Oh, I don't know.
 3            MR. KUTNICK:  I think we can just take the brackets
 4    out.  I don't know that there were any.
 5            MR. YOUNG:  That's fine.
 6            MR. KUTNICK:  But, I mean, if there were --
 7            MR. YOUNG:  It's agreed.
 8            THE COURT:  Okay.  Yes, I missed that bracket.
 9    Okay.
10            The next one I have, in fact, I think the last one
11    I have is 13.  There is a lot of bracketed --
12            MR. KUTNICK:  I don't think there was any testimony
13    about attorneys with -- attorneys interviewing.  We can leave
14    it in, I mean, but --
15            THE COURT:  Which one are you talking about?
16            MR. KUTNICK:  I'm talking about ten.  I'm sorry,
17    your Honor.
18            MR. YOUNG:  I can remove it.  I don't think there
19    was.
20            MR. KUTNICK:  There wasn't any testimony about
21    that.
22            THE COURT:  You're right, yes.  Okay.  So we will
23    take that one out.  I missed that.
24            And, 13, I just saw a lot of bracketed information.
25    Figure out what should go in and what shouldn't.
```

1       MR. YOUNG:  Okay.

2       MR. KUTNICK:  Judge, I don't think we challenged

3   the accuracy of the charts.

4       MR. YOUNG:  Okay.  Why don't we just say --

5       THE COURT:  All right.  So do you want to take

6   out -- do you want to just say, you may use these summary

7   charts as evidence, period?

8       MR. YOUNG:  And end it there?

9       MR. KUTNICK:  Yes, I would take out that paragraph,

10  the whole, the accuracy of the summaries, up to --

11      MR. YOUNG:  So this?  Get rid of this?

12      MR. KUTNICK:  Yes.

13      THE COURT:  Okay.

14      MR. YOUNG:  We're in agreement.

15      THE COURT:  All right.  Do you want to just spend a

16  couple minutes, tell me if you see anything else.  Those were

17  the things that I had seen.

18      MR. YOUNG:  Okay.

19      MR. KUTNICK:  Well, number -- I'm just looking at

20  Number 11.  Is there any evidence that a witness made a

21  statement inconsistent with the witness' testimony here in

22  court?

23      THE COURT:  I don't know.

24      MR. YOUNG:  I don't believe there was, your Honor.

25      MR. KUTNICK:  I don't believe there was.

1          THE COURT:  Okay.  So that should come out.

2          MR. YOUNG:  That's fine, your Honor.

3          MR. KUTNICK:  Usually that would always be in, but,

4    in this one, no.

5          We did not hear statements, unless it comes out on

6    redirect, that defendant made statements -- I guess we should

7    leave it in until we figure out --

8          MR. YOUNG:  Yes, 12.

9          MR. KUTNICK:  Until we finish Mr. Meza's testimony.

10         THE COURT:  Twelve?

11         MR. YOUNG:  Twelve can be taken out.

12         THE COURT:  Is probably going to come out.

13         MR. YOUNG:  I don't see anything else, your Honor.

14         MR. KUTNICK:  I'm almost done.  I'm not as fast of

15   a reader as Rick, Judge.

16         Well, Judge, I guess, even though I didn't object

17   before, 25.  I'm going to object to 25.  He is not charged

18   with conspiracy.  I definitely think that the government's

19   theory is that --

20         MR. YOUNG:  No objection, your Honor.

21         THE COURT:  25?

22         MR. YOUNG:  Yes.

23         THE COURT:  Okay.  This is not the time to just

24   decide to re-think all of these.

25         MR. KUTNICK:  Okay, well, I am objecting to 26,

1    they're agreeing to withdraw it, so.

2            MR. YOUNG:  We'll withdraw it.

3            MR. KUTNICK:  That's fine, Judge.  That's all my

4    objections.

5            THE COURT:  Okay.  Now, you hadn't given me any

6    instructions of your own, so I take it there aren't any?

7            MR. KUTNICK:  No, Judge I -- I had no idea we would

8    be here this fast.  I mean, I did not.  I mean, and I even

9    said to you at the beginning of the trial that I still wanted

10   to do some research on the defense theory instruction, and I

11   wanted to see how the testimony came out.  So, I mean, I

12   haven't -- I mean, I just heard my client's testimony, even

13   though I knew what he was going to say.

14           THE COURT:  Well, you know it's going to the jury

15   on Thursday.

16           MR. KUTNICK:  Yes.  And I can certainly have one

17   for you first thing Thursday morning.  I mean, I -- I can't

18   even promise the court that I will have one, but I certainly

19   want the opportunity to research it and potentially draft --

20           THE COURT:  Okay.  Well, then, I will see you

21   people here at 8:15 on Thursday morning.  I want to make sure

22   that we have time to go over anything before they come at

23   9:00.

24           MR. KUTNICK:  Okay.  If I do not have a defense

25   theory instruction, then --

367

1        THE COURT:  Then you don't have to come until a
2  quarter of 9:00.
3        MR. KUTNICK:  8:45?  Okay.  Got it.
4        THE COURT:  I just, I -- you know, I don't know, I
5  suppose I could say 8:30, but, you know, they have to get me
6  a clean copy of whatever instructions that we're using.  If
7  you do that we can -- we can copy them.  But if there
8  is additional --
9        MR. YOUNG:  So you want a clean hard copy, your
10  Honor?
11        THE COURT:  Yes, that's all I need.
12        MR. YOUNG:  Okay.
13        THE COURT:  Take out the numbers, get them clean.
14  But it's just that, if there is an additional instruction, I
15  need to be able to fit it in there.
16        MR. KUTNICK:  And I just needed to hear the
17  witness' testimony to kind of know --
18        THE COURT:  Okay.
19        MR. KUTNICK:  Okay?  So --
20        MR. YOUNG:  I will remove the instruction number
21  and obviously the commentary below.  Do you want page numbers
22  on the instructions, your Honor, or is that something you
23  prefer not to have, in case you want to re-order them?
24        THE COURT:  You know, I think I wouldn't because,
25  if he has one, it could end up changing the page numbers,

1  depending where it goes in.  So I think it would be best if

2  you don't put page numbers on it.  Thank you.

3          MR. YOUNG:  Understood.

4          MR. KUTNICK:  You Honor, I'm happy to communicate

5  to counsel and the court tomorrow so your Honor knows when

6  you come in what to expect.

7          THE COURT:  Okay.  That would be good.  All right.

8  Have a nice night.

9          MR. KUTNICK:  Thank you, Judge. You too.

10         (Trial adjourned at 5:00 p.m.)

11                    CERTIFICATE

12      I certify that the foregoing is a correct transcript

13  from the record of proceedings in the above-entitled matter.

14

15  /s/ *SANDRA M. MULLIN*                    January 11, 2018

16  SANDRA M. MULLIN, CSR, RMR, FCRR
    Official Court Reporter

17

18

19

20

21

22

23

24

25