```
 1                   IN THE UNITED STATES DISTRICT COURT
                        NORTHERN DISTRICT OF ILLINOIS
 2                          EASTERN DIVISION

 3                                    )
     UNITED STATES OF AMERICA,        )    Case No. 17 CR 281
 4                                    )
                    Plaintiff,        )
 5                                    )
              vs.                     )    Chicago, Illinois
 6                                    )    December 6, 2018
     CARLOS R. MEZA,                  )    8:36 a.m.
 7                                    )
                    Defendant.        )
 8

 9                              VOLUME 3
            TRANSCRIPT OF PROCEEDINGS - Jury Trial
10       BEFORE THE HONORABLE ELAINE E. BUCKLO, and a Jury

11
     APPEARANCES:
12
     For the Plaintiff:        MR. JOHN R. LAUSCH, JR.
13                             UNITED STATES ATTORNEY
                               BY:  MR. RICK D. YOUNG
14                                  MS. KAITLIN KLAMANN
                               Assistant United States Attorneys
15                             219 South Dearborn Street
                               Chicago, Illinois  60604
16
     For the Defendant:        MR. JOSHUA B. KUTNICK
17                             900 West Jackson Boulevard # 5
                               Chicago, Illinois  60607
18
                               AND
19
                               LAW OFFICE OF MINA ZARDKOOHI
20                             BY:  MS. MINA ZARDKOOHI
                               53 West Jackson Boulevard
21                             Suite 1615
                               Chicago, IL 60604
22
     Court Reporter:           SANDRA M. MULLIN, CSR, RMR, FCRR
23                             Official Court Reporter
                               219 S. Dearborn Street, Room 2260
24                             Chicago, Illinois  60604
                               (312) 554-8244
25                             sandra_mullin@ilnd.uscourts.gov
```

1       (Proceedings heard in open court. Jury out.)

2           THE COURT:  Good morning.  Thank you for being

3   prompt.

4           MR. YOUNG:  Good morning, your Honor.

5           THE COURT:  Okay.  So what is your response?

6           MR. YOUNG:  Your Honor, we object.  I think, you

7   know, a theory of the defense instruction can be appropriate

8   in certain cases, but one of the factors you should consider

9   is whether it's necessary, whether it's redundant.  I think,

10  in this case, it's neither necessary, and it is redundant.

11  It's basically just telling them if the government doesn't

12  prove the elements of the offense, namely knowledge and

13  intent to defraud, they should be acquitted.  That is

14  obviously covered by the elements instruction.  I don't see

15  what this serves with respect to the overall instructions,

16  your Honor.

17          THE COURT:  What does it add to instruction

18  Number 16?

19          MR. KUTNICK:  Your Honor, it focuses the jury

20  specifically on knowledge and intent to defraud.  And I know

21  that that is touched on in 16.  However, the instruction here

22  that I've laid out really directs them to look specifically

23  at this -- the mens rea aspect of the charge.

24          THE COURT:  So does 16.  It just adds materiality

25  or --

1    MR. KUTNICK:  Your Honor, this has obviously been

2    the essential issue in this case.  One, that my -- my

3    argument is that many jurors don't necessarily understand the

4    importance of the mental state element of a criminal charge.

5    This directly --

6    THE COURT:  Well, then, the jury instructions that

7    they give us to use are not adequate, is what you're saying.

8    Let me see what it adds.  I didn't think it added -- it's --

9    see, my first concern is that it could be confusing because

10   we have 16, which says it's the government's burden to prove

11   each element.  And so I'm not sure what -- that it wouldn't

12   be confusing to then single out and say, it's the

13   government's burden to prove beyond a reasonable doubt these

14   two elements.

15   MR. YOUNG:  I mean, I think the redundancy creates

16   the problem, your Honor, in the sense that, just like we are

17   sitting here looking at them, trying to determine, is this

18   really saying anything different, and I don't think it really

19   is at the end of the day, the jury may be doing the same

20   thing.  And unlike ourselves, the juries are not attorneys

21   and experts in the law.  There is nothing here that is not

22   encompassed within the instruction.  Element Number 2 clearly

23   says that you must find, and the government must prove beyond

24   a reasonable doubt, that the defendant did so with the intent

25   to defraud.  And then there is additional instructions on

1   what constitutes an intent to defraud.  So I don't think

2   there is any lack of clarity that the jury must find that the

3   defendant possessed a requisite intent to defraud, nor is

4   there any lack of clarity that the jury must find that the

5   defendant knowingly participated in the scheme as that is

6   clearly defined in Element 1 and is also -- there is an

7   instruction specifically describing what knowledge means.  I

8   don't think it's going to escape them that there is an intent

9   requirement.  You know, I think -- and I think, your Honor

10  makes a good point that, to some degree, this causes

11  additional confusion.  I didn't necessarily focus on this

12  earlier.  But this may -- it is the government's burden to

13  prove beyond a reasonable doubt all the elements of the

14  offense, not simply that there was knowledge and intent to

15  defraud.  So that actually might be a miss, sort of somewhat

16  confusing.

17          THE COURT:  What is missing, in your opinion, in --

18  I mean, in Instruction Number 16, which is the elements

19  instruction?  And it covers the burden of proof, and says, if

20  you don't find -- if you find that the government hasn't

21  proved anything, then you find for the defendant.

22          MR. KUTNICK:  I just think specifically my third

23  paragraph, your Honor, kind of brings it all together and

24  tells the jury you can have doubt about just this one element

25  and find him not guilty.  I think it's a clearer statement of

1    the mental state instruction.

2              MR. YOUNG:  May I respond, your Honor?

3              THE COURT:  Yes.

4              MR. YOUNG:  I will just note that the last

5    paragraph of the elements instruction says, if, on the other

6    hand, you find from your consideration of all the evidence

7    that the government has failed to prove any one of these

8    elements.  So it clearly says that the failure to prove any

9    one of the four elements, you know, knowledge, intent, the

10   false representations or the wiring, you must acquit.  So I

11   think that's made clear from the instructions.  And obviously

12   counsel had the opportunity to emphasize that fact during his

13   argument.

14             THE COURT:  I don't think this is really, I mean, a

15   separate theory of defense instruction.  I think it's

16   absolutely covered by this instruction.  And to put -- I

17   can't think of a way to put this in without creating

18   confusion.  I mean, I don't think -- I mean, maybe what

19   you're saying is you're not even -- you're not disputing

20   Elements 3 and 4, but I don't know if I can take those out.

21             MR. YOUNG:  No, Judge, I think those would be

22   instructed on all four --

23             MR. KUTNICK:  No, I wouldn't want them taken out

24   either, Judge, even though, obviously, those are not issues

25   that we concentrated highly on in our defense, you know, the

1    wire communications.

2            THE COURT:  Really all it is is emphasizing the

3    first two.  So, no, I'm going to leave them as they are.  Do

4    you have the instructions done?

5            MR. YOUNG:  Yes, your Honor.

6            THE COURT:  Okay.  If they get here -- if they all

7    get here earlier, we can start a few minutes early.

8            MR. KUTNICK:  Okay.  Thank you, Judge.

9            THE COURT:  Okay.  Thank you.

10        (Recess from 8:24 a.m. to 9:00 a.m.)

11            THE COURT:  Our juror says he is stuck on a bus, he

12    is getting off, he is going to walk.  He is at Congress and

13    Michigan.  So that really means that it's going to be another

14    20 minutes, or so.  The alternative is we excuse him.

15            MR. YOUNG:  I have no objection, your Honor.

16            MR. KUTNICK:  Which juror is it?

17            THE CLERK:  Mr. Robinson, Wyndell Robinson.

18            MR. KUTNICK:  Can I have one moment, your Honor.

19            THE COURT:  Certainly.

20            MR. KUTNICK:  Yes, we're not doing anything, so.

21            We'd like to give him a few more minutes.

22            THE COURT:  Well, I'm just telling you how long

23    many minutes it will be.  I mean, it probably means that

24    we're really going to start at about nine -- close to 9:30.

25    You know, it's your privilege.

Meza - redirect by Kutnick

1    MR. KUTNICK:  I'd like to wait, your Honor.

2    THE COURT:  Okay.  If he isn't here by 9:30, I'll

3    deal with him separately, but --

4    MR. KUTNICK:  Fair enough.

5    THE COURT:  -- we will excuse him.

6    MR. KUTNICK:  Fair enough, your Honor.

7    THE COURT:  Okay.

8    (In open court. Jury in at 9:16 a.m.)

9    THE COURT: Please be seated.  Good morning.  All

10   right.  Let's finish up.

11   MR. KUTNICK:  Thank you, your Honor.  Recall Carlos

12   Meza to the stand.

13   THE COURT:  Yes.  Mr. Meza, do you understand that

14   you are still under oath in this case?

15   THE DEFENDANT:  Yes.

16   THE COURT:  Please be seated.

17   CARLOS MEZA, DEFENDANT, PREVIOUSLY SWORN,

18   REDIRECT EXAMINATION (Continued.)

19   BY MR. KUTNICK:

20   Q.  Good morning, Carlos.

21   A.  Good morning.

22   Q.  Do you have an association with a company called Chicago

23   Trucking?

24   A.  Yes, I do.  I own it.

25   Q.  You own it?

1    A.    Yes.

2    Q.    Okay.  Did you contribute any money to Virginia

3    Worldwide through the Chicago Trucking Company?

4    A.    Yes.  Yes, I did.

5    Q.    When was that?

6    A.    In May 2013, something like that.

7    Q.    Was it '12 or '13?

8    A.    '13, or May, something.

9    Q.    Are you sure?

10   A.    Yes.

11   Q.    Okay.  Did -- how much money did you invest?

12   A.    20,000.

13   Q.    Okay.  I'm going to show you -- I'm showing you what's

14   been previously marked as Defendant's Exhibit No. 35 for

15   identification.  Could you take a look at that.  What is

16   that?

17   A.    It's a chart flow.

18   Q.    Okay.  Are you familiar with that chart?

19   A.    Yes.

20   Q.    Does that chart indicate the investment that you just

21   testified about?

22   A.    Yes.

23   Q.    Is that chart accurate, by the way?

24   A.    Yes.

25   Q.    That section of it?

1    A.    This section, yes.

2    Q.    Do you still attend the same church?

3    A.    Yes.

4    Q.    Have you attended it the entire time, the last many

5    years?

6    A.    Yes.

7    Q.    And do you still go to Ray's garage?

8    A.    Still go to Ray's garage.

9          MR. KUTNICK:  I have nothing further, your Honor.

10         THE COURT:  Thank you.  Any more?

11         MR. YOUNG:  Nothing, your Honor.

12         THE COURT:  Okay.  All right.  You are excused.

13   Thank you.

14        (Witness excused.)

15         THE COURT:  I think we're ready to proceed?

16         MR. KUTNICK:  We are, your Honor.

17         THE COURT:  Oh, right, go ahead.

18         MR. KUTNICK:  I have no further live witnesses.

19   However, we would be seeking to admit our exhibits -- some of

20   the exhibits that we are --

21         THE COURT:  All right.  Could you just list those

22   so we --

23         MR. KUTNICK:  Yes, I can.

24         THE COURT:  -- make sure we have them on the

25   record.

 1          MR. KUTNICK:  It's going to be Defense Exhibits 27

 2   and 30 through 34, which are the recordings.

 3          It's going to be Defense 28, 29, 16, 17, 24, and

 4   36.

 5          THE COURT:  Thank you.  Any objection?

 6          MR. YOUNG:  One moment, your Honor.

 7          THE COURT:  Yes.

 8          MR. YOUNG:  No objection, your Honor.

 9          THE COURT:  All right.  They're admitted.

10          (Said exhibits received in evidence.)

11          MR. KUTNICK:  Your Honor, with that, on behalf of

12   Carlos Meza, defense rests.

13          THE COURT:  Thank you.

14          MR. YOUNG:  We have no rebuttal case, your Honor.

15          THE COURT:  All right.  Are you ready to proceed?

16          MR. YOUNG:  Yes, your Honor.

17          THE COURT:  Okay.  Go ahead.

18          CLOSING ARGUMENT ON BEHALF OF THE GOVERNMENT

19          MS. KLAMANN:  Your Honor, may I proceed?

20          THE COURT:  Yes, please.

21          MS. KLAMANN:  Carlos Meza wanted to get rich quick.

22   In fact, he needed to get rich quick.  In early 2012, he was

23   in financial trouble.  The income from his rental properties

24   wasn't enough for him to live on, and his largest property

25   was about to be lost in bankruptcy.  He needed money, and he

1    needed it fast.

2         So when he heard about investment opportunities

3    that would seemingly generate tens of millions of dollars

4    within a matter of months, he wanted in. There was just one

5    obvious problem: He didn't have any money to invest. So

6    what did he do? He devised a plan to get that money from his

7    friends, to use his friend's money to pay into the

8    investments and to reap the profits. And so that's what he

9    did. He went to his friends and to his fellow church

10   members, and he lied to them. He told them whatever he

11   needed to tell them in order to get their money. He lied to

12   them about his background, telling them that he was a

13   successful businessman with experience in these types of

14   investments and with abundant resources. He lied to them

15   about the risk associated with these investments, telling

16   them that he could personally guaranty their investments,

17   even though he didn't have the money to back it up. He lied

18   to them about his own participation in these investments,

19   telling them that he had skin in the game and he paid money

20   into the pot with Bob Adams. But he hadn't. And, finally,

21   he lied to them about the use of their money. He told them

22   that all of their money was going towards these investments,

23   when, in fact, he kept parts of it in order to pay his own

24   expenses. And defendant told all of these lies with one goal

25   in mind: To get the victim's money. Ladies and Gentlemen,

1    that's fraud, and that's why we're here today.

2         Let's begin by talking about the charges against

3    defendant.  Defendant is charged with two counts of wire

4    fraud.  Count One charges defendant with wire fraud in

5    connection with Scott Spencer's initial $200,000 investment

6    that was supposed to go to Bob Adams.  Count Two charges

7    defendant with wire fraud in relation to Cordell Crane's

8    initial $50,000 investment that was also supposed to go to

9    Bob Adams.

10        But let's step back.  What is wire fraud?  At the

11   end of this case, after the attorneys are done arguing, Judge

12   Bucklo is going to instruct you on the law.  And I expect she

13   is going to tell you that the government has the burden of

14   proving four things beyond a reasonable doubt in order to

15   establish that the defendant committed the crime of wire

16   fraud.

17        The first of these elements is that the defendant

18   knowingly devised or participated in a scheme to defraud.

19   Second, the government must show that the defendant did so

20   with the intent to defraud.  Third, the scheme to defraud

21   must have involved a materially false or fraudulent pretense,

22   representation or promise.  Finally, for the purpose of

23   carrying out the scheme, or attempting to do so, the

24   defendant must have caused an interstate wire communication

25   to take place in the manner charged in the indictment.

1        In this case, over the last few days, the

2    government has presented more than enough evidence to

3    establish each of these four elements.  And I want to talk

4    about that evidence.  But before I do, I think it will be

5    helpful to talk a little bit more about these elements and

6    what they mean in plain English and what they mean in our

7    case.

8        So let's start with the first element, the scheme

9    to defraud.  Judge Bucklo is going to provide you with the

10   legal definition of a scheme to defraud.  Put very simply, a

11   scheme to defraud is a lie told to get money.  Now, over the

12   last few days in this case, you've heard about a couple of

13   different schemes.  You've heard schemes that are -- you've

14   heard about schemes that were allegedly cooked up by Bob

15   Adams or Terry Barnes.  Defendant has denied any knowledge of

16   those schemes and claims that he didn't know those

17   investments were fraudulent.  He even played for you, on his

18   direct testimony, several phone calls that he recorded with

19   those individuals or with people associated with those

20   individuals.

21       But that's not what this case is about.  This case

22   isn't about what those individuals said to the defendant.

23   This case is about what the defendant said to his victims:

24   Scott Spencer, Cordell Crane, and Ray Yacoub.  This case

25   isn't about the scheme concocted by Bob Adams or Terry

1    Barnes.  This case is about the scheme concocted by Carlos

2    Meza, all on his own, the scheme to lie to his victims in

3    order to get their money.

4         The second element, intent to defraud.  This is the

5    definition that I expect Judge Bucklo will give you for

6    intent to defraud.  A person acts with intent to defraud if

7    he acts knowingly with the intent to deceive or cheat the

8    victim in order to cause a gain of money to the defendant or

9    another.

10        We know in this case that the defendant acted with

11   the intent to defraud because he repeatedly lied to his

12   victims in order to get their money.  I expect Judge Bucklo

13   will tell you, and you'll see in the copy of the indictment

14   that goes back with you, that the government has charged a

15   number of lies.  And, again, I'm going to talk about those

16   lies.  But Judge Bucklo is going to tell you that the

17   government must prove at least one of those lies.  The

18   government doesn't have to prove every single lie charged in

19   the indictment.

20        The third element also relates to defendant's lies,

21   but the third element doesn't just require that defendant

22   told a lie and made a false promise, or made a false or

23   fraudulent pretense.  The third element requires that those

24   lies be material.

25        So what does it mean for a lie to be material?

1   This is the guidance that I expect Judge Bucklo will give you
2   with respect to when a lie is material:  A false or
3   fraudulent pretense, representation, promise or concealment
4   is material if it is capable of influencing the decision of
5   the person to whom it was addressed.  It is not necessary
6   that the false or fraudulent pretense, representation,
7   promise or concealment actually have that influence or be
8   relied on by the alleged victim, as long as it is capable of
9   doing so.  That's a lot of words.  Put very simply, a lie is
10  material if it is important, if it is capable of influencing
11  the decision of the listener.  In this case, the victims.
12  It's not necessary that it actually have influenced the
13  victims' decision to give the defendant their money.  It's
14  just important if it was capable of influencing them.
15          So I want to stop here because, as maybe you have
16  picked up, the evidence that proves each of these first three
17  elements of the charges of wire fraud are the same.  And so I
18  want to spend some time talking about that evidence while
19  these elements and these concepts are fresh in your mind.
20  And we'll come back after we review this evidence and talk
21  about the fourth and last element.
22          The evidence that establishes these first three
23  elements of wire fraud in this case are defendant's lies.
24  The lies that he told in order to get the victim's money.
25  And there are four categories of lies that he told.  He lied

1    about his background.  He lied about the risk associated with

2    these investments.  He lied about his participation in the

3    investments.  And he lied about where their money was going.

4    I'm going to talk about each of those four categories of lies

5    and show you the evidence we have that establishes each of

6    these three elements of wire fraud with respect to each of

7    those lies.

8           Let's start with defendant's lies about his

9    background.  Defendant told Scott Spencer and Cordell Crane

10   that he was a multimillionaire and had a high net worth.

11   Defendant also told Scott Spencer that he owned 100 trucks in

12   his trucking business.  Defendant told Scott Spencer he had

13   experience in these types of investments and knew the traders

14   involved.  And defendant told Scott Spencer and Cordell Crane

15   that he had millions of dollars in South America that he

16   could use to cover the victims' investments if the

17   investments fell through.

18          Now, defendant testified in this case.  And I'm

19   going to talk about defendant's testimony a little bit later.

20   But defendant testified, and he admitted, he is not a

21   multimillionaire.  He doesn't own 100 trucks.  He doesn't

22   have experience in these types of investments.  And he

23   doesn't know the traders involved.  And, finally, defendant

24   admitted that he doesn't have millions of dollars in South

25   America.  These were lies.  And these lies about his

1   background were part of his scheme to defraud because they

2   were told to the victims in order to get their money.  These

3   lies evidence his intent to defraud.  They were told to make

4   the victims think that the defendant was successful,

5   knowledgeable and connected.  In short, in order to get the

6   victims to trust the defendant with his money.  And it

7   worked.  We heard from Scott Spencer and Cordell Crane that

8   defendant's apparent successful background was a factor in

9   their decision to give him their money.

10          Defendant also lied repeatedly about the risk

11  associated with his investments.  You heard from all three

12  victims, Scott Spencer, Cordell Crane, and Ray Yacoub, that

13  defendant told them that their investments were 100 percent

14  personally guaranteed by him.  And the victims' testimony was

15  corroborated by the documents.  We saw defendant's

16  100 percent personal guaranty in the agreement that he signed

17  with Cordell Crane.

18          Now, Cordell Crane testified that defendant

19  provided him with this document.  That this was -- that this

20  document was created by the defendant and that defendant

21  signed this document in Cordell Crane's presence.  That's

22  important because this document is defendant's statement.

23  And in this document, he is telling Cordell Crane that he can

24  guaranty a return of 20 to 30 percent of his $50,000

25  investment by December 1st, 2012.

1    Now, we know, at the time that he made these
2    promises to Cordell Crane, he didn't have enough money to
3    cover this investment.  How do we know that?  Because we saw
4    defendant's tax returns.  We know that, in 2012, when he made
5    this promise, defendant made half the amount of money that
6    Cordell Crane was investing here.  He made $25,000 a year.
7    We also know, on defendant's own admission, that he doesn't
8    have millions of dollars, he is not a multimillionaire.

9    We also know defendant couldn't guaranty this
10   investment at the time that he made these promises based on
11   the hope that this investment would pay out because he
12   entered into this agreement with Cordell Crane on
13   September 10, 2012.  And you'll remember that Scott Spencer
14   also invested in this same program with Bob Adams.  And Scott
15   Spencer paid his investment of $280,000 in the middle of
16   June, 2012.  Scott Spencer told you that he understood, from
17   the defendant, that he would receive his returns on this
18   investment within two months, or by the middle of August.
19   Yet, here is defendant making a promise to Cordell Crane that
20   Cordell Crane will get a return on his investment, specific
21   return, by a date certain, even though the returns on Scott
22   Spencer's investment in the same program with Bob Adams was
23   already late.  Defendant was in no position to make these
24   promises on the date that he made them to Cordell Crane.

25   We also see defendant making these personal

1   guarantees in the agreement with Cordell Crane for his
2   $250,000 investment.  Again, Cordell Crane testified, and he
3   told you that he actually created this document.  But he told
4   you that the terms of this document were supplied by the
5   defendant.  And the defendant signed this document in
6   Mr. Crane's presence, on July 7, 2013.  So, again, this
7   document is defendant's statement.  This is defendant telling
8   Cordell Crane, again, that, in exchange for his $250,000
9   investment, money that the defendant knew was coming from
10  Cordell Crane's retirement account, that defendant would
11  guaranty him a return of $5 million, paid in five different
12  installments of $1 million each a month, with the first
13  return being paid two weeks after they enter into this
14  agreement.  Again, nothing has changed with the defendant's
15  financial picture at this time.  He doesn't have any more
16  money than he did in September 2012.  We saw his tax returns
17  for 2013.  He also made about $25,000 a year that year.  But
18  this time Cordell Crane's investment is ten times defendant's
19  annual income.  Yet, he is telling Cordell Crane that he can
20  pay him back.

21          And the time periods provided for in this document
22  are also significant.  He is telling Cordell Crane that he'll
23  pay him -- that he'll pay him a million dollars, the
24  investment will generate a million dollars, within two weeks
25  of signing this agreement.  You heard from Cordell Crane that

1    he had many conversations with defendant before he entered

2    into this investment.  He shared with defendant that he would

3    be using his retirement funds, and he shared with defendant

4    that he was concerned about his wife's approval in this

5    investment.  But he also told defendant that his wife was out

6    of town and that she would be back in two weeks.  So

7    defendant here is telling Cordell Crane whatever he needs to

8    tell him in order to get his money.  He is guaranteeing him a

9    $1 million payout in two weeks, or by the time his wife

10   returns from vacation.  And this investment, if you'll

11   recall, was a separate investment, a separate fund.  The Bob

12   Adams investment was his first investment of $50,000.  But

13   this $250,000 was supposed to go to Virginia Worldwide or

14   Terry Barnes.

15          Now, similar to his previous agreement with

16   defendant, Scott Spencer had already invested with Terry

17   Barnes and with Virginia Worldwide.  Scott Spencer, if you'll

18   recall from his testimony, paid defendant $40,000 that was

19   supposed to go to Virginia Worldwide in April of 2013, almost

20   three months before defendant enters into this agreement with

21   Cordell Crane.  And Scott Spencer told you that he and

22   defendant entered into an agreement where he would provide

23   this $40,000 to defendant and defendant would adhere to a

24   payment schedule where the investments would hit every couple

25   of weeks, maybe even every week.  And they memorialized this

1    on a white board, this white board.  And so here, defendant

2    is promising Scott Spencer, again in the very same program,

3    the investment with Virginia Worldwide, that he is going to

4    get returns on April 26th of $400,000.  I think Scott Spencer

5    testified that these following payments actually related to

6    his investment with Bob Adams.  But this initial return on

7    April 26th was supposed to come from the Virginia Worldwide.

8         Meanwhile, two-and-a-half months later, defendant

9    is telling Cordell Crane, a father of five, who he knows is

10   emptying his retirement account to invest, that he can get

11   him a million dollars in two weeks on the very same

12   investment that he knows is two-and-a-half months late with

13   Scott Spencer.  Defendant was in no position to make these

14   promises.

15        These were lies.  And these lies were part of

16   defendant's scheme to defraud the victims.  And they show

17   defendant's intent to defraud, just as I was explaining.

18   Because defendant knew at the time that he was making these

19   representations to Cordell Crane that they weren't true, and

20   that the money would not come through on the dates or in the

21   amounts that he promised.  Finally, we know that these lies

22   about defendant's personal guaranty were material because we

23   heard from Cordell Crane and Scott Spencer that his personal

24   guaranty meant something to them, and that he relied on it,

25   and that they relied on it, in giving defendant their money.

1     Defendant also lied to the victims about investing

2     his own money.  Defendant told Scott Spencer that he was

3     investing his own money in the Bob Adams investment.  If

4     you'll recall, Scott Spencer told you that that investment

5     was supposed to be that they would rent $10 million from Bob

6     Adams for a monthly fee of $250,000 a month, and they would

7     rent it for two months.  Scott Spencer would pay the first

8     month's rent of $250,000, and defendant would pay the second

9     month's rent.  Then, later, after they didn't get their

10    returns on the first two months, defendant represented to

11    Scott Spencer that he would continue to make these $250,000

12    payments.  In exchange, Scott Spencer would pay the expenses,

13    the expenses which ended up totaling $400,000.

14    But you heard from our financial expert, Steve

15    Tremaglio, that he didn't find any evidence of these $250,000

16    payments, or any payments for that matter, to Bob Adams by

17    the defendant.  These were lies.  And these lies about his

18    own participation were part of his scheme to defraud.  He

19    told defendant(sic) that he did this in order to think -- in

20    order to make the defendant(sic)think that he had skin in the

21    game too.  In order to make the defendant(sic) think that --

22    in order to make the victim think that the defendant was so

23    confident in these investments that he was putting his own

24    money up.  He was putting his money where his mouth is.  But

25    he wasn't.  And we know that these lies were material because

1    Scott Spencer told you that he wouldn't have invested if he

2    had known that the defendant wasn't investing too.

3            Finally, defendant lied to the victims about the

4    use of their money.  He told the victims that all of their

5    money was going towards these investments.  But it wasn't.

6    He spent some of it.  And Steve Tremaglio walked you through

7    those records.  He showed you that defendant opened the

8    Milwaukee McPherson bank account on May 14, 2012.  Two days

9    later, on May 16th, Scott Spencer paid $200,000 into that

10   account.  That was the only money put into that account.

11           Nine days later, defendant uses that money to buy a

12   condo unit for $28,000.  How do we know that that was Scott

13   Spencer's money?  There was no other money in the account.

14   It had to be Scott Spencer's money.

15           Five days later, defendant uses money from that

16   account to buy a minivan for his wife, $23,000.  Now, at the

17   time that he buys the car, there has been one deposit into

18   the account, a deposit of $1,500 from his church.  Now, that

19   $1,500 doesn't even come close to covering the cost of that

20   minivan, so it's safe to say that the majority of that money

21   came from Scott Spencer.

22           That same day, defendant pays Barnett Capital

23   $10,000 in legal fees.  Again, no other deposits other than

24   the $1,500 from defendant's church.  This was Scott Spencer's

25   money.

1       The next day, on May 31st, he writes another check,

2    $3,000 to pay his bankruptcy attorneys.  No other deposits in

3    the account.  This is Scott Spencer's money too.

4       Finally, on June 11, 2012, defendant pays Bob

5    Adams, but he only pays Bob Adams $100,000.  Scott Spencer

6    gave him $200,000.  Defendant kept half of Scott Spencer's

7    money.

8       And, Ladies and Gentlemen, the defendant took the

9    stand in this case, and, again, I'm going to talk about his

10   testimony a little bit later.  But he told you that Scott

11   Spencer gave him permission to spend some of his money on

12   expenses related to a development project that Scott Spencer

13   was working on in North Dakota.  Look at these expenses.

14   These are personal expenses.  These are not business

15   expenses.  They're not related to any deal in North Dakota.

16      We also heard from Scott Spencer that he did not

17   give defendant permission to use his money for anything other

18   than the investments.  We saw something similar with respect

19   to Scott Spencer's payment of $80,000.  Scott Spencer paid

20   the $80,000 on June 18, 2012.  This time, defendant actually

21   paid the money towards the Bob Adams investment on June 19,

22   2012.  He paid it to Stubbs Alderton & Markiles LLP.  I think

23   those were lawyers that were supposed to be working with Bob

24   Adams.  But that very same day, June 19th, we see $30,000

25   paid from Stubbs to a company called SN Servicing

1    Corporation.  Our financial expert looked into SN Servicing

2    Corporation, and he told you that it's a loan servicer.  And

3    he told you that that $30,000 was used to pay off a loan made

4    to Gladys McPherson, defendant's mother.  This was Scott

5    Spencer's money, and defendant was using it to pay his, and

6    his mother's, expenses.

7              Finally, Mr. Tremaglio also talked to you about

8    Cordell Crane's payment of $50,000.  Cordell Crane made this

9    payment to Milwaukee McPherson on September 19, 2012.  At the

10   time he made this payment, the account had been depleted to a

11   mere $71.  The same day that he made this wire transfer to

12   Milwaukee McPherson, $47,500 went out to ALSJ to pay off a

13   personal loan.  Again, there was very little money in the

14   account when Cordell Crane's money went in.  This was Cordell

15   Crane's money, and we know it.  We also know that Cordell

16   Crane didn't give defendant permission to spend it.  Cordell

17   Crane told you that his understanding, and what defendant

18   explicitly told him, was that his money was going to Bob

19   Adams.

20             So these lies about where the money was going or

21   how he was going to use the money were part of defendant's

22   scheme to defraud.  He told the victims that he was going to

23   use their money towards the investments, even though, at the

24   time he was soliciting their investments, he intended to use

25   it for himself.  How do we know that?  Because of the short

1    amount of time that passes between the time that the victims

2    paid defendant the money and defendant spent it.  For Scott

3    Spencer, that time was approximately nine days.  It hit

4    defendant's account, and then he began to spend it.  For

5    Cordell Crane, it was even shorter.  He spent it on the very

6    same day.  When defendant asked them for this money, he knew

7    how he was going to use it, and he knew he wasn't going to

8    put it towards the investment.

9           We know these lies about how defendant was going to

10   use the money were material because Scott Spencer and Cordell

11   Crane both told you that, had they known defendant was going

12   to pay his mom's loan off or buy a condo or buy his wife a

13   car, he wouldn't -- neither of them would have given him

14   their money.

15          So those are the lies.  Those are the lies that

16   defendant told in order to get the victims' money.  He lied

17   to them about his background, telling them that he was a

18   successful businessman, when he wasn't.  He lied to them

19   about the risk associated with the investments, telling them

20   they were guaranteed, when they weren't.  He lied to them

21   about where their money was going, saying they were all going

22   toward the investment, when it wasn't.  And he lied to them

23   about his participation in the investment with Bob Adams,

24   telling them he had skin in the game too.  But he didn't.

25          Now let's go back to our fourth element.  The

1    fourth element requires the government to prove that, for the
2    purpose of carrying out the scheme or attempting to do so,
3    the defendant caused interstate wire communications to take
4    place in the manner charged in the indictment.  This
5    requires -- this doesn't require the government to prove that
6    the defendant himself made a wiring.  It's enough that the
7    defendant caused the wiring.  And the defendant -- and the
8    government has to prove that the wiring traveled across state
9    lines and that it was for purposes of carrying out the
10   scheme.  This element is easily satisfied here.
11           As you'll remember from the beginning of my
12   argument, there are two charges against the defendant.  Count
13   One charges defendant with causing a wiring of $200,000 from
14   Scott Spencer to Milwaukee McPherson on May 16, 2012.  And
15   Count Two charges defendant with causing a wiring of $50,000
16   from Cordell Crane to Milwaukee McPherson on September 19,
17   2012.  Defendant caused these wirings because he gave the
18   victims the information to wire the money.  He told them
19   where to wire it to, and he gave them the account numbers.
20   He caused the wiring.
21           You also heard a stipulation during this case,
22   which is an agreement among the parties that a fact is true.
23   And that stipulation told you that this wiring crossed state
24   lines.
25           Finally, you know that these wirings were for the

1    purpose of carrying out the scheme because the entire purpose

2    of this scheme was to get the victims' money.  And these

3    wirings was how the defendant got it.

4           Now, I told you earlier that the government has the

5    burden of proof here, and that burden never shifts to the

6    defendant.  The government has to prove all of those four

7    elements that I just discussed with you beyond a reasonable

8    doubt.  The defendant doesn't have to put on a case.  In this

9    case, he did, and he testified.  As a result, you can

10   evaluate his testimony, his credibility, just like you can

11   the evidence in the government's case.  And throughout my

12   argument, I've pointed out various areas in which the

13   defendant -- the defendant's testimony contradicted other

14   evidence in the record.  Whether that's evidence that you

15   heard from the victims or other witnesses, or evidence in the

16   documents.  Ultimately, it's up to you who you believe.

17          Ladies and Gentlemen, this case is about the lies

18   that defendant told to get the victims' money.  The evidence

19   is clear.  Therefore, we ask you to return a verdict, the

20   only verdict that is supported by the evidence, guilty on

21   both counts.  Thank you.

22          THE COURT:  Thank you.

23          MR. KUTNICK:  Thank you, your Honor.

24          CLOSING ARGUMENT ON BEHALF OF THE DEFENDANT

25          MR. KUTNICK:  It's not about the lies that may have

1    been told or not have been told or the image that was

2    portrayed because we all portray images.  Those images aren't

3    always exactly accurate.  The real thing here, the real issue

4    is whether or not Carlos Meza had intent to defraud.  Those

5    three words are probably the most important words in the

6    entire case.

7            The Assistant US Attorneys went into the jury

8    instruction that talks about intent to defraud.  And as much

9    as the government thinks that's important, we think that's

10   very, very important.  And so I am going to go over that

11   instruction.  But the questions that you all will go back to

12   the jury room and ask yourself, the first one:  Did Carlos

13   Meza know about the Renaissance scheme, the Virginia

14   Worldwide scheme, and the Carso scheme?  And the evidence

15   that you heard from that witness stand and the evidence that

16   you saw in the documents is that he did not know.  The phone

17   calls that you will listen to, that you heard here in court,

18   and you will have with you in the back, those calls tell you

19   that Carlos did not know that he was swept into a scheme that

20   was huge, bigger than him.  And he was not doing anything

21   purposefully or intentionally to make that scheme go forward.

22           Now, the next -- one of the big pieces of evidence

23   that the government uses are these personal expenditures.

24   And Carlos talked to you about each one of those.  And you

25   all paid attention, and you saw he went through each one and

1    explained.  There was money moving here, there was money
2    moving there.  I'm going to get into each witness
3    individually.  But, most specifically, Carlos was doing a lot
4    of work for Scott Spencer.  Scott Spencer at least had the
5    wherewithal to get up and admit that, that this work was
6    actually being done, that Carlos was his go-to guy.  That
7    Carlos was performing a lot of tasks for him.  And that he
8    had instructed Carlos to make certain expenditures in
9    furtherance of his business.  Most specifically, the
10   Performance Crane business that was going on.  And you saw --
11   well, I'll get into that when I talk about Mr. Spencer.

12            So, as promised, I'm going to talk about the jury
13   instruction, just like the Assistant US Attorney did.  You
14   will see Jury Instruction No. 21, that you take back with
15   you.  You're going to have written copies of all these
16   instructions.  And the judge is going to tell you that this
17   is the law.  This is what you all swore at the beginning to
18   follow, and this is one of the most important instructions.
19   They're all important, but this is one of the most important
20   as we see it:  A person acts with intent to defraud if he
21   knowingly, with intent to deceive or cheat the victim, in
22   order to cause a gain of money to the defendant or another.
23   Well, I don't think there is any evidence about real
24   financial gain other than the personal expenditures, which
25   we'll talk about.  But the most important thing to take from

1    this instruction is:  Did he know?  The evidence shows you he

2    didn't know.  Did he intend to deceive and cheat his friends?

3    And the answer is no.  If you devise a scheme to cheat and

4    deceive your fellow church members and everybody is up in

5    arms about their money and their 401k and their -- everything

6    they've got, do you still keep going to church?  Do you still

7    keep having contact with those people?  No.  You wouldn't.

8    Because you intended to get those people's money, and you got

9    away with it.

10    But that's not what happened here.  Carlos was

11    cheated too.  He was defrauded too.  And so he didn't have

12    any reason to change his lifestyle, to not go to church

13    anymore, to not go to Mr. Yacoub's garage anymore.  He

14    continued to do it because he was a victim too.

15    Now, how do we know that Carlos was not in on the

16    scheme?  Well, you'll get a copy of this when you go in the

17    back.  It won't show the whole thing now, but I will show as

18    much as I can.  Look at all of the money going to Bob Adams.

19    It goes to him.  Money is being sent to him.  If Carlos

20    wanted this money, if he was going to -- if he intended to

21    defraud them, if he intended to cheat them, why pass any

22    money up to Bob Adams?  Just say, hey, yeah, that's a great

23    idea, Bob, thanks for the idea.  I'm going to pocket the

24    money and I'm taking off to South America.  That didn't

25    happen.  It did not happen because he didn't know about this

1    scheme.  He did not know that he was being defrauded.

2            The other reason that you know that he wasn't being
3    defrauded is because the second phase of the investment, so
4    to speak, didn't even go through Milwaukee McPherson, it went
5    directly to Virginia Worldwide, and Palmore.  So, once again,
6    if Carlos wants to make money and cheat and defraud his
7    fellow church members, why is he telling them to send these
8    huge sums of money to this other -- this other entity.  An
9    entity that he has no control of.  An entity that he has no
10   part of.  In fact, an entity that he, through Chicago
11   Trucking, you heard it here this morning, sent his own
12   $20,000 to.  That's his skin in the game.  He sent his own
13   money to Virginia Worldwide.  And how do we know that that's
14   true?  It's on the chart.  And Mr. Tremaglio even said, this
15   is an accurate chart.

16           Now, the recordings, I'm not going to spend a lot
17   of time on them, and you can do what you will in the back.
18   It's your decision to listen to them or not listen to them,
19   re-listen to them.  But there are a few things, if you do
20   choose to listen to them, or look back on your memory about
21   what you heard about the phone calls, these, Bob Adams, is a
22   sophisticated investor.  He even says to Ms. Robinson on the
23   first call, hey, I'm a sophisticated investor, we know what's
24   going on here.  This is -- he is trying to explain the
25   operation while Carlos is listening in.  Now, in hindsight,

1    you kind of see, like, they're building their story.  Okay?

2    They're putting in the details.

3             Larry Gelfond explained extensively how Virginia

4    Worldwide deal works, which is very similar to the way the

5    Renaissance scam works.  They say that they've got this whole

6    big sum of money, that you're going to be able to lease that

7    money, and then, by just showing that we have this money,

8    we're going to get these tremendous returns.  Same scam.

9             Larry Gelfond, he admits, he's like, I'm being a

10   little pushy here, but, you know, we need to get this done.

11   We're going to get this thing done.  And I'm going to get you

12   your money right away.  These are the things that he is being

13   told, that Carlos is being told.  And he believes them.  He

14   has got Scott Spencer and Cordell breathing down his neck.

15   And so you actually hear that desperation in Carlos' voice in

16   the later calls.  So that's another thing I really ask you to

17   pay attention to in the phone calls, which is Carlos' voice.

18   He doesn't do a lot of talking.  But when he does, it's

19   saying things like, are we going to be getting this money

20   here?  What's happening?  What's going on?  And, you know,

21   explain further, things like that.  So it shows you that he

22   did not know, he was not in on it.

23            I guess the government and I at least have this in

24   common, we picked out the same instructions to talk to you

25   about.  This one is Instruction No. 16.  And I -- it's really

1    interesting how different people have different takes on the
2    exact same words.  As I was listening to counsel give her
3    closing argument, I'm thinking, okay, well, this is part of
4    my argument too.  But look how different it is.

5           So the government must prove the following things
6    beyond a reasonable doubt.  Beyond a reasonable doubt.  That
7    is the standard.  That is the way to judge it.  That the
8    defendant -- I'm going to, again -- knowingly devised and
9    participated in a scheme to defraud.  Now, these are, here,
10   I'm going to point out some words now that are extremely
11   important, and you need to take into consideration.  It's
12   these:  "And," "and," "and."  Each one of these four
13   propositions must be proven beyond a reasonable doubt in
14   order to find Mr. Meza guilty.  "And," "and," "and."  They
15   have to prove beyond a reasonable doubt that he knew that he
16   was participating in a scheme to defraud.  They have to prove
17   beyond a reasonable doubt that he intended to defraud.  They
18   have to prove beyond a reasonable doubt that he -- the scheme
19   to defraud involved these misrepresentations or promises.

20          I want to talk about the promises and
21   misrepresentations.  And the purpose was -- and that it was
22   done over interstate wire communications.  Not so much an
23   issue in this case in terms of, yes, wires were done, but,
24   did -- is it proved beyond a reasonable doubt that Carlos was
25   involved with those wire transfers?  And he -- he wasn't in

1    all of them.  There were some that he was.  You know, things

2    that went into Milwaukee McPherson.  But there were others

3    that he wasn't.

4           The government is trying to mix two things together

5    here.  They're saying that he has knowledge of the fraud

6    based on his -- his redirecting of the funds for personal

7    use.  And it does not prove that.  What it actually proves is

8    that he didn't know.  Because he was so confident that he was

9    going to get that money, he was, like, yeah, yeah, I do, I

10   need to pay off this lawyer, and I'm going to take care of

11   this expense, and we're paying on -- on this property.  But I

12   know that money is coming in.  I know it's coming in.  And

13   we're all going to be okay.  So for me to divert a little bit

14   here and a little bit there, it's going to be fine.  So that

15   proves his lack of knowledge of the scheme.  That proves his

16   lack of intent to defraud.  Why would he do that if he didn't

17   anticipate the money coming back in?  Didn't he think it was

18   going to come back and bite him?  So the government is trying

19   to mix that whole -- those actions with the knowledge to --

20   the knowledge of the scheme and intent to defraud.  And that

21   doesn't work.

22          Now, I want to -- the witnesses.  Scott Spencer,

23   Cordell Crane, and Ray Yacoub have known Carlos Meza for

24   nearly 20 years.  They have known him every Sunday through

25   church.  Not Ray, but the other two.  Family vacations.

1  Dinners.  Talks in the car.  Talks on the phone.  We went

2  through with Scott Spencer all the different meetings that

3  they had.  He couldn't even remember them there were so many.

4  Then he was like, oh, yeah, I think we did meet there, and I

5  think we did meet there, and I think we did meet there.

6  These three men have tremendous opportunity to observe Carlos

7  Meza.  To observe his demeanor.  To talk to him.  To see his

8  home.  To spend time with him.  They have an opportunity to

9  see who he is.  That was not fraud.

10  One thing that does come through, specifically

11  starting with Scott Spencer, is a tremendous anger and

12  frustration towards Carlos Meza that he had.  Now, he lost a

13  lot of money, and that's fair enough.  But Carlos didn't get

14  that money.  And they have taken this -- Scott Spencer has

15  taken this frustration and his feelings of anger, and he has

16  taken it out on Carlos Meza.  But never filed a civil suit,

17  never came after him in that way, said, hey, where is my

18  money?  You said that we were -- first of all, Scott Spencer,

19  they don't have really anything to memorialize the

20  investment.  Can you believe that?  Can you believe that

21  Scott Spencer gave Carlos all that money and said, oh, yeah,

22  just go do it.  Don't even sign anything.  I mean, later on

23  he decides to, like, write something on a white board and

24  have Carlos sign it and take a picture of it.  But in the

25  initial investment, nothing.  And they're partners.  He had

1    testified that they were partners.

2              How do we know that Carlos was not defrauding Scott
3    Spencer?  Well, Scott Spencer is the one that actually
4    initiates the relationship, the business relationship,
5    between the two of them.  He knew him.  He said he knew him
6    for many, many years.  He knew that Carlos was in the real
7    estate business.  And Carlos was in the real estate business.
8    That's not a lie, that's true.  Milwaukee McPherson owned
9    properties, bought properties, sold properties, collected
10   rents.  He was in that business.  And so Scott Spencer says,
11   hey, come to North Dakota with me.  We have a big job down
12   there, and you can help me out.  It's not Carlos seeking out
13   these people to try to sweep them into the net that
14   Renaissance has created or Virginia Worldwide has created.
15   This is just a legitimate organic relationship.

16             And that's where a lot of these expenses come in.
17   Scott Spencer testified on the witness stand, yes, he was
18   doing surveying.  Yes, he was obtaining the crane.  Yes, he
19   was bridging Doug Pitt into the country.  Yes he was doing
20   lots of different things for the North Dakota project.  He
21   was working.  And when we work, we all expect to get paid.
22   And when you spend your own money, your own personal money to
23   go do things, you expect -- I mean on behalf of a business,
24   you expect to be reimbursed.  And that is what was happening.
25   That was part of the deal.

1           Scott Spencer testified that this was a

2    partnership.  He didn't testify that he was investing in

3    Carlos Meza.  Because that was not what was happening.  And,

4    in that partnership, Scott told you that they were going to

5    split the proceeds 50/50.  That's a partnership.  That was

6    their agreement.  Now, once again, Scott doesn't put anything

7    in writing, so we don't have that.  But how does Spencer sit

8    there in that seat and look at all of you and say, yeah, I

9    gave this guy $700,000 just because I know him.  That's not

10   the case.  He was not defrauded.  He was not cheated.  Carlos

11   did not intend for him to lose his money.  It was not a game.

12   It was real.  They all believed that.  Meaning, Carlos

13   believed.  Spencer, at this point I'm talking about, believed

14   in this investment.  It was not a lie, and it was not a

15   cheat.

16           Very important point that Mr. Spencer made on

17   cross-examination.  He admitted that Carlos never -- he said

18   that there was no indication that Carlos was aware that the

19   money was going -- would not be returned.  None at all.  He

20   didn't have an inkling that Carlos thought that they might

21   lose the money.  As a matter of fact, Carlos truly believed

22   that they were not going to lose the money.

23           Now, Cordell Crane is a different type of witness.

24   Now, Cordell and Carlos were friends.  Not best buddies, but

25   they were -- they were friends from church.  Their families

1    spent time together.  They did take a vacation together,
2    to -- I don't know if it came out, but they took a vacation,
3    to where, but I won't say.  They took a vacation together.
4    Families, children, wives.  They had dinners.  They went to
5    each other's homes.  I mean, these are -- these are friends.
6    But then does that mean that Carlos' wife and kids, when they
7    were on vacation were, like, in on this scheme.  Like, we're
8    going to befriend these people over a 20 -- almost 20-year
9    period.  We're going to befriend them.  We're going to be
10   their buddies.  We're going to go on vacation.  And then when
11   the time is right, we're going to get 'em.  No way.  That's
12   not what happened.

13          What happened is that Cordell Crane was going from
14   job to job to job to job.  He was unemployed.  He needed
15   money.  And Carlos needed money too, as he told you, for the
16   Milwaukee McPherson -- the building on Milwaukee, the 2715, I
17   think it was, North Milwaukee.  And so he is, like, hey, we
18   can both get ahead here.  I can help you out, you can help me
19   out.  Let's do this.  That's what it was.  And Cordell knew
20   exactly what he was getting into.  Just like Scott Spencer.
21   For these guys to get up there and say, oh, well, I'm not a
22   savvy investor, and I don't really know anything about
23   investments.  Sure, there is some risk involved, but, you
24   know, not here because Carlos gave us his 100 percent
25   guaranty.  You can't believe that.  You can't believe it.

1    It's not true.

2            Both of those -- Cordell Crane was far more

3    sophisticated than he led on to you on that witness stand in

4    terms of his investment.  And how do we know?  He at least

5    was smarter than Spencer and put things in writing.  Okay?

6    They made a contract.  And look at that -- and they -- they

7    showed it on -- I don't have it to put up there, but you just

8    saw it in the other -- in the government's presentation.

9            Here's what they did point out.  It was a 20 to

10   30 percent investment coming back in two weeks.

11           By the way, I didn't hear any evidence about the

12   wife being on vacation.  Okay?  So you all, the judge will

13   instruct you, to rely on your own recollections about what

14   you heard from the witness stand.  But I don't recall any

15   evidence that she was on vacation.  That's some weird little

16   twist that all of a sudden is coming up here that wasn't from

17   the witness stand.  And you can only consider what you heard

18   from the witness stand.  That argument is designed to make

19   Carlos look bad.  To make it look like he was taking

20   advantage of her being gone and being devious in some way.

21   We never heard that she was gone from Cordell Crane.

22           But here is -- here is why we know that actually

23   Cordell's initial -- the money that he put out there the

24   first time, the $50,000, that was a loan.  That was

25   absolutely a loan.  And the paper, the writing, tells you

1    that it was a loan.  Why?  Because it was secured by the

2    Ravenswood property.  It was secured.  So Carlos' guaranty, I

3    guaranty you're getting your money back.  It says it in

4    there.  That is because it was secured by the property.  That

5    is not a lie.  That is not a cheat.  That is not a deception.

6    And it was Cordell Crane's choice to not exercise that right

7    to come in and take that property in compensation when the

8    deal did not go through.  He absolutely could have done it.

9    He had the paper.  It was in writing.  He probably would

10   have -- he could have won.  He could have gotten all of his

11   money back, and he did not do it.  It was a loan.

12          Now, Ray Yacoub, he actually turned out to be a

13   good witness for the defense in this case.  He was real

14   honest.  Comes in.  He is like, yes, I know Carlos, I've

15   known him for years.  He brings me cars.  He brings me

16   trucks.  We do business together.  Carlos told you he was the

17   best man in Ray Yacoub's wedding.  And what did he say?

18   Yeah, I put up the 50,000, and I knew there was risk.  I knew

19   something could happen to it.  I knew that there is no

20   100 percent guarantees in investing.  And he was not a savvy

21   investor.  We're not claiming that he was.  But he was not

22   taken advantage of by Carlos Meza.  He was not cheated by

23   Carlos Meza.  He was not deceived by Carlos Meza.  Carlos

24   Meza was deceived by Bob Adams, Terry Barnes, Larry Gelfond.

25   And, unfortunately, because Carlos was -- was seeking the

1    help of his acquaintances and friends, they got sucked in,

2    too.

3              Why is this criminal?  Why are there no civil

4    lawsuits here?  How come Spencer never sued Carlos?  How come

5    Cordell never sued Carlos?  How come Ray never sued Carlos?

6    Well, Ray, you might think, you know, he didn't want to.

7    They're continuing to do business, and things like that.  But

8    that's real telling.  Why is this -- why are they going after

9    their money in some different way?  Why are they coming in

10   here and saying --

11             MR. YOUNG:  Objection, your Honor, to the reference

12   of the criminal matter.

13             THE COURT:  Sustained.

14             MR. KUTNICK:  No one held a gun to these guys'

15   heads and said, you must invest, you must invest, you must

16   invest.  They chose to invest.  They decided to invest.  And

17   big, big fact here, exclamation points:  Even when the money

18   hadn't come in, they invested again.  Why?  Because they

19   believed.  Because Carlos believed.  Because they were all

20   being deceived.

21             Now, I'm going to put this chart back up.  We

22   looked at it before because I was referencing all the money

23   going up to Renaissance and Bob Adams.  But I'd also like to

24   point out something about Carlos' skin in the game.  First of

25   all, he did testify about the $20,000 that came from Chicago

1    Trucking, May 2013.  But I also want to note, we talked about
2    this during examination, this 30, $31,000 in other deposits
3    going into Milwaukee McPherson that is completely aside from
4    the money coming from Crane and Spencer.  And you will have
5    this in the back.  So I just wanted to point out the 31,000.
6    And the reason why that's important is -- and we went through
7    it, was the rental income that was coming in from the
8    properties from Milwaukee McPherson.  Carlos was making
9    money.  Money was coming in.  It wasn't purely these other
10   guys' money.  And so that skin in the game, that -- his own
11   personal commitment, his own personal risk, also proves his
12   lack of -- his lack of knowledge of the scheme and his lack
13   of intent to defraud.

14          Now we've all been here all week, and one of the --
15   you know, in this day and age, we all have a screen between
16   us and the other person all way too often.  But one great
17   thing about a trial, about a jury trial, is that we are all
18   in this room.  And it's very important that all, with your
19   eyes, get to see and hear these witnesses.  And one of the --
20   and you also get to see and hear, in this case, Carlos Meza.
21   You got to evaluate his demeanor.  You get to evaluate what
22   he says and how he says it.

23          One of the most telling things that proves that
24   Carlos believed that this scheme was real was that, if you
25   look at the dates of these personal expenditures, the vast

1   majority of them were before anyone realized there was a
2   problem with the -- with the investment, that they weren't
3   getting money.  They were having problems getting it back.
4   And that timeframe is very important because it proves that
5   Carlos believed.  If he had been spending money afterwards,
6   then it's like, oh, well, he is freaking out.  He is like, oh
7   my gosh, we're going to get -- we're going to get taken
8   advantage of.  I better spend this money.  But, no, that's
9   not when it happened.  It happens before.  Why?  Because he
10  believed.

11          So this is kind of like this time of year, holiday
12  bonus time.  We all have gifts to buy for family and friends,
13  and things like that.  And we're like, oh, well, I don't get
14  my bonus check until, you know, some companies, maybe the
15  week before the holidays, something like that.  But what do
16  you do? You've got to buy gifts.  You've got to plan events.
17  You've got to do things.  So you're anticipating that bonus.
18  It's coming.  You spend the money anyway.  You spend it now
19  because you know that the money is coming later.  And that is
20  similar to what happened here.

21          Ladies and Gentlemen, Carlos, he was naive.  He was
22  not a savvy investor.  He can't help the way people perceived
23  him.  He wanted to be important.  He wanted to be wealthy.
24  He wanted to rub elbows with these wealthier guys.  And so he
25  was presented with an opportunity and, yeah, he didn't have

1    the cash to do it himself, so he wanted to bring in these

2    people.  And he wanted to help them make money too.  It was

3    not a scheme to defraud Scott Spencer, Cordell Crane, and Ray

4    Yacoub.  There was a scheme to defraud all those people, but

5    this man did not know about it.  He did believe.  He did not

6    intend to deceive.

7            So, then, is this wire fraud?  And the answer is

8    no.  He did not fraudulently take these people's money.  He

9    did not fraudulently remove them from their funds.  He did

10   not commit wire fraud.  And he is not guilty.

11           THE COURT:  Thank you.

12           MR. KUTNICK:  Thank you, your Honor.

13           REBUTTAL ARGUMENT ON BEHALF OF THE GOVERNMENT

14           MR. YOUNG:  Counsel tells you that the defendant

15   did not intend to defraud, that he didn't intend to cheat

16   those victims, because he didn't know about Renaissance,

17   Virginia Worldwide, or Carso.  He didn't know that they were

18   scamming him.  But that's not what this case is about.  It's

19   about the lies he told to Scott Spencer, Cordell Crane, and

20   Ray Yacoub to get their money.  He needed the money that he

21   believed was coming from those investments.  There is no

22   dispute, no dispute, that he was hoping, perhaps ridiculously

23   so, hoping those investments would come through.  Because

24   that was going to give him the money that he needed for his

25   property, the Milwaukee property, that was $20 million in

1    debt at the time.  The bottom line is, he wanted to make

2    these investments, he didn't have the money to do it, and he

3    needed that money.  And that's why he went out and started

4    lying to people.  He decided to gamble.  And I believe

5    counsel told you right at the beginning of this trial that

6    the defendant liked to gamble.  That's exactly what he was

7    doing here.

8              MR. KUTNICK:  Objection.  Your Honor, I'm sorry, I

9    objected.

10             THE COURT:  I'll have to take a sidebar.

11             (At sidebar outside the hearing of the jury.)

12             THE COURT:  All right.  I don't remember.  You're

13   taking it from the opening statement?

14             MR. YOUNG:  From the opening statement, yes, your

15   Honor.

16             MS. ZARDKOOHI:  That's not what was said.  We

17   didn't say he likes to gamble.  We made an analogy to people

18   in desperation of losing money that go on to invest more by

19   gambling.  It was liking to gambling, like noting that there

20   is a majority doing this.

21             MS. KLAMANN:  I believe you stated that Carlos'

22   biggest weakness is gambling.

23             MS. ZARDKOOHI:  No, I did not say that.

24             THE COURT:  Well, I'm just going to tell them that

25   it's -- the jury will decide what was said.  You're not going

1    to --

2                MR. YOUNG:  I'm not going to --

3                MR. KUTNICK:  It was argument anyway, it wasn't

4    evidence.

5                THE COURT:  Well, I think they're allowed to go

6    back to, I think, to refer to what either side said in their

7    opening statement.  Do you disagree?

8                MR. KUTNICK:  No, I guess not, but it was just very

9    mischaracterized by saying that he likes gambling because --

10               THE COURT:  I don't know where he is going with it.

11   Hopefully not far.

12               MR. KUTNICK:  -- it was adding more money

13   afterwards --

14               MS. ZARDKOOHI:  We were referring to --

15               MR. KUTNICK:  -- to make the initial investment,

16   then they would make a secondary investment to get -- to

17   get up --

18               MR. YOUNG:  I won't go back to the gambling, your

19   Honor.

20               THE COURT:  Should I tell them to disregard it?

21               MR. KUTNICK:  I would like that.

22               MR. YOUNG:  That's fine, Judge.

23               THE COURT:  Okay.

24          (Proceedings in open court in the hearing of the jury.)

25               THE COURT:  Please disregard that reference to

1    gambling.

2              MR. YOUNG:  Defendant needed other people's money

3    to make those investments, he didn't have it himself, and he

4    began to lie to get their money.  He began, started the lie

5    about things not that Bob Adams or Larry Gelfond had told

6    him.  About other things.  Things to sweeten the pot about

7    these investments.  And that's what this case is about.

8    That's why you know he had an intent to defraud.  That's why

9    you know that he knowingly participated in these schemes.

10             Let's talk about Scott Spencer's $280,000 that he

11   invested in May and June of 2012.  Leading up to those

12   investments, the defendant was telling Mr. Spencer that he

13   was a multimillionaire, owned a trucking company that had 100

14   trucks, had money in overseas.  You now know that is all

15   false.  And those aren't things that anyone with Renaissance

16   or Carso or Virginia Worldwide told him.  Those are things

17   the defendant made up himself to make it look like he was the

18   type of guy who is going to have access to these sort of

19   special insider -- I'm sorry, not insider -- international

20   trading programs.  His lie.

21             And then he tells Mr. Spencer that he is putting in

22   his own money to the deal.  And he gives specific amounts.

23   $250,000.  Now, counsel told you, oh, he had skin in the

24   game, $20,000 a year later to Virginia Worldwide.  There was

25   no evidence that defendant contributed a single penny to

1    Renaissance Capital.  But he is telling Scott Spencer, I'm
2    putting in my own money.
3             Leading up to the transaction, he is telling Scott
4    Spencer that I have 100 percent control of these deals.  I
5    know the traders.  That's not something that Carso or
6    Renaissance said.  That's not something anyone told him to
7    say.  And he wasn't simply regurgitating that, he was making
8    that up because it made it sound better.  You can trust in
9    these almost outlandish returns because I know.  I know.
10            And then telling them that the money -- telling
11   Mr. Spencer that the money was going for an investment.  Yes,
12   Mr. Spencer and the defendant had some prior dealings with
13   one another.  Mr. Spencer thought that, in many regards, as
14   he told you, the defendant was simply helping him out.  There
15   was never any discussion about the defendant using part of
16   the money for Renaissance to compensate him for other
17   expenses he had.
18            And take a look at some of those other expenses,
19   Ladies and Gentlemen.  Whether it's the minivan, or the
20   condo, or the legal fees, or the phone bill, or the electric
21   bill.  There is no indication that any of that is going
22   towards helping Scott Spencer with the North Dakota project.
23   He was taking that money.  He was taking that money.
24            And counsel says in his closing, and if I at all
25   misspeak, you ultimately, your memory, will prevail.  But I

1    believe counsel said, it's okay to divert money.  It's okay

2    to take money because it's all going to turn out in the long

3    run.

4                MR. KUTNICK:  Objection, your Honor.

5                THE COURT:  The jury will decide what was said.

6                MR. YOUNG:  So I'll steal it now, but if everything

7    turns out, I can put it back, and no one will know.

8    That's -- that doesn't make it okay.  That's fraud.  If you

9    lie to get the money in the first place, the fact that down

10   the road you're hoping this investment will come through and

11   you'll be able to put the money back doesn't negate your

12   intent to defraud.  It doesn't negate the lies that you told.

13               And then the lies continue on and on with

14   Mr. Spencer.  You know, as months go on, he gets him to

15   invest in over $400,000.  Then the lulling lies about the

16   money in Ecuador.

17               Let's turn to Cordell Crane and the lies that the

18   defendant told.  The lies the defendant told him to sweeten

19   the pot.  Cordell Crane invests $50,000 in September of 2012.

20   That's three months after Mr. Spencer's investment.  Three

21   months after.  There have been no returns.  You're getting

22   excuses from Renaissance Capital, Bob Adams, as you've heard.

23   Does the defendant tell Cordell Crane that the money hasn't

24   come through, things are late?  No, he doesn't.  He tells him

25   exactly what he told Mr. Spencer:  This is a sure thing.

1    It's going to happen.  Then he lies to him.  Lies to him in

2    telling him this money is going towards the investment with

3    Renaissance, when it's not.  And he knew it wasn't.  You

4    know, within a day, I believe, when you look at the records,

5    within a day of getting the money from Cordell Crane, the

6    defendant sends it out to Andrew Lee at ALSJ to repay a loan.

7    Tells Crane, your money is going towards an investment, and

8    he sends it somewhere else.  That's a lie.  And that's not a

9    lie anyone else made him or told him to say.  That's a lie he

10   told to get that money because he needed that money.

11          Now, you've heard suggestions or contentions that

12   that was just a loan, and you know it was a loan because it

13   was secured by that property on Ravenswood.  Well, first of

14   all, Ladies and Gentlemen, look at the paperwork itself.

15   That's not what the paperwork says.  The paperwork says,

16   investment.  And the defendant signed that paperwork.  If it

17   was a loan, why wouldn't the paperwork say a loan?  It said,

18   investment.  And the security of the property?  Well, if

19   property is really securing a transaction, you give the

20   person title to the property.  You get a mortgage.  Here,

21   defendant was using a property that he bought a month or two

22   earlier for $28,000 to "secure" the $50,000 so-called loan

23   that was really an investment.  But two months later, a few

24   months later, when Mr. Crane went to look into that property,

25   he found it had already been liened up.  You know, the

1    implication of that was the defendant was using that to
2    pledge for other properties, Ladies and Gentlemen.  Lies.  No
3    one made the defendant say that that investment was going to
4    Bob Adams and Renaissance.  That was the defendant.  No one
5    caused the defendant to send that money somewhere else.  That
6    was him.

7            And the lies continued with respect to Cordell
8    Crane.  As the scheme went on over time and the returns
9    aren't coming back, what does he tell Mr. Crane to lull him,
10   to try to calm him down?  He tells him, don't worry, I have
11   all this money in Ecuador.  I have all this money in Ecuador,
12   and I'm going to bring it up.  Of course, it never comes.
13   And you now know, because he told you from the stand, that he
14   doesn't have that money.  But what does that mean?  Well,
15   it's evidence of his continuing intent to defraud.  It's
16   evidence that he continues to say whatever he wants --
17   whatever he thinks he needs to say at the time to get what he
18   wants.  He wanted to calm down Mr. Crane, so he starts
19   telling him, don't worry, it will be okay, I have other money
20   I can bring up.  It wasn't Bob Adams or Larry Gelfond or
21   Terry Barnes telling him to say that.  That was all the
22   defendant.

23           And Ray Yacoub.  Ray Yacoub, who counsel said was
24   one of the best witnesses in the case, or at least best
25   witness for the defense.  And, again, it's your memory, not

1    my memory that counts, Ladies and Gentlemen.  Let's think

2    about Mr. Yacoub.  He provides $50,000 in June of 2013.

3    $50,000 toward the investment.  This is a year after Scott

4    Spencer's first investment, about ten months, or so, after

5    his second investment of $400,000.  It's roughly eight or

6    nine months after Cordell Crane has put in his money.

7    Nothing has come back.  Spencer and Crane are agitated.  You

8    know, excuses after excuse after excuse.  Does defendant tell

9    Mr. Yacoub that I have this investment opportunity, I hope

10   it's going to turn out, but I'm not sure, we've had all these

11   delays?  No.  He tells his best friend that this is a sure

12   thing.  This is a sure thing.  I have most of my money into

13   it.  $20,000 he has from the trucking company.  Most of my

14   money is in this deal.  Continuing to say, to lie to people

15   to get what he wants because he is hoping that money, that

16   investment, comes through beyond all rational belief.

17          But, nevertheless, Ladies and Gentlemen, he lied to

18   get what he wanted.  His lies.  He was sweetening the pot.

19   He wasn't simply passing on things that he had heard on the

20   phone.  He was telling his victims what he thought they

21   needed to hear to get what he wanted.  That is a scheme to

22   defraud.

23          Now, you heard that a lot of the money did go to

24   Renaissance, a lot of the money went to Virginia Worldwide, a

25   lot of the money went to Palmore Legal Services.  We told you

1    that up front.  We showed you the charts.  It doesn't mean

2    anything.  It simply means he was hoping for the payoff so he

3    could replace the money he had taken.  But that doesn't

4    negate the scheme that occurred here.  And along the way,

5    though, he was pocketing a lot of it himself, as you heard,

6    with no indication that he had ever talked about any of those

7    things with Mr. Spencer or Mr. Crane.  They believed this was

8    going towards investments.

9            Counsel suggests the witnesses are lying.  Judge

10   Bucklo is going to instruct you about the things you need to

11   consider when you assess the credibility of witnesses.

12   Things like their demeanor.  Things like their -- whether

13   they have a reason to lie.  The other evidence in the case.

14   And I ask you to do that.  Certainly, whether it's

15   Mr. Spencer, or Mr. Crane, or Mr. Yacoub, none of them are

16   happy that they've lost money in this deal.  They were upset.

17   But, I mean, they're not getting that money back.  The

18   evidence you have seen in this case has shown, that money is

19   gone.  It went to Renaissance and Palmore and some into the

20   defendant's pocket.  They're not getting that money back.

21   Consider their demeanor against the demeanor of the defendant

22   when he took the stand.  I invite you to do that.

23           And also, think about -- think about the other

24   evidence you've heard in this case.  You know, Mr. Spencer

25   tells you how he is approached by the defendant.  This is a

1    sure thing.  It's 100 percent guaranteed.  Mr. Crane tells

2    you essentially the same thing.  Mr. Yacoub.  They're all

3    telling you about the same pitch.  Are there differences?

4    Yes.  And he is certainly getting different amounts of money

5    from both.  And he is sweetening the pot here and there, no

6    doubt about it.  But all consistent, all telling you the same

7    thing, about lies above and beyond just what he was getting

8    from the people he was talking on those phone calls with.

9              And let's talk about those recordings a little bit.

10   You know, counsel mentioned them, didn't want to talk about

11   them too much, he said, but the five recordings.  You know,

12   there were -- because it's relevant.  First of all, at the

13   end of the day, there is not much on there I think that

14   should affect your decision, Ladies and Gentlemen.  And I say

15   that because the lies in this case were all the defendant's,

16   not things he was being told by those individuals.

17             But, nevertheless, in assessing the credibility of

18   the defendant, I ask you to think about those recordings.

19   And I do that because, on direct examination, you know, they

20   played five calls for you.  A couple were from Bob Adams in

21   early 2012.  The other three were from Larry Gelfond and Bob

22   Adams, in 2013, towards the end of the scheme.  And on direct

23   examination, the defendant said that, when playing call

24   No. 3, which I believe was in April 2013, at this time I

25   played the recording for Mr. Spencer and Mr. Crane because

1    they were getting upset about the fact that things were

2    taking so long.  They were getting agitated.  And I played

3    this for them to sort of alleviate their concerns.  Now, of

4    course, neither Mr. Crane nor Mr. Spencer had any

5    recollection of ever hearing any recordings.  But, then, on

6    cross-examination, when I asked him, well, why didn't you

7    play the recordings sooner?  All of a sudden he testified

8    that, well, I had been playing recordings for them all the

9    long.  You know, the 100 or so recordings that I had made, I

10   had been playing all along.  He was just saying whatever he

11   thought people wanted to hear at the moment.  Just like when

12   he was talking and getting money from Spencer, Crane and

13   Yacoub.

14            Ladies and Gentlemen, the defendant needed money

15   for his building and his other projects.  He wanted to make

16   those investments.  He started lying to the people who knew

17   him and the people who trusted him.  You know, counsel sort

18   of made comments about, why did these witnesses give him

19   money?  Because they trusted him.  You know, they believed

20   him.  And he misled them.  He lied to them, purposely, to get

21   their money.  That is a scheme to defraud.  And that is his

22   scheme to defraud and his scheme to defraud only.

23            I thank you for your time and attention.  We all

24   appreciate your service.  We know it is a significant

25   inconvenience.  The case will now be yours.  You will be

1    instructed on the law, and then you will have the opportunity

2    to go back and make a decision.  When you go back to

3    deliberate, on behalf of myself, on behalf of my colleague,

4    Ms. Klamann, and on behalf of Special Agent Jill Pettorelli

5    of the FBI, we ask that you return the only verdict

6    consistent with the evidence you have heard in this case, a

7    verdict of guilty on both counts.  Thank you.

8              THE COURT:  Thank you.

9              All right.  I'm now going to pass out the jury

10   instructions.  I'm going to read them to you, but I want to

11   give you a copy, it is easier to follow.

12             Members of the jury, I'm now going to instruct you

13   on the law that you must follow in deciding this case.  I

14   will give you each a copy to use in the jury room.  You must

15   follow all of my instructions about the law, even if you

16   disagree with them.  This includes the instructions I gave

17   you before the trial, any instructions I gave you during the

18   trial, any instructions I am giving you now.

19             As jurors, you have two duties.  Your first duty is

20   to decide the facts from the evidence that you saw and heard

21   here in court.  This is your job, not my job or anyone else's

22   job.

23             Your second duty is to take the law as I give it to

24   you, apply it to the facts and decide if the government has

25   proved the defendant guilty beyond a reasonable doubt.

1    You must perform these duties fairly and

2    impartially.  Do not let sympathy, prejudice, fear, or public

3    opinion influence you.  In addition, do not let any person's

4    race, color, religion, national ancestry, or gender influence

5    you.

6    You must not take anything I said or did during the

7    trial as indicating that I have an opinion about the evidence

8    or about what I think your verdict should be.

9    The charges against the defendant are in a document

10   called an indictment.  You will have a copy of the indictment

11   during your deliberations.

12   The indictment in this case charges that the

13   defendant committed the crime of wire fraud.  The indictment

14   contains two counts.  The defendant has pleaded not guilty to

15   the charges.

16   The indictment is simply the formal way of telling

17   the defendant what crimes he is accused of committing.  It is

18   not evidence that the defendant is guilty.  It does not even

19   raise a suspicion of guilt.

20   The defendant is presumed innocent of the charges.

21   This presumption continues throughout the case, including

22   during your deliberations.  It is not overcome unless, from

23   all the evidence in the case, you are convinced beyond a

24   reasonable doubt that the defendant is guilty as charged.

25   The government has the burden of proving the

1    defendant's guilt beyond a reasonable doubt.  This burden of

2    proof stays with the government throughout the case.

3            The defendant is never required to prove his

4    innocence.  He is not required to produce any evidence at

5    all.

6            You must make your decision based only on the

7    evidence that you saw and heard here in court.  Do not

8    consider anything you may have heard or seen outside of the

9    court, including anything from any newspaper, television,

10   radio, Internet, or any other source.

11           The evidence includes only what the witnesses said

12   when they were testifying under oath, the exhibits that I

13   allowed into evidence, and the stipulations that the lawyers

14   agreed to.  A stipulation is an agreement that certain facts

15   are true or that a witness would have given certain

16   testimony.

17           Nothing else is evidence.  The lawyers' statements

18   and arguments are not evidence.  If what a lawyer said is

19   different from the evidence as you remember it, the evidence

20   is what counts.  The lawyers' questions and objections

21   likewise are not evidence.

22           A lawyer has a duty to object if he thinks a

23   question is improper.  If I sustained objections to questions

24   the lawyers asked, you must not speculate on what the answers

25   might have been.

1    If, during the trial, I struck any testimony or
2    exhibits from the record, or told you to disregard something,
3    you must not consider it.

4    Give the evidence whatever weight you decide it
5    deserves.  Use your common sense in weighing the evidence,
6    and consider the evidence in light of your own everyday
7    experience.

8    People sometimes look at one fact and conclude from
9    it that another fact exists.  This is called an inference.
10   You are allowed to make reasonable inferences, so long as
11   they are based on the evidence.

12   You may have heard the terms "direct evidence" and
13   "circumstantial evidence."  Direct evidence is evidence that
14   directly proves a fact.  Circumstantial evidence is evidence
15   that indirectly proves a fact.

16   You are to consider both direct and circumstantial
17   evidence.  The law does not say that one is better than the
18   other.  It is up to you to decide how much weight to give to
19   any evidence, whether direct or circumstantial.

20   Do not make any decisions simply by counting the
21   number of witnesses who testified about a certain point.

22   You may find the testimony of one witness or a few
23   witnesses more persuasive than the testimony of a larger
24   number.  You need not accept the testimony of the larger
25   number of witnesses.

1    What is important is how truthful and accurate the

2  witnesses were and how much weight you think their testimony

3  deserves.

4    Part of your job as jurors is to decide how

5  believable each witness was, and how much weight to give each

6  witness's testimony, including that of the defendant.  You

7  may accept all of what a witness says, or part of it, or none

8  of it.

9    Some factors you may consider include:

10    The intelligence of the witness;

11    The witness's ability and opportunity to see, hear

12  or know the things the witness testified about;

13    The witness's memory;

14    The witness's demeanor;

15    Whether the witness had any bias, prejudice, or

16  other reason to lie or slant the testimony;

17    The truthfulness and accuracy of the witness's

18  testimony in light of the other evidence presented;

19    And inconsistent or consistent statements or

20  conduct by the witness.

21    Certain summary charts were admitted in evidence.

22  You may use those summary charts as evidence.

23    It is up to you to decide how much weight to give

24  to the summaries.

25    If you have taken notes during the trial, you may

1    use them during deliberations to help you remember what
2    happened during the trial.  You should use your notes only as
3    aids to your memory.  The notes are not evidence.  All of you
4    should rely on your independent recollection of the evidence,
5    and you should not be unduly influenced by the notes of other
6    jurors.  Notes are not entitled to any more weight than the
7    memory or impressions of each juror.

8              The defendant has been accused of more than one
9    crime.  The number of charges is not evidence of guilt and
10   should not influence your decision.

11             You must consider each charge and the evidence
12   concerning each charge separately.  Your decision on one
13   charge, whether it is guilty or not guilty, should not
14   influence your decision on any other charge.

15             Counts One and Two of the indictment charge the
16   defendant with the crime of wire fraud.  In order for you to
17   find the defendant guilty of those charges, the government
18   must prove each of the following elements beyond a reasonable
19   doubt.

20             1.   That the defendant knowingly devised or
21   participated in a scheme to defraud, as described in the
22   indictment; and.

23             2.   That the defendant did so with the intent to
24   defraud; and.

25             3.   The scheme to defraud involved a materially

1  false or fraudulent pretense, representation, or promise;
2  and.

3  4.  That for the purpose of carrying out the
4  scheme or attempting to do so, the defendant caused
5  interstate wire communications to take place in the manner
6  charged in the particular count under consideration.

7  If you find from your consideration of all the
8  evidence that the government has proved each of these
9  developments beyond a reasonable doubt as to the charge you
10  are considering, then you should find the defendant guilty of
11  that charge.

12  If, on the other hand, you find from your
13  consideration of all the evidence that the government has
14  failed to prove any one of these elements beyond a reasonable
15  doubt as to the charge you are considering, then you should
16  find the defendant not guilty of that charge.

17  The person acts knowingly if he realizes what he is
18  doing and is aware of the nature of his conduct, and does not
19  act through ignorance, mistake, or accident.  In deciding
20  whether the defendant acted knowingly, you may consider all
21  of the evidence, including what the defendant did or said.

22  A scheme is a plan or course of action formed with
23  the intent to accomplish some purpose.

24  A scheme to defraud is a scheme that is intended to
25  deceive or cheat another and to obtain money by means of

1    materially false or fraudulent pretenses, representations or

2    promises.

3           A materially false or fraudulent pretense,

4    representation, or promise may be accomplished by the

5    concealment of material information.

6           In considering whether the government has proven a

7    scheme to defraud, the government must prove that one or more

8    of the false or fraudulent pretenses, representations, or

9    promises charged in the portion of the indictment describing

10   the scheme be proved beyond a reasonable doubt.  The

11   government, however, is not required to prove all of them.

12          A false or fraudulent pretense, representation

13   promise, or concealment is "material" if it is capable of

14   influencing the decision of the person to whom it was

15   addressed.

16          It is not necessary that the false or fraudulent

17   pretense, representation, promise or concealment actually

18   have that influence or be relied on by the alleged victim, as

19   long as it is capable of doing so.

20          A person acts with intent to defraud if he acts

21   knowingly with the intent to deceive or cheat the victim in

22   order to cause a gain of money to the defendant or another.

23          The wire fraud statute can be violated whether or

24   not there is any loss or damage to the victim of the crime or

25   gain to the defendant.

1   The government need not prove that the scheme to
2   defraud actually succeeded.
3   A wire transfer of funds constitutes a transmission
4   by means of wire communication.
5   The government must prove that interstate
6   communication facilities were used to carry out the scheme,
7   or were incidental to an essential part of the scheme.
8   In order to cause interstate wire communications to
9   take place, the defendant need not actually intend that use
10  to take place.  You must find that the defendant knew this
11  use would actually occur, or that the defendant knew that it
12  would occur in the ordinary course of business, or that the
13  defendant knew facts from which that use could reasonably
14  have been foreseen.  However, the government does not have to
15  prove that the defendant knew that the wire communication was
16  of an interstate nature.
17  The defendant need not actually or personally use
18  interstate communication facilities.
19  Although an item communicated interstate need not
20  itself contain a fraudulent representation or promise or a
21  request for money, it must carry out or attempt to carry out
22  the scheme.
23  Each separate use of the interstate communication
24  facilities in furtherance of the scheme to defraud
25  constitutes a separate offense.

1    The indictment charges that the crimes happened "on

2    or about" certain dates.  The government must prove that the

3    crimes happened reasonably close to the dates.   The

4    government is not required to prove that the crimes happened

5    on these exact dates.

6    In deciding your verdict, you should not consider

7    the possible punishment for the defendant.  If you decide

8    that the government has proved the defendant guilty beyond a

9    reasonable doubt, then it will be my job to decide on the

10   appropriate punishment.

11   Once you are all in the jury room, the first thing

12   you should do is choose a foreperson.  The foreperson should

13   see to it that your discussions are carried on in an

14   organized way and that everyone has a fair chance to be

15   heard.  You may discuss the case only when all jurors are

16   present.

17   Once you start deliberating, do not communicate

18   about the case or your deliberations with anyone except other

19   members of your jury.  You may not communicate with others

20   about the case or your deliberations by any means.  This

21   includes oral or written communication, as well as any

22   electronic method of communication, such as telephone, cell

23   phones, smart phone, iPhone, Blackberry, computer, text

24   messaging, instant messaging, the Internet, chat rooms,

25   blogs, websites, or services like Facebook, LinkedIn,

1    YouTube, Twitter, or any other method of communication.

2          If you need to communicate with me while you are

3    deliberating, send a note through the court security officer.

4    The note should be signed by the foreperson, or by one or

5    more members of the jury.  To have a complete record of this

6    trial, it is important that you do not communicate with me

7    except by a written note.  I may have to talk to the lawyers

8    about your message, so it may take me some time to get back

9    to you.  You may continue your deliberations while you wait

10   for my answer.  Please be advised that transcripts of trial

11   testimony are not available to you.  You must rely on your

12   collective memory of the testimony.

13         If you send me a message, do not include the

14   breakdown of any votes you may have conducted.  In other

15   words, do not tell me you are split 6-6, or 8-4, or whatever

16   your vote happens to be.

17         A verdict form has been prepared for you.  You will

18   take this form with you to the jury room.

19         I'll just go over it a little bit.  The verdict

20   says:  With respect to the following charges in the

21   indictment, we, the jury, find the defendant Carlos R Meza:

22         Count One, there is a box for not guilty and a box

23   for guilty.  You would check one.

24         Count Two, again, it says not guilty, and it says

25   guilty.

1    There are then places for each of you to sign and

2    date the form when you have reached unanimous agreement.

3        Advise the court security officer once you have

4    reached a verdict.  When you come back to the courtroom, the

5    clerk will read the verdict aloud, or I will.

6        The verdict must represent the considered judgment

7    of each juror.  Your verdict, whether it is guilty or not

8    guilty, must be unanimous.

9        You should make every reasonable effort to reach a

10   verdict.  In doing so, you should consult with each other,

11   express your own views, and listen to your fellow jurors'

12   opinions.  Discuss your difference with an open mind.  Do not

13   hesitate to re-examine your own view and change your opinion

14   if you come to believe it is wrong.  But you should not

15   surrender your honest beliefs about the weight or effect of

16   evidence solely because of the opinions of your fellow jurors

17   or just so that there can be a unanimous verdict.

18       The twelve of you should give fair and equal

19   consideration to all the evidence.  You should deliberate

20   with a goal of reaching an agreement that is consistent with

21   individual judgment of each juror.

22       You are impartial judges of the facts.  Your sole

23   interest is to determine whether the government has proved

24   its case beyond a reasonable doubt.

25       All right.  We will now -- we will excuse you to

1   the jury room.  I will ask that our two alternates stay

2   behind for a minute, and then I will let you get your coats.

3   That will be Asmidia Gutierrez and Lori Delmar.

4          And, let's see, we need to swear John.

5      (Court Security Officer sworn.)

6          THE COURT:  Let's see, couple more things.  One,

7   lunch should arrive in about an hour.  And I, of course,

8   never know how long a jury will be out.  If it gets to be

9   toward the end of the day and you decide that you wish to go

10  home, just let us know, and you will come back tomorrow

11  morning at whatever reasonable time you decide that you want

12  to come back.  Exhibits and anything else you need will be

13  sent back in a little while.

14          All right.  Thank you.

15      (Jury out.)

16      (Alternate jurors excused.)

17          THE COURT:  So I would like you to put the

18  exhibits, just to make sure it's on the record, that you

19  agreed as to what all is going back.  And you have a redacted

20  copy of the indictment, I assume?

21          MR. YOUNG:  Yes, your Honor.

22          THE COURT:  Okay.  Just make sure that you have

23  phone numbers.

24          THE CLERK: Okay.

25          MR. KUTNICK:  I have reviewed the government's

1    exhibits going back, I have no objection.

2              MR. YOUNG:  I've reviewed their exhibits, same.

3         (Jury retired at 11:08 a.m. to deliberate on its

4         verdict.)

```
 1                 IN THE UNITED STATES DISTRICT COURT
                     NORTHERN DISTRICT OF ILLINOIS
 2                          EASTERN DIVISION

 3                                   )
        UNITED STATES OF AMERICA,    )   Case No. 17 CR 281
 4                                   )
                       Plaintiff,    )
 5                                   )
                  vs.                )   Chicago, Illinois
 6                                   )   December 6, 2018
        CARLOS R. MEZA,              )   2:23 p.m.
 7                                   )
                       Defendant.    )
 8

 9                               VOLUME 3
              TRANSCRIPT OF PROCEEDINGS - Jury Trial
10        BEFORE THE HONORABLE ELAINE E. BUCKLO, and a Jury

11
        APPEARANCES:
12
        For the Plaintiff:        MR. JOHN R. LAUSCH, JR.
13                                UNITED STATES ATTORNEY
                                  BY:  MR. RICK D. YOUNG
14                                     MS. KAITLIN KLAMANN
                                  Assistant United States Attorneys
15                                219 South Dearborn Street
                                  Chicago, Illinois  60604
16
        For the Defendant:       MR. JOSHUA B. KUTNICK
17                                900 West Jackson Boulevard # 5
                                  Chicago, Illinois  60607
18
                                  AND
19
                                  LAW OFFICE OF MINA ZARDKOOHI
20                                BY:  MS. MINA ZARDKOOHI
                                  53 West Jackson Boulevard
21                                Suite 1615
                                  Chicago, IL 60604
22
23      Court Reporter:          SANDRA M. MULLIN, CSR, RMR, FCRR
                                  Official Court Reporter
24                                219 S. Dearborn Street, Room 2260
                                  Chicago, Illinois  60604
25                                (312) 554-8244
                                  sandra_mullin@ilnd.uscourts.gov
```

1    (Proceeding heard in open court. Jury out.)

2         THE COURT:  I better just -- I'll read it for the

3    record, and then I'm going to just hand this over.

4         So, "Your Honor, we, the jury, have a question

5    regarding Count One.  The original 200,000 --" it says,

6    "invested," obviously investment -- "by Scott Spencer, are we

7    to take into account the events that occurred later in 2012,

8    and into 2013, in regards to determining that Carlos Meza

9    knowingly participated in a scheme to defraud Mr. Spencer of

10   this first $200,000, including his additional investments?

11   Thank you, foreman and jury, William Gora."

12        MR. YOUNG:  Judge, I think the answer to the

13   question is yes.  I mean, the charge is an ongoing scheme.

14   They can consider evidence throughout the period of the

15   scheme.  Obviously they need to find that he was knowingly

16   participating in the scheme at the time of the charged

17   execution and that he had the requisite intent to defraud, at

18   that time, but, yes, it is a -- it is a continuous course of

19   conduct, and they can consider evidence from the entire

20   period, both for purposes of determining, you know, his

21   intent -- his intent and knowledge to participate in the

22   scheme.

23        THE COURT:  Hand me the note.  So to determine what

24   his intent was at that time.

25        MR. KUTNICK:  My suggestion, your Honor, would be

 1   just to advise them to -- that they've heard the evidence and
 2   to continue deliberating.
 3           THE COURT:  Well, that doesn't give an answer.
 4   Actually, it's a fair question.
 5           MR. KUTNICK:  So, your Honor, can I just ask?  My
 6   interpretation of that is, they're asking, can they use other
 7   facts that they've heard in the trial to determine guilt or
 8   innocence on Count One, or state of mind.
 9           THE COURT:  Actually, I should pull out the
10   indictment.  The indictment in Count One has to do --
11           MR. YOUNG:  With the May 2012 wiring.
12           THE COURT:  -- with Mr. Spencer, and the other one
13   has to do with --
14           MR. YOUNG:  Mr. Crane, yes. Count One, is the
15   May -- I forget the exact date, 16th or 19th, wiring of the
16   $200,000 by Mr. Spencer.  Count Two is the $50,000 wiring by
17   Mr. Crane in September, 2012.  The date is May 16th of 2012.
18           THE COURT:  Well, just briefly, a two-minute
19   version, take me through -- so -- what they're considering.
20   So they're considering these later, much -- actually, much
21   larger investment.
22           MR. YOUNG:  There were a series of false statements
23   made, you know, even after the wirings, including, for
24   example, lulling statements.  Such as the, you know, the
25   statement about the Ecuadorian funds, and the like.  I think

1  their question is, can they consider that later evidence as

2  evidence of his intent to defraud.  And I believe the answer

3  to that is, yes.  All the evidence introduced in this period

4  related to the time period of the scheme in the indictment.

5  Those are not, you know, other facts.

6          I think you do need to qualify it and make clear

7  that, you know, while they may consider evidence from

8  throughout the scheme, they need to find that he possessed

9  the requisite intent and had the requisite knowledge at the

10  time of the execution.  But I think they can consider that

11  evidence in determining whether he possessed an intent to

12  defraud both then and during the earlier aspects of the

13  alleged scheme.

14          THE COURT:  Well, let me just ask what you would

15  say if -- what if, actually, he hadn't intended at the time?

16  What if he was just also incredibly gullible.

17          MR. YOUNG:  If he did not --

18          THE COURT:  And later -- but later, he realized, oh

19  gee, I've lost their money and -- and I don't want to tell

20  them, so what you're calling later statements of lulling.

21  Would you still say that that made him guilty of the fraud

22  there?  I don't know that it --

23          MR. YOUNG:  I would not, your Honor.

24          THE COURT:  Okay.  So that's why we would need to

25  make it very clear.

1    MR. YOUNG:  He must have the requisite intent --

2    THE COURT:  At the time.

3    MR. YOUNG:  -- at the time of the execution.

4    THE COURT:  Right.

5    MR. YOUNG:  And my position is they can consider

6    the evidence from the entire scheme in determining whether or

7    not he had that intent at that time.  But, absolutely, I

8    agree, your Honor, he must have that intent at the time of

9    the charged executions.

10   THE COURT:  What would we -- how would we make that

11   clear, if we were going to -- I don't know that a simple --

12   MR. YOUNG:  I would propose -- oh, I'm sorry.

13   THE COURT: I'm not sure that a simple yes would

14   adequately say what we're agreeing would be the law.

15   MR. YOUNG:  No, I agree, your Honor.  I would

16   propose that:  You may consider evidence from the entire

17   period of the alleged scheme in determining whether or not

18   the government has satisfied the elements of the offense.

19   However, you must find that the defendant -- that the

20   government -- that the defendant had the requisite knowledge

21   and intent as set forth in the elements at the time of the

22   charged execution; namely, May of 2012, and September of

23   2012.  I don't have the exact dates.

24   MR. KUTNICK:  Judge, since I think this could

25   actually cut both ways for either side, I actually am

1    agreeing with the prosecution.

2              THE COURT:  Okay.  Here.  Do you need a piece of

3    paper, or you have one?  Why don't you see if you can write

4    out --

5              MR. KUTNICK:  There should be a succinct --

6              THE COURT:  -- all of this and then see if you can

7    agree.

8              MR. KUTNICK:  Okay.

9              THE COURT:  Maybe that would be the best way.

10             MR. YOUNG:  Judge, here is our proposal.  The

11   writing is mostly mine, so I apologize in advance.

12             MR. KUTNICK:  I think the word "with" might have

13   been missing somewhere too.

14             MR. YOUNG:  Probably.  Knowing me, probably.

15             THE COURT:  You know, I've never known, when I

16   looked at this this morning, I've never known wiring was a

17   word.

18             MS. ZARDKOOHI:  It is now.

19             MR. KUTNICK:  The verb is, to wire.

20             THE COURT:  If it's going to be from me, can we

21   just use -- is there a word?

22             MR. YOUNG:  I think if you want to substitute

23   something for wiring, I think that's fine, your Honor.  I

24   don't think there would be an objection to that.

25             MR. KUTNICK:  No.  I'm sure we could tinker with

1    the grammar.

2            THE COURT:  It's a minor thing, but we could change

3    it to wire transmissions, which is what you put later; right?

4    Is that what the issue is?  Or that's the time?

5            MR. YOUNG:  Yes, the date in there, your Honor, is

6    the date of the --

7            THE COURT:  You may consider any evidence you heard

8    in the trial in determining whether the government has met

9    its burden of proof with respect to all of the elements of

10   the offense, including evidence that occurred after the date

11   of the alleged -- maybe what we should say $200,000

12   investment?

13           MR. KUTNICK:  Or wire transmission in Count One?

14           THE COURT:  Is that -- okay.

15           MR. YOUNG:  That's fine.

16           THE COURT:  However, you must find that the

17   defendant possessed the requisite mental state, namely

18   knowledge and with intent to defraud.  Is that the way you

19   want to say it?  Mental state, knowledge and -- why did you

20   put a "with?"

21           MR. KUTNICK:  And with intent to defraud.

22           Oh, you can take out with, then, I guess.  That

23   was --

24           THE COURT:  Whichever you want.  At the time of the

25   alleged wire transmission, so you have a plural.  Is it more

1   than one?

2            MS. ZARDKOOHI:  No, it's one.

3            MR. YOUNG:  It should be singular.

4            MR. KUTNICK:  One wire transmission.

5            THE COURT:  On May 16, 2012, in order for him to be

6   found guilty.

7            MR. KUTNICK:  I don't know, Judge.  Actually, as

8   I'm hearing it, I just think the wording of -- I mean, I

9   think it's correct, but I think that I would like to re-word

10  the second part of it.

11           THE COURT:  That's why it's always good to hear.

12           MR. KUTNICK:  Okay.  So, your Honor, the way I

13  would -- I would switch it, for my position, is, I would say,

14  however, you must -- however, if you find that the defendant

15  did not possess the requisite mental state, namely, knowledge

16  and intent to defraud at the time of the alleged wire

17  transfer on May 16, 2012, then you must find him not guilty.

18           MR. YOUNG:  Of that count.  That's fine.

19           MR. KUTNICK:  Of that count, yes.

20           MR. YOUNG:  Of Count One.

21           THE COURT:  Okay.  Did you change it?

22           MS. ZARDKOOHI:  Just one second, Judge.

23           THE COURT:  You can take as long as you want, but I

24  have known jurors to come back with verdicts while people

25  were going over -- arguing about language.

1          MR. KUTNICK:  Okay.

2          THE COURT:  Are you changing it again?

3          MR. KUTNICK:  No.

4          MS. ZARDKOOHI:  No, just that last sentence.

5          THE COURT:  All right.  This is what, we will just,

6     to confirm, this is what you've agreed on because I will get

7     it typed.

8          Yes, you may consider any evidence you heard in the

9     trial in determining whether the government has met its

10    burden of proof with respect to all of the elements of the

11    offense, including evidence that occurred after the dates of

12    the alleged wire transmission in Count One.

13         However, if you do not find that the defendant

14    possessed the requisite mental state, namely, knowledge and

15    intent to defraud, beyond a reasonable doubt at the time of

16    the alleged wire transmission on May 16, 2012, you must find

17    him not guilty.

18         Is that agreed, that this is what I should send

19    back to them?

20         MR. YOUNG:  It's agreed by the government, your

21    Honor.

22         MR. KUTNICK:  Agreed by defense.

23         THE COURT:  Okay.  I'll get it typed and have

24    somebody give the jury the note.  Thank you.

25         MR. KUTNICK:  Thanks, Judge.

1          THE COURT:  Okay.  Thank you.

2          It would probably be best if you stayed around.  I

3    find that, once juries start to ask questions, they sometimes

4    ask more.

5          MR. KUTNICK:  We're across the hall.

6          THE COURT: Okay.

7       (In open court. Jury in at 3:42 p.m.)

8          THE COURT:  Please be seated.

9          Mr. Gora, do you speak for the jury?

10         THE FOREPERSON:  Yes.

11         THE COURT:  Has the jury reached a unanimous

12   verdict?

13         THE FOREPERSON:  Yes, your Honor, we have.

14         THE COURT:  All right.  Then if you could just hand

15   up the verdict.

16         All right.  I am now going to read the verdict.

17   Please pay close attention to it, as you may be asked whether

18   the verdict as published constitutes your individual verdict

19   in all respects.

20         With respect to the following charges in the

21   indictment, we, the jury, find defendant Carlos Meza:

22         Count One, not guilty.

23         Count Two, guilty.

24         It is signed by all of the jurors.

25         Does anybody wish to have the jury polled?

1        MR. KUTNICK:  Yes, your Honor, I do.

2        THE COURT:  Okay.  Tawana Dearing, does the verdict

3   as published constitute your individual verdict in all

4   respects?

5        JUROR DEARING:  Yes, it does.

6        THE COURT:  Donald Longmire, does the verdict as

7   published constitute your individual verdict in all respects?

8        JUROR LONGMIRE:  Yes, it does.

9        THE COURT:  Javier Passeri, does the verdict as

10  published constitute your individual verdict in all respects?

11       JUROR PASSERI:  Yes, it does.

12       THE COURT:  Jeseyra Alcantar, does the verdict as

13  published constitute your individual verdict in all respects?

14       JUROR ALCANTAR:  Yes, it does.

15       THE COURT:  Andrea Caruso, does the verdict as

16  published constitute your individual verdict in all respects?

17       JUROR CARUSO:  Yes.

18       THE COURT:  Alexander Chavez, does the verdict as

19  published constitute your individual verdict in all respects?

20       JUROR CHAVEZ:  Yes.

21       THE COURT:  Kevin Novy, does the verdict as

22  published constitute your individual verdict in all respects?

23       JUROR NOVY:  Yes, it does.

24       THE COURT:  William Gora, does the verdict as

25  published constitute your individual verdict in all respects?

1            JUROR GORA:  Yes, your Honor.

2            THE COURT:  Yolanda Bell, does the verdict as

3   published constitute your individual verdict in all respects?

4            JUROR BELL:  Yes, your Honor.

5            THE COURT:  Lynn Sturznickel, does the verdict as

6   published constitute your individual verdict in all respects?

7            JUROR STURZNICKEL:  Yes, it does.

8            THE COURT:  Wyndell Robinson, does the verdict as

9   published constitute your individual verdict in all respects?

10            JUROR ROBINSON:  Yes, your Honor.

11            THE COURT:  Karen Gatewood, does the verdict as

12   published constitute your individual verdict in all respects?

13            JUROR GATEWOOD:  Yes, it does.

14            THE COURT:  All right.  In that case, I will ask

15   the clerk to file the verdict, and we will enter the verdict

16   as it has been rendered.

17            I want to thank you, all of you, very much for your

18   service, for your attention, and for your careful

19   consideration of all of the evidence.

20            I will follow you back to your jury room.  I

21   promise not to keep you for any length of time at all, but I

22   do have some certificates I'd like to give you, and I'd like

23   to individually thank you.  I will be right there.

24            All right.  Thank you.

25            COURT SECURITY OFFICER:  All rise.

1      (Jury out at 3:46 p.m.)

2              THE COURT:  So I should set -- Maria will give you

3      a time and --

4              THE CLERK:  Sentencing set for February 28, 2019,

5      at 10:30.  Defendant's sentencing memorandum and objections

6      due February 14th.  Responses due February 21st.

7              THE COURT:  All right.

8              MR. YOUNG:  Thank you, Judge.

9              THE COURT:  Thank you.  It's nice to have people

10     who are very confident and very polite and I think respectful

11     of the jury and of everybody before me.  So thank you very

12     much.

13             MR. KUTNICK:  Thank you, your Honor.

14             MR. YOUNG:  Thank you, Judge.

15         (Which were all the proceedings heard.)

16                          CERTIFICATE

17        I certify that the foregoing is a correct transcript

18     from the record of proceedings in the above-entitled matter.

19

20     /s/ *SANDRA M. MULLIN*                    January 11, 2018

21     SANDRA M. MULLIN, CSR, RMR, FCRR
       Official Court Reporter

22

23

24

25