```
                   IN THE UNITED STATES DISTRICT COURT
                     NORTHERN DISTRICT OF ILLINOIS
                           EASTERN DIVISION


                                      )
   UNITED STATES OF AMERICA,          )    Case No. 17 CR 281
                                      )
                    Plaintiff,        )
                                      )
             vs.                      )    Chicago, Illinois
                                      )    June 13, 2019
   CARLOS R. MEZA,                    )    10:46 a.m.
                                      )
                    Defendant.        )


                 TRANSCRIPT OF PROCEEDINGS - Sentencing
                BEFORE THE HONORABLE ELAINE E. BUCKLO


   APPEARANCES:

   For the Plaintiff:        HON. JOHN R. LAUSCH, JR.
                             United States Attorney
                             BY:  MR. RICK D. YOUNG
                                  MS. KAITLIN KLAMANN
                             Assistant United States Attorneys
                             219 South Dearborn Street
                             5th Floor
                             Chicago, Illinois  60604

   For the Defendant:        MR. JOSHUA B. KUTNICK
                             900 West Jackson Boulevard # 5
                             Chicago, Illinois  60607


   Also Present:             MS. LAURA O'CONNOR, US Probation




   Court Reporter:           SANDRA M. MULLIN, CSR, RMR, FCRR
                             Official Court Reporter
                             219 S. Dearborn Street, Room 2260
                             Chicago, Illinois  60604
                             (312) 554-8244
                             sandra_mullin@ilnd.uscourts.gov
```

1     (Proceedings heard in open court:)

2          THE CLERK:  Calling 17 CR 281-1, USA versus Carlos

3     Meza.

4          MR. KUTNICK:  Good morning, your Honor.  Joshua

5     Kutnick on behalf of Carlos Meza.

6          THE COURT:  Good morning.

7          MR. YOUNG:  Good morning, your Honor.  Rick Young,

8     appearing on behalf of the United States.

9          THE COURT: Good morning.

10         PROBATION OFFICER:  Good morning, your Honor.

11    Laura O'Connor on behalf of US Probation.

12         THE COURT:  Good morning.  Okay.  Let's begin.  We

13    have a number of objections.

14         All right.  The first one was the enhancement for

15    substantial financial hardship.  As I understand it, you

16    agree that it's technically applicable, so I don't believe --

17    it seems like it's applicable.

18         MR. KUTNICK:  I think I can concede that it's

19    technically applicable, your Honor.  But the reason why I

20    object to it is because I feel that the guidelines treat this

21    in -- when it comes to the loss amount calculation, as I

22    described in my memorandum, the two-point enhancement did

23    not -- did not previously exist, and it's because they had

24    made an adjustment of the loss amounts.  So, your Honor, I

25    just -- I put that in there briefly because, though

1    technically it does apply, of course, your Honor knows we're

2    asking for probation in this matter, and I just wanted to

3    point out that the guidelines do treat this in another area,

4    which is the loss amount.

5              THE COURT:  Okay.  But, in this case, it wouldn't

6    make any difference in terms of the guideline calculation for

7    where he would come in on the guidelines.

8              MR. KUTNICK:  It seems as though that the

9    adjustments that were made in the guidelines make it a wash.

10             THE COURT:  Okay.  Well, we'll leave it, then.

11             Nobody is arguing for obstruction, so we won't put

12   that in.

13             Acceptance of responsibility.  This is not the

14   exceptional case.  He chose to go to trial, which is his

15   right, but the guidelines say no acceptance.

16             The main issue it seems like we've got here is this

17   loss amount that we need to deal with in terms of mostly --

18   partly in terms of restitution.

19             PROBATION OFFICER:  Your Honor, before you

20   continue, could you just clarify about the substantial

21   financial hardship, whether or not you're applying that

22   enhancement or not.  I didn't hear --

23             THE COURT:  Yes.

24             PROBATION OFFICER:  You are?  Okay.  Thank you.

25             MR. KUTNICK:  And, your Honor, could I just briefly

1    talk about acceptance before we move onto --

2                THE COURT:  Yes, you may.

3                MR. KUTNICK:  And I went in great detail in my
4    memorandum, and I'm not going to reiterate that about all the
5    things that Carlos has done from the beginning.  And the
6    reason why I think that it is the exceptional case, your
7    Honor, is because this was not a person who came in and said,
8    I didn't do this, I had nothing to do with this, you're
9    wrong.  He said, yes, I did A, and B, and C, and D.  From
10   Day 1 he did that, your Honor.  He did it when he talked to
11   the government prior to his charging, or right after his
12   charging.  I wasn't involved.  He did it on the witness
13   stand.  And he has been consistent all along.

14               The only thing that he has ever denied, your Honor,
15   is his knowledge of the fraudulent scheme.  And I think that
16   the jury's verdict -- and I know what the jury's verdict is
17   worth, what it's worth.  But it does reflect at least their
18   belief after hearing the evidence of his lack of knowledge at
19   the outset.  And so, therefore, everything that he has been
20   saying from the beginning is true.  It admits conduct.  He
21   just does not admit that knowledge of an intent to defraud.
22   Your Honor, that is --

23               THE COURT:  Are you pointing to a particular point
24   in time, though, as opposed to throughout the whole length of
25   it?

1    MR. KUTNICK:  Well, I think that if he is going to

2    be granted acceptance of responsibility, then his position

3    should have, as it was, been consistent from the outset of

4    the case all the way up until now.

5    THE COURT:  You could not know something was

6    fraudulent to begin with and still obtain money by fraud,

7    which makes sense of the -- of what the jury decided.

8    MR. KUTNICK:  I think what your Honor is saying,

9    and I agree, is that the jury most likely felt that at the

10   onset of the incident that Carlos was not aware of the intent

11   to -- the fraudulent scheme.  But as time went on, he perhaps

12   should have been aware.  And I think that that is why they

13   found him guilty of Count 2.

14   MR. YOUNG:  May I respond, your Honor?

15   THE COURT:  Yes, why don't you respond.

16   MR. YOUNG:  The essential element of a mail fraud

17   charge is that not simply the defendant obtained money as

18   part of a scheme, but that he participated in the scheme

19   knowingly and with an intent to defraud.  And the jury found

20   that with respect to Count 2; that beyond a reasonable doubt,

21   not that he should have known, but that he did know and that

22   he acted with that intent to defraud.  And from the beginning

23   of this case, through the trial, through the presentence

24   investigation, and right here today at sentencing, at least

25   in the memoranda that were filed and leading up to

1    sentencing, defendant still contains that he never knew

2    anything, that he never sought to defraud anyone.  To suggest

3    that he is entitled to acceptance of responsibility because

4    he acknowledged some underlying facts is not consistent with

5    the law.

6              As your Honor knows, you know, in these types of

7    cases, we're frequently faced with the sort of acknowledgment

8    or agreements about what happened.  It's really -- the case

9    really stems on what the defendant knew and when he knew it.

10   He has always denied that.  The guidelines are clear that a

11   defendant is not entitled to acceptance of responsibility if

12   he has required the government to prove an essential element

13   of the offense.  He went to trial, completely his right to do

14   so, of course, your Honor.  But he made us prove to a jury

15   beyond a reasonable doubt that he acted knowingly and with an

16   intent to defraud.  He is simply not entitled to acceptance.

17             THE COURT:  I agree.  Let's go on to the next

18   thing.

19             Okay.  Loss amount.  You know, the one part --

20   well, I don't know, let's see.  So how much do you people

21   differ?  I guess you differ quite a bit.

22             MR. KUTNICK:  We do.

23             THE COURT:  Well, then, we're going to have to go

24   through each one.  I will tell you the only -- the part that

25   I -- you'd have to really convince me on is, when a jury says

1    not guilty, I am not inclined to essentially overrule them,

2    even if technically maybe I can.  So I think we have to

3    take -- I am going to take out that part.  Anything else, we

4    can talk about.

5              MR. YOUNG:  All right.  So with respect to the

6    $280,000 that Mr. Spencer provided in May and June of 2012,

7    your Honor would want to exclude that from the loss amount?

8              THE COURT:  Yes.  But anything else let's -- okay.

9    So you are -- let's see, where are we?

10             MR. YOUNG:  That would not have an effect on the

11   guideline range.

12             THE COURT:  No, I -- but we need to -- we're going

13   to have to figure that out, so.

14             MR. KUTNICK:  Just so I'm clear, your Honor, it was

15   the 280 that was charged in Count 1, that's what we're taking

16   out.  The other money that Spencer invested, that's -- we're

17   still talking about that; correct?  Is that right?

18             THE COURT:  We're still talking about that.

19             MR. KUTNICK:  Okay.

20             THE COURT:  So your argument is only the $50,000

21   involved in Count 2 is all that is the loss amount?

22             MR. KUTNICK:  Yes.  And I go into great detail how

23   we calculated that in my sentencing memorandum.  And these

24   are all expenditures that I believe the government agrees

25   were made.  I mean, this came out of the government exhibits.

1    And I'm looking at Page 5 of my sentencing memorandum, your
2    Honor.

3              THE COURT:  I'm on Page 5.

4              MR. KUTNICK:  And, I mean, if you see, we've laid
5    out the money that he made expenditures of, 107,000.  Those
6    are detailed, and those are reflected in the evidence in the
7    case.  And then Carlos admits to -- well, he also made these
8    payments, so, the payments mainly to ALSJ, Inc., on loan
9    amounts, which would have offset the amount that he took in.

10             So, I mean, kind of simply, your Honor, the 107,000
11   that he -- of expenditures minus his 57,000 shows --
12   that's -- it makes sense that there is Mr. Cordell Crane's
13   50,000 remaining, which Carlos readily admits that he owes
14   that money and that that should be ordered in restitution.

15             Additionally, your Honor, just to explain a little
16   further, if your Honor recalls, there were facts that came
17   out during the trial regarding this loan that was made.  The
18   money that Cordell Crane gave to Carlos Meza was secured by a
19   condo, a property.  There was actually a contract to that
20   effect.  Now, Cordell Crane never availed himself of taking
21   ownership of that condo which had equity that would have
22   covered the loss amount.  I don't know why he didn't do that,
23   but it was there to do.

24             But what happened is that Carlos got a loan of
25   $50,000 on June 19th of 2012, from Renaissance Capital Group.

1    That's the Bob Adams that's way up here that the money -- at
2    least a very large portion of the money was flowing to.  And
3    then Carlos used that loan to -- he did -- he purchased the
4    condo from ALSJ, Inc.  He purchased a van for himself, which
5    he admits.  But he then pays back those loans.  So he
6    accounted for those, your Honor.  Without going too deep into
7    every single number, he would obtain loans, pay off other
8    loans of Crane.  Crane had a loan for a condo, or something,
9    that he owed ALSJ, Inc., 47,500.  Carlos paid ALSJ, Inc.
10   47,500, or 50,000.  There were some fees involved.  But the
11   point is, your Honor, I guess, overall, with loss amount, I
12   have attached to my memorandum -- one moment, please.  Oh, I
13   don't have it on my copy, but I have it here.  This is -- you
14   know these; right?

15          MR. YOUNG:  Yeah.

16          MR. KUTNICK:  This is Government Grand Jury
17   Exhibit 8, your Honor.  And this was -- I don't know if you
18   can see -- if you can see this, Judge.  You don't need to
19   read everything, it's more of the flow of it all.  That, this
20   is Robert Adams, and these are these other entities.  This is
21   Carlos Meza.  And clearly the vast, vast, vast majority of
22   this money went to other entities.

23          THE COURT:  All right.  I can't read it, but it
24   seems to me that was a trial exhibit.

25          MR. KUTNICK:  Well, it was introduced at trial.

1    THE COURT:  Yes.

2    MR. KUTNICK:  It's, actually, just on this point,

3    your Honor, Robert Adams, Terry Barnes and Larry Gelfond are

4    big over-the-top players here.  And that does not mean that

5    Carlos is not responsible for the conduct that he did.  But

6    when we're talking about loss amount, these three gentlemen

7    are extremely -- are relevant to talk about because the

8    government's own flow charts show that the vast majority of

9    the money taken -- invested or taken or paid by the victims

10   did not go to Carlos Meza, it went to these other

11   individuals.  These other individuals conned Carlos Meza

12   initially.  And to attribute those numbers to Carlos' loss

13   amount is unfair.  He -- the investors had -- Crane and

14   Spencer both had the opportunity, and they did their own

15   diligence in order to check these investments out.  Many of

16   the -- most of the investments never even went through

17   Carlos' accounts or any of his entities, Milwaukee McPherson.

18   They were -- these monies were wired directly to other

19   entities controlled by Adams, Barnes and Gelfond.

20        So, your Honor, to attribute all of these dollar

21   amounts to Carlos Meza is really not showing what he is truly

22   responsible for.  And so we're asking you to take a close

23   look at -- I know your Honor did take a close look at our

24   memo and how we broke it down and his admission, and find

25   that the loss amount is not $1.17 million.

1          THE COURT:  Well, I'm trying to figure out exactly

2    where is it that we came up with that number to begin with.

3          MR. KUTNICK:  1.17?

4          MR. YOUNG:  Your Honor, if you look at Page 4 of

5    the government's sentencing memo, we break down all the

6    payments by all the --

7          THE COURT:  All right.

8          MR. YOUNG:  -- purported victims of the offense.

9          THE COURT:  Yes, okay.  All right.  So let's just

10   do it by that.

11         Scott Spencer.  Now, the first one, that was the

12   Count 1, right, the 200,000.

13         MR. YOUNG:  Count 1, yes.

14         THE COURT:  Okay.

15         MR. YOUNG:  And the second payment of 80,000 was

16   closely related to that first payment, your Honor.  As you

17   may recall, Mr. Spencer essentially split them, so I would

18   assume they go hand-in-hand.

19         THE COURT:  Okay.  After that, Randy Stroh.

20         MR. YOUNG:  Right around the same time.  So if your

21   Honor is not inclined to include the payments made by

22   Mr. Spencer in May and June, I would agree that the payment

23   by Mr. Stroh should not be included.

24         THE COURT:  Okay.  Then we get to -- well, I guess

25   there is no dispute about the $50,000 with respect to Cordell

1   Crane.

2              MR. KUTNICK:  Correct.

3              THE COURT:  The second large payment with respect

4   to Scott Spencer on 10/18 --

5              MR. YOUNG:  Your Honor, whatever -- I'm sorry.

6              THE COURT:  Go ahead.

7              MR. YOUNG:  Whatever the jury may have believed at

8   the beginning, certainly by September of 2012, when Mr. Crane

9   provided that $50,000 to the defendant, and thereafter, they

10  concluded that he knew and that he was lying to the victims.

11  He may not have knew everything, but he was certainly

12  misrepresenting the sure-thing in nature of these

13  investments, as he hadn't shared with Mr. Crane the fact that

14  Mr. Spencer had already lost $280,000.

15             Likewise, in October, when he goes back to

16  Mr. Spencer for an additional $400,000, he does not share

17  that Mr. Crane has lost $50,000.  He further sort of

18  sweetened the pot by making misrepresentations, as you recall

19  from trial, that Mr. -- that he, the defendant had been

20  contributing his own funds during this time period.  Again,

21  sweeten the pot to get him to induce.

22             And then we have Mr. Crane's payment, Mr. Spencer's

23  payment.

24             But perhaps even more telling, in the spring of

25  2013, he goes to Thomas George, another person who he met at

1    church, and he represents to Mr. George, as reflected in the

2    documents we have attached, Mr. George, unfortunately,

3    tragically, is deceased, was not available to testify at

4    trial or here, but tells him, I have 100 percent guaranteed

5    investment in an international trading program.  100 percent

6    guaranteed.  Tells him that I had success in these programs.

7    At this point in time, he has lost hundreds of thousands of

8    dollars.  The money of people who Mr. George actually knew,

9    could have gone to talk to, had defendant told him this.  But

10   that's not what he is telling them.  Whatever he may have

11   believed about Mr. Milton, Mr. Adams, and Mr. Gelfond, all

12   these scam artists who were lying to him, he certainly knew

13   at this point in time these were not risk-free investments.

14   These were not the sure-things that were going to come

15   through in a short period of time.  He may have been hoping

16   that, and I don't dispute that because we see where the money

17   goes, but he knew they were not sure-things.  He knew this

18   was a gamble.  And he was lying to these people because he

19   wanted to risk their money, not his.  He wanted to strike it

20   big.  There is nothing wrong with wanting to make a lot of

21   money and wanting to make it really quickly.  But there is

22   when you start lying to other people because you don't want

23   to take the risks that are associated with those types of

24   investments.

25              So, your Honor, as we look at this chart, you know,

1    same thing with Ray Yacoub in June of 2013, $50,000, his

2    life-long mechanic.  He goes to another person who he knew,

3    another person who he trusted, tells him about a sure-thing

4    that's going to pay off in a matter of months.  Tells him

5    that he, the defendant, had put his own money in the deal,

6    just like he had told Mr. Spencer, way back when.  He is

7    making false promises at that point in time.  There is no way

8    he could be representing to anyone that these are investments

9    that are going to come through.  Had he told them everything,

10   you know, I've met these people over the phone and never

11   talked to them, I've lost hundreds of thousands of dollars,

12   I'm hoping this time it's going to come through, give me your

13   money, we wouldn't be here.  But that's not what happened,

14   Judge.  Same with Mr. Tomlinson in August.

15            I submit to your Honor that from September and

16   thereafter, you should find that each of the payments made by

17   each of the purported victims of the people the government

18   submits to are victims should be included, including

19   Mr. Spencer, including Mr. Crane.  You know, even later in

20   the process, when Mr. -- the defendant is going back to

21   Mr. Crane, Mr. Crane is certainly aware of the fact that he

22   has lost some money in the deal.  What he is not aware of is

23   that Mr. Spencer has lost hundreds of thousands of dollars.

24   That Mr. George has lost, you know, tens of thousands of

25   dollars.  That Mr. Yacoub has lost tens of thousands of

1  dollars.  You know, he is spinning them on, it's going to be

2  a sure-thing.  It's going to happen.  It's going to happen.

3  He knows that's not true, your Honor.  These are all victims

4  of the offense, and I -- we submit to you that everyone on

5  this chart after -- including and after Mr. Crane in

6  September of 2012, all those payments should be included.

7  And that would be -- I'm sorry, that would be approximately

8  $881,500.  It would not affect the guideline range, it would

9  affect, obviously, the amount of restitution, your Honor.

10           MR. KUTNICK:  Starting with Cordell Crane, and also

11  Mr. Spencer, they both approached Carlos in order to invest.

12  Carlos did not go out seeking these people, saying, hey, give

13  me money, give me money.  In the Crane situation, they were

14  very, very close family friends, very close.  That's detailed

15  in my memorandum and --

16           THE COURT:  Yes.  No, I remember --

17           MR. KUTNICK:  -- Crane admitted to it on the stand.

18           THE COURT:  -- that testimony.

19           MR. KUTNICK:  He was unemployed at the time.  And

20  he decided to take $250,000 out of his 401K to invest in a

21  time that he was unemployed.  He sat with Carlos in his car

22  during a phone conversation with Larry Gelfond and listened

23  about the investment and decided, I want in.  This was not a

24  predatory thing on Mr. Meza's part.  This was -- he wanted --

25  Carlos didn't have money to invest.  He wanted to make money.

1    He admits he wanted to make money.  But he also wanted to

2    help his friends make money.  And that was the -- the motive

3    for everything.

4            Scott Spencer sent his son to work with Carlos all

5    day, every day, for months, and months, and months to get an

6    idea about, what is happening here?  What are we investing

7    in?  What are we doing?  Scott Spencer did his own diligence,

8    his own investigation.  He had his own personal phone

9    conversations with the Adams, Barnes, Gelfond.  He -- he even

10    admitted on the stand that at trial, Spencer, that he knew

11    that investments carried risk.  So even if Carlos was

12    optimistic about the returns on the investment, that does not

13    mean that he was making absolute, 100 percent ironclad

14    guarantees.  He was optimistic, there is no doubt.  And he --

15    because he had also been manipu -- I'll say persuaded by

16    these other individuals that this was legitimate.

17            Ray Yacoub, who testified at trial also, your

18    Honor, he owns a garage, they were friends of many years.  He

19    was best man at Carlos' wedding.  These relationships show

20    you, your Honor, that this is not a predatory situation where

21    he is trying to get these people's money and stick it in his

22    pocket and run away.  This is a situation where he wanted to

23    make money for himself and his friends, and he believed it.

24    Now, at -- I agree that he was not informing people of money

25    not coming back.  However, he -- he was playing the

1    recordings for them, giving them the information of -- if

2    your Honor recalls, Carlos had recorded many extensive phone

3    conversations with Adams, Barnes and Gelfond that he then

4    played for the victims.

5              THE COURT:  All of them?

6              MR. KUTNICK:  I can't answer that.

7              MR. YOUNG:  I think we have a factual dispute

8    there, your Honor, because at trial both Mr. Crane and

9    Mr. Spencer denied that any recording was ever played for

10   them.  In the reports we've submitted for other individuals,

11   there is no indication that he ever played those -- those

12   tapes for them.  So I think there we have a disagreement

13   about a factual matter.

14             MR. KUTNICK:  But I do believe that, if my memory

15   serves me correct, that Crane did admit to being in the car

16   during that extensive phone conversation, which was not a

17   recording, it was a live conversation.

18             Just to go on with Yacoub, I think that that

19   friendship kind of shows Carlos' benevolent intent, to some

20   degree; that he wants to make money for himself and for these

21   other people.

22             THE COURT:  Well, this is quite a bit after he knew

23   that the money wasn't coming back.

24             MR. YOUNG:  I think going to your friends and

25   getting them to these -- in transactions is not a good thing.

1    It's more reflective of sociopath.  But in any event, your

2    Honor, there is no doubt the victims of the offense, like

3    Mr. Meza, were seduced by the promises of quick returns.  But

4    the victims, unlike Mr. Meza, didn't have all the

5    information.  The victims, unlike Mr. Meza, were dealing with

6    someone they knew, someone they trusted.  Mr. Meza was

7    dealing with people he had never met and essentially --

8            THE COURT:  Okay.  I'm more concerned with his

9    criminal matter, especially.  I mean, his actual

10   misrepresentations.  So his misrepresentations to, let's just

11   go through them, to Mr. Crane were --

12           MR. YOUNG:  Your Honor, he is representing to

13   Mr. Crane that this is a sure-thing.  It is 100 percent

14   guaranteed, that there is no risk.  When, at this point, he

15   has already lost a lot of money.  There is clearly a risk.

16   In addition, he is telling Mr. Crane that all the money has

17   gone into the transaction, when early on that $50,000 deal it

18   has not.  Mr. Spencer in --

19           THE COURT:  That's right.

20           MR. YOUNG:  -- October of 2012, is induced to

21   invest another $400,000.  He is told that his first $280,000

22   is essentially locked up but that this $400,000 will help

23   facilitate the transaction.

24           In conjunction with that, you know, apart from the

25   fact he is not told about the investment made by Mr. Crane

1    that didn't come through, he is told that, by the defendant,

2    that he has been putting in $250,000 a month since the

3    initial investment in May and June in order to keep this all

4    in sort of in the works.  Clear misrepresentation.

5              THE COURT:  Did he tell each one of these people

6    that he had also invested his own money?

7              MR. YOUNG:  He told Mr. Spencer that, and he told

8    Mr. Yacoub.  There was no evidence that he had told that to

9    Mr. Crane, Mr. George.  Mr. George stated that he had the

10   impression the defendant had made money as part of these

11   transactions, but it was -- perhaps there can be some implied

12   conclusion from that that he put his own money in but didn't

13   necessarily say that he put his own money in.  And the same

14   for Mr. Tomlinson.

15             THE COURT:  Remind me why Mr. Crane put in another

16   $250,000 after he hadn't gotten anything back at his earlier

17   one.

18             MR. YOUNG:  He trusted the defendant.  He believed

19   the defendant, that this was going to come through --

20             THE COURT:  He has to believe something --

21             MR. YOUNG:  And that --

22             THE COURT:  -- that was misrepresented; otherwise,

23   it's just his own -- I mean, you take your victim as you find

24   them, and we certainly know from huge -- one fairly famous

25   huge case, I mean, that, you know, you can be greedy and

1    gullable, but, still, there has to be culpable behavior on

2    the part of the defendant.

3              MR. YOUNG:  Mr. Crane at this point in time, your

4    Honor, had already lost $70,000.  That was a lot of money to

5    him.  And at the time that Mr. Meza, the defendant,

6    approached him, he had lost his job.  So he was desperate --

7              THE COURT:  That was true with the very first one,

8    I think.

9              MR. YOUNG:  No, that was -- that was later in

10   connection with the $250,000 --

11             THE COURT:  All right.

12             MR. YOUNG:  -- investment.  You know, he was

13   obviously hoping to recoup.  And Mr. Crane is here and may

14   wish to address the court later, but, and will correct me if

15   I say something wrong, but I think the evidence is that he

16   was looking to make the money back that he had, and he

17   trusted Mr. -- the defendant that it was going to come

18   through.

19             THE COURT:  Okay.  Looking to make the money back

20   and trusting him.

21             MR. YOUNG:  But not being told.  You know, not --

22   being told that this is different this time.  Being told

23   that, I'm dealing with different people than I was the first

24   time but not being told that Mr. George and Mr. Spencer, just

25   within the last few months, had also put money in and that

1   had not come back.  And those deals were also with the same

2   new people that he was purportedly dealing with when he was

3   talking to Mr. Crane in June.

4           So, again, you know, things are different:  I know

5   what I'm doing.  This is going to come through.  Oh, but, by

6   the way, you know, I've gotten an additional $40,000.

7   Although, it wouldn't have been additional because Mr. Crane

8   knew nothing about the other $100,000 or $700,000 Mr. Spencer

9   had contributed.  But I've got another $40,000 from Scott

10  Spencer in April of 2013.  And that was supposed to sort of

11  pay off right away.  Never did.  I got another $60,000 from

12  Thomas George in April, in June, you know, with these same

13  people.  That was supposed to come through, and it never did.

14          Judge, he is making promises that at this point in

15  time are false promises because he knows these are not

16  risk-free, sure-things at this point in time.  And I'm sure

17  if Mr. Crane addresses you today, he would tell you, yes, I

18  should have known that at the point I did this.  You know,

19  you know, I should have arrived at that.  But this isn't

20  about his intent.  We're here about the defendant's intent.

21  And he was lying and concealing things from his victims.

22          THE COURT:  When he got the next -- okay.  When he

23  got the last $250,000 from Cordell Crane, where did that

24  money go?  Is that what you're talking about, that it went

25  straight up to this?

1    MR. YOUNG:  It went to an IOLTA account controlled

2    by -- not controlled by the defendant, by other individuals.

3    But that was actually part of the scheme in the sense that he

4    was telling these people that their money was safe because it

5    was going to a trust account, sort of an escrow account.  And

6    that literally was true, except for the fact that it was then

7    being, you know, taken by the other individuals.

8    MR. KUTNICK:  And nothing being kicked back to

9    Mr. Meza.

10   MR. YOUNG:  That is true.  The $250,000 went to the

11   trust and then went to various locations to other

12   individuals.  Terry Barnes.  You heard some of the names.  I

13   don't think the names are important, but there is no dispute

14   that that money did not flow back to the defendant.

15   THE COURT:  But he knew that, and he knew nothing

16   was coming back.

17   MR. KUTNICK:  He was aware that -- he was aware

18   that he had not -- they had not received returns on the

19   previous investments; however, he was hopeful, based on what

20   he was being told, that these additional investments were

21   going to make everything right to cause everything to go

22   through and have them get their returns.  That's why they

23   continued -- he would -- they would continue to give money

24   after they hadn't received returns.  You see that in victim,

25   after victim, after victim.  Even though they had given

1   money, they still are hopeful.  And the reason that they're

2   hopeful is because Carlos is hopeful, legitimately.  And

3   there were --

4           THE COURT:  But Carlos had -- he had the

5   information.  He knew that nothing was coming -- coming back,

6   and he isn't telling them.

7           MR. KUTNICK:  Well, but each individual knew that

8   they had not received returns on their own investments and

9   then they continued to invest.  And I think that that

10  shows --

11          THE COURT:  Well, it's a fairly, probably, not

12  uncommon reaction that you get desperate and you decide to

13  put more money after -- after other money, thinking that

14  you -- hoping this will work it out.  And now a lot of this

15  money also went for his -- or at least some of it went for

16  his own personal --

17          MR. KUTNICK:  Yes.  And we admit to all of that,

18  your Honor.  It's detailed blow-by-blow.  It's about $47,000.

19          MR. YOUNG:  As your Honor will recall, that was the

20  $50,000.  And then approximately 130 out of the 280,000 that

21  was paid by Mr. Spencer, which I understand you're not

22  including, but approximately 130 of that went to what we

23  would characterize as personal expenditures.

24          From the Spencer payment in October 2012, and

25  thereafter, that money all went into accounts that were

1   controlled by other individuals, and we have no evidence that

2   they were kicking back money to the defendant.  They weren't

3   paying returns, but they weren't paying kickbacks either.

4   And I think counsel would agree with that.

5           MR. KUTNICK:  That's correct.  But we do -- the

6   130,000, was not for personal -- any personal use.  I mean,

7   the things that are in evidence that are detailed that he

8   used for his own personal things --

9           MR. YOUNG:  Although she is not including that, so

10  I don't know if we need to disagree.

11          MR. KUTNICK:  Okay.  Well, your Honor, the point is

12  that he -- and Carlos testified to this, that, you know,

13  he -- he was owed money by Spencer, he testified to, for

14  services that he did when he was on these various -- these

15  projects.  There was a crane project, there was the North

16  Dakota project.  And so some of that money Carlos claims, and

17  he claimed on the stand, that he was actually entitled to as

18  compensation for work that he had done.

19          So in terms of misappropriation of money, we agree

20  that he paid out some personal expenses, some legal expenses.

21  He bought a car.  And I was looking for it in my -- your

22  Honor, I thought I had detailed each thing that he admits

23  responsibility for, which is exactly what the government

24  accused him of actually taking those items.

25          MR. YOUNG:  Well, I think we would agree, your

1    Honor, that there was a disagreement between Mr. Spencer and

2    the defendant about whether or not he was owed money.  At the

3    end of the day, you're not including those counts.

4            THE COURT:  It doesn't make any difference.

5            MR. YOUNG:  So I don't know if it's a disagreement

6    you need to resolve for purpose of the sentencing.

7            THE COURT:  All right.  I don't think we do.

8            What did happen -- just remind me.  What happened

9    with the condo?  I know -- I remember there was testimony

10   that -- who was it, was that Mr. Crane, that he didn't

11   actually try to foreclose, I guess, really, on the condo.

12   But I thought there was something about it that it wouldn't

13   have worked anyway; or was he just talked out of it, or what.

14           MR. YOUNG:  The condo was double-pledged.  It was

15   also pledged for the --

16           THE COURT:  His mother.

17           MR. YOUNG:  -- loan from the hard money lender,

18   ALSJ, I believe it was.  And the condo, I believe, was also

19   gone.  I mean, defendant is shaking his head.  But the condo

20   was gone soon thereafter.  But, regardless, of think whether

21   or not -- this shouldn't be about whether or not Mr. Crane

22   could have mitigated his damages more quickly.  At this

23   period of time that --

24           THE COURT:  I agree.

25           MR. YOUNG:  -- that the condo may have been

1       available, and let's assume it was available for months

2       thereafter, let's assume it was worth the $50,000, he is also

3       being told by the defendant that it's going to come through,

4       it's going to come through, it's going to come through.  He

5       is being essentially lulled, like there is no need to take

6       action because this is going to come through and you're going

7       to make a lot of money.  In January, one of the payments here

8       is, you know, he has gone back to Mr. Crane to tell him, give

9       me another 6500 because this is going to help pay a fee in

10      order to clear up your money.  Same thing a few months later.

11      So I don't think the availability of the condo --

12              THE COURT:  All right.  I agree.  There is really

13      not anything more to talk about on this.

14              But what are we ending up with in terms of numbers.

15              MR. YOUNG:  Your Honor, if you were to include all

16      the amounts paid from September of 2012, which would be items

17      4 through 13 on the chart that is reflected on Page 4 of the

18      government's sentencing memorandum, the total as we have

19      calculated would be $881,500.

20              MR. KUTNICK:  Your Honor, I just want to note that

21      the PSR said that Spencer -- the money Spencer invested does

22      not appear to be invested in any trading program.  But

23      government exhibits show, and I can -- I'll cite them, that

24      $611,250, was transferred, it did go through Milwaukee

25      McPherson, which is Meza's company, but then was transferred

1    to Renaissance Capital Group in 2012.  That's government's

2    Trial Exhibit SC-1, SC-2 and SC-3.

3           Clearly, your Honor -- I would just say that the

4    400,000 for Scott Spencer, and you've already excluded the

5    other 280,000 for him, should not be included.  It's -- there

6    is -- you know, that money went directly to -- not directly,

7    but through Meza, without him taking money out, to

8    Renaissance Capital Group.

9           THE COURT:  Why does that make any difference?  It

10   just means that someplace or other there is somebody else

11   who -- there are people who clearly, based on what I heard,

12   ought to be responsible as well for the fraud.

13          MR. YOUNG:  And we certainly don't disagree that

14   that's something your Honor should consider in fashioning an

15   appropriate sentence, where the money ultimately went and how

16   the defendant profited.  But for purposes of the guidelines,

17   and we're just determining what loss was caused as a result

18   of the scheme that the defendant knowingly participated in, I

19   believe that's appropriately included.

20          THE COURT:  I agree.  Okay.

21          MR. KUTNICK:  And, your Honor, that's -- I -- we

22   respect the court's ruling.  I do want, at some point after

23   we get through the loss amount, talk about these other

24   individuals because it is important as it goes to Carlos'

25   criminal liability.

```
1            THE COURT:  Liability or appropriate sentence?
2            MR. KUTNICK:  Appropriate sentence, obviously.
3            THE COURT:  Okay.  All right.  Right.  We will -- I
4     think we've dealt with the objections now.
5            Okay.  Then I'll listen to the government, and then
6     I'll -- so you know what you need to respond.
7            MR. KUTNICK:  So, your Honor, you are including
8     Items 4 through 13?
9            THE COURT:  Yes.
10           MR. KUTNICK:  And that gives us a total loss amount
11    of -- I think you had it, Rick, didn't you?
12           MR. YOUNG:  $881,500.
13           MR. KUTNICK:  Which is in the same guideline;
14    correct?
15           MR. YOUNG:  Right, yeah.  So it would result in a
16    guideline of 23, including the base offense level of seven,
17    an increase in the loss amount of 14, and then the two levels
18    for substantial hardship.  And then the offense level of 23,
19    in combination with the defendant's criminal history category
20    of one, would result in an advisory range of 46 to 57 months.
21           THE COURT:  Right.  So it doesn't change that.  It
22    was just --
23           MR. YOUNG:  Correct.
24           THE COURT:  -- knowing what we needed to include in
25    a restitution amount.  And then we can talk separately about,
```

1  we will, about, now, the appropriate sentence.  So go ahead.

2  　　　　　MR. YOUNG:  Your Honor, we believe the appropriate

3  sentence would be one in that range, you know, of 46 to

4  57 months.  This was a long-term scheme that involved

5  multiple lies, misrepresentations, false promises to various

6  people, people who trusted the defendant, many -- some of

7  whom suffered substantial hardships and ultimately resulted

8  in, you know, a loss of nearly a million dollars, $800,000.

9  　　　　　He lied repeatedly to those people to get that

10  money.  Yes, he was being told things, and he was seduced by

11  the promises of, you know, very quick and high returns on

12  these investments.  And so were the victims.  But it's the --

13  it's the additional lies or the concealment that puts us

14  here.  The things he did so they can get their money and

15  ultimately subject them to the risks that he was unwilling to

16  take.  You know, the lies about, I'm putting my money into

17  these own deals, which is a very meaningful misrepresentation

18  because that suggests that you have enough competence in this

19  transaction to put, you know, your own money in.  That you,

20  like the person who you're raising money from, has sort of a

21  stake in the game.  You know, he lied to them about,

22  Mr. Crane, about how he was using the money.  You know,

23  telling him this is for the investment, when, in fact, it is,

24  you know, paying off other expenditures.  A flat-out lie, a

25  lie that he denied on the stand, but the jury concluded

1    otherwise.

2              You know, he is not telling, and perhaps even more
3    importantly, about all the money he has already lost.  You
4    know, all the false starts, all the delays.  You know, he is
5    leading them to believe that this has been working, this has
6    been going well.  And he is not even telling them who -- not
7    only is he not telling them about the losses, you know, the
8    man who cares so much about his friends is not even telling
9    him the other people who are investing because he knows that
10   they could simply go and ask because they're all from the
11   same church.  And I think that demonstrates sort of the
12   calculation with which he was doing this.  Who is going to
13   invest, you know, whether it's $50,000, or Mr. George's
14   $60,000, or Mr. Yacoub's $50,000, who is going to invest
15   money in a sure-thing when you know other people have already
16   lost hundreds of thousands of dollars.  Perhaps even more
17   telling, when you know no one, to date, has gotten a single
18   penny on.  No one.  And the defendant certainly knew that.
19   And as much as he was hoping that this would come through and
20   he would make money and they would make money, he knew at the
21   end of the day that no one was going to give him that money
22   if they knew what he knew.  You know, he didn't tell them
23   that, you know -- and, again, this is a disagreement, you
24   know, the defendant will claim otherwise, as he did on the
25   stand.  But he wasn't playing the recordings for them.  And

1   it's ridiculous for him to assert that he did.  The one thing

2   he did admit on the stand is, I was recording these calls

3   because I didn't understand what was going on.  Why would you

4   play those calls for your victims if you can't even reconcile

5   enough about what is going on, what these different plans

6   are, and, you know, instruments, and the like.  He didn't

7   play those for them, Judge.  Another lie.  Mr. Crane,

8   Mr. Spencer denied it.  The defendant claims otherwise.

9          But apart from that, Judge, what is not disputed,

10  and as even Mr. Kutnick acknowledged here today is, he wasn't

11  telling about the other people losing all the money, wasn't

12  even telling them about who else was investing because then

13  they could have found out.  You know, Mr. Kutnick has spent

14  so much time talking about the due diligence the victims have

15  done -- had done.  Why didn't he give him their names?  Why

16  didn't he tell Mr. Crane to go talk to Mr. Spencer?

17  Certainly could have done so.  Why didn't he tell Mr. George

18  to go talk to Mr. Spencer and Mr. Crane?  Because he knew

19  what would happen if he did.  You know, he was keeping

20  everyone sort of compartmentalized because, if they started

21  talking, this would all unravel, and he wouldn't get the

22  money he so desperately wanted to make it big.  He lied to

23  these people knowing that this wasn't, you know, fun money or

24  mad money, whatever the right saying is, Judge.

25          You know, Mr. Spencer, certainly in a better

1    economic position than many of the others.  But, you know,

2    Mr. George, a businessman operating a small business, $60,000

3    is a lot of money.  Mr. Yacoub is a mechanic, $50,000.

4    Mr. Crane, who had already lost money, $250,000, that he knew

5    was out of his retirement account because, as they were

6    sitting in that car, Mr. Crane was telling him how worried he

7    was about this money and how he was afraid that he is going

8    to have to pay the tax on this if he pulls it out of his

9    retirement account.  But don't worry, the defendant told him,

10   that money will be coming through, but didn't mention all the

11   other false starts.

12           And at the end of the day, you know, he did this

13   for no other reason than greed.  I mean, he wanted to help

14   his friends.  He was looking to make money for himself.  And

15   this house wasn't facing foreclosure, as I can tell.  You

16   know, thankfully no children were sick.  You know, his mother

17   was going to lose a building that they were hoping to make a

18   lot of money on.  But he was doing this because he wanted to

19   be something that he is not.  He wanted to be the

20   entrepreneur, the big man, you know, in the church and in the

21   neighborhood that he is not.  He wanted to be the rich guy

22   that he was not.  And he lied to do so.

23           And he has never, to this day, accepted

24   responsibility, from trial, to here, to right now, Judge, for

25   anything, for anything.  You know, friends and family lose

1   hundreds of thousand of dollars, and you come in and you're

2   blaming them.  It's appalling, your Honor.

3            And that acceptance of responsibility, I think in

4   his failure to accept responsibility, he has even

5   demonstrated through -- or perhaps maybe his character has

6   demonstrated through the pre-sentence investigation report.

7   Doesn't provide tax returns to the probation officer.

8   Doesn't provide -- doesn't sign over a credit report.  When

9   he is asked about what he does for a living, very amorphus.

10  Some kind of ride share business where he is paid in cash,

11  but then also talking about how he is a contractor investing

12  in properties, which I guess is sort of his motif:  I want to

13  be something I am not.  But then when the probation officer

14  starts asking questions, well, how many properties?  How are

15  you getting monies?  You know, the story keeps changing.  You

16  know, oh, I -- I have -- I have investors.  Well, who are the

17  investors?  Oh, I don't have investors.  I am trying to

18  obtain financing.  Well, what are the properties?  Oh, I

19  actually don't have any properties, I haven't done this for

20  two to three years.  You know, sort of, as the probation

21  officer made the comment, I think it's very fitting, as she

22  pulled the string from the tapestry, it all unraveled, you

23  know.  She was trained well enough to do that.

24  Unfortunately, the victims in this case were not.  They're

25  not professional interrogators.

1    But, Judge, he stole.  He stole repeatedly.  He

2  lied to the people he knew and trusted, which makes this

3  worse, not better.  A significant sentence is appropriate in

4  this case.  And he does have a criminal history.  It's a

5  misdemeanor, and it occurred right around this time, but it's

6  a forgery conviction.  More dishonesty from someone who is

7  otherwise involved in multiple lies.  This is not

8  aberrational conduct by any sense.  It went on for a long

9  period of time, involved a lot of money, and it's not the

10  only time he lied, Judge.

11    A significant sentence is necessary to reflect the

12  seriousness of the offense, promote respect for the law, to

13  provide just punishment based on his history and

14  characteristics, and to deter others.  At the end of the day,

15  your Honor, you know, apart from the nature of the conduct,

16  which I think is egregious, you know, we're talking about

17  hundreds of thousands of dollars lost.  You know,

18  approximately $880,000.  That is a lot of money, your Honor.

19  You know, the probationary sentence that the defendant is

20  suggesting just does not -- does not comport, in the

21  government's respectful opinion, with the factors set forth

22  in 3553.

23    THE COURT:  Thank you.

24    MR. YOUNG:  I will leave it with that, your Honor.

25    THE COURT:  Go ahead.

1       MR. KUTNICK:  Thank you, your Honor.  Just, first

2   of all, address the government's positions.  Yes, we agree,

3   Carlos I think agrees, that he wanted to be something that he

4   was not.  He wanted to make a lot of money, to be a wealthy

5   person, and he certainly wanted to show himself as a savvy

6   and sophisticated investor.  And he did not have that

7   sophistication.  So that is a misrepresentation that he

8   admits to, your Honor.  But he wanted these victims to get

9   returns.  He also wanted himself to get returns, admittedly.

10      I think that the government is arguing that by not

11  telling one investor that the other investor didn't get his

12  money back, that that demonstrates knowledge of fraud.  I

13  completely disagree.  They were continuing to try, with hope,

14  all of them had hope, that the money would come through.  And

15  it would make sense that Carlos would not want to destroy or

16  dash those hopes by saying, oh, and by the way, this person

17  and this person are still waiting for their money back.

18  Because they were hopeful that they were going to get -- they

19  were going to get returns.

20      Mr. Meza is not blaming the victims in this case.

21  Not at all.  But we have pointed out that they had the

22  opportunity to do due diligence, and they did so.  That's it.

23  It doesn't mean that they are -- it just means that they were

24  not completely fleeced.  The wool was not pulled over their

25  eyes completely.  They were able to see what was going on.

1          The prior conviction, your Honor, the misdemeanor?

2    That was all around the same time.  It was involving these --

3    Andy Lee, who was a witness in this case and was involved

4    with this case.  And it -- I haven't seen all the discovery

5    in the case, but it was a situation where there was confusion

6    regarding payback of a certain loan.  And instead of them

7    coming after Carlos civilly, they decided to go to the

8    criminal court, and a resolution was made.  That's why he

9    ended up pleading guilty to that misdemeanor count, your

10   Honor.

11         The defendant, Carlos Meza, was not part -- was not

12   part of the huge, complex scheme that you had seen through

13   the exhibits.  He was not part of it.  He maybe should have

14   known about it.  He did know for sure that people were not

15   getting returns.  But the law, the statute and the

16   guidelines, contemplate more malicious intent in crimes.

17   People who go out and predatorily go after victims, knowing

18   that they're never, ever going to get anything back, that is

19   a different kind of defendant than Carlos Meza, who actually

20   had legitimate hope.  And I think -- that's why we're asking

21   for probation, your Honor, because his hope was based on the

22   information that he was getting.  And, yes, admittedly, he

23   was not sharing every single piece of information that he

24   had, such as that other investments had not been returned,

25   but he was adequately -- not adequately -- accurately

1    conveying the information that he was being given.  And when

2    he didn't understand something, he would talk to his friends

3    and say, hey, I don't understand this.  What do you -- what

4    do you think this means?

5             He was not part of the complex -- he was -- he was

6    a pawn in the complex scheme.  He was not an orchestrator of

7    the complex scheme.  And the government agrees that these

8    other individuals are people who have responsibility here

9    and for whatever reason have not been held to that

10   responsibility.

11            Your Honor, I'd like to just start, just briefly

12   touch on Carlos', you know, his personal qualities.  I think

13   it's important to note that he is a family person.  We

14   detailed in the sentencing memorandum.  He has three

15   daughters, age 23, 20 and 15.  His oldest daughter is a

16   student at Brigham Young University, and she is set to

17   graduate next year, 2020.  She has done mission work.  She

18   has done an internship with Disney.  And I've included

19   letters from his daughters.  And I'm sure -- I know the court

20   has seen.

21            THE COURT:  Yes.

22            MR. KUTNICK:  His other daughter is currently on a

23   mission, a religious mission, in Washington.  She has

24   traveled to Mexico where she has learned Spanish, and she is

25   returning to college in the fall to complete her

1    undergraduate degree.

2          They also have a 15-year-old daughter who is

3    currently at home, she is in high school.

4          And defendant has talked about his very close

5    relationship with his mother.

6          Your Honor, there are a couple of private things

7    that I would like to share with the court that I have talked

8    to counsel about, and we would like to do it at sidebar and

9    potentially either off the record or under seal.

10         THE COURT:  Well, it won't be off the record.

11         MR. KUTNICK:  Under seal would be fine.

12         THE COURT:  All right.

13         MR. KUTNICK:  It's brief, your Honor.

14    **********PROCEEDINGS HEARD AT SIDEBAR UNDER SEAL************

15    ████████████████████████████████████████████████

16    ████████████████████████████████████████████████

17    ██████████████████████████████████████████████████

18    █████████████████████████████████████████████████

19    █████████████████████████████████████████████████

20    █████████████████████████████████████████████████

21    ████████████████████████████████████████████████

22    ██████████████████████████████████

23        ██████████████████████████████████████████

24    ███████████████████████████████████████████

25    ██████████████████████████████████████████████



```
1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
```

20   ***************END OF SEALED SIDEBAR PROCEEDINGS*************

21        (In open court.)

22        MR. KUTNICK:  Your Honor, I want to talk a little

23   bit about the collateral consequences of imprisonment.  And I

24   know the court is aware it would certainly disrupt a person's

25   life tremendously, but I also want -- also the collateral

1    consequences of this case.  This happened in a church

2    community.  These are people who they know each other.  And

3    Carlos' family has been treated poorly, members of his family

4    have been treated poorly in the church.  They have -- his

5    role in the church has been diminished.  He has suffered

6    things in his community that he will probably never get back,

7    merely as a result of being charged and convicted.  And your

8    Honor can consider those things as punishment that he has

9    received for the acts that he has been found guilty of.

10            If he is imprisoned, your Honor, the family is not

11    going to have the income to maintain the family home.

12    It's -- there is almost no equity in the home as it is.  The

13    mortgage is about $1,800 a month.  And Carlos' wife works as

14    an administrative assistant at a hospital.  And though she

15    does make some money, and it is not an extreme amount of

16    money, and she -- I don't see how she would have any choice

17    but to leave the home or have the home go into foreclosure.

18    That is also something that the court -- I would like the

19    court to consider in determining whether prison is an

20    appropriate option.  This is a -- though Carlos has

21    responsibility in this matter and unavoidably Carlos' family

22    will suffer as a result of this case, by giving him a

23    sentence of probation, your Honor, we can at least try to --

24    will actually give him a chance to try working on his

25    restitution.  Him sitting in a jail cell, in a prison cell,

1    for the next however long does nothing for him to even chip

2    away at this 800,000 restitution amount, which I'm sure will

3    be awarded.

4            Locking him up does not serve the purposes of

5    making whole again the victims.  It does not diminish --

6    probation would not diminish the seriousness of the offense.

7    He would be monitored.  His financials -- he would have to

8    provide information about his financials and where he was

9    making money, how he was making money.  These are all things

10   that I would like the court to consider in determining that

11   probation is the appropriate sentence here.

12           He didn't put any money in his pocket, Judge, not

13   any -- some he did -- some personal expenses, we talked about

14   that.  But when looking at whether or not, like the degree of

15   how bad the case is, how bad it is, and it is bad, and the

16   victims did suffer undeniably, they suffered.  But at least

17   at the outset, the lack of knowledge and the lack of intent

18   makes Carlos Meza different than this kind of intentional

19   predatory person who is knowingly going after people's money.

20   That is not the case here, and that is why probation is an

21   appropriate sentence.

22           THE COURT:  When you were talking about probation

23   and making restitution, he hasn't made any restitution at all

24   at this point; right?

25           MR. KUTNICK:  Well, he has not -- and, actually,

1    your Honor, he has not been ordered to do so, of course, yet.

2    He and I have discussed that, and he asked me, he is like,

3    should I start putting forward money.  And my suggestion, I

4    admit, was, let's see what your Honor orders.  But he

5    absolutely is ready, willing and able to pay whatever

6    restitution amounts he is able to pay.

7             THE COURT:  And he also wasn't exactly forthcoming

8    with probation in terms of what he has been doing, his tax

9    returns, or even his current activities in term of his

10   ability to -- to pay restitution.  I have to say whether --

11   whatever he is doing, he is paying taxes on for that income.

12   I mean, that statement that, well, he says he is paid in

13   cash, or whatever it is, and --

14            MR. KUTNICK:  Your Honor, he had eye surgery.  When

15   was your eye surgery?

16            THE DEFENDANT:  March 30th.

17            MR. KUTNICK:  We had actually continued the

18   sentencing --

19            THE COURT: Right.

20            MR. KUTNICK:  -- because of an eye surgery that he

21   had, and he has been unable to work for several months.

22   That's recently, of course.  But he will be able to work

23   again, once he is recovered from his surgery.

24            In closing, your Honor, the 3553 factors, in

25   looking at Carlos, his personal characteristics, his family,

1   the crime itself.  When you look at all these things, they

2   are not on the scale of egregiousness, the highest, highest

3   most evil crimes.  They're somewhere below that.  And that's

4   why a below-guideline sentence of probation is appropriate.

5   Like I said, putting him in a prison cell for any amount of

6   time does not -- does not make the victims get their money

7   back, does not necessarily deter anybody from -- other people

8   from doing this conduct.  Mr. Meza is already deterred from

9   any kind of conduct.  He has learned so much from this

10  experience about being diligent, looking into things, being

11  suspect of individuals.  Not so trusting.  These people who

12  he trusted were also church members, your Honor, and they had

13  some credibility, in his mind, based on that.

14          For all these reasons, your Honor, we ask that you

15  give him a sentence of probation, you order him to pay

16  restitution, and allow him to get to work right away on

17  trying to get these victims some of their money back.

18          THE COURT:  Thank you.  Do you want to say

19  anything?

20          THE DEFENDANT:  Yes.

21          MR. YOUNG:  May -- your Honor, we do have victims

22  here.  And I'm not sure if they would like to address the

23  court, or not.  I wasn't sure if your Honor would prefer to

24  do that before Mr. Meza allocutes, or not.

25          THE COURT:  If they're going to, it certainly

1    probably should be before.  I will tell you if we -- I guess

2    they have a right.  If they do, we probably will not finish

3    this this morning --

4                MR. YOUNG:  Okay.

5                THE COURT:  -- because I have to be at a meeting at

6    12:15.

7                MR. YOUNG:  Okay.  We have Mr. George's wife here

8    and Mr. Crane.  I'm not sure if they want to address the

9    court, but would either of you like to address the court?

10               Mr. Crane would like to step up, your Honor.  May

11   he step up?

12               MR. CRANE:  Just a couple of things.  I wrote a

13   letter to the parole officer explaining a lot of the impact

14   to my family that has happened due to the actions of Mr. Meza

15   and his family.  It wasn't just Carlos, it's his wife, his

16   mother and others were knowledgeable.

17               THE COURT:  I don't want to hear about his wife --

18               MR. CRANE:  I'm just saying an impact to my family.

19               I was expressly told by Mr. Meza not to do any due

20   diligence or investigate Bob Adams or Renaissance Capital or

21   it would jeopardize the deal.  So what defense counsel was

22   saying with regards to --

23               MR. YOUNG:  One moment.

24               Talk about the impact.

25               MR. CRANE:  Okay.  I will.  Sorry. There was

1    several factual discrepancies that I thought needed to be

2    cleared up, but I will say the impact has been, my -- my

3    impact in the church has been completely changed by Mr. Meza

4    representing that he is still in good standing and other

5    items in the church.  It caused a lot of consternation.  My

6    family is nearly broken up because of this with my wife with

7    trust factors.  I was under the impression with the 250,000

8    that Mr. Meza was doing this solely on his own.  He had

9    learned from others, and that's why that affinity fraud trust

10   was placed because he was going to make good on everything

11   because he directly now was in control of all funds.  He had

12   funds to cover it in Ecuador.  That he would make good if it

13   didn't happen for me.

14            My family, all my kids that are of age or older,

15   now have trust factors with their father.  I have had

16   confidence issues in maintaining work.  I have tax

17   implication problems with the IRS due to the amount that was

18   not returned.  All these impacts are incredibly difficult for

19   me and my family.

20            And I've got a lot of other thoughts, but I'll keep

21   it brief.  That I've learned a lot about the law from this.

22   I'll say one thing, my respect to Mr. Young, he said to me,

23   as we were preparing earlier in the case before it even went

24   to trial, I have a duty to disclose if there is something

25   wrong with your testimony or anything that's not in concert

1    with what you're representing.  And I found that refreshing.

2    The same burden is not with the defense.  I find the

3    defense's testimony appalling to me.  It does not represent

4    the true factor of what happened in my conversations with

5    Mr. Meza and the impact it has had with my family over time.

6            I wish him well that one day he will understand

7    what he has done to others and that he will stop his

8    practices.  It disturbs me to hear that he is still investing

9    and doing and soliciting others.  That he is still trying to

10   do the same things he has done before.  It is my hope that

11   some day Mr. Meza will learn to correct that behavior and be

12   a better person.  And I -- again, all this started in our

13   church.  I saw him solicit others.  Widows, old widows, and

14   others, with funds.  And it's just -- it's just -- there is

15   so much more to tell, but it has been incredibly difficult in

16   all aspects of my life.  I guess I'll leave it at that.  And

17   you have my testimony from the parole officer which outlined

18   the impact statement financially, so I won't repeat that.

19   Thank you.

20            THE COURT:  Thank you.

21            Do you want to go ahead?

22            THE DEFENDANT:  Yeah. Your Honor, counsels, I admit

23   that I was wrong for me to introduce my friends and

24   associates and fellow church members to unscrupulous

25   fraudsters that came into my life, and I'm sorry for it.  But

1    I, too, thought that I was doing the right thing at the time.

2    But it turned out that we were involved in this fraudsters

3    hornets' nest.  Robert Adams, from Renaissance Capital LLC,

4    incorporated his associates such as Alan Milton, Larry

5    Gelfond and Terry Barnes, along with their respective

6    lawyers.  Robert Adams, a church member, had sold himself as

7    a successful individual with a lot of experience in his

8    business.  And he used Alan Milton and several others that we

9    all trusted.  We all did our due diligence before engaging

10   with them.  Larry Gelfond and Terry Barnes, who also sold

11   themselves as professionals in their fields.  But they turned

12   out not to be trustworthy too.

13          We thought that we were safe because funds were

14   transferred in a place in an attorney IOLTA account with each

15   one of my friends in control of their attorney IOLTA account.

16   But later I found out somehow, without anyone's knowledge,

17   funds were released to accounts that these fraudsters

18   controlled.  Now I regret tremendously involving these people

19   in transactions that I foolishly believed in as well as they

20   did.  But at the time it all seemed very legitimate.  I'm

21   sorry for it.

22          But before it all begun, Spencer and Crane listened

23   to numerous recordings of the supposed benefits of it, and

24   also participated in phone calls directly with Robert Adams

25   and Larry Gelfond and Terry Barnes.  Each one of these

1   individuals conducted their own due diligence before getting
2   involved in their investment scheme.  They had as much
3   information as I had -- as I had when deciding to invest.

4   I readily admit I'm responsible for the $50,000
5   loss laid out by attorney.  But even that amount was secured
6   by the real estate, where I placed the condo as collateral.
7   It is not right, and how can I be held responsible for
8   hundreds of thousands of dollars that never went through my
9   hands.  This money was never in my care or under my control,
10  and I never received any share of it.  I never profited from
11  these investments.  I admit that I separately used some funds
12  from the secure loan that I pay off, personal business
13  expenses, but those expenses are covered by the $50,000 loan,
14  that I am responsible for it, and I was secured by the condo
15  pledged as collateral.

16  Crane's loan was secured by the condo located on
17  Ravenswood.  This property was free and clear, unencumbered
18  by any mortgage, which gave him a strong position as
19  collateral against his loan.  However, Crane never took
20  advantage of his financial position and decided to seek a
21  remedy on the loan contract with me by choosing to use the
22  criminal system as a collection agency in regard to it.

23  I understand that people have been hurt.  I feel
24  deeply sorry for the agony and pain that were caused by this
25  situation.  But to hold me totally responsible is unfair.

1   And consider the other factors and circumstances surrounding

2   this matter.  If I am taken away from my family, it would

3   create more hurt and suffering in the situation.  If I'm

4   taken away from my family, it would not help Spencer, nor

5   Crane or others to get their money back from these fraudsters

6   who benefited on all the funds they took.

7           Please, your Honor, allow me to stay with my

8   family.  They need me.  My wife is currently diagnosed with a

9   sickness, and she is going to need extensive treatment.  My

10  youngest daughter is only 15 and has her own personal needs

11  to have both parents present in her life, as my other two

12  daughters had.  My oldest daughter is currently attending

13  college, and she also needs for my assistance and counseling

14  as only parents can provide her.  My middle daughter is

15  currently doing charitable work for 18 months as a missionary

16  for the Church of Jesus Christ Latter Day Saints.  She also

17  needs assistance in many ways.

18          I am dealing with health issue because of the

19  retinal detachment in my eyes can cause blindness.  And I am

20  currently receiving and will continue to need medical

21  attention.

22          Please allow me to endeavor to make things right

23  for everyone.  Please sentence me to probation.  This will

24  allow me to continue to provide the need to support to the

25  family as the person that I have always been.  By sentencing

1    to probation, I can continue to serve and support my family,

2    church and community and the victims themselves as well to

3    help them recoup their funds.  That's all I have to say.

4             THE COURT:  Thank you.  Turning to 3553 factors.

5    The nature and circumstances of the offense is the first

6    thing that I need to look at.  It's really a large amount

7    of -- you know, I mean, it's a large amount, it's a fraud.  I

8    think maybe you were initially on this one as well deceived,

9    but you deceived the people around you.  You know, and you

10   deceived them in some cases, I mean, knowing that it was

11   going to be a hardship for them if they did not get the money

12   back.  And it was pretty callous.

13            Your history and characteristics, you know, I hear

14   a lot of excuses, and, you know, not much acceptance.  And

15   just, you know, even looking at this probation report, I have

16   to say, I am not convinced how you're going to act even going

17   forward.  I suppose, while there isn't much criminal history

18   there, there is, as the government points out, some.  And

19   it's the same kind of -- I mean, it's also dishonesty.

20            In terms of your other characteristics, it sounds

21   like that, from what I understood, that you and your wife are

22   both going to be okay.  The other matter that you told me

23   about at sidebar, I will take into consideration, and that is

24   a mitigating factor that I'm concerned with.

25            So I need for the sentence to reflect the

1   seriousness of the offense and promote respect for the law

2   and provide just punishment, to afford adequate deterrence

3   and to protect the public from further crimes by you, and in

4   the end to impose a sentence that is sufficient but not

5   greater than necessary.

6          I think the punishment in terms of satisfying those

7   factors doesn't need to be the guideline provision.  On the

8   other hand, I cannot justify probation in this case.

9          So pursuant to the Sentencing Reform Act of 1984, I

10  am committing you to the custody of the Bureau of Prisons for

11  a term of 19 months on Count 2.  You are ordered to pay

12  restitution in the amount of $881,500.

13         Upon your release from prison, you will be on

14  supervised release for a term of three years.  Within

15  72 hours of your release from custody, you shall report in

16  person to the probation office in the district in which you

17  are released.

18         I also must impose a $100 special assessment.

19         Mandatory conditions of supervised release are:

20  That you shall not commit another federal, state or local

21  crime.  You shall not unlawfully possess a controlled

22  substance.  You shall cooperate in the collection of a DNA

23  sample, if that is required by law.

24         You have read the proposed discretionary

25  conditions.  Are there any of those that you do not think are

1    appropriate to your client's reintegration?

2              MR. KUTNICK:  I have seen them, and I don't believe

3    we had any objections to them.

4              THE COURT:  All right.  Then, that you seek and

5    work conscientiously at lawful employment or pursue

6    conscientiously a course of study or vocational training that

7    will equip you for employment.

8              That you refrain from knowingly meeting or

9    communicating with any person whom you know to be engaged or

10   planning to be engaged in any criminal activity.

11             That you refrain from possessing a firearm,

12   destructive device or other dangerous weapon.

13             That you remain within the jurisdiction where you

14   are being supervised, unless you are granted permission to

15   leave by the court or a probation officer.

16             That you report to the probation officer as

17   directed by the court or a probation officer.  That you

18   permit a probation officer to visit you at any reasonable

19   time; at home, at work, at school, at a community service

20   location or other reasonable location specified by the

21   probation officer.

22             That you permit confiscation of any contraband

23   observed in plain view of the probation officer.

24             That you notify the probation officer promptly

25   within 72 hours of any change in your residence, employer or

1   work place.  And absent constitutional or other legal

2   privilege, answer inquiries by a probation officer.

3          That you notify the probation officer promptly

4   within 72 hours if you are arrested or questioned by a law

5   enforcement officer.  That if you are unemployed after the

6   first 60 days of supervision, or if unemployed for 60 days

7   after termination or layoff from employment, that you perform

8   at least 20 hours of community service per week at the

9   direction of the US probation office until you are gainfully

10  employed.  The amount of community service shall not exceed

11  200 hours.

12         That you not incur new credit charges or open

13  additional lines of credit without the approval of a

14  probation officer, unless you are in compliance with the

15  financial obligations imposed by this judgment.

16         That you provide a probation officer with access to

17  any requested financial information necessary to monitor

18  compliance with conditions of supervised release.

19         That you notify the court of any material change in

20  your economic circumstances that might affect your ability to

21  pay restitution, fines or special assessment.

22         That you provide documentation to the IRS and pay

23  taxes as required by law.

24         That you pay the financial penalty that is imposed

25  and remains unpaid at the commencement of the term of

1    supervised release.  Your monthly payment schedule shall be

2    in an amount that's at least ten percent of your net monthly

3    income defined as income net of reasonable expenses for basic

4    necessity, such as food, shelter, utilities, insurance and

5    employment-related expenses.

6              That you not enter into any agreement to act as an

7    informer or special agent of a law enforcement agency without

8    the permission of the court.

9              That you notify, as directed by the probation

10   officer, third-parties the risks that may be occasioned by

11   your criminal record or personal history or characteristics

12   and shall permit the probation officer to make such

13   notifications and to confirm your compliance with such

14   notification requirement.

15             You have 14 days to file a notice of appeal, and we

16   need to give you a reporting date.

17             MR. KUTNICK:  Your Honor, regarding a surrender

18   date, he is still recovering from his eye condition, his

19   surgery.  He also has his state case that is pending, which

20   he anticipates going to trial in September.  We would be

21   asking for a surrender date in late October.

22             THE COURT:  All right.  I think that's all right.

23   But I have to say, if that state case -- state cases could

24   get continued.

25             MR. KUTNICK:  Of course.

1        THE COURT:  And I am not going to continue it.

2        MR. KUTNICK:  Understood, your Honor.

3        THE COURT:  Okay.

4        MR. YOUNG:  One other matter, your Honor, just an

5   administrative matter, and your Honor may have asked this at

6   the beginning, and I've forgotten, so I apologize, but, I

7   don't know if -- I can't recall if the defendant was asked

8   whether or not he had the opportunity to read the PSR and

9   discuss it with his counsel, as required under the law.

10       THE COURT:  All right.  Did you read the PSR and

11  did you have the opportunity to discuss it with counsel, and

12  have we gone over everything that -- where you had any

13  objections?

14       THE DEFENDANT:  I believe so.

15       MR. KUTNICK:  Yes, we did, your Honor.

16       THE COURT:  Okay.  Thank you.

17       MR. YOUNG:  Thank you, Judge.

18       THE COURT:  All right.

19       MR. KUTNICK:  Are you giving an exact date, your

20  Honor?

21       THE COURT:  Yes, we do need to give you a date.

22       THE CLERK:  October 31st, 2019.

23       THE COURT:  Okay.  All right.

24       MR. YOUNG:  Thank you, your Honor.

25       THE COURT:  Thank you.  Thank you, everybody.

1          MR. KUTNICK:  Thank you, your Honor.

2          (Which were all the proceedings heard.)

3                          CERTIFICATE

4          I certify that the foregoing is a correct transcript

5     from the record of proceedings in the above-entitled matter.

6     */s/Sandra M. Mullin*                    *July 1, 2019*
      Sandra M. Mullin, CSR, RMR, FCRR
7     Official Court Reporter

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25