```
1              IN THE UNITED STATES DISTRICT COURT
                  NORTHERN DISTRICT OF ILLINOIS
2                      EASTERN DIVISION

3                                   )
   UNITED STATES OF AMERICA,        )   Case No. 17 CR 281
4                                   )
                   Plaintiff,       )
5                                   )
             vs.                    )   Chicago, Illinois
6                                   )   December 3, 2018
   CARLOS R. MEZA,                  )   9:00 a.m.
7                                   )
                   Defendant.       )
8
                EXCERPT TRANSCRIPT OF PROCEEDINGS
9                Voir Dire and Opening Statements
       BEFORE THE HONORABLE ELAINE E. BUCKLO, and a Jury
10

11  APPEARANCES:

12  For the Plaintiff:        MR. JOHN R. LAUSCH, JR.
                              UNITED STATES ATTORNEY
13                            BY:  MR. RICK D. YOUNG
                                   MS. KAITLIN KLAMANN
14                            Assistant United States Attorneys
                              219 South Dearborn Street
15                            Chicago, Illinois  60604

16  For the Defendant:        MR. JOSHUA B. KUTNICK
                              900 West Jackson Boulevard # 5
17                            Chicago, Illinois  60607

18                            AND

19                            LAW OFFICE OF MINA ZARDKOOHI
                              BY:  MS. MINA ZARDKOOHI
20                            53 West Jackson Boulevard
                              Suite 1615
21                            Chicago, IL 60604

22
    Court Reporter:          SANDRA M. MULLIN, CSR, RMR, FCRR
23                           Official Court Reporter
                             219 S. Dearborn Street, Room 2260
24                           Chicago, Illinois  60604
                             (312) 554-8244
25                           sandra_mullin@ilnd.uscourts.gov
```

1    (Proceedings heard in open court. Venire out.)

2    THE CLERK: 17 Criminal 281, United States versus

3    Carlos Meza, for jury trial.

4    THE COURT:  Good morning.

5    MR. YOUNG:  Good morning, your Honor.  Rick Young

6    and Kaitlin Klamann on behalf of the United States.

7    THE COURT:  Good morning.

8    MS. ZARDKOOHI:  Good morning, Judge.  Mina

9    Zardkoohi on behalf of Carlos Meza.  And my partner is in the

10   building, I'm hoping.  He called about ten minutes ago, said

11   that he should be there right at 9:00.  He didn't know about

12   the courtroom change, but he does know now, so.

13   THE COURT:  Oh, I mean I said we would be going

14   someplace.  All right.  Well, they've gone down to get the

15   jury, so.

16   MS. ZARDKOOHI:  Okay.

17   THE COURT: I just want to make sure -- see if we

18   had any issues that we needed to deal with before they come

19   in because, when they come in, I'll start.

20   MR. YOUNG:  I don't believe we do, your Honor.  We

21   had some discussions over the weekend, but nothing that was a

22   disagreement or anything like that.

23   MS. ZARDKOOHI:  Not that I'm aware of for today,

24   no. None, Judge.

25   THE COURT:  I did wonder, when I saw your list of

1    exhibits, I just want to make sure, I mean, the number of

2    jurors that I've arranged to have here is with what you had

3    told me would be, you know, a three, four-day trial.

4              MR. YOUNG:  Judge, I believe it will be.  You know,

5    we've eliminated a couple of witnesses.  I think we're in the

6    area of, like, seven or eight.  I'm very sure that we will

7    rest on, you know, Wednesday, or if there is court on

8    Wednesday, I don't know, with the National Day of Mourning;

9    or Thursday, if not.

10             THE COURT:  Is there some danger that there is not

11   going to be?

12             MR. YOUNG:  Well, it's my understanding that

13   President Trump is closing federal offices on Wednesday.  We

14   will obviously be here, but.

15             THE COURT:  Well, I don't know that he has the

16   authority to close the courts.  I'm not sure.

17             MR. YOUNG:  That -- I imagine he does not, your

18   Honor.  So I'm just saying, you know, I'm not sure what the

19   courts are going to do.  But, in any event --

20             THE COURT:  Well, I hadn't heard anything about it.

21   Yeah, I briefly -- I've forgotten about that.

22             MR. YOUNG:  But, in any event, assuming court is in

23   session on Wednesday, your Honor, I would expect that we

24   would rest no later than sometime on Wednesday.  It may even

25   be Wednesday morning.

1          THE COURT:  Okay.  That's good.

2          MS. ZARDKOOHI:  Judge, so far our only witness, if

3   he testifies, is the defendant.  The number of exhibits was

4   partly including potentially a bit for impeachment.  Just to

5   be entirely open out there, we included those.

6          THE COURT:  Okay.

7          MS. ZARDKOOHI:  But the number of exhibits really

8   is only as to the testimony of Carlos Meza, in case he

9   decides to.  We haven't decided at this point.

10          THE COURT:  Okay.  Well, he is in the building, I

11   assume?

12          MS. ZARDKOOHI:  I'll text him now again.  Do you

13   mind, Judge, if I --

14          THE COURT:  Okay.  Well --

15          MR. YOUNG:  Your Honor, just so you know, Special

16   Agent Jill Pettorelli of the FBI will be sitting with us at

17   table.

18          THE COURT:  Good morning.

19          SPECIAL AGENT PETTORELLI:  Good morning.

20          THE COURT:  Okay.  You're 15 minutes late.

21          MR. KUTNICK:  I thought it was 9:15.

22          THE COURT:  No.  The order said 9:00.

23          MR. KUTNICK:  Oh, I'm very sorry, your Honor.  I

24   thought it was 9:15.

25          THE COURT:  And the jury is waiting.  Okay.  We

1    will give him a second to get his coat off, and then we will
2    bring them in.
3               MR. KUTNICK:  I really apologize, your Honor, to
4    everybody.  I had no idea.
5               THE COURT:  It's always a lot easier to get a jury
6    if you get an early jury.  Okay.  We can bring them in.
7          (Prospective Jurors in.)
8               THE COURT: Okay.  Do you want to swear the jury.
9               THE CLERK:  Please raise your right hand.
10         (Prospective Jurors sworn.)
11              THE COURT:  All right.  Please be seated.  Good
12   morning.  I'm Judge Elaine Bucklo.  I will be presiding over
13   this case.  So you are here as prospective jurors, and I want
14   to talk to you for just a minute about why this is so
15   important.
16              First, we fought a Revolution so that you could sit
17   here today.  The American Colonists went to courts where the
18   King in Parliament had restricted the right of the Colonists
19   to have jury trials in some types of cases.  This is one of
20   the reasons for the events of July 4, 1776.  Your presence in
21   this courtroom is a living symbol of the birth of our nation.
22              And, second, there is no country that entrusts as
23   much to juries as this Nation does.  The American way with
24   juries speaks to the world that we trust our citizens to
25   decide important cases to do justice under law.  Jury service

1    demonstrates the faith of democracy, that we are competent to
2    govern ourselves.

3             And, third, the faithful performance of jury
4    service is crucial to the persons in this lawsuit.  Even if
5    our juries were not the result of the American Revolution and
6    were not a symbol of our self-rule, your presence and your
7    work here would still matter.

8             Now, this case has been brought by what is called
9    an indictment filed by the government against the defendant.
10   It should be understood that an indictment is not evidence,
11   and it does not create any inference that the defendant is
12   guilty of what the government claims.

13            During the course of the trial, you will
14   undoubtedly, at times, hear objections made the lawyers.  It
15   is their duty to do so when they think it should be done, and
16   it is a help to the court.  And its purpose as part of our
17   system is to have the case heard on the issues and to keep
18   out irrelevant and immaterial matters.  So, as jurors, you
19   should not hold any objection against either the government
20   or the defendant or think that either side is improperly
21   trying to keep something from you.

22            Do not hold it against either side that I either
23   uphold or overrule an objection.  If a question is unanswered
24   because I uphold an objection, you must not draw any
25   inferences or conclusions from the question itself as to what

1    you think that answer might have been.

2            Now, we're going to go about trying to make sure

3    that the jurors who are going to hear this case will be fair

4    and impartial and render a just verdict.  As the first step

5    in that process, we want to find out a little bit about each

6    of you.  So I am going to ask you in turn, all of you, to

7    provide a short autobiographical statement covering, as

8    you'll see on the piece of paper you have in front of you,

9    your name, the neighborhood or town that you live in, and

10   other places that you've lived for the last ten years.

11           Your present employment or self-employment, giving

12   us the name of your employer, if you are not self-employed.

13   The business in which the employer is engaged, and what you

14   do as part of that business.  Tell us how long you have been

15   employed.  And if you've had other employment in the last ten

16   years, if you would tell us that too.

17           Please tell us what your education has been.

18           Please tell us if you are married, and if you are

19   married, if your spouse is employed outside of the home,

20   please tell us what kind of work your spouse does.

21           Also, we'd like to know how old your children are.

22   And if they're grown up and they're working outside the home,

23   or they're working, I'd like to know what kind of work

24   they're doing.

25           I would also like to know your hobbies and major

1    interests.

2            Your primary source for news.

3            The names of any organizations of which you are a

4    member.

5            And whether you have previously served as a juror;

6    and, if so, how long ago.

7            My experience is that when people stand we can see

8    them and hear them better.  So I'm going to ask you, just for

9    this part of it, to stand while you're giving us your

10   miniature who's who.

11           All right.  First thing, I trust we have everybody

12   in order, but we will begin here.  I think it should be

13   Mr. Allen.

14           PROSPECTIVE JUROR ALLEN: Good morning, your Honor.

15   My name is Dustin Allen.  I live in Schaumburg.  I used to

16   live in Wheeling a couple of years ago.  And from 2010 to

17   2013, I lived in Tallahassee, Florida.  And prior to that, I

18   lived in Pittsburgh, Pennsylvania.

19           I'm currently an associate attorney at Lynch Law

20   Offices.  I've been there about a month, and I essentially

21   manage the bankruptcy practice, client intake, motions,

22   court, all that.  Prior to that employment, I worked for

23   about five years at David Siegel & Associates, also doing

24   bankruptcy work.  And prior to that, I was a tutor for high

25   school kids.

1          THE COURT:  I'm sorry, prior to that what?

2          PROSPECTIVE JUROR ALLEN: I was a tutor for high

3     school kids.

4          THE COURT:  Okay.

5          PROSPECTIVE JUROR ALLEN: My undergraduate degree is

6     in biochemistry, and I've got a law degree.

7          I am married.  My spouse does not work outside of

8     the home.  I've got two kids, ages three and one.

9          Hobbies, I like to play hockey.

10          Primary source of news, internet sources like New

11     York Times and Washington Post, and other internet news

12     aggregation sites.

13          Other than the bar associations, I don't think I'm

14     a member of any organization.

15          And I have not previously served on a jury.

16          THE COURT:  Thank you.  Ms. Dearing.

17          PROSPECTIVE JUROR DEARING:  Good morning, your

18     Honor.  My name is Tawana Dearing.  I live in the South

19     Deering area.

20          I'm a certified nursing assistant.  I have been for

21     over the past 17 years.  I work for Custom Home Health.  I do

22     live-in care.

23          My education is, I have a high school diploma.  I

24     have my Certified Nursing Assistant license.

25          No, I'm not married.  I'm single.  I have twin boys

1    that's the age of 17.

2            My hobbies are reading.  I like movies.

3            My source of news, internet, CNN, Channel 9.

4            And I'm not a part of any organizations.

5            And, no, I've never served on a jury before.

6            THE COURT:  Thank you.

7            PROSPECTIVE JUROR WIEGAND:  Good morning, your

8    Honor.  My name is Emily Wiegand.  I live in Mount Prospect.

9    I've been living there for five years.  Prior to that, I

10   lived in Chicago.

11           I work for the law firm Winston & Strawn.  I'm an

12   attorney recruiting and development manager there.  I worked

13   there since 2006, but I worked at Schiff Harden, another law

14   firm, from 2014 to 2017, and then I returned to Winston &

15   Strawn for the past few years.  And in my job, I recruit

16   lateral associates and help with the summer program and law

17   student recruiting.

18           I have a Bachelor's.

19           I'm married, and my husband does work outside of

20   the home.  He is a concrete contractor.  I have two children,

21   two boys, they are six and four.

22           My hobbies are playing with my kids, watching TV.

23           My primary source of news is CNN and watching it --

24   getting it through the internet and watching it on TV.

25           I'm a member of CALPA, which is a legal

1    professional organization in Chicago.

2              And I've never served on a jury before.

3              THE COURT:  Thank you.

4              PROSPECTIVE JUROR ADAMS:  Good morning, your Honor.

5    My name is Steve Adams, currently living in Chicago Heights.

6    Been in the south suburbs most of my life.

7              My present employer is Union Pacific Rail, and my

8    job title there is a yard spotter.

9              THE COURT:  I'm sorry, what is your job title?

10             PROSPECTIVE JUROR ADAMS:  Yard spotter.

11             THE COURT:  Okay.  Thank you.

12             PROSPECTIVE JUROR ADAMS:  In short, if you ever

13   stopped at a rail crossing and a freight train gotten

14   stopped, I'm the guy that loaded that train.  So, been there

15   about nine years.  Before then, I worked the same field.

16             Have some college.

17             I'm not married.  I have two kids.  A son, he is

18   14.  A daughter, she is 22.  She currently works for Ford.

19             Primary source of news, CNN, Channel 9.

20             Haven't been previously on a jury, and I am not a

21   member of any organizations.

22             THE COURT:  Thank you.

23             PROSPECTIVE JUROR ADAMS:  You're welcome.

24             PROSPECTIVE JUROR POOLE:  Good morning, your Honor.

25   My name is Pamela Poole.  I'm from Yorkville, Illinois.  I

1    have been there 12 years.

2          My present employment is with Central State Funds.

3    It's in Rosemont, Illinois.  I am a medical claims examiner.

4          My education is high school graduate, some college.

5          I am married.  My husband does work outside of the

6    home.  He is a manager at a wastewater treatment plant

7    facility.  The ages of my children are 31, 20, and 16.  My

8    oldest do work outside the home also.  He works with children

9    with disabilities.

10          My hobbies are collecting Christmas villages and

11   setting them up.  So this is my favorite time of the year.

12          Primary source of news is social media, Channel 7

13   news.

14          I don't belong to any organization.

15          And, no, I've never served on a jury.

16          THE COURT:  Thank you.

17          PROSPECTIVE JUROR LONGMIRE:  Good morning, your

18   Honor.  My name is Don Longmire.  I've lived in Ingleside,

19   Illinois for the last 42 years.  Have only lived in Ingleside

20   my entire life, pretty much.

21          I work for the Fox Waterway Agency in Fox Lake,

22   maintaining the Chain of Lakes.  Been there for 27 years.

23          My education is a high school graduate.

24          I am married, been married for 20 years.  My wife

25   is an electrician.  I have two twin daughters that are 17.

1    They're still in high school.

2          My hobbies, I love to -- I like to fish, ride my

3    motorcycles, get out and have fun.

4          Primary news is pretty much local news.

5          And organizations, I am a member of the Sojourners

6    Motorcycle Club.

7          And, no, I have not served on a jury before.

8          THE COURT:  Thank you.

9          PROSPECTIVE JUROR STEINHEISER:  Good morning, your

10   Honor.  My name is Scott Steinheiser.  I live in Mundelein,

11   Illinois and have done so for the past 25 years.

12         My current employment is with a pharmaceutical

13   company named Kaleo, and it's based out of Richmond,

14   Virginia.  Started there in October, October 1.  Prior to

15   that, I was a self-employed consultant at my own LLC for six

16   years.  And before that I worked for another pharmaceutical

17   company based here in North Brook, Illinois, Astellas

18   Pharmaceuticals.

19         I have a Bachelor's degree in Business.

20         I am married.  My wife is employed outside the home

21   as a nanny.  We have four sons.  They're all adults.  My

22   oldest son is a server and a starving artist.  My next oldest

23   son works full-time at a home improvement store.  My third

24   son is a graphic artist for a company that manufactures floor

25   scrubbers.  And my youngest son also works as a server in a

1    restaurant and is a senior in college.

2            My major hobbies are reading, TV -- watching TV,

3    watching movies, riding my bicycle and home improvement

4    projects.

5            My primary source for news is my Apple news feed.

6    Secondarily, by the Chicago Tribune.  And, thirdly, by

7    watching CNN, and occasionally ABC.

8            I am a member of three organizations:  The

9    Healthcare Compliance Association.  The Society of Corporate

10   Compliance and Ethics, and the Association of Certified Fraud

11   Examiners.  I am certified by the first two, not by the

12   latter.

13           And I have served as a juror in the past, two

14   times, both in Waukegan.  One in the late '80s, I don't

15   recall if it was '85 or '86, and then one in either the fall

16   of 2012, or the spring of 2013.

17           THE COURT:  Do you remember what kind of case that

18   was?

19           PROSPECTIVE JUROR STEINHEISER:  I do.

20           THE COURT:  What was it?

21           PROSPECTIVE JUROR STEINHEISER:  Which case?

22           THE COURT:  The second one.

23           PROSPECTIVE JUROR STEINHEISER:  Second one?  Yes,

24   it was a case related to damages, insurance damages for a --

25           THE COURT:  Okay.

1              PROSPECTIVE JUROR STEINHEISER:  -- car accident.

2              THE COURT:  Okay.  Thank you.

3              PROSPECTIVE JUROR PASSERI:  Good morning, your

4    Honor.  My name is Javier Passeri.  I live in Schaumburg for

5    the past 15 years.

6              I work for a construction company as an auto

7    mechanic and maintenance and heavy equipment for six months.

8    And previously I used to work in another company doing the

9    same thing for 18 years.

10             I have some college education.

11             I'm married.  Two daughters, both in high school,

12   17 and 16.

13             I like to play soccer, bike, and watch TV.  I watch

14   news on TV, internet, radio, and newspapers.

15             Not a member of any organization.

16             And I didn't serve in any jury before.

17             THE COURT:  Thank you.

18             PROSPECTIVE JUROR ALCANTAR:  Good morning, your

19   Honor.  My name is Jeseyra Alcantar.  I live currently in the

20   southwest side for the past 13 years.

21             My employment, I'm a teacher assistant for special

22   needs students in CPS for the past three years.  Before that,

23   I used to work as a head teacher in a daycare facility.

24             I have a degree in early childhood education.

25             I am married.  My husband works at a printing

1    factory as a pressman assistant.  I have three children, ages

2    22, 16, and 9.  My daughter, she is the 22-year-old, she

3    works at a daycare as a director assistant.

4            My hobbies are reading and listening to music.

5            My primary source of news is Channel 5 and

6    internet.

7            I am not a member of any organization.

8            And I have served as a juror before, once.

9            THE COURT:  How long ago?

10           PROSPECTIVE JUROR ALCANTAR:  More than five years

11   ago.

12           THE COURT:  Was it a state court or federal court?

13           PROSPECTIVE JUROR ALCANTAR:  State.  It was just a

14   DUI.

15           THE COURT:  Thank you.

16           PROSPECTIVE JUROR CARUSO:  Good morning, your

17   Honor.  My name is Andrea Caruso, and I live in the City of

18   Chicago, and I've lived here for the past 13 years.

19           I'm currently a property manager with MB Real

20   Estate and have worked in my position for the past three

21   years, and then before that as an administrator.

22           I have both a Master's and Bachelor's in Music

23   Performance.

24           I am married, and my husband is a Lyft driver and

25   musician.  I have no children.

1          Outside of my property management position, I do

2    sing with -- for churches, synagogues and the Chicago

3    Symphony Chorus.

4          My primary source for news is the New York Times,

5    CNN, Washington Post, internet.

6          As a musician, I'm a part of the American Guild of

7    Musical Artists Union.

8          And I have served as a juror last year.

9          THE COURT:  Where was that?

10         PROSPECTIVE JUROR CARUSO:  I'm sorry?

11         THE COURT:  Where were you a juror?

12         PROSPECTIVE JUROR CARUSO:  Down off of California,

13    the courthouse over there, so.

14         THE COURT:  Okay.  Was there a verdict?

15         PROSPECTIVE JUROR CARUSO:  Yes.

16         THE COURT:  Okay.  Thank you.

17         PROSPECTIVE JUROR PHILLIPP:  Good morning, your

18    Honor.  My name is Michael Phillipp.  I'm from Western

19    Springs, Illinois.  I've been living there for about six

20    months.  Prior to that, I lived in the City of Chicago for

21    about two years.

22         I'm an account executive for a recruiting software

23    company called Hireology.  Prior to that, I was a senior

24    account executive for a company, CareerBuilder.  And I was

25    also in staff and recruiting for a few years prior.

```
 1              I have a Bachelor's degree from Northern Illinois
 2   University in Marketing.
 3              I am not married, do not have any children.
 4              Hobbies I have are watching movies, going out,
 5   watching the Bears.  And then primary source of news is
 6   probably social media.
 7              I have not been in any organizations.
 8              And have not served as a juror in the past.
 9              THE COURT:  Thank you.
10              PROSPECTIVE JUROR GRIMM:  Good morning, your Honor.
11   My name is John Grimm.  I've lived in the Grayslake area for
12   28 years.  I'm currently self-employed for the last eight
13   years.  I own a junk removal company.  Prior to that, I was
14   an insurance claims manager for 24 years.
15              I have some college.
16              I'm married for 38 years.  I have two adult
17   children.  My son is an electrician.  My daughter is a first
18   grade teacher.
19              Hobbies is anything to do with tools.
20              Primary source of news, I read the Daily Harold
21   every day except this morning.  And whatever Yahoo news feeds
22   on my phone.
23              Really not involved in any organizations.
24              And I have never previously served on a jury.
25              THE COURT:  Thank you.
```

1  PROSPECTIVE JUROR SEATON:  Good morning.  My name

2  is Len Seaton.  I live in Flossmoor, Illinois.

3  I work for AT&T.  I am a manager there.  The

4  business is telecommunications.  I travel across the country

5  meeting with CEOs, CIOs and discussing AT&T services and

6  contracts with corporations.  I've been there for 18 years.

7  Education is Associates Science degree.

8  I am married.  My wife works outside of the home.

9  She is the COO for one of the major hospitals here in

10  Illinois.  I have three daughters.  One is 16, one is 31 that

11  works in the medical field, and one, 28, that also works in

12  the medical field.

13  Hobbies:  Jogging, the gym and reading.

14  Primary source of news would be social media and

15  TV.

16  Organizations:  Part of a national fraternity and

17  also part of the AT&T mentoring program.

18  I have never served on a jury before.

19  THE COURT:  Thank you.

20  PROSPECTIVE JUROR SILVER:  Good morning, your

21  Honor.  Can you hear me?  Okay. My name is Nancy Silver.  I

22  live in Buffalo Grove.  I've been there for 33 years.

23  I'm currently the HR director and head

24  administrator for a retirement home for missionary priests,

25  and I've been there five years.  Prior to that, I was the

1    head of customer service for a heart monitoring company in

2    Lincolnshire.

3           I have a Bachelor's degree in, long time ago,

4    Criminal Justice.

5           I am married.  My husband is in customer service

6    for Protective Insurance.  We have four grown children.  My

7    oldest daughter is a Special Ed teacher at Niles North High

8    School.  My son is a VP of operations for Ticketmaster.  My

9    next daughter is a marketing manager for Arity, which is a

10   subsidiary of Allstate, and our youngest daughter is a

11   registered dietitian for FFC Health Clubs.

12          My hobbies are my four grandchildren and taking

13   care of my 92-year-old mother.

14          My primary source for news is NBC Today and what

15   comes on the internet.

16          I am a member of the Society of the Human Resource

17   Management.

18          And I've never served as a juror before.

19          THE COURT:  Thank you.

20          PROSPECTIVE JUROR CHAVEZ:  Good morning.  My name

21   is Alexander Chavez.  I was born and raised in the City of

22   Chicago.

23          I am currently a project manager and controls

24   engineer for a company called Chicago Electric.  Before that,

25   I was also a controls engineer for a similar company.

1          I have a Bachelor's degree in Engineering.

2          I am not married.  I have no kids.

3          My hobbies are playing and watching soccer and

4    other sports.

5          My primary source for news is TV and internet.

6          I am not part of any organization, and I've never

7    served as a juror.

8          THE COURT:  Thank you.

9          PROSPECTIVE JUROR NOVY:  Good morning, your Honor.

10   My name is Kevin Novy.  I live in Braidwood, Illinois all my

11   life.

12         Present employer:  INEOS Styrolution.  And we make

13   polystyrene there, plastic, which is used in everything.

14   Been with them 11 years.

15         Education:  High school and trade schools.

16         I'm divorced.  No children.

17         Hobbies are:  Farming, riding my motorcycles and

18   taking care of my parents.

19         Primary source of news is radio, TV and newspapers.

20         No organizations.

21         And I've been selected as a juror before, but I

22   haven't had to serve on a trial.

23         THE COURT:  All right.  Thank you.

24         PROSPECTIVE JUROR GORA:  Good morning, your Honor.

25   My name is William Gora.  I live in Homer Glen, Illinois for

1    the past 32 years.  I've spent 32 years in manufacturing

2    management, in planning and scheduling.  After experiencing a

3    couple downsizings, I now have a couple part-time jobs.  I

4    work at the Morton Arboretum in Lisle for the security

5    department, and I work for a retail store called the Big R in

6    Homer Glen.

7              I have a Bachelor's degree in Business.

8              I am married.  My wife is a registered nurse for

9    Loyola.  I have three children.  The oldest, 27, degree in

10   Master's in Nutrition.  She works for a food research

11   company.  23-year-old daughter, a sergeant in the United

12   States Marine Corps, serving as Marine security guard in

13   Niger right now.  And an 19-year-old son who is a freshman in

14   college.

15             My hobbies are:  Run, gardening, working outside.

16             Primary source for news would be hard copy

17   newspapers and local TV.

18             Not really presently a member of any professional

19   organizations since my original career path.

20             And I have been chosen for jury duty, but I've

21   never gotten on a trial.

22             THE COURT:  Thank you.

23             PROSPECTIVE JUROR BELL:  Good morning, your Honor.

24   My name is Yolanda Bell.  I currently live in Dolton,

25   Illinois.  Before then, I was born and raised in Robbins,

1    Illinois.

2           I currently work for a woman's ob/gyn office,

3    Women's Healthcare of Illinois, and I've been there a week, I

4    just started.  Before that I worked for Women's Care Group in

5    Oak Lawn.

6           I do have my Certified Medical Assistant in

7    phlebotomy.

8           I am divorced.  I have one son that's 27.  He is a

9    caterer and works at Schnucks in Bloomington, Illinois.

10          I'm not a part of any type of organization.

11          My news source is CNN and Channel 9 and whatever

12   comes up on the phone.

13          My hobbies are:  Catering, reading, taking care of

14   my grandkids and taking care of my parents.

15          And I have never been chosen for jury before.

16          THE COURT:  Thank you.

17          PROSPECTIVE JUROR DRUCKER:  Good morning.  My name

18   is Lauren Drucker.  I live in Mount Prospect.

19          Right now, I am self-employed, I would say.  I just

20   baby-sit time to time.  I've worked a lot of places in the

21   past 10 years.  Do you want me to name all of them?

22          THE COURT:  How long have you been baby-sitting?

23          PROSPECTIVE JUROR DRUCKER:  Just, like, I think

24   four months.

25          THE COURT:  All right.  What did you do before

1    then?

2              PROSPECTIVE JUROR DRUCKER:  I worked at Bensenville

3    Park District as a Director.  It was just for, like, summer

4    camp.

5              THE COURT:  All right.  Go ahead.

6              PROSPECTIVE JUROR DRUCKER:  My education, I have a

7    Bachelor's degree in Recreational Therapy.

8              I'm not married.  I don't have any kids.

9              My hobbies are:  Watching TV, going to concerts.

10   And I also volunteer at a Petco for dog adoptions.

11             My primary source of news, probably just social

12   media.

13             And then I'm not part of any organizations.

14             And I've never served on a jury.

15             THE COURT:  Thank you.

16             PROSPECTIVE JUROR STAWINSKI:  Good morning, your

17   Honor.  My name is Tom Stawinski.  I live in Buffalo Grove.

18   I used to own a trucking company.  I sold it in March, and

19   I've just kind of been traveling the world since.

20             Some college.

21             Not married.

22             Hobbies:  Sports, fitness.

23             Primary source of news:  YouTube, Facebook,

24   whatever comes up online.

25             Not part of any organizations.

1           And have been selected for jury but never served on

2    trial.

3           THE COURT:  Thank you.

4           PROSPECTIVE JUROR STURZNICKEL:  Good morning, your

5    Honor.  My name is Lynn Sturznickel.  I live in Jefferson

6    Park in Chicago.

7           I work for a privately held software company called

8    Infor.  I assist with the CEO and the C-Suite team.

9           I do have some college.

10          I am not married.  I do not have children.

11          I like to play hockey.  I have dogs.  I hang out

12   with my family.

13          Social media for news.  Sun Times.  Today Show,

14   whatever is on there.  Magazines.

15          I'm not a member of any organization.

16          And I have never served as a juror.

17          THE COURT:  Thank you.

18          PROSPECTIVE JUROR MENDOZA:  Good morning, your

19   Honor.  My name is Samson Mendoza.  I live in Joliet.

20          Currently employed by Waste Management, been there

21   22 years.

22          I'm married.  My wife works at a hose factory, hose

23   company, does accounting work.  I can't remember the name.

24          I have two -- three kids.  The oldest one is 27.

25   He is -- he does something for Allstate.  Claims.  Something

1    with claims.  The other one is 21.  He does -- actually, he

2    does nothing right now.  He got laid off last week.  And my

3    youngest one is still in school, middle school.

4                Hobbies:  Nothing at the moment.

5                News source:  That would be when somebody says, did

6    you hear something happened?  I don't really look at the

7    news.

8                Organizations:  None.

9                I've served on a jury about eight years ago.  Drunk

10   driving.  That's about it.

11               THE COURT:  Okay.  Thank you.

12               PROSPECTIVE JUROR ROBINSON:  Good morning, your

13   Honor.

14               THE COURT:  Good morning.

15               PROSPECTIVE JUROR ROBINSON:  My name is Wyndell

16   Robinson.  I grew up in the City of Chicago in the community

17   of Chatham.  I have lived previously in Greenville, South

18   Carolina and just recently acquired a living space in

19   Los Angeles, California.

20               I am self-employed, retired hairstylist.

21               Licensed stylist, education.

22               I am married, separated, and she works with CPS.  I

23   have two children, 17, and my son is 26.  My son now is a

24   tattoo artist/bartender, free-spirited son, in Denver,

25   Colorado.

1          My hobbies are:  Playing chess, working out, beer

2     and football.

3          My source of news is internet, but mainly world

4     news, Channel 7.

5          I am not a member of any organization.

6          And I have not served in a jury before.  Thank you.

7          THE COURT:  Thank you.

8          PROSPECTIVE JUROR FLANAGAN:  Good morning, your

9     Honor.  My name is Laura Flanagan.  I live in California

10    Monday through Friday, and then I live in Wilmette on the

11    weekends.

12         My present employment is with Foster Farms, which

13    is a California-based company; hence, the reason I am there

14    Monday through Friday each week.  And I've been with them for

15    over two years.  Previously to Foster Farms, I was with

16    Conagra Foods.

17         My education is I have an undergraduate degree in

18    engineering, an MBA from Stanford Graduate School of

19    Business, and then another program in corporate governance

20    with the Kellogg's School of Management because I serve on

21    boards of public companies.

22         I am married, and my spouse is employed in private

23    equity.  And I have two children, 11-year-old son and a

24    daughter who turns 10 tomorrow.

25         I am -- hobbies.  I wish I had some.  I am a

1    working mom that commutes each week, so I have no time for

2    hobbies.

3            And my primary source for news is the Wall Street

4    Journal and other digital feeds.

5            And names of organizations:  I'm a member of the

6    G100.  I used to be a member -- or it's on hold -- of the

7    Economic Club of Chicago.

8            And I have previously served on a jury, it was a

9    legal malpractice case, and I served for a month.

10          THE COURT:  Thank you.

11          PROSPECTIVE JUROR ECKERT:  Good morning, your

12    Honor.  My name is Jason Eckert.  I live in the western

13    suburbs of Wheaton, Illinois.  Prior to that, I was in

14    Warrenville, Illinois.

15          I own a small business, started it in 1999, working

16    in the frozen food manufacturing and distribution.  It's real

17    exciting.

18          I have a Bachelor's degree from Western Illinois

19    University.

20          I am married.  My wife is a stay-at-home mom.  I

21    have four kids:  17, 15, 13, and 11, two girls, two boys.

22          Hobbies:  I drive my kids around, take them to

23    sports.  I'm involved in my church.  We do Bible studies.

24          My primary source for news is probably online:  The

25    internet, Fox News.

1      Names of organizations:  I'm a member of College

2  Church in Wheaton.  I'm a member of the American Frozen Food

3  Institute.  Woo!  I've never served as a juror before.

4      THE COURT:  Thank you.

5      PROSPECTIVE JUROR GATEWOOD:  Good morning, your

6  Honor.  My name is Karen Gatewood.  I live in Westmont.

7      And my present employment is from Amita Healthcare,

8  and I have been there 31 years.  And my husband also works

9  for Amita Healthcare.  When you work there, you're kind of --

10  everybody is married to everybody, or related.

11      And, let's see, I am almost finished, so close, to

12  my associates degree.

13      Let's see, my kids.  My daughter is 27, my son is

14  22.  He is in the Coast Guard, stationed in Detroit.

15      My interests, hobbies are -- is going to the

16  movies.

17      My source of news is Channel 9 and reading the

18  Tribune.

19      And the names of organizations.  I do -- I'm always

20  an election judge at least every six months.  I volunteer

21  with our church.  I am with the Boys Scouts of America and

22  the Girl Scouts of America.

23      And, let's see, and I did serve as a juror a couple

24  years ago, but I wasn't picked.  So I kind of sat there all

25  day, so.

1        THE COURT:  Thank you.

2        PROSPECTIVE JUROR GUTIERREZ:  Good morning.  My

3   name Asmidia Gutierrez.  And I live in the south side of

4   Chicago for the past 35 years.

5        And I am a real estate agent, since 2001.

6        And I have a high school diploma and a real estate

7   license.

8        I'm married, separated, and he is a truck driver.

9   And I have two children.  My son is 35, and he is a computer

10  programmer.  And my daughter is 31, and she works with

11  children with disabilities.

12       And my hobbies are:  Exercise, movies, travel,

13  reading.

14       And my primary source for news is from TV.

15       And I'm not a member of any organization.

16       And I served as a juror about four years ago at a

17  Markham facility.

18       THE COURT:  Okay.  Thank you.

19       PROSPECTIVE JUROR HADDAD:  Good morning, your

20  Honor.  Donna Haddad.  I live in Park Ridge.  I've lived

21  there since 2008.  I grew up in Chicago.  I spent three years

22  in Dubai from 2011 to 2014 on assignment with work.

23       I work for IBM.  I have been there for 19 years.

24  And I support our Watson AI, artificial intelligence,

25  technology now, but I've done various other things.  Before

1    that, I was a litigator in private practice at a law firm.

2    And I was actually an extern in the Northern District of

3    Illinois in law school.

4            I have an undergraduate degree in Economics and

5    Political Science.  I have a law degree.

6            I'm married.  My husband works for Jones Lang

7    LaSalle, commercial real estate.  My children are 7, 12, and

8    14.

9            My hobbies are travel, and I volunteer for a

10   humanitarian aid agency.

11           My primary source of news is various news feeds

12   I've set up on my phone, including New York Times, Chicago

13   Tribune.

14           Names of organizations:  I'm the immediate

15   past-president of the Arab American Bar Association, and I

16   currently serve on their board.  And I'm also on the board of

17   the Arab American Business and Professional Association.

18           And I've never served on a jury.

19           THE COURT:  Thank you.

20           PROSPECTIVE JUROR KRAMER:  Good morning.  My name

21   is Dan Kramer.  I live in Grayslake, Illinois.  Before that

22   was Gurnee and then Round Lake Beach.

23           I've worked for NGS Printing as an estimator.

24           I have a Master's degree.

25           My wife is a nurse for a kid's hospital.  I have

1    one child, she is six years old.

2           My primary source of news is Fox News, Ben Shapiro,

3    and just internet.

4           I'm not part of any kind of groups.

5           And I've not served as a juror before.

6           THE COURT:  Thank you.

7           PROSPECTIVE JUROR DELMAR:  Good morning, your

8    Honor.  My name is Lori Delmar, and I've lived in Arlington

9    Heights for over 19 years.

10          I work for Allstate Insurance Company.  I'm in the

11   procurement department.  I've been there 20 years.  I buy

12   professional services for them.

13          I have an undergraduate degree and some graduate

14   classes.

15          My husband is currently not working due to a

16   medical illness.  He will return, though, to do training and

17   consultant after the first of the year.  I have one daughter,

18   who is 15.

19          My primary sources for news are CNN, Fox News and

20   my husband.

21          I serve on the board of directors for the Wheeling

22   Instrumental League.

23          And my hobbies include:  Traveling, going to the

24   theater, music, and I'm very active in my daughter's high

25   school.

1          THE COURT:  Thank you.

2          PROSPECTIVE JUROR HAMRIN:  My name is Don Hamrin.

3    I live in Oak Forest, which is in the south suburbs.

4          I'm a teacher.  I work for Arbor Park Middle

5    School.  I teach a computer-generated science class.  I coach

6    pretty much year round.  I coach cross-country, track, boy's

7    basketball.  I'm self-employed in the summer.  I do siding

8    and work on houses.

9          I have a Master's in curriculum and instruction.

10          I'm married.  My wife is a dental hygienist in

11    LaGrange.  I have four kids.  My daughter is a junior in

12    college, she is 20.  And then the three boys are senior,

13    sophomore and fifth grade.

14          I like to run, play basketball, watch my kids play

15    whatever.  The kids I coach, watch them whatever they play.

16    I read, I volunteer at my church.

17          I mainly watch Fox 32 and read the Times.

18          Organizations:  I'm a member of the NEA, National

19    Education Association, and my church.

20          And no previous jury service.

21          THE COURT:  Thank you.

22          PROSPECTIVE JUROR GUARINO:  Good morning, your

23    Honor.  My name is Arica Guarino.  I live in New Lenox for

24    the past five years.  Prior to that, I lived in Burbank for

25    four.  Romeoville before that.

1    I am a speech language pathologist.  I work for

2    Reliant Pro Rehab.  I'm also self-employed.  I contract

3    therapists to home-health agencies.  Prior to that, I was an

4    executive assistant to different corporations here in the

5    city, law firms, PR firms, a bank, which led to my change to

6    healthcare and helping others.

7    I have two Bachelor's degree, one in Industrial

8    Organizational Psychology, another in Communication

9    Disorders.  And I also have a Master's in Communication

10   Disorders.

11   I am married, almost 17 years.  My husband is a

12   union carpenter; however, he is currently laid off.  He works

13   for Cole Construction.  I have a 13-year-old daughter and a

14   14-year-old son.

15   Hobbies include:  Running, yoga, meditation,

16   carting my kids around everywhere.

17   Primary news source is just whatever pops up on my

18   news feed, on Facebook or Fox News.

19   I belong to ASHA, which is the American Speech and

20   Hearing Association.

21   And I have never served on a jury.

22   THE COURT:  Thank you.

23   PROSPECTIVE JUROR HUANG:  Good morning, your Honor.

24   My name is Jian Huang, and I've lived most of my life in

25   Chinatown of Chicago.

1              I am currently unemployed.

2              I'm still attending college right now.

3              I am single, no children.

4              Hobbies involve watching movies or shows.

5              Primary source of news would be anything online or

6      from friends or family.

7              No organizations.

8              And never served as a juror.

9              THE COURT:  Thank you.

10             PROSPECTIVE JUROR CARTER:  Good morning, your

11     Honor.  My name is Shannon Carter.  I've lived on the

12     southeast side of Chicago for pretty much all my life.

13             I'm currently unemployed, but my past employer was

14     the American Library Association.  I have a Master's in

15     Public Administration.

16             I am not married.  I don't have any children.

17             My hobbies are music and documentaries.

18             My primary sources of news are progressive news

19     outlets.

20             I'm not a member of any organizations.

21             And I've never served as a juror before.

22             THE COURT:  Thank you.

23             PROSPECTIVE JUROR SCIMECA:  Good morning, your

24     Honor.  My name is Nicole Scimeca.  I live in Park Ridge,

25     Illinois.

1          I work for WGN-TV for the past 18 years.  I do news

2     graphics and animation design.

3          Education is an associates degree.

4          I'm married to a plumber, and I have a ten-year-old

5     son.

6          No major hobbies.

7          Primary source of news is WGN.

8          No organizations.

9          And I have never served as a juror.

10         THE COURT:  Thank you.  All right.  Thank you, all

11    of you, for telling us something about yourselves.  Now we're

12    going to turn to some questions that will require -- begin

13    telling you a little bit about the case.

14         This case is entitled, United States versus Carlos

15    Meza.  I'm going to ask counsel to introduce themselves and

16    the people sitting at their tables.

17         MR. YOUNG:  Good morning.  My name is Rick Young,

18    and I am an Assistant United States Attorney, and I work for

19    the United States Attorney's office here in the Northern

20    District of Illinois.  Seated with me at counsel table is

21    Kaitlin Klamann, who is also an Assistant United States

22    Attorney, and Special Agent Jill Pettorelli, who works for

23    the Federal Bureau of Investigations.  Thank you.

24         MR. KUTNICK:  Good morning, everyone.  My name is

25    Joshua Kutnick.  I am a defense attorney.  Here at my table

1    is Mina Zardkoohi, and also my client, Carlos Meza.

2         THE COURT:  Thank you. The indictment in this case

3    charges Mr. Meza with two counts of wire fraud.  More

4    specifically, the indictment alleges that Mr. Meza caused

5    interstate wire communications in furtherance of a scheme to

6    defraud and to obtain money from certain individuals by means

7    of materially false and fraudulent pretenses, representations

8    and promises.  Mr. Meza has pled not guilty to the charges

9    against him.

10        First, let me ask if anybody thinks that they know

11   the defendant or anybody at either counsel table?  Oh,

12   actually, no, I should preface this by saying, I am going to

13   be asking a number of questions.  If your answer is anything

14   other than an unqualified no, then I want you to raise your

15   hand.  On most of them, I will probably just ask you about it

16   right now.  Some of them could be -- will be personal.  If

17   they are, then I will just say I'll talk to you later over at

18   sidebar.

19        But, okay.  So the first one is:  Do any of you

20   know anybody at either table?

21        THE COURT:  Yes?

22        PROSPECTIVE JUROR WIEGAND:  I used to work with

23   Katie at Schiff Hardin.

24        THE COURT:  And I should tell you, it takes me a

25   while to go back to find who you are.

1   PROSPECTIVE JUROR WIEGAND:  Emily Wiegand.

2   THE COURT:  Who do you know?

3   PROSPECTIVE JUROR WIEGAND:  I know Katie Klamann.

4   THE COURT:  Anybody else?  Okay.  There are a

5   number of people whose names you will hear, some of them will

6   testify.  Others, you'll just hear the name.  I'm going to go

7   through this list.  Please tell me -- I mean, again, raise

8   your hand at the end of it if you think you know any of these

9   people.  Robert Benjamin.  Cordell Crane.  James Dorger.

10  Wade George.  Karim Khoja.  Andrew Lee.  Milena Markova.

11  Brian Murphy.  Jill Pettorelli.  Elan Peretz.  Scott Spencer.

12  David Tomlinson.  Steven Tremaglio.  Or Ray Yocoub.

13  Does anybody think they know any of those people?

14  (No hands raised.)

15  THE COURT:  Have any of you or somebody close ever

16  been a defendant in a criminal case?  When I say anybody

17  close, if it's somebody -- your family member or your best

18  friend.  And, if so, I will talk to you about this

19  separately, but I will need to just get down get your names.

20  PROSPECTIVE JUROR SEATON: Len Seaton.

21  THE COURT:  Others?

22  PROSPECTIVE JUROR SEATON:  What was the question

23  again, your Honor?

24  THE COURT:  Well, I need to find out if you or

25  anybody close to you has ever been a defendant in a criminal

1    case.

2        PROSPECTIVE JUROR ADAMS:  Yes, I have.  Steve

3    Adams.

4        THE COURT:  Okay.

5        PROSPECTIVE JUROR HADDAD:  Your Honor, Donna

6    Haddad.

7        THE COURT:  Okay.  Anybody else?  I think I saw

8    another person.

9        PROSPECTIVE JUROR MENDOZA: Samson Mendoza.

10       PROSPECTIVE JUROR PHILLIPP:  Michael Phillipp.

11       PROSPECTIVE JUROR ROBINSON:  Wyndell Robinson.

12       THE COURT:  This case involves allegations of

13   investment fraud.  Is there anything about the nature of the

14   case that might affect your ability to be fair and impartial

15   to either side?

16       (No hands raised.)

17       THE COURT:  All right.  Do you have any experience

18   in investing in stocks, bonds, foreign currencies or other

19   kinds of financial instruments?  There is probably going to

20   be a number of hands here, so.  Well, let me see, I think I

21   could just do this.  While you're sitting there, first one

22   would be Mr. Allen.

23       PROSPECTIVE JUROR ALLEN: I mean, I invest in 401K

24   and a Roth IRA, and that sort of thing, but that's about it.

25       THE COURT:  Okay.  Is there anything about your

1   investment experience that you think would affect your

2   ability to be fair and impartial in this case?

3   　　　　　　PROSPECTIVE JUROR ALLEN: No, your Honor.

4   　　　　　　THE COURT:  Thank you.  Anybody else in the first

5   row there?

6   　　　　　　PROSPECTIVE JUROR STEINHEISER:  Scott Steinheiser.

7   　　　　　　THE COURT: Mr. Steinheiser?

8   　　　　　　PROSPECTIVE JUROR STEINHEISER:  Yes, same, 401K.

9   　　　　　　THE COURT:  Okay.

10  　　　　　　PROSPECTIVE JUROR STEINHEISER:  And no.  No.

11  　　　　　　THE COURT:  All right.

12  　　　　　　And second row here?

13  　　　　　　All right.  First row in the back.  This is where I

14  start having trouble seeing who is raising their hand.

15  　　　　　　PROSPECTIVE JUROR KRAMER:  401K and e-trade

16  account.

17  　　　　　　THE COURT:  Is there anything about that experience

18  that would prevent you from being fair and impartial in this

19  kind of case?

20  　　　　　　PROSPECTIVE JUROR DELMAR:  Lori Delmar.  A 401K,

21  mutual funds.  And I have brokerage accounts with a couple

22  bankers in the area.

23  　　　　　　THE COURT:  I may need to get that -- there was

24  somebody in the first row here.

25  　　　　　　PROSPECTIVE JUROR STAWINSKI:  Yes.  Tom Stawinski.

 1    Just futures trading, 401K, that kind of stuff, too.  And,
 2    no, it would not affect my --
 3              THE COURT:  Okay.  Thank you.
 4              PROSPECTIVE JUROR CHAVEZ:  Alexander Chavez, real
 5    estate investments.  No, it would not affect my --
 6              THE COURT:  Okay.  Thank you.  Anybody else?  I can
 7    probably hear you without that.
 8              PROSPECTIVE JUROR FLANAGAN:  Okay.  Laura Flanagan.
 9    Not only personal investments, stocks, bonds, currencies.
10    But, professionally, I'm also in charge of the investments
11    for the pension fund and the 401K for the company in which I
12    work.  And my husband is also in private equity and is
13    consistently making investments all the time.
14              THE COURT:  Is there anything about those
15    experiences that would prevent you from being fair and
16    impartial to either side in this case?
17              PROSPECTIVE JUROR FLANAGAN:  I would need to know
18    more facts about the case before I could answer that in an
19    educated manner.
20              THE COURT:  Okay.
21              PROSPECTIVE JUROR HADDAD:  Just personal investing,
22    and I was in an investment club with some friends.  But, no,
23    it would not impact my ability.
24              THE COURT:  Okay.  Thank you.  There has been
25    involvement in this case by agents from the FBI and the

1    Illinois Attorney General's office.  Do any of you have any

2    experience with either these agencies or any other law

3    enforcement agencies that might affect your ability to be

4    fair and impartial in this case?  If the answer is yes, I'm

5    going to ask you about it separately.

6         THE COURT:  I've written down Mr. Steinheiser.

7    Anybody else in the box?  Okay.  And the first row back

8    there?  Yes, that was Yolanda Bell, Mr. Hamrin, Mr. Robinson.

9         At the end of this case, I will instruct you as to

10   the law that you are to follow.  You must follow the law as I

11   give it to you, even if you would disagree with it.  Is there

12   anybody who would not do that?

13        (No hands raised.)

14        THE COURT:  You will receive a lot of instructions.

15   One of those is that you are to treat the testimony of law

16   enforcement officers the same way as any other witness.  That

17   means that they don't get more credit and they don't get less

18   credit.  Is there anybody who would not be able to do that?

19   Which is, in other words, is just to evaluate it the same way

20   you would evaluate any other witness.

21        (No hands raised.)

22        THE COURT:  Do any of you hold any religious,

23   philosophical, moral or other beliefs that would make it

24   difficult for you to judge another person?

25        (No hands raised.)

1          THE COURT:  I expect that this case will conclude
2    this week.  We will not hear -- we will not -- so it would be
3    Monday, Tuesday, Wednesday, Thursday.  The only thing I do
4    not know is I'm not positive whether this court will be open
5    on Wednesday or not because of the funeral of President Bush.
6    We just haven't been told.  So it is possible that we won't.
7    I expect, regardless, that we will finish the case on
8    Thursday.  Is there anybody who needs to tell me anything
9    with regard to that?  I know you have been called for jury
10   duty for however long you are on -- are called.  But I will
11   listen.  Ms. Dearing?
12         PROSPECTIVE JUROR DEARING:  Yes.  I do live-in
13   care, so I wouldn't be able to attend on Thursday.
14         THE COURT:  Well, we'd need to talk about that.  I
15   mean, actually, if you're chosen for the jury, you have to be
16   here.
17         PROSPECTIVE JUROR DEARING:  Okay.
18         PROSPECTIVE JUROR PHILLIPP:  Yeah, my mom is
19   battling cancer.  And I watch her at home every other day.
20   And I also have a job interview on Wednesday.  Been through,
21   like, eight interviews for it, and it's the final interview.
22   So it just -- it would -- it would be an inconvenience to
23   reschedule it.  But, you know, I know this is the law.  And
24   it wouldn't be convenient for me with my situation with my
25   mother, but I get it.  At your discretion, I guess.

1          THE COURT:  Okay.  Thank you.

2          PROSPECTIVE JUROR SCIMECA:  I am a newly diagnosed

3    diabetic, and my sugars are way off whack.  Some days I'm

4    like at 50, and then two hours later I'm over 200.  So I have

5    to administer insulin according to my glucose monitor.

6          THE COURT:  Okay. I see another hand?

7          PROSPECTIVE JUROR GUARINO:  Just that my husband is

8    recently laid off of work, and my, you know, missing work

9    would be really detrimental to us.  I brought proof of his

10   being laid off and not working as well, your Honor, if you

11   needed it.

12         PROSPECTIVE JUROR FLANAGAN:  Yes.  As I stated

13   before, I work in California, Monday through Friday each

14   week.  So I have tried to make arrangements to be here this

15   week.  But I would not be able to report for service on

16   Monday.  And on the previous jury I served, I was told the

17   case would take four days, and it took 28.  So perhaps --

18         THE COURT:  That doesn't happen in this court.

19         PROSPECTIVE JUROR FLANAGAN:  Perhaps your

20   projection is more accurate, but I'm still scarred by that

21   experience, so I cannot be here on Monday.

22         PROSPECTIVE JUROR KRAMER:  I'm Dan Kramer.  My

23   company doesn't pay for jury duty.  It would be a financial

24   strain to be here for three to four days in a row.

25         THE COURT:  Thank you.  All right.  I am going to

1  call the attorneys over to side to see if -- and then I am

2  going to be calling up a number of you to go over some

3  issues.  Okay.

4        (At sidebar outside the hearing of the venire.)

5              THE COURT:  Okay.  We need to call people over

6  before that.  Did I miss anything?

7              MR. YOUNG:  I don't believe so, your Honor.

8              MR. KUTNICK:  Was there a question on -- I have the

9  voir dire questions about, yes, about religious beliefs.

10             THE COURT:  Yes.  Sometimes we have some.  We

11 didn't today.

12             MR. KUTNICK:  Right.

13             THE COURT:  Okay.  I don't know enough about this.

14 I mean, I take it there wasn't anything that anybody said in

15 terms of their employment that would involve companies or

16 anything.

17             MR. KUTNICK:  I don't think so.

18             MR. YOUNG:  I don't believe so, your Honor.

19             THE COURT:  Okay.  All right.  Well, I mean, it's

20 unusual that we actually have somebody who knows someone.

21 But I would say that's disqualifying.

22             MR. KUTNICK:  I agree.

23             MR. YOUNG:  No objection, your Honor.

24             THE COURT:  All right.  Next I need to have

25 Mr. Steven Adams.  I need to find out about what --

1          MR. KUTNICK:  Criminal.

2          THE COURT:  Criminal case.

3          Mr. Adams, if you could come over here, please.

4      (At sidebar with Prospective Juror Adams outside the

5      hearing of the venire.)

6          THE COURT:  Hello.  I just needed to find out about

7      the criminal case or someone --

8          PROSPECTIVE JUROR ADAMS:  In the early '80s I was

9      arrested for possession of stolen property.  Early '90s, I

10     had a drug case.  And then that was it.

11         THE COURT:  Were you convicted in the drug case?

12         PROSPECTIVE JUROR ADAMS:  No.  I was convicted on

13     the possession of stolen property.  1987.

14         THE COURT:  In state court, federal court?

15         PROSPECTIVE JUROR ADAMS:  State court.

16         THE COURT:  Did you serve time?

17         PROSPECTIVE JUROR ADAMS:  Yes, three.  They gave me

18     a sentence of three years.  I did 15 months.

19         THE COURT:  All right.  And is there anything about

20     those experiences that would prevent you from being fair and

21     impartial to either side in this case?

22         PROSPECTIVE JUROR ADAMS:  You didn't ask that, but,

23     yes.  I don't really -- I'm agreeing with him already.  I

24     just think that state or feds or -- I don't know, I don't

25     think I could be partial, be honest with you.

1       THE COURT:  Thank you for your honesty.  Thank you.

2       PROSPECTIVE JUROR ADAMS:  All right.  We're done,

3  or?

4       THE COURT:  Just go back.

5       PROSPECTIVE JUROR ADAMS:  Okay.

6     (Prospective Juror Adams exits the sidebar proceedings.)

7       THE COURT: I will strike him.

8       Mr. Steinheiser.

9     (At sidebar with Prospective Juror Steinheiser outside

10       the hearing of the venire.)

11      PROSPECTIVE JUROR STEINHEISER:  Yes.

12      THE COURT:  You raised your hand when I asked

13  about -- my question was law enforcement.  I should look up

14  and see.  Okay.

15      PROSPECTIVE JUROR STEINHEISER:  For full

16  disclosure, I wanted to say that two years ago, it related to

17  a client at work, I received a document subpoena from US

18  Attorney's office in Georgia.  I don't know what district

19  that is.  It was related to work for a specific client.

20  Nothing came of it.  I don't know if you needed the name of

21  the client.

22      THE COURT:  No.

23      PROSPECTIVE JUROR STEINHEISER:  Okay.  But I wanted

24  to --

25      THE COURT:  Yes.

1           PROSPECTIVE JUROR STEINHEISER:  It won't impact my

2    ability.

3           THE COURT:  You're a member -- you're a licensed --

4    I'm not sure that's the right word.

5           PROSPECTIVE JUROR STEINHEISER:  I'm --

6           THE COURT:  Certified Fraud Examiner?

7           PROSPECTIVE JUROR STEINHEISER:  I'm not a Certified

8    Fraud Examiner, I'm a member.  I had joined last year.

9           THE COURT:  Okay.  Is there anything that you heard

10   or anything of your experience that receiving the subpoena or

11   anything that would prevent you from being fair and impartial

12   to either side in this case?

13          PROSPECTIVE JUROR STEINHEISER:  No, not at all.

14          THE COURT:  Thank you.

15          MR. KUTNICK:  Your Honor, while he is here, can I

16   ask a question of him?

17          THE COURT:  Tell me what it is.

18          MR. KUTNICK:  Membership, certified organization.

19          THE COURT:  You may ask.

20          MR. KUTNICK:  Okay.  So as a pharmacy consultant,

21   what, I guess, caused you to become a member of the Certified

22   Fraud Examiners group?

23          PROSPECTIVE JUROR STEINHEISER:  I'm a compliance

24   monitor and auditor for admin for my clients, and I had

25   joined the group to hopefully gain some more auditing skills

1      in relation to -- I also have done in the past, not

2      currently, but in the past corporate investigations.

3                MR. KUTNICK:  Do you attend, like, seminars and

4      conferences, and things like that?

5                PROSPECTIVE JUROR STEINHEISER:  So the only thing I

6      have received from that organization, the Association of

7      Certified Fraud Examiners, is their monthly newsletter.  I

8      have not attended any seminars for that organization.

9                MR. KUTNICK:  Thank you very much.

10               THE COURT:  Thank you.

11               MR. KUTNICK:  Thank you, Judge.

12          (Prospective Juror Steinheiser exits the sidebar

13          proceedings.)

14               THE COURT:  Michael Phillipp.

15          (At sidebar with Prospective Juror Phillipp outside the

16          hearing of the venire.)

17               PROSPECTIVE JUROR PHILLIPP:  Good morning.

18               THE COURT:  You said someone had some involvement

19     in a criminal case?

20               PROSPECTIVE JUROR PHILLIPP:  Yes.  So I was in a

21     fraternity, and we were all accused of like a hazing

22     incident.  This is, I want to say, four years ago.

23               THE COURT:  Where was this?

24               PROSPECTIVE JUROR PHILLIPP:  Northern Illinois

25     University.

1          THE COURT:  Okay.  What happened?

2          PROSPECTIVE JUROR PHILLIPP:  There was someone that

3   was pledging a fraternity had passed away.  The family of the

4   son that passed away had filed a hazing charge against all of

5   us.  It was a civil and criminal.  We were not found guilty.

6   It was more so like the -- they charged the school, but

7   nothing, you know, with me has been -- I had to do some

8   community service, but that was about it.

9          THE COURT:  Is there anything about that experience

10  that would prevent you from being fair and impartial to

11  either side in this case?

12         PROSPECTIVE JUROR PHILLIPP:  No, ma'am.  No.

13         THE COURT:  Okay.  Thank you.

14         PROSPECTIVE JUROR PHILLIPP:  Thank you.  I did also

15  raise my hand about the -- my mom has cancer, she can't walk,

16  or anything.

17         THE COURT:  Oh, that's right.

18         PROSPECTIVE JUROR PHILLIPP:  She can't walk or

19  anything, so I actually work from home every day.  So it

20  would just be really hard on me just to not be there for her,

21  so.  And then I have --

22         THE COURT:  Did you ask them when you filled out

23  the thing whether --

24         PROSPECTIVE JUROR PHILLIPP:  Well, I've pushed it

25  along a couple times.  But she has been dealing with this

1  for, you know, over a year-and-a-half now.  So I was -- so I

2  pushed it -- this off a few times.  But I was like, I don't

3  know if it's going to take a day, if it's going to take more

4  than a couple days.  I just don't think it would make sense.

5        THE COURT:  There isn't anybody else who can be

6  there?

7        PROSPECTIVE JUROR PHILLIPP:  No, it would just be

8  an inconvenience for all of us.  But, no, I don't think so.

9  For the whole week, no.

10        THE COURT:  Jury service is inconvenient.

11        PROSPECTIVE JUROR PHILLIPP:  Yes.

12        THE COURT:  That's the nature of it.  But it's also

13  a responsibility of citizenship.

14        PROSPECTIVE JUROR PHILLIPP:  Yes.

15        THE COURT:  Unless there really is something that,

16  you know --

17        PROSPECTIVE JUROR PHILLIPP:  I completely

18  understand.  If you can't let me slide, I understand.  If

19  there is any way I can push this back to a time where I'm not

20  taking away from my mother.  As I mentioned, I have been

21  through nine interviews for this job I'm applying for.

22        THE COURT:  That's right.

23        PROSPECTIVE JUROR PHILLIPP:  Final interview on

24  Wednesday.

25        THE COURT:  Well, can I ask you, if you get the

1    job, what are you going to do about your mother, then?

2              PROSPECTIVE JUROR PHILLIPP:  That's -- well, as I

3    mentioned, I do, like, every other day where I can, you know,

4    split time with my dad.  But I can't just take off every day

5    as well.  But, yes, so he would watch my mom that day and

6    when I go interview.  And it's just for an hour, so.

7              THE COURT:  All right.  I was thinking if you were

8    successful, so, in getting the job.

9              PROSPECTIVE JUROR PHILLIPP:  I hope I get it.

10              THE COURT:  And then --

11              PROSPECTIVE JUROR PHILLIPP:  I'm sorry, are you

12    asking what job it is?

13              THE COURT:  No, I'm asking about your mother then.

14              PROSPECTIVE JUROR PHILLIPP:  Yes.  What I would do

15    with her, or?  My dad would watch her while I'm gone for an

16    hour.  I watch her usually throughout the whole day, but my

17    dad can help out as well if I'm not able to be here.

18              THE COURT: All right.  We'll see.  Thank you.

19              PROSPECTIVE JUROR PHILLIPP:  All right.  I

20    appreciate it.  Thank you.

21          (Prospective Juror Phillipp exits the sidebar

22          proceedings.)

23              THE COURT:  What do you people want to do?  Maybe

24    we will wait and see how many people we have.

25              MR. KUTNICK:  My position is he doesn't want to be

1    here.  He has got two different excuses as to why he doesn't

2    want to be here.  He has got the professional obligation on

3    Wednesday.  My position is we want jurors that are not

4    distracted by those outside things, are paying attention

5    because --

6            THE COURT:  Well, let's go on, then we will get

7    back to him.  Let's see how many others.

8            Mr. Seaton.

9        (At sidebar with Prospective Juror Seaton outside the

10           hearing of the venire.)

11           THE COURT:  Hi.  You have indicated someone had a

12   criminal case of some sort?

13           PROSPECTIVE JUROR SEATON:  Yes.  My sister has been

14   a public defender for over 15 years with the state.  She is

15   now a judge.  And in the past would talk a lot about her

16   educating me on different trials, and things that I see, some

17   on TV, and I will ask her certain questions, you know.  She

18   was kind of --

19           THE COURT:  All right.  Is there anything about the

20   fact of her being a judge and a former defender that would

21   prevent you from being fair and impartial to either side in

22   this case?

23           PROSPECTIVE JUROR SEATON:  I would say no.  But, on

24   the other hand, information I received from her how to

25   analyze things I may use some of the -- can't say techniques,

1   but some of the information that she has provided.  So, I

2   mean, I could try to be, but --

3            THE COURT:  Well, the idea is that you listen to

4   all the evidence, and you will judge each side by the

5   evidence and the instructions that I give you and that you

6   are committed to deciding the case on that basis.  Can you do

7   that?

8            PROSPECTIVE JUROR SEATON:  Yes.

9            THE COURT:  Does anybody have any questions?

10           MR. KUTNICK:  May I ask him who the judge is that

11   is his sister?

12           THE COURT:  Sure.

13           PROSPECTIVE JUROR SEATON:  Debra A. Seaton.

14           MR. KUTNICK:  Where does she sit?

15           PROSPECTIVE JUROR SEATON:  She worked downtown.

16   Now she is in Markham Courthouse.

17           MR. KUTNICK:  Markham, okay.

18           THE COURT:  Anything else?  Okay.  Thank you.

19     (Prospective Juror Seaton exits the sidebar

20     proceedings.)

21           THE COURT: Yolanda Bell.

22     (At sidebar with Prospective Juror Bell outside the

23     hearing of the venire.)

24           PROSPECTIVE JUROR BELL:  Yes, ma'am.

25           THE COURT:  Hello.  You raised your hand when I

 1   asked a question about law enforcement.

 2          PROSPECTIVE JUROR BELL:  My sister is Special Agent

 3   Loretta Moore with the DEA.  So I don't know if she would

 4   have anything to do with any case like this or deal with

 5   anybody here in Chicago.  She is in Belize now, but she does

 6   have ties to Florida, and stuff like that.  So I wasn't sure.

 7          THE COURT:  She is an agent with the DEA?

 8          PROSPECTIVE JUROR BELL:  Special Agent DEA, yes.

 9          THE COURT:  Would that fact prevent you from being

10   fair and impartial to either side in this case?

11          PROSPECTIVE JUROR BELL:  No.

12          THE COURT:  Okay.

13          PROSPECTIVE JUROR BELL:  Not at all.

14          THE COURT:  Thank you.

15          PROSPECTIVE JUROR BELL:  Thank you.

16      (Prospective Juror Bell exits the sidebar proceedings.)

17          THE COURT:  Samson Mendoza.

18      (At sidebar with Prospective Juror Mendoza outside the

19          hearing of the venire.)

20          PROSPECTIVE JUROR MENDOZA:  Hi.

21          THE COURT:  Hi.  You had raised your hand when I

22   asked if anyone had had any involvement in a criminal case.

23          PROSPECTIVE JUROR MENDOZA:  Yes.  My son.

24   Marijuana possession.  And family and me or also --

25          THE COURT:  Yes.

1    PROSPECTIVE JUROR MENDOZA:  -- anybody I -- well,

2    how do I put this?  Self-defense murder.

3            THE COURT:  Pardon me?

4            PROSPECTIVE JUROR MENDOZA:  Self-defense murder.

5            THE COURT:  Who?

6            PROSPECTIVE JUROR MENDOZA:  Me.

7            THE COURT:  When was that?

8            PROSPECTIVE JUROR MENDOZA:  I was 20.  So that

9    would have been 2000.

10           THE COURT:  It was a while ago?

11           PROSPECTIVE JUROR MENDOZA:  Yes.  I'm 48 now.

12           THE COURT:  What happened with the case?

13           PROSPECTIVE JUROR MENDOZA:  Self-defense.

14           THE COURT:  Did you go to trial?

15           PROSPECTIVE JUROR MENDOZA:  Went to trial.

16           THE COURT:  And?

17           PROSPECTIVE JUROR MENDOZA:  Not guilty.

18           THE COURT:  Found not guilty.  Okay.  And your son,

19   has that been a recent thing?

20           PROSPECTIVE JUROR MENDOZA:  That was recent, yes,

21   ma'am.

22           THE COURT:  What has happened with it?

23           PROSPECTIVE JUROR MENDOZA:  Community service and

24   had to pay fines.

25           THE COURT:  All right.  Now, anything else?

1          PROSPECTIVE JUROR MENDOZA:  That would be it.

2          THE COURT:  Do any of those -- would either of

3    those experiences prevent you from being fair and impartial

4    to either side in this case?

5          PROSPECTIVE JUROR MENDOZA:  No, ma'am.

6          THE COURT:  Thank you.

7      (Prospective Juror Mendoza exits the sidebar

8      proceedings.)

9          THE COURT:  Wyndell Robinson.

10     (At sidebar with Prospective Juror Robinson outside the

11     hearing of the venire.)

12         PROSPECTIVE JUROR ROBINSON:  Good morning.

13         THE COURT:  Good morning.  You had raised your hand

14   a couple times, one about somebody involved in criminal case,

15   and also whether in terms of connections to the law

16   enforcement.

17         PROSPECTIVE JUROR ROBINSON:  I have been in a

18   criminal case but never convicted.

19         THE COURT:  And what have you been charged with?

20         PROSPECTIVE JUROR ROBINSON:  It was a gun charge.

21         THE COURT:  How long ago?

22         PROSPECTIVE JUROR ROBINSON:  Eight to 10 years, or

23   more.  In my youth.

24         THE COURT:  Okay.  And did you go to trial?

25         PROSPECTIVE JUROR ROBINSON:  No.  No.

1          THE COURT:  They dropped it?

2          PROSPECTIVE JUROR ROBINSON:  Yeah.  It was thrown

3     out.

4          THE COURT:  Anything else?

5          PROSPECTIVE JUROR ROBINSON:  With the law

6     enforcement, I have a cousin that is recently retired Secret

7     Service but actively Director of Security for Phoenix Suns.

8     And I have a cousin who is actively working right here, 26th

9     and California.  He is a deputy sheriff, I think it was.

10          THE COURT:  Okay.

11          PROSPECTIVE JUROR ROBINSON:  That's it, as far as

12     law enforcement that's close.

13          THE COURT:  Would any of that prevent you from

14     being fair and impartial to either side in this case?

15          PROSPECTIVE JUROR ROBINSON:  No.

16          THE COURT:  Okay.  Does anybody have any questions?

17          MR. YOUNG:  Can I just ask one question?  Sir, with

18     respect to the gun charge that is dropped, was that something

19     that was brought by state, or, if you know, the federal

20     government?

21          PROSPECTIVE JUROR ROBINSON:  The state.

22          MR. YOUNG:  Thank you, sir.

23          PROSPECTIVE JUROR ROBINSON:  You're welcome.

24          THE COURT:  All right.  Thank you.

25          (Prospective Juror Robinson exits the sidebar

1        proceedings.)

2              THE COURT: What should I do about Ms. Flanagan?

3              MR. KUTNICK: I don't think -- my position is that

4    it's going to be very -- a hardship on her with her

5    employment.

6              THE COURT: I may look on it differently, but,

7    regardless, if you people want to be rid of her, we'll get

8    rid of her.

9              MR. YOUNG: Judge, it sounds like she made

10   arrangements for this week, and she can -- I mean, I don't

11   anticipate this going into next week. To me, she didn't

12   espouse anything that is beyond the inconvenience that all

13   jurors experience. And I certainly don't want to minimize in

14   that in any regard, but nothing she said would indicate that

15   she should be excused, in my opinion.

16             THE COURT: Well, that's right. She really

17   doesn't. She is just a privileged person who thinks that she

18   should --

19             MR. KUTNICK: Can I -- one more comment? Looking

20   at my notes, your Honor, when you asked her whether or not

21   she could be fair and impartial, she didn't immediately say

22   yes. She said she needed more facts to see if she could be

23   fair and impartial. I think that is -- is a reason also that

24   she should be excluded.

25             THE COURT: Well, what facts am I actually going to

```
1    give her?

2              MR. KUTNICK:  I mean, she has a lot of investment

3    she does, whatever, CEOs do.  I guess my position is that

4    normally we're looking for that gut answer, yes, I can be

5    fair and impartial.

6              THE COURT:  She is just trying to get out of jury

7    duty.

8              MR. YOUNG:  Yes, your Honor.  I mean, she

9    equivocated, but a significant equivocation some ways

10   probably the most intelligent answer because they don't know

11   that much about the case.

12             THE COURT:  That's from --

13             MR. YOUNG:  I don't believe this is something that

14   really depends upon intricate knowledge of certain types of

15   training, or the like.

16             THE COURT:  Leave it for the moment.  Maybe we

17   should talk to her a tiny bit more.

18             Donna Haddad.

19             We'll talk about her a tiny bit more.

20        (At sidebar with Prospective Juror Haddad outside the

21          hearing of the venire.)

22             THE COURT: Hello.

23             PROSPECTIVE JUROR HADDAD:  Hi.

24             THE COURT:  You raised your hand when I asked about

25   criminal.
```

1       PROSPECTIVE JUROR HADDAD:  I have a half brother

2    who pled guilty to a felony drug charge.

3       THE COURT:  Okay.  How long ago?

4       PROSPECTIVE JUROR HADDAD:  It had to be a long time

5    ago because I don't think I was a lawyer yet.  So over

6    20 years.

7       THE COURT:  Are you close to him?

8       PROSPECTIVE JUROR HADDAD:  Estranged relationship.

9       THE COURT:  Is there anything about that that would

10   prevent you from being fair and impartial to either side in

11   this case?

12      PROSPECTIVE JUROR HADDAD:  No.

13      THE COURT:  Thank you.

14      PROSPECTIVE JUROR:  My nanny's mom had a heart

15   attack.  She is leaving for Greece in the morning.  I'm going

16   to be in a little bit of a bind.  But obviously I'll do what

17   I need to do.  So that's -- that is what it is, so, it's

18   okay, but --

19      THE COURT:  I assume you can do something.

20      PROSPECTIVE JUROR HADDAD:  I'm hoping we can find

21   some family members to pitch in, if we need to.  But, yes,

22   she just told me.  So it happened over the weekend.  She is

23   flying to Greece in the morning, but she is here today, is

24   the good news.

25      THE COURT:  How old are your children?

1    PROSPECTIVE JUROR HADDAD:  Seven, 12 and 14 at

2    three different schools.  So that's the problem.  It's just

3    the driving, but.

4         THE COURT:  Do you have other family members?

5         PROSPECTIVE JUROR HADDAD:  My mom doesn't drive.

6    So I'm going to see if maybe my brother can help get them

7    around.

8         THE COURT:  Okay.  I mean, this is relatively short

9    trial.

10        PROSPECTIVE JUROR HADDAD:  Yes, I heard that, which

11   is helpful.  Because I don't know how long she is going to be

12   in Greece.  She doesn't know.  I have to see how her mom is

13   doing, so.

14        THE COURT:  Okay.  Somebody needs to get them all

15   to school?

16        PROSPECTIVE JUROR HADDAD:  Home.

17        THE COURT:  Pick them up.  How about your husband?

18        PROSPECTIVE JUROR HADDAD:  He also works full-time,

19   so we'd have to figure it out.

20        THE COURT:  Okay.  I think it sounds like you can.

21        PROSPECTIVE JUROR HADDAD:  I hope, yes, okay.

22        THE COURT:  You can do that.  Okay.  Thank you.

23        (Prospective Juror Haddad exits the sidebar

24        proceedings.)

25        THE COURT: Donnald Hamrin.

1          (At sidebar with Prospective Juror Hamrin outside the

2      hearing of the venire.)

3          PROSPECTIVE JUROR HAMRIN:  Hi.

4          THE COURT:  You indicated that somebody was

5      involved in law enforcement.

6          PROSPECTIVE JUROR HAMRIN:  No, his accountant was

7      indicted by the FBI for tax fraud.

8          THE COURT:  Who?

9          PROSPECTIVE JUROR HAMRIN:  A friend of mine.

10         THE COURT:  Oh, I see.

11         PROSPECTIVE JUROR HAMRIN:  His accountant took all

12     his money and put it away and --

13         THE COURT:  Oh.

14         PROSPECTIVE JUROR HAMRIN:  Just the FBI I think

15     investigated him and didn't want to put him out of business,

16     but they did, which is kind of unfortunate.

17         THE COURT:  This is a friend's accountant?

18         PROSPECTIVE JUROR HAMRIN:  Personal friend of mine.

19     His accountant embezzled money from him, then the FBI came

20     after them, and he still owed all the money -- all the back

21     taxes, just they said they didn't want to put him out of

22     business, but they did because he was still liable for the

23     money, but.

24         THE COURT:  The accountant?

25         PROSPECTIVE JUROR HAMRIN:  No, no, my friend.

1          THE COURT:  Oh, your friend.

2          PROSPECTIVE JUROR HAMRIN:  That's what they did,

3     so, kind of unfortunate.

4          THE COURT:  Is there anything about that --

5          PROSPECTIVE JUROR HAMRIN:  Yes.

6          THE COURT:  -- experience that would prevent you --

7          PROSPECTIVE JUROR HAMRIN:  I'm not a big fan of the

8     FBI, just put my friend out of business.

9          THE COURT:  Anybody have any questions?

10          MR. YOUNG:  How recently was this, sir?

11          PROSPECTIVE JUROR HAMRIN:  That was about ten years

12     ago.  Triple R Graphics.

13          MR. YOUNG:  Was your friend someone who lived in

14     the Chicago area?

15          PROSPECTIVE JUROR HAMRIN:  Suburbs, yes.

16          MR. YOUNG:  I'm sorry.  What put him out of

17     business?

18          PROSPECTIVE JUROR HAMRIN:  Well, okay, the

19     accountant embezzled all his tax money, said he was paying

20     it.  The FBI came after them, but they were investigating him

21     for, like, two years, but they didn't tell my friend and let

22     him keep doing.  Then they held him liable for all that

23     money, said, no, we don't want to put you out of business,

24     but eventually he was out of business.

25          MR. YOUNG:  The accountant embezzled your friend's

```
 1    tax --

 2              PROSPECTIVE JUROR HAMRIN:  Correct, yes.

 3              MR. YOUNG:  IRS ultimately still held him

 4    accountable.  You're upset because the FBI delayed and never

 5    told him?

 6              PROSPECTIVE JUROR HAMRIN:  Yes, absolutely.

 7              MR. YOUNG:  It's possible you are going to hear

 8    from witnesses from the FBI in connection with this trial.

 9    Would that affect your ability to sort of weigh that witness'

10    testimony the same manner that you would weigh the testimony

11    of other witnesses?

12              PROSPECTIVE JUROR HAMRIN:  I would hope so, but I

13    don't know.

14              MR. YOUNG:  When you say, "I would hope so," you

15    hope it would affect you?

16              PROSPECTIVE JUROR HAMRIN:  No, it wouldn't affect

17    me.

18              MR. YOUNG:  But you don't know?

19              PROSPECTIVE JUROR HAMRIN:  Right.

20              MR. YOUNG:  Nothing further, your Honor.

21              THE COURT:  All right.  Thank you.

22              PROSPECTIVE JUROR HAMRIN:  All right.

23         (Prospective Juror Hamrin exits the sidebar

24         proceedings.)

25              THE COURT:  I think I'm going to strike him.
```

1          The last person was Nicole Scimeca.  She is the one

2    that apparently came in -- should I ask her about her medical

3    problem, or shall I just excuse her?

4          MS. ZARDKOOHI:  The diabetic one?  Who is a

5    diabetic?

6          MR. KUTNICK:  Yes.

7          MR. YOUNG:  Maybe we should ask.  I mean, obviously

8    we could accommodate her.

9          THE COURT:  All right.  Nicole Scimeca.

10        (At sidebar with Prospective Juror Scimeca outside the

11            hearing of the venire.)

12          PROSPECTIVE JUROR SCIMECA:  Hi.

13          THE COURT:  Hi.  So I think -- I mean, we can

14    generally accommodate a lot of medical problems, but I guess

15    I need to know how much of a problem it would be.

16          PROSPECTIVE JUROR SCIMECA:  Okay.  Because it's

17    autoimmune-related, I can't get regulated.  So there is

18    sometimes my sugars can be as low as 60 to where I'm

19    sweating.  And then I eat, and then I'm up to over 280, where

20    you kind of get dizzy, or whatever, confused.  But it's the

21    low sugars where I'm concerned with.  So I actually have an

22    appointment at Mayo Clinic in a month to see what's causing

23    the low sugars.

24          THE COURT:  Have you been okay here this morning?

25          PROSPECTIVE JUROR SCIMECA:  Yeah, but it's on my

1    phone, so I can't check it.  I turned it off, so I can't

2    check what my sugars are at right now.

3              THE COURT:  Oh, dear.  Well, yes, you've got to be

4    able to do that.

5              PROSPECTIVE JUROR SCIMECA:  Because it's a monitor

6    where they monitor right to your phone to see what your sugar

7    levels are in.  Just low sugars what concerns me because you

8    start to get shaky and real sweaty, you could pass out.

9    That's what I'm worried about.

10             THE COURT:  Yeah.

11             PROSPECTIVE JUROR SCIMECA:  So --

12             THE COURT:  Well, if you could monitor your phone

13   so you could be sure, and then if there was an issue you

14   would just --

15             PROSPECTIVE JUROR SCIMECA:  Get up and leave.  But

16   it beeps at you.

17             THE COURT:  Well, is it --

18             PROSPECTIVE JUROR SCIMECA:  Two beeps loud at you.

19   There is no way to control the volume on the app.

20             THE COURT:  That's all right.  We would want to

21   stop.  We would need to stop for you to -- --

22             PROSPECTIVE JUROR SCIMECA:  Get something to eat.

23             THE COURT:  So if you had a snack around, would you

24   be able to -- would you be okay?

25             PROSPECTIVE JUROR SCIMECA:  Hold it off, yes.

 1          THE COURT:  No, I don't mean to stop.  I mean, we

 2   would stop the proceedings.

 3          PROSPECTIVE JUROR SCIMECA:  Uh-huh.

 4          THE COURT:  And then you -- if you got something to

 5   eat, would you be okay in a few minutes.

 6          PROSPECTIVE JUROR SCIMECA:  Sometimes it takes like

 7   15 minutes, 20 minutes to get the sugars back into your

 8   system.

 9          THE COURT:  Is that because you let it go too long,

10   or, I mean --

11          PROSPECTIVE JUROR SCIMECA:  They don't know because

12   it's all autoimmune related.

13          THE COURT:  Okay.  We'll talk about it.  Thank you.

14          PROSPECTIVE JUROR SCIMECA:  Okay.  Thank you.

15      (Prospective Juror Scimeca exits the sidebar

16       proceedings.)

17          THE COURT:  Up to you people.

18          MR. YOUNG:  I mean, it's going to cause delays,

19   Judge.

20          MR. KUTNICK:  She doesn't seem to --

21          THE COURT:  Okay.

22          MR. KUTNICK:  It's going to be problematic to her.

23          THE COURT:  All right.  So I think I will excuse

24   them all to the hallway, and we will talk about -- unless you

25   want me to bring up -- the only other person to bring up

1    would be if you wanted to bother bringing up Ms. Flanagan.  I

2    have mixed feelings about that.  I think there probably isn't

3    anything we can ask that's going to get us any more

4    information.  Okay.  Is that all right?  So I'll excuse them,

5    and then we will talk about these and then --

6            MR. YOUNG:  That's fine, your Honor.

7            THE COURT:  -- take your picks.

8            MR. KUTNICK:  That's fine, your Honor.

9        (Proceedings heard in open court.)

10           THE COURT:  All right.  I am going to excuse all of

11   you to the hallway, and I will -- while we determine who is

12   going to sit on this jury.  Ordinarily it probably takes

13   about 20 minutes, but that part I don't make a promise on.

14   I'll ask that you stay on this floor and that you not talk

15   about the case, and we will bring you back as soon as we can.

16       (Prospective jurors out.)

17           THE COURT:  Okay.  I think we have two people that

18   we need to talk about before I -- one is Mr. Phillipp.  That

19   was No. 11.  And Ms. Flanagan.  I'll tell you, I --

20   Mr. Phillipp just -- well, I would be tempted to excuse him.

21   Anybody disagrees, let me know.

22           MR. KUTNICK:  I don't have an objection, your

23   Honor.

24           THE COURT:  Okay.  We will do that.  Ms. Flanagan

25   is a more difficult situation.  She will be difficult.  She

1    has no legal excuse.  But if this goes over until next week,

2    we're going to have a fight on our hands, probably.  So I'm

3    not sure that it's worth it to keep her.

4                MR. YOUNG:  I'll defer it to you, your Honor.

5                MR. KUTNICK:  We have no objection to excusing her,

6    your Honor.

7                THE COURT:  All right.  In that case, if you will

8    give me -- the government, you can give me up to six strikes,

9    and you have up to ten, and then we'll see where we are.

10               MR. KUTNICK:  Judge?  Your Honor, can I just be

11   clear about who we've lost at this point?

12               THE COURT:  Oh, yes, that's fair.  Okay.  These are

13   the ones that I wrote down.  No. 3, No. 4, No. 11, No. 24, 31

14   and 35.

15               MR. KUTNICK:  Thank you, Judge.

16               THE COURT:  Is that what --

17               MR. KUTNICK:  That comports with my notes, yes.

18               THE COURT:  Okay.  All right.  Just give me a list

19   in writing when you're ready.

20               MR. KUTNICK:  Okay.

21        (Recess from 10:51 a.m. to 11:00 a.m.)

22        (Proceedings heard in open court. Prospective jurors

23         out.)

24               MR. KUTNICK:  Thank you, Judge.  We're ready.

25               THE COURT:  Okay.  If you want to just give me the

1    list.

2              MR. KUTNICK:  Oh, I will write it as a list, Judge.

3    Just by numbers?  Do you want the numbers or just the names?

4              THE COURT:  Well, numbers and names is best.  But

5    it's okay, you can just put the numbers down, that's fine,

6    because I will double check them before -- with you before we

7    do anything.

8              That first number, is that a one?

9              MS. ZARDKOOHI:  The first number is one, yes.  And

10   then it's --

11             THE COURT:  And then the next person is Poole?

12             MS. ZARDKOOHI:  Five, yes.

13             THE COURT:  And then Steinheiser?

14             MS. ZARDKOOHI:  Seven, correct.

15             THE COURT:  Grimm is the next?

16             MS. ZARDKOOHI:  Correct.

17             THE COURT:  Silver.

18             MS. ZARDKOOHI:  Correct.

19             THE COURT:  Stawinski.

20             MS. ZARDKOOHI:  Correct.

21             THE COURT:  Eckert?

22             MS. ZARDKOOHI:  Yes.

23             THE COURT:  Kramer -- Oh, no, Haddad?

24             MS. ZARDKOOHI:  And then Kramer.

25             THE COURT:  And then Kramer.  And then Guarino?

1      MS. ZARDKOOHI:  Correct.

2      THE COURT:  Let me see what we have, then.  And the

3  government's were Seaton, Drucker, Mendoza.  That's it.

4      Okay.  Let me see. So Juror No. 1 would be Tawana

5  Dearing.  Juror No. 2, Donald Longmire.  Juror No. 3, Javier

6  Passeri.  Juror No. 4, Jeseyra Alcantar.  Juror No. 5, Andrea

7  Caruso.  Juror No. 6, Alexander Chavez.  Juror No. 7, Kevin

8  Novy.  Juror No. 8, William Gora.  Juror No. 9, Yolanda Bell.

9  Juror No. 10, Lynn Sturznickel.  Juror No. 11, Wyndell

10  Robinson, Juror No. 12, Karen Gatewood.

11      Does that correspond with what you people have on

12  your list?

13      MR. YOUNG:  It does, your Honor.

14      THE COURT:  Okay.  Then we still have a number

15  left.  We need two alternates.  So starting with No. 27.

16  Really, if you -- if either one of you wants to -- you

17  each -- you each have one more strike.  If you want to

18  exercise a strike as to 27, tell me.  Otherwise, that will be

19  Alternate 1.

20      MR. KUTNICK:  No, we don't.

21      MR. YOUNG:  No, your Honor.

22      THE COURT:  Okay.  And the next one would be Lori

23  Delmar.

24      MR. YOUNG:  No, your Honor.

25      MR. KUTNICK:  What number?  That would be --

1     MS. ZARDKOOHI:  30.

2     THE COURT:  It would be No. 30 because --

3     MR. KUTNICK:  One moment, your Honor.  No

4     objection.

5     THE COURT:  Okay.  I think two should be

6     sufficient.

7     MR. YOUNG:  Yes, your Honor.

8     THE COURT:  Do you agree?

9     MR. KUTNICK:  Yes.

10    THE COURT:  Okay.  So let me just go over it one

11    more time.  Defendant struck No. 1, that's Allen.

12    So Juror No. 1 is Tawana Dearing, that's No. 2

13    there.  We struck for cause, Juror No. 3 and 4.  Defendant

14    struck Juror No. 5.  So Juror No. 2 is No. 6, Donald

15    Longmire.  Defendant struck No. 7.  Juror No. 3 is

16    Mr. Passeri.  Juror No. 4 is Jeseyra Alcantar.  Juror No. 5,

17    Andrea Caruso.  We struck for cause No. 11.  Defendant struck

18    No. 12.  The government struck No. 13.  Defendant struck No.

19    14.  So Juror No. 6, then, becomes Alexander Chavez.  Juror

20    No. 7 becomes Kevin Novy.  Juror No. 8 is William Gora.

21    Juror No. 9 is Yolanda Bell.  The government struck No. 19.

22    Defendant struck 20.  Juror No. 10 then becomes Lynn

23    Sturznickel.  The government struck No. 22.  Juror No. 11 is

24    then Wyndell Robinson.  Cause, No. 24.  Defendant struck 25.

25    Juror No. 12 becomes Karen Gatewood.  Alternate 1 is Asmidia

1  Gutierrez.  Defendant struck 28 and 29.  So Alternate 2

2  becomes Lori Delmar.  Is that jury satisfactory to everybody?

3          MR. YOUNG:  Yes, your Honor.

4          MR. KUTNICK:  It is, your Honor.

5          THE COURT:  Okay.  Then let's bring them back, and

6  we will then get the jury arranged.  It's going to be 11:20.

7  Actually, as they're coming in, tell me what you want to do.

8  Shall I have early lunch, or do you want to do openings?

9          MR. YOUNG:  I would prefer to do openings, your

10  Honor.

11          THE COURT:  Do you want to do openings now?

12          MR. KUTNICK:  We can go ahead and do openings, your

13  Honor.

14          THE COURT:  Okay.  We're fine, John.

15      (Prospective jurors in.)

16          THE COURT:  Okay.  I'm going to call names, and if

17  I call your name, if you would please come up and be seated

18  in the jury box.  Tawana Dearing.  Donald Longmire.  Javier

19  Passeri.  Jeseyra Alcantar.  Andrea Caruso.  Alexander

20  Chavez.  Kevin Novy.  William Gora.  Yolanda Bell.  Lynn

21  Sturznickel.  Wyndell Robinson.  It's actually okay to sit

22  anyplace.  Karen Gatewood.  And our alternates will be

23  Asmidia Gutierrez and Lori Delmar.

24          If you will raise your right hand.

25      (Jurors sworn.)

1    THE COURT:  All right.  If you will be seated,

2    please.  We now have a jury, so we will not further require

3    the services of all of the rest of you who are good enough to

4    come but won't be on this jury.  I do need you to go back to

5    the second floor.  I do think that it's possible that they

6    will call you to another courtroom, and I do hope that,

7    before your time as jurors end, that you have the opportunity

8    to serve on a jury.  Jury service is one of the most

9    important things that we do as citizens.  It's a privilege.

10   It is often an inconvenience, but it is always something

11   that, when people are done, they are glad that they

12   participated in this very important part of being a citizen

13   of this country.  So thank you all for being here.  So they

14   can go back to there.  Okay.  Thank you.

15        (Prospective jurors out.)

16        THE COURT: Okay.  All of you in the box have now

17   been sworn as the jury to try this case.  By your verdict,

18   you will decide the questions of fact that arise during the

19   trial based on my instructions of law to you at the close of

20   the trial.  It is important that you give careful attention

21   to the testimony and the evidence as it is received and

22   presented for your consideration.  You should keep an open

23   mind, and you should not form or express any opinion about

24   this case one way or another until you consider your verdict

25   after having heard all of the evidence, the closing arguments

1    of the attorneys, and my instructions to you on the
2    applicable law.

3        Now, during this trial, you must not discuss this
4    case with anyone, not among yourselves, not with your family,
5    not with your friends, not with anybody.  But you can tell
6    them that you are -- and you must not permit anybody to talk
7    about it in your presence.  You can tell them that you're on
8    a jury, you will tell them about it when it's over.

9        I don't expect that there would be any headlines or
10   articles relating to this trial, but if by some chance I'm
11   wrong on that, then you must not read them or listen to it as
12   well.

13       You must not do your own research on the internet
14   or anyplace else.  If anybody should speak to you or attempt
15   to speak to you about the case or try to influence you in any
16   manner, it is your legal duty to report that to me
17   immediately.

18       Let's talk briefly about the order of this trial.
19   The lawyers for the parties are now going to be permitted to
20   address you in what they call their opening statements; that
21   is, they will tell you what they think that the evidence will
22   show.  The government will then go forward with the calling
23   of witnesses and presentation of evidence in what we call the
24   government's case-in-chief.  When the government finishes by
25   announcing that it rests, defendant will have an opportunity

1    to put on any evidence he chooses, after which the government

2    may be permitted to put on any additional evidence.

3              When the evidence portion of the trial is done,

4    then the lawyers will, again, address you in their closing

5    arguments.  And after that, I'll instruct you to the law.  I

6    think that's all I really need to tell you right now.

7              Is the government ready?

8              MR. YOUNG:  Yes, your Honor.

9              THE COURT:  If you want to take -- you know, I

10   don't want you to be roasting in here.  You certainly -- when

11   we break for lunch, which won't be too long, we will show you

12   where the jury room is, and you will be able to leave your

13   coats, and all, there.  But, gee, I don't want you to be

14   uncomfortable.  And, by the way, you may sit anyplace you

15   want, and, indeed, the witnesses will be here.  To the extent

16   that you feel like -- particularly if you feel like you need

17   to be closer to the witnesses, just sit anyplace.  We don't

18   have assigned seats.  We just needed assigned seats to figure

19   out who when we were picking the jury to make sure we had the

20   right person.

21             Okay.  Go ahead.

22             MR. YOUNG:  Thank you, your Honor.

23        OPENING STATEMENT ON BEHALF OF THE GOVERNMENT

24             MR. YOUNG:  Defendant wanted to make a lot of

25   money, and he wanted to make it very quickly.  The defendant

1    wanted to make millions of dollars, and he wanted to make it

2    within a matter of a few weeks, or no more than a few months,

3    so he decided that he was going to make an investment.  He

4    decided to invest, and he thought he had found a sure thing,

5    a can't-lose deal.  He thought he had found a way to make the

6    millions of dollars that he needed so quickly.

7             But there was a problem.  The defendant didn't have

8    his own money to invest.  He needed hundreds of thousands of

9    dollars to invest in the sure thing that was going to pay him

10   the millions of dollars that he needed.  So he started to

11   look for other people to give him money to invest with.  He

12   started to look, essentially, for partners.  People who would

13   provide him with the money so that he could invest it and

14   they would share in the returns.

15            The defendant began approaching people he knew,

16   people who trusted him, people from his church, his friends.

17   He started approaching them and asking them to give him money

18   to make this investment.  And he started to lie to them.  In

19   order to get their money to make that investment, he started

20   to lie to them.  And when he did that, he committed a crime.

21   He lied to them about the amount of risk that was going to be

22   involved in this investment.  He told them that there would

23   be no risk, that he would personally guarantee their

24   investment, when, in fact, he was in no position to

25   personally guarantee anything.  He didn't even have the money

1    to make the investment himself.  He lied to them about the

2    amount of money that he was putting into the investment.  The

3    defendant told them that he was putting his own money into

4    the transaction, paying fees along the way.  When, in fact,

5    he wasn't putting anything into these transactions.  He

6    didn't have the money.  That's why he was going to other

7    people.

8         The defendant lied to them about where all their

9    money was going.  He led the people he approached to believe

10   that their money was going towards this investment.  And most

11   of it was.  But he was also keeping portions of that money

12   for himself, never telling anyone, using portions of other

13   people's money to purchase a car, a condo, to pay off

14   personal debts in his own name and the name of his mother.

15        He lied.  He lied to other people in order to get

16   their money so that he could make these investments, these

17   sure-things investments, that, at the end of the day, never

18   came through, never paid off, never generated any returns.

19        The defendant collected over a million dollars from

20   the people he approached, the people he knew, the people who

21   trusted him.  And they lost it all.

22        Ladies and Gentlemen, this case is about the lies

23   that the defendant, this man sitting right over here, Carlos

24   Mendoza (sic.), told people to get their money so he could

25   make that investment.  It is not about the fact that the

1    investment ultimately did not turn out, and it is not about

2    the fact that, you know, whether or not the investment was a

3    sure thing or not.  It is about the fact that he lied to get

4    other people's money.

5            Because of those lies, the defendant is charged

6    with two counts of wire fraud.  He is charged with engaging

7    in a scheme to defraud.  A scheme to defraud that involved

8    lying to those people to get their money by telling them lies

9    I just talked about.  And by getting them to wire funds to

10   him in accounts controlled by him, the money that he was

11   collecting.  Those are the charges in this case.  And over

12   the next few days, the evidence you hear will establish the

13   defendant's guilt of those charges beyond a reasonable doubt.

14           This all began back in 2011 and 2012.  At that

15   time, the defendant, Carlos Meza, was looking for money.  He

16   was looking for money to put towards a building, a large

17   apartment building, located right here in Chicago on

18   Milwaukee Avenue.  He had actually had an ownership interest

19   in the building, although it was nominally in the name of his

20   mother.  But they had fallen behind on the mortgage, the loan

21   that secured the building.  It was in foreclosure

22   proceedings.  It was part of a bankruptcy proceeding.  The

23   defendant needed millions of dollars in order to save the

24   property from foreclosure, to save it from a sheriff sale.

25           Right around that time, right around the time he

1    was looking for the money to save that building on Milwaukee

2    Avenue, he learned about an investment opportunity.  He

3    learned about an investment opportunity that sounded too good

4    to be true.  Sounded too good to be true and turned out to be

5    too good to be true, as you will hear.

6            He learned about trading programs, some of them

7    international trading programs, by which in return for

8    investment of a few hundred thousand dollars you could

9    generate millions of dollars in a return.  You know, 10 to

10   $20 million in return, theoretically.  Investment programs

11   that were not well known.  Investment programs that were

12   available only to a select few.

13           Now, the defendant never was able to really explain

14   how these investment programs worked when he went out and

15   tried to raise money.  But it essentially involved a fee or

16   an upfront payment of a few hundred thousand dollars, two to

17   $250,000, that would get you into this program, and

18   thereafter the money that would be generated would be the

19   astronomical amounts I just described, 10 to $20 million.

20           Now, as I said, the defendant didn't have money to

21   pay that fee, the 200 to $250,000, so he started going to

22   people he knew.  He started looking for people to give him

23   that money, to be his partners, if you will, in this

24   investment, in these, you know, trading programs, these

25   international trading programs, wherever they may have been.

1    He approached the people he knew, people who trusted him,

2    friends, members of his church, to get their money to make

3    this investment.

4        Over the years, he had led these people to believe

5    that he was a successful businessman.  That he was a

6    multimillionaire.  That he owned many properties that were

7    flourishing.  That he owned a large trucking company that had

8    hundreds of trucks.  That he had assets located, you know,

9    internationally, in Ecuador, in other locations.

10       He approached these people, the defendant

11   approached these people, and told them that he had a golden

12   opportunity, an opportunity to make millions of dollars

13   within relatively short periods of time.  Two weeks, in some

14   cases.  Two months in others, 60 days.  He ultimately raised

15   over a million dollars from these people.  Over a million

16   dollars.  And no one ever got a penny back with respect to

17   that million dollars.  They never had any return on their

18   investment.  But, as I said, this case is ultimately not

19   about whether or not these international trading programs,

20   you know, were real or not.  And they're not about whether or

21   not defendant believed they were real at the time.  It's

22   about whether or not the defendant lied to get that money.

23   The bottom line is that the defendant didn't have the money

24   he needed to make those investments, and he lied to other

25   people to get that money so he could make those investments.

1    You're going to hear about those lies over the next

2    couple days.  First, you're going to hear how the defendant

3    lied to people about his financial background and status, how

4    he led people to believe that he was successful.  You know,

5    owned those properties, owned those trucking companies.  That

6    he was exactly the type of person who would have access to

7    one of these trading programs, one of these

8    not-very-well-known trading programs that are available only

9    to a select few.

10    Second, he led people to believe, the people who

11    trusted him, the people he approached, that he was putting

12    some of his money into these transactions.  That he, the

13    defendant, essentially had skin in the game.  That he was

14    putting hundreds of thousands of dollars a month, in some

15    cases, in these programs to keep it going.  Adding assurance

16    to these people who he approached that there must be

17    something here because, if he is putting his money in it, I

18    can too.

19    Third, he lied about the amount of risk that was

20    involved in these transactions.  He told them that they were

21    risk-free and that he could personally guarantee their

22    return -- their investment, I should say.  He can personally

23    return their -- personally ensure, guarantee, their

24    investment, when he didn't have the financial ability to do

25    that by any sense of means.

1     And, fourth, he lied to them about where their

2 money was going.  He led them to believe that all their money

3 was going towards these investments, when it wasn't.  He was

4 keeping portions of it.  Most of it was -- most of it was

5 going towards the investments that would theoretically be

6 international trading programs.  But not everything.  A

7 significant portion was also going into the defendant's

8 pocket.  And he wasn't telling anyone about that.  To

9 purchase the car, the condo, pay off the debts.

10     Those are the lies you're going to hear about, the

11 lies the defendant told the people he approached, the people

12 who knew him and entrusted him, his friends, in order to get

13 the money he wanted to make that investment in the hopes of

14 saving that building.

15     Over the next few days, you're going to hear from a

16 variety of witnesses.  You're going to hear from the people

17 who the defendant approached.  You're going to hear from the

18 people who gave him the money.  You're going to hear from the

19 victims of this scheme.

20     You'll hear from Scott Spencer, someone who knew

21 the defendant from the -- from their church.  Had known him

22 for a number of years.  Had been very friendly with him.  In

23 the past had even -- they had talked about investments and

24 had looked into a real estate investment back in North Dakota

25 right around the time of these international trading

1    programs, the defendant approached him.  But the defendant

2    approached Mr. Spencer and told him about this opportunity to

3    invest in this international trading program.  And

4    Mr. Spencer will tell you, he ultimately provided the

5    defendant will nearly three-quarters-of-a-million dollars

6    between 2011 and 2013.

7          You will hear from another fellow church member, a

8    gentleman by the name of Cordell Crane who also knew the

9    defendant for a number of years and actually considered him

10   to be his closest friend at the time.  He ultimately provided

11   the defendant with over $300,000 for use in these

12   international trading programs.  They lost everything.  But

13   they will tell you about what the defendant told them.  They

14   will tell you that he told them about returns of 10 to

15   $20 million in return for a $250,000 investment, returns that

16   could be generated within 60 days in one case.  And another

17   case told one of them about $250,000 returning $5 million

18   with returns coming as quickly as two weeks.  They trusted

19   the defendant.  They invested with the defendant.

20         They will talk to you about how over time, when the

21   money didn't come in as the defendant had promised, the

22   defendant began to give Mr. Spencer and Mr. Crane various

23   excuses about where the money was.  It was being held up

24   somehow.  There was a paperwork snafu.  There was some

25   passport number that someone didn't have.  Always some reason

1   why it had not come through, but it was right around the

2   corner and would be happening soon.  The check was in the

3   mail, if you will.

4           He would also ask them for additional funds, ask

5   them for additional money, saying that they needed the money

6   to complete the deal, whether it was for some kind of fee or

7   for taxes or needing to buy out one of the people involved in

8   their particular program who was holding up the trade.

9           And as time passed and Mr. Spencer and Mr. Crane

10  became more agitated about where their money was, the

11  defendant began to lie also about being able to take care of

12  them or take -- replace their investment.  We will tell you

13  how he would tell them in order to lull them, in order to

14  sort of calm them down that:  Don't worry, you know, whatever

15  the delays may be with the paperwork or the need to buy

16  someone out, I have money.  I have millions of dollars in

17  Ecuador that I can bring up to take care of your investments.

18  That money never came.  They lost everything.  And they will

19  tell you the impact it had.

20          You know, Mr. Spencer had cleaned out some of his

21  retirement account, had mortgaged his business.  It had a

22  very deep impact on him.  Mr. Crane, likewise, it cleared out

23  his retirement accounts in order to make these investments.

24  They banked everything they knew -- or they banked a lot of

25  what they had, I should say, on the defendant because they

1     trusted him.

2             You will also hear from a financial analyst by the

3     name of Steven Tremaglio.  He will talk to you about the

4     money, the flow of funds in this case.  He will talk to you

5     about the money that was collected from, you know, Mr. Crane,

6     Mr. Spencer, and others by the defendants.  In some cases,

7     the money was wired at the defendant's instructions right to

8     an account held in the name of a company controlled and owned

9     by the defendant.  In other cases, at his direction, it was

10    sent to other accounts, controlled by people purportedly

11    involved in these international trading programs.  And you

12    will hear the names:  Bob Adams, Larry Gelfond, Terry Barnes,

13    among others.  In either event, defendant was directed on

14    where to send the money.  Most of the money ultimately went

15    to those people I just mentioned:  Adams, Gelfond and Barnes.

16    But a significant portion did not.

17            Scott Spencer, for example, one of the church

18    members who knew the defendant for a number of years,

19    provided the defendant with $280,000 in May, June of 2012,

20    the spring of 2012.  About 150 of that money, you know, a

21    little more than half, made it to the trading program.  But

22    the other half didn't.  Used by the defendant.  Mr. Tremaglio

23    will explain to you exactly how the defendant used the funds

24    in that case and others.  How he kept money for himself.

25            You will also see a variety of records.  There is a

1    lot of bank records, and some of those will be summarized in

2    charts that Mr. Tremaglio has prepared and will talk to you

3    about.  But you will also see other documents.  For example,

4    you will see the defendant's tax returns.  Tax returns for

5    the year 2012 and 2013, reflecting that, at the same time he

6    was representing he was a successful businessman who had

7    access to these large trading programs, he was reporting a

8    gross income -- a gross income of roughly 20 to $30,000.  Had

9    a contracting business with gross receipts of roughly 100,000

10   but that was making less than $10,000 a year.  Those are some

11   of the witnesses you will hear from, and that is some of the

12   evidence you will hear -- or see over the next few days.

13          Ladies and Gentlemen, this morning you were

14   introduced to the defendant, and none of you knew him.  But

15   by the end of this trial, you are going to know what he did.

16   He lied and he stole.  He lied and he stole to people who

17   trusted him, people he knew, in order to make these

18   investments that were hoping going to be his payday, his

19   golden ticket.  It didn't work out.  Those investments never

20   came through.  And the people who gave him that money based

21   on those lies lost everything.  And they wouldn't have lost

22   that money, but for those lies.

23          I appreciate -- I want to thank you for your time

24   and attention so far today.  You know, at the conclusion of

25   this trial -- and it will be a short one, as Judge Bucklo

1    indicated to you.  At the conclusion of this trial in a few

2    days, my colleague, Ms. Klamann and I, are going to have the

3    opportunity to address you again.  And when we do, we're

4    going to talk to you about the evidence and how it

5    establishes the defendant's guilt beyond a reasonable doubt.

6           We will also ask you at that time to return the

7    only verdict consistent with the evidence in this case, which

8    is a verdict of guilty on both of the counts.  Thank you.

9           THE COURT:  Thank you.

10       OPENING STATEMENT ON BEHALF OF THE DEFENDANT

11         MS. ZARDKOOHI:  I want to also thank you for being

12    here.  My name is Mina Zardkoohi.  And together with my

13    colleague, Josh Kutnick, we represent Carlos Meza.

14           Carlos is a regular guy, and he wanted more.  He

15    wanted more for himself and for his friends.  And he took

16    care of his friends, his acquaintances, his neighbors.  He is

17    a go-to guy.  People knew that he was in business of property

18    improvement.  So they would go to him.  They would go to him

19    for questions, answers, tasks and to-dos.  You will hear from

20    the witnesses.  One of them, for example, as the government

21    has mentioned, is going to be Scott Spencer.  Scott Spencer,

22    who is an experienced investor.  And he is going to tell you

23    that Mr. Meza, Carlos, helped him on his North Dakota

24    property.  That he was his go-to guy.  That he helped him

25    with various issues.  From, for example, title surveys to

1    securing various equipment.  Cranes to bobcats.  From moving

2    furniture around.  He was his go-to guy for the North Dakota

3    property.

4    You will also hear from Cordell Crane.  Cordell

5    Crane is a friend of Carlos.  They've known each other for

6    quite some time.  They had dinners together.  They even went

7    on a vacation together.

8    You will hear from Ray Yocoub.  Ray Yocoub is

9    Carlos' mechanic for past 20, or so, years.  They -- Ray

10   helped him out.  So he, in turn, helped Ray out.

11   Carlos was all this to many people.  But he was

12   also a victim.  At some point, Carlos trusted people.  He

13   trusted a group of fraudsters who posed themselves as capital

14   providers, as trader.  He was gullable.  He wanted to improve

15   his financial situation and that of his friends.

16   The allegations here are that Carlos was in on two

17   schemes.  One, involving a company called Renaissance Capital

18   run by a person called Robert Adams.  And the other a company

19   called Carso operated by Terry Barnes.

20   Now, you will hear a lot about these names and

21   these companies, but you will not hear a single shred of

22   evidence that Carlos was in on these schemes, that he knew

23   that people were going to be deceived.

24   You will also hear allegation that some of the

25   money was appropriated for non-investment purposes.  But you

1  will also hear from witnesses who are going to tell you

2  exactly their relationship with Carlos and why those

3  expenditures may have occurred.

4          As the government said, you will hear from a

5  financial investigator.  The financial investigator will

6  explain how far-reaching and complex this scheme was.  The

7  money that came to, for example, Robert Adams, some of it

8  even left the country.  But many more people were involved.

9  Not just Carlos and a group of people that you will hear

10 about in the next three, four days.

11         I want to take you back to how it all began for

12 Carlos.  Milwaukee McPherson is a company owned by Carlos'

13 mother.  He is the CEO of the company.  He is the manager for

14 the company.  He takes care of a building the company owns.

15 It's 70-unit building in Chicago.

16         Now, this building was in a lot of trouble.  It

17 needed money.  So Carlos wanted to keep the company in his

18 own possession, the possession of his family.  So he decided

19 to look for somebody who can help him with refinancing.  He

20 turned to a mortgage broker, and the mortgage broker

21 recommended a number of people who could help with the

22 financing.

23         This is where Carlos fell into trouble.  He fell

24 victim to complex schemes, and he wasn't aware that he was

25 walking into it.  All he wanted to do essentially was keep

1    the property in his name and his mother's name.

2         Carlos was told that a highly lucrative opportunity

3    exists.  But in order to get in on that opportunity, you need

4    10 million.  Carlos did not have that money.  And neither did

5    any of the people that you are going to hear from over the

6    next couple of days.  But here comes Mr. Bob Adams.  He was

7    recommended as someone who can lease, essentially, those

8    $10 million to Carlos and the rest of the people in exchange

9    for a fee, $250,000.  You put it down, they would give you

10   lease to 10 million, and investments will come through.  So

11   people invested.

12        But the money never materialized.  All the money

13   that went into Robert Adams' account, none of that came back

14   to Carlos or any of the people invested.

15        Months had passed, and everybody was hopeful.  But

16   after months had passed, people started getting desperate.

17   And in that desperation, they looked to somehow recoup

18   investments by investing more.  And the same person who

19   recommended Robert Adams recommended another person, Terry

20   Barnes from Carso.  Again, a group of shady people out there

21   lurking for desperate, wanting to recoup their money.

22        Of course, people invested again.  And, here, it's

23   like gamblers who keep on losing, and, yet, they keep on

24   gambling in hope for a final win.  This is Carlos' weakness.

25   This is his mistake.  That he trusted and hoped the money

1    would come back to him and his friends.

2           He believed that so much money could be made so

3    quickly.  Many people lost money in this scheme.  You will

4    hear from many of them blaming Carlos.  But you will also

5    hear that a lot of them went in and made their own decisions.

6    Some of them did, for example, their own investing before

7    this, like Scott Spencer.  Others, for example, decided to

8    bypass Carlos and not use him as an intermediary.

9           Carlos did hear about this investment first, and he

10   did share it with his friends, but he believed in the genuine

11   nature of this investment.  And all of these people in the

12   end made their own decision to invest.

13          You will also hear that Carlos kept him in the loop

14   quite diligently about his conversations with Robert Adams

15   and others and his attempts to recoup this investment.  But

16   in the end, the money was no where to be seen.  These people

17   lost a lot of money, and they wanted someone to blame.  They

18   ended up blaming Carlos.

19          This trial is about disappointment and anger

20   directed at Carlos.  You will hear evidence of that.  But,

21   remember, you will not hear any evidence that Carlos knew of

22   the scheme.  Because he didn't.  He believed the money will

23   come through.  It didn't.  And here we are.

24          I believe that after you heard all the evidence in

25   this case over the next few days that you will find Carlos

1   not guilty.  Thank you.

2           THE COURT:  Counsel, may I just see you for a

3   minute please.

4           (Sidebar proceedings had not on the record.)

5           THE COURT:  Okay.  We're going to break at this

6   point for an hour's lunch, which is what we will do each of

7   these few days.  And we'll also have a morning break and an

8   afternoon break.  We'll talk about that later.  You'll be

9   shown where the jury room is, and you will come back to that.

10  And I'll ask that you use -- because the one you're using is

11  right here.  So I'll ask that you use this elevator and the

12  government and defense will use that elevator.  I don't

13  expect that you run into each other.  If you do run into

14  anybody and they don't say anything, just understand that

15  they're complying with my instructions that they not talk to

16  you.

17          There is a cafeteria downstairs.  It's not bad.

18  It's pretty decent.  But you are certainly welcome to go out.

19  Just, we'll say one hour.  So if you would come back at five

20  of 1:00 and just be ready to go at that time.  Let's make

21  sure that you have time, so we will say 1:00 o'clock.  We'll

22  begin, then, at 1:00 today, and he'll go over the jury room

23  there with you.

24          COURT SECURITY OFFICER:  All rise.

25          THE COURT:  I just remind you, if you get on your

1  phones, you can tell people that you're on the jury, but you

2  tell them you may not talk about it at this point.

3        Okay.  We will see you at 1:00 o'clock.  Thank you.

4        (Recess from 11:53 to 1:55.)

5        (Proceedings heard in open court.  Jury out.)

6        MR. YOUNG:  Can the witness come in and take the

7  stand, your Honor.

8        THE COURT:  Sure, he might as well.  I don't know

9  that we discussed it.  Ordinarily we hand out notebooks.  Any

10  objection?

11        MR. KUTNICK:  No objection.

12        MR. YOUNG:  No, your Honor.

13        MR. KUTNICK:  Your Honor, I have my binder of

14  exhibits for the court.  The only thing is it is tabbed, but

15  I haven't written the numbers on here, but they're in order.

16  There is an exhibit list there as well.

17        THE COURT:  You can be seated.  You're going to

18  have a few minutes.  I think we're waiting on a couple of

19  jurors still.

20        (Jury in.)

21        THE COURT: Please be seated.  Good afternoon, first

22  of all. You've been given notebooks.  You're free to take

23  notes.  It's totally up to you.  I'll instruct you about the

24  use of any notes that you do take at the end of trial.

25

1      (Whereupon, proceedings were had that were transcribed

2  under separate cover.)

3                          CERTIFICATE

4      I certify that the foregoing is a correct excerpt

5  transcript from the record of proceedings in the

6  above-entitled matter.

7

8  /s/ *SANDRA M. MULLIN*_____          November 8, 2019

9  SANDRA M. MULLIN, CSR, RMR, FCRR
   Official Court Reporter

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25