```
1              IN THE UNITED STATES DISTRICT COURT
               NORTHERN DISTRICT OF ILLINOIS
2                    EASTERN DIVISION

3                              )
   UNITED STATES OF AMERICA,   )   Case No. 17 CR 281
4                              )
               Plaintiff,      )
5                              )
         vs.                   )   Chicago, Illinois
6                              )   November 19, 2018
   CARLOS R. MEZA,             )   2:00 p.m.
7                              )
               Defendant.      )
8
        TRANSCRIPT OF PROCEEDINGS - Pretrial Conference
9         BEFORE THE HONORABLE ELAINE E. BUCKLO

10
   APPEARANCES:
11
   For the Plaintiff:      MR. JOHN R. LAUSCH, JR.
12                         UNITED STATES ATTORNEY
                           BY:  MR. RICK D. YOUNG
13                              MS. KAITLIN KLAMANN
                           Assistant United States Attorneys
14                         219 South Dearborn Street
                           Chicago, Illinois  60604
15
   For the Defendant:      MR. JOSHUA B. KUTNICK
16                         900 West Jackson Boulevard # 5
                           Chicago, Illinois  60607
17
                           AND
18
                           LAW OFFICE OF MINA ZARDKOOHI
19                         BY:  MS. MINA ZARDKOOHI
                           53 West Jackson Boulevard
20                         Suite 1615
                           Chicago, IL 60604
21

22 Court Reporter:         SANDRA M. MULLIN, CSR, RMR, FCRR
                           Official Court Reporter
23                         219 S. Dearborn Street, Room 2260
                           Chicago, Illinois  60604
24                         (312) 554-8244
                           sandra_mullin@ilnd.uscourts.gov
25
```

1          (Proceedings heard in open court:)

2              MR. KUTNICK:  Joshua Kutnick, K-u-t-n-i-c-k, on

3     behalf of Carlos Meza.

4              MS. ZARDKOOHI:  Mina Zardkoohi, M-i-n-a,

5     Z-a-r-d-k-o-o-h-i, also on behalf of Carlos Meza.

6              MR. KUTNICK:  And, Judge, I'm introducing you to

7     Ms. Zardkoohi.

8              THE COURT:  Are you going to participate in the

9     trial?

10             MS. ZARDKOOHI:  Yes.

11             THE COURT: Then I better learn how to pronounce

12    your name.

13             MS. ZARDKOOHI: If it's spelled out, it's quite --

14    this is how it's spelled out.  Zardkoohi.  You can skip the

15    "H."

16             THE COURT: Okay.  What kind of --

17             MS. ZARDKOOHI:  My husband is Persian, that's

18    Iranian.  Not mine. My maiden name is Serbian.  It's even

19    worse.  That's why I took his.

20             THE COURT: Zardkoohi?

21             MS. ZARDKOOHI: Yeah, good.  Thanks.

22             MR. YOUNG:  Rick Young and Kaitlin Klamann on

23    behalf of the United States.

24             THE COURT:  I'm sorry, what is your name, please?

25             MS. KLAMANN:  Kaitlin Klamann.

1          THE COURT:  All right.  We have some motions in

2     limine to deal with.  The government filed several.

3          MR. KUTNICK: I filed one.  It's one motion, but it

4     has a few issues.

5          THE COURT:  I saw.  Okay.  So we will start with

6     the one that the government has with respect to 803(6) and

7     902(11) regarding records.  Is there any opposition?

8          MR. KUTNICK: There is not.

9          THE COURT:  Then your other one was to exclude

10    certain evidence.  One about alleged negligence, lack of

11    reliance or misconduct by the victims.

12          MR. KUTNICK:  So, Judge, my only objection is I

13    want to be able to question the victims about the extent that

14    all investments can be risky.  Not blaming them for not being

15    diligent, not blaming them for -- I mean, because whether or

16    not they were diligent, the fraud would have occurred, is my

17    reading of the case law.  And so I'm not going into blaming

18    them for it.  But I do want to elicit what I just stated,

19    that, you know, this is a -- they're investing a lot of

20    money, there is risk involved.  You know, perhaps they've

21    invested money before.  And there is no 100 percent

22    guarantees in investment.

23          THE COURT:  Any problem with that?

24          MR. YOUNG:  I don't have an issue with that, your

25    Honor.

1          THE COURT:  Okay.

2          MR. KUTNICK: Thank you.

3          THE COURT:  The government's charging decisions.

4          MR. KUTNICK: Can I add one caveat to that before

5     we --

6          THE COURT:  Yes.

7          MR. KUTNICK:  -- move on, which is, the discovery

8     does show some communication between the victims and some of

9     these, like, larger perpetrators of this big scheme that's

10    bigger than Carlos' -- the allegations against Carlos.

11         THE COURT: Okay.  Actually, you know, before you

12    get to that.

13         MR. KUTNICK: Sure.

14         THE COURT:  I was about to ask this.  You know,

15    maybe I should have started with that.  Tell me about this

16    whole thing.  Give me -- you know, I've read what's in the

17    indictment, I've read the little bit that's in here.  But

18    tell me what -- tell me the story of this, and then you can

19    correct it.

20         MR. KUTNICK:  I would like to hear the story too,

21    Judge.

22         MR. YOUNG:  Your Honor, around 2012, the defendant

23    began dealing with certain individuals.  You know, some of

24    the names are referenced in the motion in limine.  Bob Adams,

25    Alan Milton, Mark Horton.  And they were supposedly offering

1    opportunities to, as I understand it, invest money in some

2    type of international --

3              THE COURT:  So who started dealing?  Are you saying

4    that --

5              MR. YOUNG:  The defendant.

6              THE COURT:  He started dealing with them?  What do

7    you mean?

8              MR. YOUNG: He was referred to them by someone, and

9    they begin telling him about opportunities to invest money --

10             THE COURT:  Okay.

11             MR. YOUNG:  -- internationally and to make very,

12   very large returns in very short periods of times.  You know,

13   in the millions or billions of dollars, in some cases.

14             He then, in turn, began -- because he didn't have

15   his own money to invest, began trying to raise money from

16   basically friends.  Primarily people he knew from the church

17   where he went.  You know, five of the victims, as I will call

18   them, you will hear testify at the trial were fellow church

19   members, or, in one case, the son of the other church member

20   because the actual member has been deceased.

21             But he told them about these opportunities to make

22   money with these investments, told them that this was --

23   these were sort of 100 percent guaranteed transactions; that

24   there was no risk; that they would be able to make relatively

25   huge amounts in short periods of time.  You know, for

1    $250,000, he promised returns of $10 million to one investor,

2    for example.

3            He failed to tell them, sort of, about certain

4    things, such as, sort of his really lack of familiarity with

5    these types of transactions.  His, sort of, lack of knowledge

6    or -- of these individuals.  In some cases, he represented,

7    we believe the evidence will show, that he was investing his

8    own money in the transactions when he was not.

9            He also didn't tell the investors that he was

10   taking some of the money for other non-investment purposes,

11   such as purchasing a vehicle, in one case, or paying off a

12   loan on a property in another case, and things along those

13   lines, your Honor.

14           THE COURT:  What kind of money are we talking

15   about?

16           MR. YOUNG:  One of the investors, Mr. Spencer, put

17   in about $700,000.  Another investor by the name of Cordell

18   Crane put in around $300,000.  An individual by the name of

19   Wade George I think put in -- might have been -- I don't

20   remember the amount, but it was a lower amount, maybe 40,

21   $50,000.  There was a Ray Yacoub, who is not a church member,

22   but he put in $50,000.  And then another church member by the

23   name of David Tomlinson put in $15,000.

24           So essentially he is dealing with certain

25   individuals who have not been charged and are not alleged as

1    co-schemers in the indictment, and then raising money to make

2    those investments from individuals in sort of his circle,

3    and, as alleged in the indictment, providing false

4    information to them about --

5                THE COURT:  How long did this whole thing last?

6                MR. YOUNG:  Roughly two years, your Honor.  From

7    roughly 2012 to, you know, towards the end of 2013.

8                THE COURT:  Must have been a rich church.

9                MR. YOUNG:  The investors did have some funds to

10   invest.

11               THE COURT:  Okay.  You said something in your

12   motion about Church of the Latter-Day Saints.  Is that what

13   this was?

14               MR. YOUNG: Yes.

15               THE COURT:  Is this in Chicago?

16               MR. KUTNICK: It's in the northern suburbs.

17               THE COURT:  Oh, okay.  All right.  Now, we'll just

18   go back to your question.  You had a caveat?

19               MR. KUTNICK: My caveat was that the -- several of

20   the victims I believe had contact with these other

21   individuals, like Bob Adams.

22               THE COURT:  Okay.

23               MR. KUTNICK: Specifically Bob Adams.

24               THE COURT:  What happened to them, by the way?

25               MR. YOUNG:  They have not been charged.

1    THE COURT:  Oh, I see because it's a question of --
2    never mind.
3    MR. KUTNICK:  So I just don't want the jury to
4    think that the only information that is ever received about
5    these investments comes directly from the defendant.  I want
6    them to -- the jury to understand that these -- some of these
7    individuals had their own conversations with these, the
8    Renaissance Company, specifically Bob Adams.  And, also, I
9    believe Terry Barnes -- well, there are several different
10   entities where money was sent up.  Okay?  And so any contacts
11   that the victims had with those people above Carlos, I'd like
12   to be able to question them on that.
13   THE COURT:  Okay.  I'm trying to figure this out.
14   So you would be cross-examining a victim --
15   MR. KUTNICK: Right.
16   THE COURT:  -- presumably, and say:  Did you also
17   have conversations with --
18   MR. KUTNICK: Bob Adams.
19   THE COURT:  -- Bob Adams?
20   MR. KUTNICK: Uh-huh.
21   THE COURT:  Well, that's a yes-or-no answer.
22   MR. KUTNICK: Did he tell you about these huge
23   returns on investments?  Things of that nature.
24   THE COURT:  Who will be --
25   MR. YOUNG:  Judge, I think only one of the victims

1    spoke with Mr. Adams.

2            MR. KUTNICK:  Maybe just one.  Maybe it was just

3    one.

4            MR. YOUNG:  But I don't have an objection to that,

5    to the extent it influenced their decision in some regard.  I

6    mean, I think there may be a hearsay objection at a certain

7    point.

8            THE COURT:  Well, I never felt like I was really

9    good at hearsay, so tell me now if we're going to have a

10   hearsay issue so I can think it through.

11           MR. KUTNICK: Well, there are ways around that, of

12   course.  Did you have a conversation with Bob Adams?  After

13   that conversation, did you believe A, B, C, D.

14           THE COURT:  Yeah, no, I was just trying to decide

15   for what purpose it was being offered, but I guess --

16           MR. YOUNG:  If it's going to state of mind, I think

17   there is not going to be a hearsay --

18           MR. KUTNICK:  And I just don't want to run afoul of

19   the motion in limine, and I think that it's kind of

20   borderline with this -- with that line of questioning.

21           MR. YOUNG:  No, I think our point was just the

22   actual charging decisions, that individuals haven't been

23   charged, not that asking about --

24           MR. KUTNICK:  No, I'm talking -- we haven't

25   gotten -- I went back to Number 1.  I'm sorry.

1      MR. YOUNG:  Oh, I'm sorry.

2      MR. KUTNICK:  About -- this is, I think, under

3  Number 1.

4      MR. YOUNG:  No, I have no objection to with

5  questioning witnesses about --

6      THE COURT:  Okay.  And the charging decisions, I'm

7  assuming you don't have -- it would be hard to -- you should

8  read it so you make sure that you --

9      MR. KUTNICK:  I have a note.  Hold on.  It says no

10  objection, but I want to double check my note.

11      THE COURT:  I doubt that you --

12      MR. KUTNICK: No, we don't intend to argue that the

13  government should have arrested anyone else.  But we do

14  intend to argue, Judge, that the defendant was a victim of

15  Renaissance and Bob Adams.

16      THE COURT:  Okay.

17      MR. YOUNG:  No issue, Judge.

18      THE COURT:  All right.  I think that takes care of

19  the government's.

20      MR. KUTNICK: Yes.

21      THE COURT:  Now, yours, the first thing you want to

22  do is --

23      MR. KUTNICK: It helps to -- I can pull out the

24  indictment, Judge, because that is where I get that from.

25      THE COURT:  Well, we can start with -- I can read.

1    Does the government object to the first one?

2           MR. YOUNG:  We do, your Honor.  We believe the

3    testimony at trial from several of the victims would be that

4    they knew the defendant from the church, you know, for a

5    number of years before he approached them.  But more than

6    that, your Honor, that, you know, their decision to invest

7    these very significant amounts of money was due in large part

8    to the fact that they trusted the defendant based upon how

9    they knew him and from where they knew him, where they knew

10   him from, namely, church.

11          Furthermore, your Honor, we think the fact that,

12   you know, four of the five, you know, victims that you will

13   be hearing from at trial were, in fact, church members leads

14   to the inference that he was specifically approaching people

15   who he knew and he felt would trust him in connection with

16   this type of investigation.  So we do think -- or this type

17   of investment, I'm sorry.  We do think it's appropriate to

18   elicit, not simply that they knew him from church, but that

19   their relationship to him being of that nature was part of

20   the reason why these investors trusted him.  This wasn't

21   someone coming up to them on the street asking them to

22   invest, you know, $700,000 or $300,000.  This is someone they

23   knew for a very long time from their church and with whom

24   they shared faith, and as well as what we believe is the

25   natural inference that he, in, fact took advantage of that

1    and approached people because he believed they would trust

2    him in making this type of very large, sizable investment

3    based largely on, you know, his description of the investment

4    to them.

5              THE COURT:  What is your legal objection to that

6    coming in?

7              MR. KUTNICK:  It's mainly the inflammation of the

8    jury.  That they could -- I want to just make the distinction

9    between two phrases that are in the indictment.  One is,

10   shared religious beliefs, which I have an objection to.  And

11   the other was friendship to gain their trust and confidence,

12   which I do not have an objection to.

13             And I think that the government can put on their

14   case without getting into religious beliefs because I think

15   that, if we have some religious people on the jury and if

16   they feel that Mr. Meza exploited spiritualism, so to speak,

17   or common, as they say, shared religious beliefs, that

18   that's -- that's inflammatory.  It could enrage them and say:

19   Well, really?  This guy not only took these people's money,

20   but he did it by using, for lack of a better term, you know,

21   God?  And I just think that it doesn't impinge on the

22   government's case to say they were members of the same

23   church, they knew each other for years, they were friends.

24   All of that, I have no objection to.  But to go after this

25   shared religious beliefs I think is likely to inflame the

1  jury.  That's my legal argument, Judge.

2  THE COURT:  Maybe it would be easier to deal with

3  this if we knew what it is you think that they're going to

4  say about all of this.

5  MR. YOUNG:  You know, I think the witnesses will

6  say, in part, your Honor, they didn't think another member of

7  their church would lie to them.  That they invested, they

8  trusted him because they knew for a number of years -- not

9  just that, but they knew him from church.  And they didn't

10  think another member of their church would lie to them.

11  THE COURT:  That can't be -- I mean, what they

12  thought about that, that really --

13  MR. KUTNICK:  I don't think I have a problem with

14  that.

15  THE COURT:  I don't know how that would be --

16  Yeah, I don't know how that could be objectionable.

17  MR. KUTNICK: I don't think I have aproblem with

18  that as the way Mr. Young just said.

19  One second please, Judge.

20  Okay. So what Mina is pointing out, and I think

21  that Carlos is saying, is that, Bob Adams is also a member of

22  the Mormon church.  And, so, you know, you have all that.  It

23  keeps going.  You know, there is -- and I don't think there

24  is evidence that that was used to induce the victims to pay

25  money.  It may have been a subjective belief of the victims,

1   like, oh, well, he goes to my church.  But there wasn't any

2   kind of affirmative use of shared religious beliefs.

3          THE COURT:  It doesn't sound like -- that you're

4   expecting that they're going to say that, that there is.  I'm

5   not hearing a dividing line where you're really -- of what is

6   expected to be testified to where you're on different sides.

7          MR. KUTNICK: Here is what I thought of, as I was

8   working on this, your Honor.  I pictured very talented

9   Assistant US Attorneys in maybe opening saying:  You know,

10  they sat next to this man every week.  They -- you know,

11  they -- things, you know, that -- pushing that church button.

12  I think it can be pushed too much here.  And I have no

13  problem letting them push it to the extent that it connects

14  the dots, but I just -- it's as if -- the example I used with

15  Mr. Young this weekend was bowling team.  Like, yeah, someone

16  who is on your bowling team, you would trust.  They're your

17  buddy.  You see them often, you've known them for years.

18  That's okay, as long as we keep it at the bowling team.  But

19  once we get into church and we're dealing with matters of

20  religion and spiritualism and exploitation of that --

21         THE COURT:  But that's the difference is I'm not

22  hearing, at least, that the church part is really different

23  from the bowling team, other than maybe, if you're a member

24  of a church, you do it -- you trust that bowling teams

25  probably don't get into issues of -- well, other than

1   cheating, if you could cheat bowling.  But, otherwise, they

2   probably don't get into issues of honesty at all.  And a

3   church, you know, I'm not sure how that's going to cut

4   against your client.  But unless he is intending to really

5   use that, or they are in saying -- I don't want to put words

6   in anybody's mouth, but it doesn't sound like you're

7   expecting that.

8          MR. YOUNG:  I don't think we're expecting -- we're

9   not trying to hit the button or sort of, you know, make this

10  the issue of the case, your Honor.  But they were members of

11  the same church for a number of years.  And I think a church,

12  as your Honor indicated, is a little bit different than a

13  bowling team, in the sense that there, you know, could be the

14  assumption that people who attend church, who are active in

15  their church are, you know, perhaps more moral, that -- or at

16  least some basis to believe that they're more moral because

17  of that.

18         I'll also note that I expect the witnesses to say

19  that, you know, the defendant held a leadership position at

20  the church.  And because of that, you know, they believed

21  that -- you know, they held him to a higher standard, and

22  they didn't think that a person who held that position would

23  lie to them or violate their trust.

24         MR. KUTNICK: My --

25         THE COURT:  Did he?  He is shaking his head back

1    there.

2              MR. KUTNICK: My understanding is that -- and I

3    don't know a lot about the structure of the religion, but

4    that members mostly take leadership roles.  They don't have

5    clergy in the sense that other religions have clergy.  That's

6    my belief.  And Carlos will correct me if I am wrong.

7              THE DEFENDANT:  I'm sorry, what?

8              MR. KUTNICK: You don't have clergy the way that

9    other religions have clergy.  Members step up to or are

10   appointed to leaderships positions; isn't that right?

11             THE DEFENDANT:  That is correct.

12             MR. KUTNICK:  Okay. So it's very -- you know, lots

13   and lots of people get leadership positions.  It's not like,

14   oh, the select chosen few.  And people rotate in those

15   positions, where they will serve for a while as a leadership,

16   and then they will step down, and then someone else also step

17   back up.  I just think we're getting too deep into the whole

18   religion thing.

19             THE COURT:  Well, I would be careful about that

20   because I'll just have to rule on any specific objection at

21   trial.  But it's certainly not specific enough that I would

22   feel comfortable just granting your motion at this point.

23   And I'm not hearing that it's going to go, I was going to

24   say, over the line.  I'm not really quite sure what the line

25   would be because what their testimony is as to what

1    influenced them or what was used to influence them or might

2    have objectively made a difference, I mean, that can come

3    out.  So, I mean, I suspect I'll hear it if there is

4    something that looks like it's trying to go beyond what is

5    appropriate in terms of their relationships.  But I think

6    maybe you're worried about something that could happen but

7    that doesn't sound like it's going to happen.

8              MR. KUTNICK: That may be, Judge.  I just --

9              THE COURT:  Okay.

10             MR. KUTNICK:  -- wanted to distinguish between

11   spiritual and organizational.

12             THE COURT:  Okay. I'm not hearing that there is

13   going to be any issues of spiritual beliefs --

14             MR. KUTNICK: Okay.

15             THE COURT:  -- that are going to come out.  I take

16   it you're not expecting that either?

17             MR. YOUNG:  No, Judge.

18             THE COURT:  Okay.  Let's go on to two.  I really

19   don't know what you're asking.

20             MR. KUTNICK: I can explain more, your Honor.  At

21   least one -- I think there were -- there was at least one

22   meeting that took place among several victims in a hotel

23   meeting room --

24             THE COURT:  Okay.

25             MR. KUTNICK:  -- to discuss the allegations against

1    Mr. Meza.  There was another meeting that included a federal

2    agent, I believe, with also -- I don't know if it was the

3    same people or mostly the same people.  But I am moving to

4    exclude any evidence of either of those meetings.  I think it

5    is more prejudicial than probative.  In a way, it's just --

6            THE COURT:  I suspect they don't want to bring that

7    up either.

8            MR. YOUNG:  No, I don't think we're intending to go

9    into the meetings, Judge.

10           THE COURT:  Okay.  Three.  Do you agree to that

11   one?

12           MR. YOUNG:  Yes, Judge.

13           THE COURT:  I don't know, what is four?

14           MR. KUTNICK: Mr. --

15           THE COURT:  I read it, but do you have any --

16           MR. YOUNG:  Four, the defendant was convicted of

17   misdemeanor theft by deception in the circuit court.  So

18   under 609(b) because the conviction was for a crime involved

19   in element of dishonesty, we believe it is appropriate to

20   impeach him on that conviction at trial, should he testify.

21           I agree with the defendant's motion to the extent

22   he says that it should be limited to sort of the details of

23   what's on the face of the conviction.  But we do believe it's

24   appropriate for cross-examination.  Even though it's a

25   misdemeanor, it is a crime that involves dishonesty.

1          MR. KUTNICK: My response, your Honor, is that the

2     similarity between the offenses, the time period in which it

3     occurred, the -- one of the -- the victim is a witness in

4     this case.  The victim in that state case is a witness in our

5     case.  It is -- because of all those things, I think that the

6     prejudicial nature outweighs the probative value, even for

7     impeachment purposes.  The government has many, many, many,

8     many instances with which to try to impeach Mr. Meza's

9     testimony that would clearly do the job; whereas, this, I

10    believe, goes too far.

11         MR. YOUNG:  I would just add to that, I mean, in

12    terms about the victim, and the like, wouldn't come out if

13    the cross-examination is limited to, as it would be, the --

14    sort of the date, the conviction.

15         THE COURT:  All right.  Well, the only way -- well,

16    I don't know, I mean --

17         MR. KUTNICK: I'm sorry, Judge.

18         THE COURT:  Maybe you don't know at this point if

19    Mr. Meza is going to testify.  Unless he is going to testify,

20    it's not going to come out anyway.

21         MR. KUTNICK:  Of course.  And we're only talking

22    about if he were to testify.  We don't know 100 percent at

23    this point, but it's certainly likely.

24         And the other thing is, your Honor, that even by

25    naming the crime, the date and the disposition, you know,

1    Carlos may be put in a position where then he kind of has to

2    explain those facts.  And we're just arguing that it's highly

3    prejudicial, Judge.

4              THE COURT:  Tell me more about the crime of which

5    he was convicted.

6              MR. KUTNICK: So --

7              THE COURT:  What was it?

8              MR. YOUNG:  It was a violation of the Illinois

9    combined statute 720 Section 561.  It's theft by deception.

10             MR. KUTNICK: Yes, thank you.  Basically a large

11   check bounced.  $47,000.

12             MR. YOUNG:  I think that's correct.  That's my

13   understanding.

14             THE COURT:  Do I have a choice?  I mean, the rule

15   says:  Must be admitted.

16             MR. YOUNG:  It does not require the balancing test

17   that is required for -- in Section A of 609, your Honor, so I

18   believe it should be admitted.  I assume that your Honor

19   always has discretion under Rule 403 and won't suggest

20   otherwise.  But I do believe it's appropriate here, your

21   Honor.  It is going to be limited to sort of the face of the

22   judgment.  It's certainly prejudicial, but I don't think it's

23   unfairly prejudicial.  And I would note here that obviously,

24   if the defendant testifies, as in any case, his credibility

25   is going to be a central issue at the trial.

1       THE COURT:  That's true.

2       MR. YOUNG:  Both in terms of his intent to defraud

3  and both in terms of -- I think he is going to contradict

4  things that were said to him by a particular -- or, I'm

5  sorry, he is going to contradict things that witnesses say he

6  said to them.  He is going to deny them based upon my review

7  of their testimony, as well as, you know, prior statements he

8  has made.  I think the jury, it's appropriate for them to

9  know in assessing his credibility that he does, in fact, have

10  a conviction for a crime of -- that involves dishonesty.

11      MR. KUTNICK: I just wanted to double check the

12  rule, your Honor, because my read of it, when I was working

13  on this, was that it still is subjected to the 403 balancing

14  test.  But I wanted to check the rule before I'm quoted on

15  that.

16      THE COURT:  I mean, of course it's prejudicial.

17  That's the point of it.  So it's a question of whether it's

18  unfairly prejudicial if he testifies.  And he is saying:

19  They're lying, I'm not.  I mean, allows these to come in.

20      I would suggest -- I'll look at that, too, but as

21  I'm sitting here, it seems to me -- what would take this out

22  of the realm of cases where it's allowable?  In fact, they

23  say:  This shall be admitted.  What makes this one different?

24  They're always going to be prejudice.  What's the point?

25      MR. KUTNICK:  I think that the points that I made

1  in the beginning of my objection, which is the fact that the

2  victim in that case is a witness here, the timeframe which it

3  occurred is the same timeframe.

4          THE COURT:  That doesn't have to come out, though.

5          MR. KUTNICK: Okay.  Also, your Honor --

6          THE COURT:  And, indeed, the victim shouldn't be --

7  shouldn't testify -- should be instructed not to say, oh, he

8  has already been convicted of that, or something.  I think

9  that shouldn't come in because I agree that that could --

10  that that might be unfairly prejudicial in terms of that.

11  But there is no reason why that needs to -- to come in.

12          MR. KUTNICK: Your Honor, just to add something

13  about -- we were saying, well, Mr. Meza is telling the truth

14  and the other witnesses are lying.  That is not really what

15  the defense theory is.

16          THE COURT:  Okay.  I don't -- all right.

17          MR. KUTNICK: But there is very little of --

18          THE COURT:  I was taking that from Mr. Young

19  saying, well, his credibility will be in question, which is

20  certainly the case if -- and if he is saying this didn't

21  happen --

22          MR. KUTNICK:  Well, I mean, I think that the

23  government knows --

24          THE COURT:  -- then they've got two stories.

25          MR. YOUNG:  Mr. Spencer.  I was referring to

1  Mr. Spencer who claims that the defendant told him that he,

2  the defendant, was also contributing $250,000 towards the

3  transaction.  The defendant, when previously interviewed,

4  denied that he had said that to Mr. Spencer.

5        MR. KUTNICK: And Mr. Young is correct.  There will

6  be, I guess, small points of:  Well, he said this.  No, I

7  didn't.  You're right.

8        THE COURT:  They wouldn't be so small.

9        MR. KUTNICK:  Well, no, we anticipate that that's

10  going to be a part of the case, for sure, whether Mr. Meza

11  contributed his own money.

12        THE COURT:  It could make a difference to a

13  reasonable investor, don't you think?  Never mind.

14        MR. KUTNICK:  I think it's a significant fact in

15  the case, your Honor.

16        THE COURT:  Well, as I'm hearing it right now, I am

17  going to deny your motion.  But there is no reason why the

18  fact that it might be related to this should come in at all,

19  I agree with that.  That would be -- that would be unfairly

20  prejudicial.

21        Okay.  Number 5.  What is this?

22        MR. KUTNICK:  Pending matter.

23        THE COURT:  You're not going to bring that in.

24        MR. YOUNG:  We are not going to bring in the

25  indictment or the charges, your Honor.  The underlying

1   circumstances that have led to the charges might be

2   appropriate for cross-examination or 608(b) because they are

3   acts that involve dishonesty, namely, false statements made

4   to other church members about certain services he was going

5   to perform, obtaining money from them, and then sort of

6   forging checks and cashing them.

7        MR. KUTNICK:  Your Honor, my position is that this

8   is a currently pending felony charge in McHenry County.  He

9   is presumed innocent, and that the government should not be

10  allowed to elicit any evidence regarding the allegations, the

11  charges.

12       THE COURT:  Nothing about the charges.  You're not

13  going to bring anything about the charges.

14       MR. YOUNG:  No, your Honor.  I'd also agree that

15  under 608(b) we can ask the question on cross-examination.

16  But to the extent he denies it, we're barred from proving it

17  up with extrinsic evidence.  So we wouldn't be seeking to

18  introduce any evidence other than through his testimony, if

19  he were to sort of acknowledge.  But 608(b) allows for

20  cross-examination on prior bad acts involving dishonesty.

21       THE COURT:  See, what I'm hearing is two different

22  things.  Prior bad acts is one thing.  The fact that he has

23  been charged is different.

24       MR. YOUNG:  I agree, your Honor.  It's never our

25  intent to bring up the fact that he has been charged with

1    this criminally or there is a pending case.

2           THE COURT:  I mean, the fact that there is -- so I

3    don't know what the -- what are the acts?

4           MR. YOUNG:  There was a member of his church who

5    was in mortgage foreclosure, or having problems with their

6    property.  Mr. Meza, the defendant, approached them and said

7    that he could assist them in obtaining a loan modification,

8    basically negotiate with the lender some type of sort of

9    reduced mortgage payments.  In the course of purportedly

10   doing that, he represented to the church members, fellow

11   church members, that he needed certain money to pay other

12   individuals who were helping him.  I think there were two

13   attorneys, and I believe there was representation to be like

14   a real estate broker.  The people, in response to his

15   request, wrote checks payable to those individuals, the names

16   that were provided to them by the defendant.  The defendant

17   never gave that money to those individuals.  Instead, he

18   forged their names on those checks and deposited them into

19   his own bank accounts and kept the money.

20          MR. KUTNICK:  And those -- the victims of that case

21   are not witnesses here.  So I don't even know how the

22   government would elicit evidence of that, except through

23   Mr. Meza himself.  And he is in an untenable position because

24   it is a pending case that he would then be almost forced to

25   testify under oath about a pending criminal matter.  And I

1    think that that would be a violation of his -- well, he

2    would -- he could assert a Fifth Amendment privilege, and

3    that would be very prejudicial in front of the jury.

4         THE COURT:  It could get tricky.

5         MR. KUTNICK:  And I will say this one argument

6    again, your Honor, which is, they've got a lot of things that

7    are uncharged, other bad acts, that I'll just say that this

8    would just be piling on.

9         THE COURT:  Maybe you should skip this one.

10        MR. YOUNG:  We won't go into it, your Honor.

11        THE COURT:  Okay.  What about six?  I mean, I read

12   it.  It doesn't mean anything to me right now. You said the

13   name Robert Adams, I've heard that, and -- to question

14   government investigators and other witnesses about their

15   knowledge.  I guess maybe that -- go ahead, Mr. Young.

16        MR. YOUNG:  No, I was going to say, your Honor, in

17   principle, I don't have an issue with this.  There may be

18   foundation objections at the time.  But absent that, I mean,

19   it's hard to sort of deal with this in the abstract now on a

20   particular question.

21        THE COURT:  It's a little vague to me.  The problem

22   is about their knowledge.  What does that mean?  But

23   apparently --

24        MR. KUTNICK:  I can explain, Judge.

25        THE COURT:  Go ahead.

1    MR. KUTNICK:  Robert Adams, Renaissance, Larry

2    Gelfond, Terry Barnes, Virginia Worldwide and Carso were all

3    investigated extensively by the government for their role in

4    their various respective scams, so to speak.

5    MR. YOUNG:  Albeit not by the agents in this case.

6    MR. KUTNICK:  No, but in terms of their -- the

7    agent's knowledge of the entire case, I would like to be able

8    to cross them on what they learned in their investigation

9    about these individuals and their fraudulent activities

10   without violating the other motion in limine saying they

11   should have been arrested, just that they were investigated

12   and what they learned in those investigations.

13   THE COURT:  So they put on an agent.  You get up

14   and cross-examine, and you're going to say:  Have you heard

15   the name Robert Adams?  Who is he?  Then what?

16   MR. KUTNICK:  Oh, I think, based on my review of

17   the discovery that's been tendered that the investigating

18   agents know a lot about Renaissance and these other

19   fraudulent activities because it's --

20   THE COURT:  How is it actually relevant?

21   MR. KUTNICK:  Because the -- it kind of ties into

22   my No. 7.  Because the government is alleging that Meza

23   misled potential investors about his level of knowledge of

24   the nature and legitimacy of the investments for which he was

25   soliciting funds.

1    We're going to talk about this more, I guess, when
2    we get to No. 7.

3    THE COURT:  Well, you can jump to seven, if you
4    want.

5    MR. KUTNICK: Okay.  But I think that is highly
6    problematic.  I mean, a huge part of the defense is that
7    Carlos Meza was a victim too, and that he was not aware of
8    the nature and legitimacy of the investments for which he was
9    soliciting funds.  This is -- we contend that that's not what
10   happened here, that Mr. Meza was -- he had heard about an
11   investment opportunity, he wanted in on that investment
12   opportunity.  He wanted to use that to make money for himself
13   and also to make money for his friends.  And that he was not
14   aware of the nature and legitimacy of the investments.

15   So to -- the jury should know about the fraudulent
16   activity of all of these other individuals because that would
17   tend to show that Mr. -- it would tend to support our theory
18   of defense, that Mr. Meza was duped as well.

19   THE COURT:  That he was fooled also?

20   MR. KUTNICK: Yes.

21   THE COURT:  What's your response?

22   MR. YOUNG:  I don't have relevance objections, your
23   Honor.  I believe they should have some latitude there.  It's
24   just going to come down to the foundation.  Because, you
25   know, to the extent the agents, you know, have read reports,

1 or the like, you're going to have hearsay issues.

2 MR. KUTNICK: Well, there is also lawsuits from all

3 over the country against these organizations where these

4 people were committing these -- this fraudulent activity in

5 cities all over the place. So it's -- you know, the -- I

6 would have to do a little research on it whether or not we

7 could actually show those to the jury. But certainly a court

8 can take judicial notice of filed documents.

9 MR. YOUNG: Although that would be in your case,

10 you're talking about.

11 MR. KUTNICK: Right.

12 MR. YOUNG: Well, I guess -- okay.

13 MR. KUTNICK: Right. If we were trying to show that

14 Renaissance is this big, bad entity, we could tend to do it

15 through the agent saying, well, they were investigated, and

16 it was an extensive investigation, and you learned that it

17 was a billion-dollar scheme, and, you know, we can -- that's

18 where I want to go with it.

19 MR. YOUNG: Again, Judge, I think there is some

20 foundation, you know, concerns there, complaints are

21 allegations. Whether or not that is actually admissible

22 evidence, I question. I think they do -- they should -- they

23 are entitled to some latitude here to show that, you know,

24 these things were being told to the defendant before he was

25 relating them to the -- and I believe that's their defense.

1    But to me it's more just the sort of foundational concerns.

2    MR. KUTNICK:  And that's correct.  There is going

3    to be a lot of --

4    MR. YOUNG:  So it's hard to answer that, like, in a

5    vacuum, I guess that is what I am getting at, until I know

6    exactly what you're seeking to admit or how you're seeking to

7    admit it.  It's sort of hard to respond to the objection.

8    THE COURT:  Yes, I have some concern about.  So you

9    learned -- I mean, how do you say that you learned this?  I

10   mean, were you told this, you found this, you've seen a

11   report this, you know there is lawsuits?  What?  And --

12   MR. KUTNICK:  Well, I would -- I guess I would say

13   to the agent:

14   In your investigation of this case, you had the

15   opportunity to investigate the Renaissance -- I forget what

16   the formal -- Renaissance Capital Group?  Yes, I did.

17   And in that investigation, you learned that

18   Renaissance Capital Group was responsible for financial

19   frauds in the amount -- in the seven-figures amounts, or

20   eight figures, or -- what is it?  Billions of dollars?

21   In your investigation you learned that Renaissance

22   was conducting these activities all over the United States?

23   THE COURT:  So those are the questions.  Would you

24   object?

25   MR. YOUNG:  Well, Judge, I mean, the fraud is a

1    legal conclusion by the agent.  So, I mean, I guess I would

2    object to the conclusion.  The rest of it I think would be

3    based primarily upon things they've read from interviews, or

4    the like.  So, I mean, I think there would be foundational

5    concerns.

6              THE COURT:  I mean, it is a conclusion.  I have no

7    idea what the answer is.  First I'm hearing.  It isn't like

8    I've read anything about this.  But you say you learned that

9    they were engaged in fraud?

10             MR. KUTNICK: I mean, I suppose it would have to be

11   worded more artfully:  You've learned of allegations that

12   they were engaged in large scale fraud?  I mean --

13             MR. YOUNG:  Maybe a better way to do this is

14   perhaps if you want to -- if there is some kind of

15   stipulation you want to propose, to the extent we've given

16   you something, you know, in discovery.  Obviously we have

17   tendered a great deal of discovery related to many things to

18   counsel.  If there is something along those lines, it might

19   be better to handle it that way, we can sort of parse

20   through.

21             I will also say that we put the names of a couple

22   of our agents on the witness list sort of prophylactically.

23   But, at this point, I think it's very likely we won't be

24   calling the agents.  So -- then if you ask to call them in

25   your case, obviously they will be made available to you.

1      MR. KUTNICK:  Right.

2      MR. YOUNG:  But Mr. Tremaglio, the financial

3  analyst, will be testifying.  He certainly -- he can testify

4  about, like, things he observed in bank records about money,

5  and things like that.

6      MR. KUTNICK: That's -- you both make the good

7  point.  He -- Mr. Young's -- Mr. Tremaglio, is that his name?

8  Steve?

9      MR. YOUNG:  Yes.

10      MR. KUTNICK: He is going to be a witness.  He is

11  basically a forensic accounting investigator for your office?

12      MR. YOUNG:  Yes.

13      MR. KUTNICK: He is -- he created this document,

14  this flow chart, your Honor, these two flow charts that the

15  government has tendered to us.  And these -- I mean, without

16  you having to learn all of these, your Honor, very, very

17  simply, these are the victims in our case.  This is Mr. Meza.

18  This is, of course, Bob Adams and Renaissance, and this is

19  the huge, large financial scam that was occurring there.

20  These groups is where the government alleges that Mr. Meza

21  skimmed off some funds to go to these organizations.  And

22  then this chart reflects other fraudulent organizations that

23  were kind of doing the same type thing as Renaissance

24  Corporation.  They've got Carlos Meza involved, you know, not

25  only here, but also here.  This is Milwaukee McPherson.  This

1    is the company that's associated with Mr. Meza.  So they've

2    got him wrapped into this part of it, too.

3           So, I mean, the case cannot be -- I mean, I would

4    want to try to elicit testimony from any government witness

5    that had knowledge of this whole thing to try to paint the

6    picture of what was going on, the big picture of what was

7    going on.

8           THE COURT:  Well, I think Mr. Young has to be right

9    about that, unless you do it by -- maybe you can come up with

10   a stipulation that might give you more than you're going to

11   get in questioning.  But, otherwise, you might be able to ask

12   something about alleged or -- I'm not -- without having more

13   specific questions, that's hard.  But to say you learned

14   that?  I mean, what do you mean you learned that?  I think

15   any government attorney is going to object, and I would

16   probably have to sustain it.

17          MR. KUTNICK:  Well, there is the one witness who I

18   think Scott Spencer who did actually talk to Bob Adams.  So

19   that I think is ripe for cross-examination.

20          THE COURT:  So are you saying -- you concluded, you

21   personally concluded, that was?  Because you're saying there

22   weren't -- there haven't been charges, there haven't been

23   convictions, there haven't been anything?  I don't know about

24   these other companies.

25          MR. YOUNG:  No one else has been charged.

1    MR. KUTNICK: I'm just going off of what the

2    government has told me.

3    THE COURT:  Well --

4    MR. KUTNICK: And that conversation was in -- was

5    tendered in discovery, the conversation between Scott Spencer

6    and Bob Adams.

7    So here is what they're saying.  They're saying

8    that Carlos would come to them and make these promises, five

9    promises.  Okay?  That if you give me X number of dollars in

10   three months, you're going to get $10 million, something like

11   that.  And what I would want to elicit from that witness is:

12   You talked to Bob Adams, and Bob Adams told you those five

13   things; didn't he?  That's -- that's --

14   MR. YOUNG:  We're fine with that.  He would cover

15   that.

16   MR. KUTNICK: Okay.

17   MR. YOUNG:  I think we were talking about the law

18   enforcement officers.

19   MR. KUTNICK:  Well, if the government is not going

20   to call them, then I have to make a decision about whether

21   they would benefit my case at all.

22   THE COURT:  All right.  Well, it sounds like I am

23   not really going to be able to actually rule on those two.

24   But if you try to put in you learned that, it's probably

25   going to be not a question that you really could get answered

1  by somebody.

2  MR. KUTNICK:  But Mr. Tremaglio would be able to

3  testify to anything that was on this chart.

4  THE COURT:  Well, apparently, if he made it.

5  MR. KUTNICK: And that would encompass --

6  THE COURT:  Boy, don't let the jury see that chart

7  until after they're selected.

8  MR. KUTNICK:  That -- it would encompass them

9  questioning of Mr. -- I'm going to say his name wrong --

10 Tremaglio.

11 THE COURT:  Did he prepare these charts?

12 MR. YOUNG:  Yes, your Honor.

13 MR. KUTNICK: So I could see wanting to

14 cross-examine him about his knowledge of all of the players

15 that he has got here.  Well, not all, because it's not --

16 THE COURT:  Well, certainly if that's going in,

17 then I suppose -- I don't know why you couldn't cross-examine

18 him about:  Why is this person there, or this company there,

19 and what is that -- what does that mean?  Yes, I agree with

20 you to that extent.

21 MR. KUTNICK:  Okay.

22 THE COURT:  That's more specific.

23 MR. KUTNICK: I think that that's -- if the agents

24 aren't going to testify, that's the way I would anticipate it

25 coming in.

1          THE COURT:  Okay.  All right.  I think we've

2   reached some agreement.

3          MR. KUTNICK: I agree, Judge.

4          THE COURT:  So, now, let's find out about the

5   length of this trial.  You keep telling me three days.  I'm

6   skeptical.  And I do not like to tell a jury less than the

7   real time.

8          MR. YOUNG:  I think we will be somewhere closer to

9   9 or 10 actual witnesses.  The list has 13 or 14, but a

10  couple of those were --

11          THE COURT: Right, I saw that.

12          MR. YOUNG:  We've had some of -- a stipulation of

13  at least one of those witnesses.

14          MR. KUTNICK: A lot of those witnesses are fairly

15  short witnesses.

16          THE COURT:  Let me pull out your list.  You have 14

17  people.  So maybe you could just tell me a little bit about

18  who these people are.

19          MR. YOUNG:  Sure.

20          THE COURT:  Some of these you really don't think

21  you're going to call, we will just leave them alone.

22          MR. YOUNG:  Cordell Crane -- Mr. Benjamin, the

23  witness, I think we may be able to reach a stipulation to.

24          MR. KUTNICK:  We're working on it.

25          MR. YOUNG:  Cordell Crane is one of the victims.

1    He will definitely testify.

2              James Dorger is a law enforcement officer.  I don't

3    anticipate that we will actually call him.

4              Mr. George is the victim of one of the -- I'm

5    sorry, the son of one of the victims.  So he will testify but

6    his testimony will be relatively short.

7              MR. KUTNICK:  If I could just interrupt, an issue

8    with him, only because I was working on this this morning,

9    actually.  I would question whether the government is

10   planning to elicit any statements that his deceased father

11   made to him?

12             MR. YOUNG:  No, because those would be hearsay.  So

13   it would be limited to discussions that Mr. George had with

14   the defendant following his father's death.

15             THE COURT:  Okay.

16             MR. YOUNG:  Mr. Lee and Mr. --

17             THE COURT:  How about Mr. Khoja?

18             MR. YOUNG:  I'm sorry, I crossed him out.  We're

19   not going to call Mr. Khoja.

20             THE COURT:  Not.  Okay.

21             MR. YOUNG:  Mr. Lee and Ms. Markova are both

22   employees of a company by the name of ALSJ.  Some of the

23   investor funds was used to pay off debts that the defendant

24   owed to that company.  I anticipate their testimony will be

25   relatively brief, just to explain that, you know, he owed

1  money, this check that was paid to us represented payment of
2  that loan.
3          Brian J. Murphy was an FBI agent who we're not
4  intending on calling.  Same with No. 9, Ms. Pettorelli.
5          Mr. Peretz is the president -- or I don't know the
6  title, but managing partner, perhaps, of a company by the
7  name of Barnett Capital.  It received investor funds, or
8  defendant paid amounts of money that he owed to Barnett using
9  investor funds.  So he would be a relatively short witness
10  just to explain that he had done some unrelated business with
11  the defendant, he owes money, this is the money he used to
12  pay it.
13          Mr. Spencer is one of the victims.  He will be
14  testifying.
15          Mr. Tomlinson is one of the victims.  He will be
16  testifying.
17          Mr. Tremaglio is our financial analyst.  He will be
18  testifying.
19          And then Ray Yacoub is another victim, and he will
20  be testifying.
21          So I think that's about eight or nine.
22          THE COURT:  Okay.  So you look at that --
23          MR. YOUNG:  And I think --
24          THE COURT:  Think about it.  Now, how many hours of
25  testimony?

1    MR. YOUNG:  I think we can -- I think we have a
2    good shot at resting by the end of the day on Wednesday,
3    Judge.  Mr. Spencer is probably the longest witness, but I
4    think that will be maybe the hour-and-a-half, or so.
5    Everyone else would be -- you know, Mr. Crane would be
6    shorter, and probably even an hour, or so, on direct.  I
7    can't speak for cross, obviously.  But most of the other
8    witnesses, Judge, I think are all, you know, shorter.  You
9    know, some of our other victims, Mr. Tomlinson, Mr. George,
10   Mr. Yocoub had more -- sort of less dealings with the
11   defendant.  I think those directs would all be under an hour,
12   Judge.
13        THE COURT:  Okay.  So that's already four days.
14   Then if you rest by the end of the day on Wednesday, that's
15   the end of the third day.  So if there wasn't anything more,
16   then the next day would be for closing and instructions.
17        Now, what about you?  Are you for sure putting on a
18   case.
19        MR. KUTNICK:  No, not for sure.  At this time --
20   well, we need a little bit more time before making a final
21   decision about whether we have additional witnesses besides
22   Mr. Meza.
23        THE COURT:  Yes, you can --
24        MR. KUTNICK:  If we can have that --
25        THE COURT:  Yes, you may.  I'm just trying to

1      figure out how long the trial is going to be.

2              MR. KUTNICK:  Well, if we were to have a witness --

3              THE COURT:  I mean, in terms of knowing, one, if I

4      need to increase the number of jurors that I am going to

5      call, and for just planning.

6              MR. KUTNICK: If we had witnesses besides Mr. Meza,

7      they would not be numerous.  It would maybe be a couple.

8              THE COURT:  Okay.

9              MR. KUTNICK:  And they would also not be lengthy,

10     they would be very brief.  I think that, if there were a

11     defense witness that would be lengthy, if would be Mr. Meza,

12     should he choose to testify.

13             THE COURT:  All right.  So --

14             MR. KUTNICK:  When I say lengthy, not a whole day.

15             THE COURT:  But if he testifies, then it will go

16     beyond that week because I don't have trial on Fridays.

17     Okay.  I just needed to know that.

18             MR. KUTNICK:  As long as we're talking about

19     government witnesses, your Honor, I didn't write this in my

20     motion in limine, but I'm sure the government is not caught

21     by surprise.  I object to all of these, what I categorize as

22     404(b) witnesses.  I mean, their other crimes evidence.  The

23     government hasn't filed a motion to submit evidence of proof

24     of other crimes.  These people, yes, they are mentioned in

25     the discovery, so we're aware of them.  However, I think that

1    there is a danger that -- about hearing about all these other

2    instances that the jury, you know, is going to use it as

3    basically propensity evidence.  That if, you know, he did it

4    to this person and this person and this person, then he must

5    have done it to these people.  I think that the government

6    should have to articulate a legal basis for admitting what I

7    would term other crimes evidence.

8            THE COURT:  All right.  Two people -- two of these

9    are named in the -- or they're referred to in the indictment,

10   Victim A, Victim B; is that right?

11           MR. KUTNICK:  Yes.

12           MR. YOUNG:  Correct.

13           THE COURT:  Which two are they?

14           MR. YOUNG:  Mr. Crane and Mr. Spencer are Victim A

15   and Victim B.  I believe Mr. Spencer is A, but I'm not

16   certain.  But they're A and B.

17           THE COURT:  Okay.  And so the others are --

18           MR. YOUNG:  George, No. 4.  Tomlinson, No. 12, and

19   Yocoub, No. 14.

20           THE COURT:  So this is the same thing?

21           MR. YOUNG:  Yes, Judge.  I mean, I disagree that

22   it's other acts evidence.  It's a scheme that's alleged over

23   a period of time.  You know, the Victims A and B were alleged

24   as victims.  It was alleged victims, including A and B.  This

25   all happened during the period alleged in the indictment.

1 The representations made to them about an investment in some

2 type of, you know, international financial transaction is the

3 same. The representations about sort of, you know, short

4 time turnaround is the same. You know, the guarantee, it's a

5 sure thing, it's going to happen within 60 days is the same,

6 so.

7 THE COURT: Was it to invest in the -- it was to

8 invest in the same --

9 MR. KUTNICK: No.

10 THE COURT: I'm not -- because I can't actually say

11 it, I'm not sure whether it was to invest in --

12 MR. KUTNICK: In the same entity, I guess you were

13 going to maybe say? And the answer is no, I believe. Right?

14 MR. YOUNG: Same entities. There is Palmore and

15 there is Adams and --

16 MR. KUTNICK: Virginia Worldwide.

17 MR. YOUNG: Spencer and Crane's monies are going to

18 those entities, and these people's monies goes to those same

19 entities.

20 THE COURT: Ordinarily I don't think -- as long as

21 it really is the same scheme, I don't think they would be --

22 the government would be limited to the exact Victims A and B.

23 But if there is any dispute as to whether this is the same

24 scheme because, if it's not, then it would get into 404(b),

25 which doesn't necessarily mean that they couldn't put it in.

1    But Seventh Circuit has gotten more restrictive on that in

2    recent years.  So if you're going to argue about that, I

3    think you're going to have to give me some facts probably in

4    writing.

5           MR. KUTNICK: Okay.  I think it would have to trace

6    the funds that each of those victims invested and see where

7    the commonality is between those investments and the

8    investments of Mr. Crane and Mr. Spencer.

9           THE COURT:  Let me look at the indictment.  Just a

10   second.

11          MR. YOUNG:  Do you have the chart?

12          MR. KUTNICK:  Which chart?

13          MR. YOUNG:  The one you had out a moment ago.

14          MR. KUTNICK: I mean, so, your Honor, what Mr. Young

15   just pointed out to me, and I agree with him is that,

16   specifically David Tomlinson is a witness.  His money did end

17   up in one of the same funds, so to speak, as Scott Spencer.

18   However, his money never goes through either Mr. Meza or

19   Mr. Meza's company, Milwaukee McPherson.  So to say that, you

20   know, he is a victim of Mr. Meza when the money doesn't even

21   go through him, you know.  I think there are communications

22   that they have, but -- I think it's distinguishable because

23   the other -- because Mr. Crane and Mr. Spencer's money, at

24   least in the transactions on their Grand Jury Exhibit 8, all

25   go through Carlos Meza.

1        MR. YOUNG:  Actually, Crane goes through Virginia

2    Worldwide and Spencer goes through Palmore later.  You're

3    just talking about the charged executions.

4        MR. KUTNICK:  Right. I'm talking about Tomlinson

5    does not; correct?

6        MR. YOUNG:  No, but you said all of the Crane and

7    Spencer money went through Milwaukee McPherson.  That's not

8    correct.

9        MR. KUTNICK: No, you're right, there are other sums

10   that do not go through Milwaukee McPherson.

11       MR. YOUNG:  So early in the scheme, the defendant

12   was telling the investors to wire the money to an account

13   that he held in the name of his company, Milwaukee McPherson.

14   Later on in the scheme, he told investors to wire it directly

15   to other accounts.  He told Mr. Spencer to wire funds to an

16   account held by Virginia Worldwide.  He told Mr. Crane,

17   either Victim A or B, I forget which one, to wire funds to an

18   account held by Palmore Legal Services.

19       So later in the scheme, instead of going through

20   Mr. -- the Milwaukee McPherson account, they were going

21   directly to these other accounts.

22       The other victims, as we will call them for

23   purposes of our discussion, Mr. Tomlinson, Mr. George and

24   Mr. Yocoub, wired the funds directly to these other accounts

25   at the instruction of the defendant.  So they didn't --

1    THE COURT:  Then who controlled those accounts?

2    MR. YOUNG:  Those are controlled by the other

3    individuals we've been talking about.  Bob Adams and --

4    MR. KUTNICK: Terry Barnes.

5    MR. YOUNG:  Terry Barnes and other individuals.

6    THE COURT:  So how did defendant benefit?

7    MR. YOUNG:  Well, he didn't benefit directly from

8    those wirings, but they were made as part of sort of the same

9    investment scheme.  He was making misrepresentations to them,

10   we allege the evidence would show.

11   THE COURT:  I see, to get them to do it.  Why would

12   he do that?

13   MR. YOUNG:  Well, I think in part because he

14   believed that this money was going to hit, which --

15   MR. KUTNICK: That's what we agree with.  He did

16   that because he believed that he was going to make a lot of

17   money for himself and for his investing partners.

18   MR. YOUNG:  But our position is he was telling them

19   things that were not true in order to get them to do that.

20   So it still fits within the -- so even though he wasn't sort

21   of skimming that money, for lack of a better word to describe

22   it, as he had some of the earlier investments, he was still

23   obtaining that money by means of fraud, in the hopes that

24   these sort of then, you know, investment programs would pay

25   off.

1     MR. KUTNICK: We disagree.

2     THE COURT:  And pay off for him how?

3     MR. YOUNG:  Well, if -- he was essentially gambling

4 with other people's money.  He was getting them to invest in

5 these programs because he didn't have the money himself, and

6 hoping then, once it would hit, you know, and he'd get these

7 returns of, you know, millions of billions of dollars, he

8 would split that with them.

9     THE COURT:  Okay.  But this is where I get lost at

10 the moment.  If he says to Victim A:  Gee, if you invest

11 $200,000, you're going to get millions.  And so Victim A

12 does, and he invests it with Adams, whatever this guy is,

13 what other than -- why would the defendant do -- how was he

14 going to benefit?  How was he potentially going to benefit if

15 he takes -- Victim A takes his $200,000 and gives it to

16 Adams?

17     MR. YOUNG:  Because when the investment comes

18 through.  It would be like me taking your money and then

19 gambling with it, and then once I win, I take half, you take

20 half.

21     THE COURT:  Okay.  But that's what I was trying to

22 find out.

23     MR. YOUNG:  Yes.

24     THE COURT:  He was going to benefit.

25     MR. YOUNG:  Yes, I'm sorry.

1    THE COURT:  Oh, okay.  Because he had an agreement

2    with Adams, or whatever it is, that he would then get half of

3    it.

4    MR. YOUNG:  They would split -- right.  They would

5    split the return with the victim.  He would tell the victim

6    that we're basically going to be partners in this.

7    THE COURT:  Oh, wait a minute.  Okay.  So his

8    agreement is -- so he thinks that this money with Adams is

9    actually going to pay off and his agreement with Victim A is,

10   if it does, I get half.

11   MR. YOUNG:  Yes.  I'm going to get some, you're

12   going to get some.  We're sort of partners in this

13   investment.

14   MR. KUTNICK: Well, the allegation isn't that

15   Mr. Meza was going to get any piece of the victims' returns.

16   Mr. -- I think the government's evidence was that Mr. Meza

17   represented that he was investing his own money as well, so

18   then he would be a beneficiary himself, or that he said that

19   he was investing his own money as well.  That's what their

20   evidence is.

21   THE COURT:  Right.

22   MR. KUTNICK:  He realizes no benefit, your Honor,

23   except for the money that he allegedly skimmed off, which is

24   a tiny percentage of the entire amounts that we're talking

25   about here.

1    THE COURT:  Yeah, I saw that.  That wasn't an awful

2  lot.  But I figured there had to be more to it than that.

3  Probably was.

4    MR. KUTNICK:  May I, Judge?  I don't want to

5  interrupt you.

6    THE COURT:  Yeah, no.

7    MR. KUTNICK:  Well, this is -- okay.  So it's kind

8  of like two counts.  One, the money that is allegedly

9  skimmed, and I don't think either side has too many questions

10  about that.  It's kind of is what it is.  But the other part

11  is where we really do -- the government kind of wants to have

12  it both ways.  In the one sense that Carlos was in on this

13  big, greater scheme, like he knew about it.  Yeah, there is

14  no evidence to support that fact.  None.  There is no

15  communications between the defendant and any of these other

16  characters, Bob Adams, Terry Barnes, Larry Gelfond, to show,

17  hey, we're going to take these people's money and they're

18  never going to get it back.  That does not exist in this

19  case.

20    THE COURT:  Well, then, he will be found not

21  guilty.

22    MR. KUTNICK: I mean, I think even the government

23  would agree that there are no direct evidence of that.  Of

24  course, I think their case is based on circumstantial

25  evidence that, well, he should have known or, you know,

1    things like that.

2            THE COURT:  Well, should have known doesn't usually

3    get you --

4            MR. YOUNG:  No, I agree.

5            THE COURT:  -- that direction.

6            MR. YOUNG:  It's knowledge.  It's not, should have

7    known.

8            Judge, later on in the scheme he is making

9    representations to investors that are very similar to the

10   representations he made early on, specifically to Mr. Yocoub

11   and Mr. Tomlinson that:  This is a sure thing, this is going

12   to hit.  I mean, I agree with counsel that we're, at the

13   outset, you know, there is not going to be any evidence that

14   he knew these things weren't true or that these investments

15   wouldn't come through.  But, you know, a year into the

16   scheme, after, you know, sort of taking money, multiple

17   amounts of money from Mr. Spencer and Mr. Crane, after seeing

18   none of this come through, he is going to new investors and

19   basically telling them the same thing; that, you know, this

20   is a sure thing, and it's going to hit in 60 days.  At this

21   point, even if he -- even if he is hoping that it's going to

22   pay off, it's going to come through, he cannot, in good

23   faith, be representing that this is a sure thing he is going

24   to pay off in 60 days because he has, you know, basically a

25   year of, you know, just not happening.  It's like sort of

1    saying, you know, I'm going to go put this on the horse, I'm

2    going to make a particular bet, and it's definitely going to

3    come through.  Except he is not telling them that this is a

4    horse race and this is sort of a matter of chance.  He is

5    telling them that this is an investment in a transaction that

6    is, you know, a sure, definite thing.

7            THE COURT:  Well, let's talk about the horse.  So

8    you've got some "wise guy" who goes up to you and says:  You

9    know, I know that horse is going to -- he is going to win

10   big.  It may look like he is No. 20, but he really -- he is

11   going to win.  If "wise guy" isn't going to benefit, where is

12   the -- I mean, where is the fraud?

13           MR. YOUNG:  Well, Judge --

14           THE COURT:  Where is the criminal act?  I mean, he

15   can go say some outrageous thing and somebody goes and acts

16   on it.  But if they --

17           MR. YOUNG:  The statute requires obtaining money

18   with an intent to defraud.

19           THE COURT:  Okay.

20           MR. YOUNG:  I don't have to personally benefit or

21   profit from it.

22           THE COURT:  Okay.  Well, that's true.

23           MR. YOUNG:  If I -- you know --

24           THE COURT:  Sometimes you want someone else to

25   benefit.

1          MR. YOUNG:  Or to cause a loss to another, you
2    know, so.

3          THE COURT:  Or to cause the loss, I agree.

4          MR. YOUNG:  I think the motive here is that he
5    believes this investment is going to pay off.  Now, he is not
6    telling the people who are giving the money everything, not
7    disclosing everything to them.  And when it pays off, he is
8    going to keep part of the proceeds.  That is the motive to do
9    this at this point.

10         THE COURT:  Okay.  Because the proceeds, even
11   though it bypasses him and it goes directly from the victim
12   to this company.  So let's say it paid off.  How does he end
13   up getting some of that money?

14         MR. YOUNG:  Because he is the person dealing with
15   them, primarily.  I mean, there is some contact.

16         THE COURT:  I'm not getting this.

17         MR. KUTNICK: I'm not aware of any agreement between
18   Meza and any of the victims to split the profits.

19         Oh, okay.  I will take that back.  Strike it.

20         THE COURT:  So that's where it would be?  That
21   there was an agreement to split profits?  Well then, okay,
22   you know --

23         MR. YOUNG:  I'm inferring, your Honor.  I can't
24   tell you what the exact agreements were between defendant and
25   these other individuals.  But I can tell you that he was the

1  go-between with the investors and these sort of the

2  recipients of the funds.

3  　　　　　THE COURT:  Okay.  But for a criminal case, what do

4  the victims say?  Do they say -- they say he said, go invest

5  on this, but --

6  　　　　　MR. KUTNICK: Judge, our -- I'm sorry, I don't want

7  to interrupt the court, or Mr. Young.

8  　　　　　Can we take a short -- can we take a short break,

9  your Honor, to talk to Mr. Meza?

10  　　　　　THE COURT:  Sure.  We'll come back in a few

11  minutes.

12  　　　　　MR. KUTNICK:  Thank you.

13  　　　　　(Recess from 3:12 p.m. to 3:20 p.m.)

14  　　　　　THE COURT:  Where were we?  Oh, we were trying to

15  decide whether all of these witnesses can testify as to the

16  scheme, and I'm trying to understand the scheme.  And --

17  　　　　　MR. KUTNICK: First of all, I have a mint in my

18  mouth, and I don't want to be disrespectful to the court--

19  　　　　　THE COURT: Well, I can wait a few minutes.

20  　　　　　MR. KUTNICK:  Okay. I want to show you again Grand

21  Jury Exhibit No. 22, your Honor.  And specifically -- so --

22  and this is not the one with Renaissance, this is separate.

23  These are different fraudsters, I would call them.  So right

24  here, the government has said no, they're not going to use

25  this victim, Mr. Karim Khoja.  So I will just move on.  I

1  won't even talk about him.  But he is similarly situated with

2  David Tomlinson.  And if you see, the money from David

3  Tomlinson goes straight up to Palmore without going anywhere

4  near Mr. Meza.  Same thing with Ray Yacoub.  His investment

5  goes directly to Palmore without going anywhere near Carlos

6  Meza.  There is no allegation that Mr. Meza profited from any

7  of those or was supposed to be profiting from any of those

8  investments.

9       THE COURT:  Well, that was what I was trying to

10  understand.

11       MR. KUTNICK: So, and then --

12       THE COURT:  Was this just a -- somebody talking

13  when he doesn't know, maybe, what he is saying, apparently

14  didn't know what he was saying or what was his intent?  You

15  do have to show.

16       MR. YOUNG:  Yes, your Honor.  His intent was to

17  obtain money and property from them by means of false

18  representations regarding his certainty of the nature of

19  these investments.  I mean, I'll note that the --

20       THE COURT:  To obtain property, okay.  Well,

21  that's -- I mean, you seem to be saying he wasn't going to --

22  he couldn't have intended to obtain property because it

23  wasn't going there.  Mr. Young is saying, yes, he did intend

24  to, and I was just trying to understand how.

25       MR. KUTNICK: I don't -- I don't think that there is

1    any evidence to show that he was going to personally benefit

2    from these investments.

3            THE COURT:  Well, you don't actually have to

4    personally invest, if you intend somebody else to -- if it's

5    fraud and you intended someone else benefit you --

6            MR. KUTNICK: Someone above you, for instance.

7            THE COURT:  Yeah.

8            MR. KUTNICK: I have not seen any evidence that has

9    been tendered of that.  And I just want to add, the one other

10   victim here, because it refers to another witness, Thomas

11   George, he is in the same situation as the other two

12   witnesses that I just discussed.  That his investment went

13   straight also to Palmore, did not go through Carlos Meza or

14   any of his entities.  And unlike this one, your Honor, which

15   is Scott Spencer, which the government indicates was prompted

16   by Meza.  So we don't have an objection to that.  This Thomas

17   George investment does not.  It goes straight to Virginia

18   Worldwide without ever having anything to do with Meza or

19   Milwaukee McPherson.

20           So I guess my argument is that we're seeking to bar

21   the witness George, Yocoub, and Tomlinson because there is no

22   evidence to show that Mr. Meza was going to profit personally

23   or was doing it in an effort to help people above him profit.

24   Or the other thing that --

25           MS. ZARDKOOHI:  Cause.

1          MR. KUTNICK:  Yeah, to cause them to lose the

2     money.  Because, if anything, I think that it was contrary.

3     He did not intend them to lose the money.  He intended to get

4     them in -- connected with a good investment.

5          THE COURT:  Tell me the dates of these different

6     witnesses and maybe something more about what was -- what

7     were the representations that you say were made.

8          MR. YOUNG:  Sure.  Your Honor, the date of the

9     scheme is from in or about 2012-2013.  Mr. Yocoub's

10    investment I believe was in the Summer of 2013.

11    Mr. Tomlinson's investment was in the Summer of 2013.

12    Mr. George's investment was I think in the Spring of 2013.

13          You have the chart there, I apologize.

14          MR. KUTNICK: I do.  George -- yes, June of 2013 --

15    April and June of 2013.

16          MR. YOUNG:  Okay.  So they're all within the

17    alleged period of the scheme, your Honor.

18          THE COURT:  Okay.  So --

19          MR. YOUNG:  And --

20          THE COURT:  Spencer?

21          MR. YOUNG:  Spencer --

22          THE COURT:  Because those are the ones you said --

23    Spencer and Crane are --

24          MR. YOUNG:  Spencer makes investments in May 2012,

25    June 2012, August 2012, October 2012, and then April of 2013.

1          Mr. Crane's first investment I believe is in the

2    Summer of 2012, and then his last investment is roughly

3    July 2013.  I don't remember the exact was --

4          THE COURT:  You said Summer of 2013?

5          MR. YOUNG:  Yes, your Honor.

6          THE COURT:  There were two investments, or more?

7          MR. YOUNG:  There were more.  But the last ones

8    were July 9th of 2013.  And --

9          THE COURT:  Okay.  So I've got the timeline.

10          MR. YOUNG:  The timeline --

11          THE COURT:  I got that.

12          MR. YOUNG:  Is within the period of the scheme.

13    They are, like the others, members of his church or friends.

14    And they were -- he solicited funds with them to invest in

15    various trading programs, like the others.  And he

16    misrepresented sort of the nature of the transaction like he

17    did with the others, your Honor.  That these were sort of

18    sure things when, in fact, he didn't have sort of a

19    good-faith basis to make that assertion to.

20          THE COURT:  Tell me how these things come about.

21          MR. YOUNG:  What do you mean?

22          THE COURT:  I mean, did he have lunch with them?

23    Did he get together with them?  Was he close friends with

24    them?

25          MR. YOUNG:  Mr. Yocoub was his auto mechanic.  So

1　　he approached him after years of dealing with him about this

2　　investment opportunity.  Mr. Tomlinson and Mr. George were

3　　church members.

4　　　　　　　THE COURT:  And so I know you had said that.  I was

5　　just trying to -- so was this a one-time thing?  I'm trying

6　　to get a picture of it.  So when would he see them, or how

7　　did he approach them?

8　　　　　　　MR. YOUNG:  He would see them -- Mr. Yocoub, he

9　　would see when his car needed repairs.  On a regular basis,

10　　he would bring cars of his friends, cars of businesses, and

11　　the like.  The others he would see at church on a regular

12　　basis, and then he approached them about these investments,

13　　most of them will say that, you know, after -- you know.

14　　　　　　　THE COURT:  After church, or would they get

15　　together?

16　　　　　　　MR. YOUNG:  Usually at church was the nature of the

17　　relationship.  So it would have been in connection with that

18　　or some kind of church-related function.  Although, they

19　　would see each other occasionally outside of church, and he

20　　approached them about these investments.  And after a couple

21　　of discussions, they ultimately decided to make the

22　　investments.

23　　　　　　　MR. KUTNICK: They would socialize.  They were

24　　family friends.  There were many meetings outside of church.

25　　There were -- it wasn't strictly at church, actually.

1      THE COURT:  No, I understand they knew --

2      MR. KUTNICK: They --

3      THE COURT:  I mean, we had that discussion earlier.

4   I am trying to see how these come together in terms of a

5   potential scheme.  Were they the same kind of statements?

6   Were they same -- well, they weren't the same investments, or

7   they were different?

8      MR. YOUNG:  They were ultimately made with

9   different parties involved, but they were representing the

10  same types of investments in these sort of international

11  transactions that are sure things.

12     MR. KUTNICK: Well, yes, they are different

13  entities.  And one real distinguishing factor is that in the

14  other --

15     MR. YOUNG:  Your Honor, I think we need to brief

16  this.  This is a lot of detail to sort of raise.

17     THE COURT:  All right.  That's fine.  You can do

18  that.  It's probably better to do that than to --

19     MR. KUTNICK:  Just --

20     THE COURT:  -- get to trial and be dealing with it.

21  I mean, it might clarify things for all of you.

22     MR. KUTNICK:  Another distinguishing factor, your

23  Honor, which I think is very, very important when comparing

24  these victims that we're talking about versus Cordell Crane

25  and Scott Spencer, is that there is no -- not even an

1    allegation that Mr. Meza skimmed anything off of those

2    investments because they didn't go through him.  They went --

3         THE COURT:  Well, attempt, of course, is just --

4    can be just as criminal, but.

5         MR. KUTNICK:  Right, but it kind of shows -- the

6    ones that he skimmed money off of, allegedly, shows more of

7    his intent to profit, potentially, his ability to control

8    which funds went to and from to the, as I call, the

9    fraudsters, the big fraudsters.  So those factors are not

10   here with these three victims.

11        THE COURT:  Okay.  I don't --

12        MR. YOUNG:  I mean, it's hard to, your Honor,

13   because we're getting into the -- the question is:  Is it

14   within the alleged scheme?  I think the answer is yes.

15   Counsel is raising issues with the proof.

16        THE COURT:  I understand that.

17        MR. YOUNG:  And which is, that's a matter

18   ultimately for the jury to decide.  I mean, I think they are

19   clearly within the alleged scheme.  They are, both in terms

20   of time periods, both in terms of the nature of the

21   representations.  And while the monies were going to

22   different entities, that was also true of Mr. Crane and

23   Mr. Spencer.  I mean, he was changing sort of the parties he

24   was the dealing with, but I don't believe that is a

25   meaningful part of, you know, the scheme with respect to how

1    he was obtaining the money from investors.

2              THE COURT:  All right.  I mean, what you are

3    saying, there is some reason you wish to bring in these other

4    three as well as the other two.

5              MR. KUTNICK:  And I think there is a great danger

6    of the jury running away with that and using it for, as I

7    said, purposes that are not legally proper, such as

8    propensity.

9              MR. YOUNG:  It's not propensity because it's a

10   scheme, would be the government's position.

11             MR. KUTNICK: Or if he did it to those people, then

12   he must have done it to these people.

13             MR. YOUNG:  It's the charged offense, though, it's

14   not acts of.  It's not other acts, or it's not propensity.

15   There is -- you're a member of a scheme, I think there is a

16   time period both in terms of the matter of which we

17   defined --

18             THE COURT:  Okay.  I guess we're going to have to

19   leave it at that.  Well, we can figure out how to do this.  I

20   mean, you told me why you think that it's not part of the

21   scheme and that it is just propensity.  I mean, if you -- I

22   mean, I can just leave it at that.  If you're wrong, of

23   course, then you suffer in the end.

24             MR. KUTNICK: May I -- Judge, I know we've gone a

25   long time on this, and I don't want to belabor it, but if it

1    is coming in under, let's say, 404(b) instead of as part of

2    the scheme, then --

3                 THE COURT:  Well, if -- yes, I mean, that's the

4    issue is, is it part of the scheme or not.  Without actually

5    knowing -- I mean, okay, I can -- certainly the timeline

6    sounds like it is.  I don't know, not having heard about it,

7    exactly what statements.  That's why I'm starting to say,

8    okay, where were these taking place?  Were these similar

9    conversations?  Were these conversations that took place in

10   the similar --

11                 MR. KUTNICK: It's almost a year later.

12                 MR. YOUNG:  A year later from what?

13                 MR. KUTNICK: From the original -- from the other --

14                 MS. ZARDKOOHI:  Not a year.

15                 MR. KUTNICK:  It's not a year, it's about --

16                 MS. ZARDKOOHI: Eight months, or something.

17                 MR. KUTNICK:  Yeah, the other transactions are,

18   like, October of 2012, and now we're here in April of 2013,

19   June of 2013.

20                 MR. YOUNG:  But the period of the scheme is what

21   controls, and the scheme is alleged to have begun in 2012,

22   and continued to 2013, apart from the execution, as I think

23   counsel is inferring, to the actually charged execution,

24   which are earlier in the period.  But the scheme alleged in

25   the indictment is from 2012 to 2013.  So in terms of temporal

1   connection, these clearly occurred within the time period of

2   the alleged scheme in the indictment.

3           THE COURT:  I mean, Mr. Young says that the last

4   investments by A and B were in the Summer of 2013.

5           MR. KUTNICK: I agree, that there is an April 2013

6   investment by Spencer and a July -- two July 2013 investments

7   by Crane.  So I agree with that.  But when it came to the

8   investments in Palmore Legal Services and Carso, those were

9   of a -- even though Cordell Crane and Scott Spencer were

10  involved in those as well, the other three witnesses we're

11  talking about, Tomlinson, Yocoub and George, had no part of

12  that previous part of the scheme.

13          MR. YOUNG:  Well, they're different victims.  So I

14  don't think there has to be -- the pitch is the same to all

15  the victims.

16          THE COURT:  Okay.  And the pitch is?

17          MR. YOUNG:  These international investments.  That

18  there was going to be, you know, sort of a risk-free

19  investment, and there was going to be a very quick turnaround

20  in the investment.

21          MR. KUTNICK: The entire --

22          THE COURT:  Well, I will look back at the most

23  recent cases in the Seventh Circuit because they do draw some

24  lines.

25          MR. KUTNICK: Your Honor, the entire indictment, I

1    agree that the indictment says, from in or about 2012, until

2    in or about 2013, which is a wide timeframe, but it

3    continually talks about Victim A and Victim B.

4                THE COURT:  But that's not uncommon that they --

5                MR. KUTNICK: Right.  They and other persons.  I

6    admit that's there.  And I'm not arguing that we're

7    surprised, or anything.  We know about these witnesses.  But

8    I'm just worried about its -- I'm worried about its

9    prejudicial effect.  And I don't know how probative it

10   actually is.

11               MR. YOUNG:  Paragraph 6 of the indictment.  "It was

12   further part of the scheme that Meza fraudulently induced

13   multiple victims, including Victim A and B from, to entrust

14   their money to him and others," you know, based on the false

15   promises and representations, guarantees described above.

16               So I think the indictment clearly encompassed the

17   victims beyond Victims A and B.

18               THE COURT:  Well, the way we're going to have to

19   leave it right now, at least, is we'll hear the evidence at

20   trial.  And if I think there is a problem, we will have to

21   deal with it then. It doesn't sound like -- I mean, if you

22   find -- direct me to some case, I am going to look at them.

23   And if you find some case where you say -- show me that that

24   is, in advance, literally wrong, let me know about it.

25               MR. KUTNICK: We will look for it.

1          THE COURT:  Okay.  All right.  Your instructions

2     are all agreed.

3          MR. KUTNICK:  Yes.

4          THE COURT:  I mean, obviously subject to any of

5     them not turning out to be appropriate.  So I don't think we

6     need to discuss them.  I mean, that's what it said, it said

7     agreed.

8          MR. KUTNICK:  No, correct.  That is correct, your

9     Honor.  I just did tell Mr. Young that I haven't had a lot of

10     opportunity to look at potential defense theory instructions.

11          THE COURT:  Sure.

12          MR. KUTNICK: So I'm still working on that.  And I

13     told him, as soon as I have something, I would get that over

14     to them.

15          THE COURT:  Okay.

16          MR. YOUNG:  Things obviously come up at trial, your

17     Honor, so we're --

18          THE COURT:  So I think I better tell the jury that

19     this could be one week to six-day trial, but that we won't be

20     meeting on Friday.  And do you know how I pick juries?

21          MR. KUTNICK: I haven't picked one with you, Judge.

22          THE COURT:  I will question -- or begin by letting

23     the entire 32 people, or whatever we have called, give their

24     autobiographies, and then I will start asking them more

25     specific questions.  I mean, I will introduce you and the

1 case and ask questions, and at that point say, you know, if

2 anybody -- if your answer is anything other than just no,

3 then raise your hand.  And when we get to personal kinds of

4 questions, we will talk to them at sidebar.

5    When we're done with everything, we excuse them

6 all, and we will talk about any who should be stricken for

7 cause.  And then after that, you pick.  You've got ten,

8 you've got six.

9    In terms of the 12, if the first juror in the box

10 has not been struck for any reason, that becomes Juror No. 1,

11 and we just keep going until we get to 12.  And then without

12 going back on them after we have our 12, I will -- if, you

13 know, the 13 juror there that because you haven't --

14 nobody -- everybody has been on the jury, whoever is the next

15 one, we should probably -- well, we should get two alternates

16 anyway.  And this is a little early for major flu season, so

17 two is probably sufficient.  But among the remaining people,

18 you can move to strike.  You each have one more strike

19 against the alternates.  And then I expect ordinarily we get

20 that done by lunchtime.  And then in the afternoon, you give

21 your opening statements and then call a first witness.

22    And I break, for the jurors' sake, at 4:30 and take

23 one hour for lunch.  And we will be on 17.  So

24 10-to-15-minutes break in the morning and afternoon.  I don't

25 have anything else on days I'm on trial, so I will start as

1   early as the jury wants to start.  But we might be able to

2   start as early as 9:15 on any given day.  Often jurors I find

3   would rather start early because they have come in from

4   places.

5           Anything about any of that gives anybody a problem?

6   Okay.  I think we're in 1725, or something.

7           MR. KUTNICK: Judge, just when it comes to the

8   peremptories.  So you have the 32, we go through 32.  Then we

9   both present our cause motions.  The court rules.  We have

10  what's left, and then is it -- do you do like a

11  back-and-forth?

12          THE COURT:  Oh, no, no, no.  Sorry, I should have

13  said that.  No, you each give me your strikes in writing.  If

14  you both strike the same one, well, that one isn't going to

15  sit, but you don't get another one.

16          MR. KUTNICK: Oh, really?  Okay.  Interesting.

17  Okay.  Thanks.

18          THE COURT:  Okay.  Anything else?

19          MR. KUTNICK: I don't think so.

20          THE COURT:  All right.  Well, you look like you

21  will all be fine people to go to trial with.

22          MR. KUTNICK:  So we're just going to deal with that

23  issue at trial, we're not going to brief it, or anything like

24  that?

25          THE COURT:  If you find a case that you think

1    really does, I would just as soon you gave it to me before

2    trial.

3              MR. KUTNICK: I certainly will.

4              THE COURT:  If something that brings up something,

5    I suppose I could end up asking you people to come back.  But

6    I will certainly look at it, and we will look at the cases as

7    well.

8              MR. KUTNICK: Okay.  Thank you, Judge.

9              THE COURT:  Okay.  Thank you very much.

10         (Which were all the proceedings heard.)

11                         CERTIFICATE

12         I certify that the foregoing is a correct transcript

13    from the record of proceedings in the above-entitled matter.

14

15    /s/ *SANDRA M. MULLIN*_____          November 7, 2019

16    SANDRA M. MULLIN, CSR, RMR, FCRR
      Official Court Reporter

17

18

19

20

21

22

23

24

25